### UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

**Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500**

### MOTION INFORMATION STATEMENT

Docket Number(s): 25-2041

Motion for: Expedited Appeal

Caption [use short title]

Mulhern Gas Co., Inc., et al.,

Plaintiffs-Appellants

v.

Set forth below precise, complete statement of relief sought:

Plaintiffs move to expedite the appeal, enforce an expedited briefing schedule without extensions, and set the case for oral argument on the next available calendar after briefing is complete.

Walter T. Mosley, in his official capacity as New York Secretary of State and member of the State Firm Prevention and Building Code Council

Defendant-Appellee

MOVING PARTY: Plaintiffs                OPPOSING PARTY: Defendant

☑ Plaintiff        ☐ Defendant

☑ Appellant/Petitioner        ☐ Appellee/Respondent

MOVING ATTORNEY: Sarah O. Jorgensen        OPPOSING ATTORNEY: Dustin Brockner

[name of attorney, with firm, address, phone number and e-mail]

Reichman Jorgensen Lehman & Feldberg LLP

1201 W. Peachtree St., Suite 2300 Atlanta, GA 30309

Tel.: (404) 609-1040 / sjorgensen@reichmanjorgensen.com

New York State Office of the Attorney General

The Capitol, Albany, NY 12224

Tel.: (518) 776-2017 / dustin.brocker@ag.ny.gov

Court- Judge/ Agency appealed from: U.S. District Court for the Northern District of New York − Hon.  Glenn T. Suddaby

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes   ☐ No (explain):_____

Opposing counsel's position on motion:
☐ Unopposed   ☑ Opposed   ☐ Don't Know
Does opposing  counsel intend to file a response:
☐ Yes   ☑ No   ☐ Don't Know

**FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:**

Has this request for relief been made below?   ☐ Yes  ☐ No
Has this relief been previously sought in this court?   ☐ Yes  ☐ No

Requested return date and explanation  of emergency: _____

Is the oral argument on motion requested?   ☐ Yes  ☑ No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?   ☐ Yes  ☑ No  If yes, enter date:_____

Signature  of Moving Attorney:

_Sarah Jorgensen_   Date: 9/24/25   Service : ☑ Electronic   ☐ Other [Attach proof of service]

Form T-1080 (rev. 10-23)

# No. 25-2041

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., d/b/a Master Plumbers Council of the City of New York; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; and TRANSPORT WORKERS UNION LOCAL 101, AFO-CIO,

*Plaintiffs-Appellants*,

v.

WALTER T. MOSLEY, in his official capacity as
New York Secretary of State and member of the State Fire Prevention
and Building Code Council,

*Defendant-Appellee*,

NEW YORK GEOTHERMAL ENERGY ORGANIZATION; and PUSH BUFFALO,

*Intervenor-Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of New York, No. 1:23-cv-01267
Hon. Glenn T. Suddaby, District Judge

### PLAINTIFFS-APPELLANTS' MOTION TO EXPEDITE

Brian C. Baran
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

Sarah O. Jorgensen
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 W. Peachtree St., Suite 2300
Atlanta, GA 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Counsel for Plaintiffs-Appellants*

## RULE 26.1 DISCLOSURE STATEMENT

Under Appellate Rule 26.1(a), Plaintiffs–Appellants state as follows:

Mulhern Gas Co., Inc. is a for-profit corporation organized under the laws of New York.  It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

New York State Builders Association is a nonprofit corporation organized under the laws of New York.  It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

National Association of Home Builders is a nonprofit 501(c)(6) corporation incorporated in Nevada.  It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock; it does not have any publicly traded stock.

New York Propane Gas Association is a nonprofit corporation organized under the laws of New York.  It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

National Propane Gas Association is a national trade association organized under 501(c)(6).  It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Northeast Hearth, Patio and Barbecue Association is a nonprofit corporation organized under the laws of New Hampshire.  It does not

i

have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Plumbing Contractors Association of Long Island is a nonprofit corporation organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York, is a nonprofit corporation organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

Holmes Mech. LLC is a for-profit limited liability company organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation holds a 10 percent or greater interest in the company.

International Brotherhood of Electrical Workers Local 1049 is a labor union. It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

Plumbers Local Union No. 200 is a labor union. It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

International Brotherhood of Electrical Workers Local Union 97 is a labor union.  It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

Transport Workers Union Local 101, AFL-CIO is a labor union.  It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

## MOTION TO EXPEDITE

Plaintiffs–Appellants move under Circuit Rule 27.1 and Appellate Rules 27 and 2(a) to expedite this appeal, enforce an accelerated briefing schedule, and set the case for oral argument on the next available calendar after briefing is complete. This case presents the question whether New York State's ban on gas appliances and infrastructure is preempted by the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§6201 *et seq.*, consistent with the Ninth Circuit's holding in *California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). The same legal issue is already before this Court in *Association of Contracting Plumbers of New York v. City of New York*, No. 25-977 (2d Cir.) (opening brief filed July 31, 2025; answering brief due October 30, 2025).

New York's ban is scheduled to take effect December 31, 2025 for most new buildings under seven stories. N.Y. Energy §11-104(6)-(8); N.Y. Exec. §378(19). That will wreak havoc on Plaintiffs, who are small family-owned businesses, trade associations, and labor unions that rely on the availability of natural gas appliances and systems for their and their members' livelihoods. To prevent this irreparable harm, Plaintiffs are seeking an injunction pending appeal in the district court. Whether or not the interim injunction is granted, however, there is good cause to expedite the appeal. If the injunction is denied, expediting would mitigate the irreparable harm Plaintiffs will suffer during the appeal. If

1

the injunction is granted, expediting would mitigate any harm the Secretary or Intervenors contend that delaying the gas ban would cause.

Counsel for the Secretary and counsel for Intervenors have indicated that they oppose this motion and intend to respond.

## BACKGROUND

**1.** EPCA expressly preempts any state or local "regulation concerning the … energy use" of covered appliances.  42 U.S.C. §6297(c). The Ninth Circuit, the only court of appeals to have addressed the scope of preemption, held in *California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), that EPCA preempted Berkeley's ban on gas piping in new buildings.  The Ninth Circuit recognized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest.*, 89 F.4th at 1107.  It did not matter that Berkeley took a "more circuitous route to the same result" by prohibiting the piping necessary to use those appliances. *Id.* at 1098, 1107.  Berkeley likewise could not avoid preemption just because its ban "lower[ed] the quantity of energy consumed to zero" instead of some nonzero number; rather, "a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source." *Id.* at 1102 (cleaned up).  On Berkeley's request for rehearing en banc, only 8 out of 28 active judges dissented from the denial of rehearing. *California Restaurant Ass'n*, 89 F.4th at 1119-25 (Friedland, J.).

2

New York's statutes prohibit both gas appliances and gas piping. The ban is contained in two statutory provisions that require the New York State Fire Prevention and Building Code Council to adopt building and energy code provisions implementing the prohibition. N.Y. Energy §11-104(6)-(8); N.Y. Exec. §378(19). Specifically, the gas ban requires the Council to amend the Codes to prohibit "the installation of fossil-fuel equipment and building systems" in most new buildings under seven stories (with limited exceptions) beginning December 31, 2025, and buildings over seven stories beginning December 31, 2028. *Id.* The Council has done so; it adopted final regulations in July. *See* D.Ct.Dkt.64 at 10-11, 22-24.[1]

The question in this case is whether New York's gas ban is a preempted "regulation concerning the … energy use" of EPCA-covered products, 42 U.S.C. §6297(c), as the Ninth Circuit held for Berkeley's similar ban in *California Restaurant Ass'n*. Because the district court expressly disagreed with the Ninth Circuit and held that New York's gas ban is not preempted, affirming its decision would create a circuit split.

---

[1] *State Fire Prevention and Building Code Council Meeting – July 2025*, N.Y. Dep't of State, https://dos.ny.gov/event/state-fire-prevention-and-building-code-council-meeting-july-2025 (last visited Sept. 10, 2025) (meeting materials, including proposed notices of adoption of final code amendments); N.Y. Dep't of State, *Third Quarter Meeting of the State Fire Prevention and Building Code Council – July 25, 2025*, at 23:58-25:48, 41:38-43:00 (YouTube, July 28, 2025), https://www.youtube.com/watch?v=1WdV3ix9AgY (recording of meeting at which the Council voted to adopt and issue the amendments as permanent rules).

3

**2.** Plaintiffs brought this suit against the New York Secretary of State in October 2023, seeking a declaration that the gas ban is preempted by EPCA and an injunction against its enforcement. D.Ct.Dkt.1.[2]

Plaintiffs moved for summary judgment on preemption. D.Ct.Dkt.37. The Secretary moved under Rule 12(c) for judgment on the pleadings on standing and ripeness grounds. D.Ct.Dkt.38.

The district court rejected the Secretary's jurisdictional objections, D.Ct.Dkt.64 at 20-28, but ruled for the Secretary on the merits, *id.* at 28-34; D.Ct.Dkt.66. The court held that New York's ban is not preempted for the reasons stated by the dissent from the denial of rehearing en banc in *California Restaurant Ass'n*, 89 F.4th at 1119-25. *See* D.Ct.Dkt.64 at 28, 30-31. In other words, gas bans are permissible because they are not "energy conservation standards" and do not force manufacturers to redesign appliances on the factory floor.

The district court entered judgment for the Secretary on August 21, 2025. D.Ct.Dkt.67.

**3.** Plaintiffs filed their notice of appeal the next day. D.Ct.Dkt.68. Plaintiffs also have a pending motion in the district court under Civil

---

[2] The suit also named several other defendants who have since been dismissed based on their assertions of sovereign immunity. Those dismissals are not at issue on appeal.

Rule 62(d) for an injunction pending appeal.  D.Ct.Dkt.70.  The response is due October 1, 2025.[3]

Plaintiffs opening brief on appeal is due October 3, 2025.  Dkt.15.1.

## ARGUMENT

Plaintiffs seek to expedite this appeal in order to avoid or mitigate devastating and irreparable harm they will suffer once the gas ban goes into effect on December 31, 2025, before this Court would be able to decide the appeal in the normal course.  Appellate Rule 2(a) provides that "a court of appeals may—to expedite its decision or for other good cause—suspend any provision of these rules in a particular case and order proceedings as it directs."  Fed. R. App. P. 2(a).  There is good cause to expedite the appeal here because Plaintiffs will suffer further irreparable harm the longer the gas ban is in effect.

Plaintiffs ask, first, that rather than set a briefing schedule in accord with Local Rule 31.2(a), which would allow up to 91 days for the response briefs, the Court instead set an accelerated briefing schedule.  Plaintiffs already requested and received an accelerated October 3 deadline for their opening brief.  Plaintiffs propose that the Secretary's and

---

[3] If the district court denies the motion, Plaintiffs intend to move for an injunction pending appeal in this Court.  *See* Fed. R. App. P. 8(a).

Intervenor's responses be due November 18, which allows 46 days for the response briefs, and that Plaintiffs' reply be due December 4.[4]

Second, Plaintiffs ask that the Court set oral argument for the first available date after the briefing is completed. In addition to mitigating the serious harm from delay, that would also facilitate hearing this case together with the related *Contracting Plumbers* appeal, No. 25-977, which presents the same issue and is scheduled to be fully briefed by November 20. *See* No. 25-977 (2d Cir.), Dkt.11.1.

1. Once the gas ban takes effect on December 31, Plaintiffs will suffer devastating harms that cannot be unwound if the gas ban is later enjoined—including not only substantial lost sales and revenues, but also the closing of businesses or lines of business, lost customers and goodwill, lost work opportunities, layoffs of highly trained and skilled employees, and business reorganizations including sales of assets and location changes. These specific, imminent harms, laid out below and in the attached declarations, cannot be undone and cannot be compensated with monetary damages given New York's sovereign immunity. *See United*

---

[4] When conferring with the Secretary and Intervenors, Plaintiffs originally proposed November 4 for responses and November 18 for the reply. The Secretary and Intervenors offered to request December 1 for their responses (and suggested December 15 for the reply) on the condition that Plaintiffs would agree not to move to expedite. In light of the Secretary's indication that it needs more time than November 4 for its opening brief, Plaintiffs have adjusted their proposed schedule as a compromise.

*States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (per curiam) (affirming the district court's finding that the plaintiff's "injury was irreparable even though [its] losses were only pecuniary because a suit in federal court … to recover the damages … would be barred by the Eleventh Amendment"); *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (monetary damages are inadequate when the Eleventh Amendment prevents recovery).

These types of harms are well recognized as irreparable under this Court's precedent. *See Tom Doherty Assocs. v. Saban Ent., Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) (economic harms can be irreparable, as when "a party is threatened with the loss of a business"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (lost business opportunities can be "difficult to establish and measure" and can thus amount to irreparable harm); *Entergy Nuclear*, 733 F.3d at 423 (forcing a business to shut down would cause irreparable harm). A "threat[]" to "the very viability of [Plaintiffs'] business[es]" amounts to irreparable harm. *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 668 (2d Cir. 2023) (cleaned up). That is because "the right to continue a business is not measurable entirely in monetary terms, especially when that business is essential to the [party's] manner of living." *Id.* (cleaned up).

The loss of customer relationships and goodwill, as well as longstanding relationships with suppliers and contractors, also constitutes irreparable harm. *See JTH Tax*, 62 F.4th at 673 ("[I]t would

be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." (attribution omitted)); *Register.com*, 356 F.3d at 404 (loss of reputation, goodwill, and business opportunities); *Tom Doherty*, 60 F.3d at 38 (loss of goodwill). Likewise, the loss of a party's employees can constitute irreparable harm because it "deprives [the party] not only of its investment in training and developing those employees, but also … the relationships developed with them at [the party's] expense." *Marsh USA Inc. v. Karasaki*, 2008 WL 4778239, at \*14 (S.D.N.Y. Oct. 31, 2008).

**2.** Plaintiffs filed in the district court, and are attaching here for this Court's convenience, declarations attesting to the serious harms they will suffer during the pendency of appeal if the gas ban goes into effect.

Start with the propane gas industry. As the National Propane Gas Association ("NPGA") explains, most of its 100 New York members "are small, family-owned businesses that employ fewer than 50 people." *See* Ex.A (D.Ct.Dkt.70-2) ¶5. Those businesses sell propane systems, equipment, and gas and will see their market in new construction disappear on December 31, imposing serious injuries that cannot be later undone. *Id.* ¶¶4, 6, 18. Not only will NPGA's members suffer an immediate and substantial drop in sales and revenues for new construction in the millions of dollars, but also existing homeowners are declining using propane as an energy source in light of concerns with the

ban's impact on future availability of equipment, service, and supply. *Id.* ¶¶6-17. Most members plan to lay off employees in 2026 and may have to make other organizational changes to avoid closing. *Id.* ¶¶8-17. As one member wrote, "Unless changes are made, we foresee being forced to close our doors entirely—ending a vital local service and eliminating dozens of good-paying jobs in the process." *Id.* ¶17.

Mulhern Gas Co., a member of NPGA and the New York Propane Gas Association, explains that it "has delivered, installed, and serviced propane equipment and propane gas for local customers for more than fifty years. The impending gas ban is an existential crisis for the company—New York has outlawed much of our new business development and impacted our existing business." Ex.B (D.Ct.Dkt.70-3) ¶¶3, 7. Roughly 20% of the company's sales are in new homes, and when the ban goes into effect, there will be "an immediate drop in sales of roughly 10%" with "a continuing decline in sales and service thereafter." *Id.* ¶10. Mulhern Gas will have to lay off employees, "downsize or sell" assets, and "change [its] business plans and operations going forward." *Id.* ¶¶ 11-13.

Like Mulhern Gas, Holmes Mech. LLC is a family-owned HVAC and gas systems business in upstate New York that has seen its sales decline and expects to lose an additional 25% of its overall sales revenue when the ban goes into effect at year's end. Ex.C (D.Ct.Dkt.70-4) ¶¶3-5, 9. Trying to switch to sales of electric heat pump systems to save the business has

come with costs and has left customers dissatisfied. *Id.* ¶¶7-11. As Holmes puts it, "Our business is being disrupted and slowing to a crawl while we try to reorganize operations, sales, and employees." *Id.* ¶10.

New York homebuilders also will be injured when the ban kicks in. The New York State Builders Association represents the residential building construction industry and has approximately 1800 members employing tens of thousands of New York residents. Ex.D (D.Ct.Dkt.70-5) ¶3. As several of its members attest, they had "committed to costly working drawings and specifications that incorporate gas infrastructure" and contracted with gas utilities for multi-unit residential developments before the ban was adopted; once the ban goes into effect, it "will prevent [them] from delivering the promised customers to the utility, which will require [them] to pay the cost of the infrastructure that the utility would otherwise bear"—often tens of thousands of dollars. Ex.E (D.Ct.Dkt.70-6) ¶¶5-6; *see also* Ex.F (D.Ct.Dkt.70-7) ¶5; Ex.G (D.Ct.Dkt.70-8) ¶¶5-9; Ex.H (D.Ct.Dkt.70-9) ¶3; Ex.D ¶¶5-6. And because all-electric construction costs more, the gas ban will raise the cost of housing, resulting in slower sales and a lack of customer choice. Ex.E ¶¶7-9; Ex.F ¶¶7-9; Ex.H ¶¶4-5. In some areas, the lack of adequate electrical grid infrastructure will delay building developments and further raise costs. Ex.F ¶8; Ex.G ¶¶5-7, 9-10; Ex.D ¶¶5-8. As a result, builders anticipate building and selling fewer homes in 2026, harming their businesses and requiring them to change business plans and operations. Ex.F ¶¶7-8

10

("We estimate that our sales numbers will drop by at least 50% with the all-electric mandate, with a substantial drop happening the first year in 2026."); Ex.E ¶¶7-9; Ex.G ¶10; Ex.H ¶¶4-5.

The impacts are even more catastrophic for the members of Northeast Hearth, Patio & Barbecue Association, many of which earn the majority of their revenue from gas fireplace installation in new construction—a line of business that will vanish on December 31. *See* Ex.I (D.Ct.Dkt.70-10) ¶¶5-6 ("A vast majority of gas fireplaces are in new construction."); *see also* Ex.J (D.Ct.Dkt.70-11) ¶3 ("Most gas fireplaces sold today are installed in new construction homes—roughly 90%. That makes new buildings critical for the gas fireplace market and business."). Northeast Hearth's members are often small, family-owned businesses that are threatened with the devaluation or loss of their entire business, will be forced to lay off half or more of their employees, and will otherwise have to restructure their businesses to try to survive. *See, e.g.*, Ex.I ¶¶5-6; *see also* Ex.J ¶¶2, 4-11 (Best Fire Hearth & Patio will suffer "a more than 50% loss of revenue" and will need to lay off one-third of its employees and take other steps to try to save the business); Ex.K (D.Ct.Dkt.70-12 ) ¶¶2-6 (Season Fireplaces will lose half its sales and will have "a major struggle to keep the business going … . I possibly would have to sell the building I run my business in … . And I would probably have to cut my staff in half."); Ex.L (D.Ct.Dkt.70-13) ¶¶3-11 (Ocean Stone & Fireplace reports that "new developments represent about 85% of our

11

overall income"; as a result of the ban, it will have to lay off employees, end relationships with suppliers, and dump unsellable inventory; the business will lose two-thirds of its existing value). As one family-owned business stated, a "court decision sometime in 2026 will come too late to help. I may have already had to shutter my business by then." Ex.K ¶¶9, 11. As for Northeast Hearth itself, it has already seen a 15% membership decline as its New York members go out of business, merge, or sell in the face of the impending ban; of 100 New York members, 25 are already gone. *See* Ex.I ¶7.

Plumbers, pipefitters, and gas utility workers will also suffer harm in 2026 if the ban is not enjoined pending appeal. As the Plumbing Contractors Association of Long Island explains, "Gas plumbing projects represent about 30% of our members' business … . Our members currently anticipate a loss of 15% to 20% of their business in 2026 when the law becomes effective." Ex.M (D.Ct.Dkt.70-14) ¶6. The lost work opportunities will cost some members their business or force them to restructure, retrain, and lay off employees. *Id.* ¶¶9-11. Similarly, the Master Plumbers Council reports that roughly 30% of its members' business is in gas-related plumbing work, its members are all having contracts canceled or downsized, and they will have to lay off employees. Ex.N (D.Ct.Dkt.70-15) ¶¶5-10.

The International Brotherhood of Electric Workers Local Union 97 has roughly 600 members dedicated to gas utility work. When the ban

goes into effect, the number of pipe extensions and service line connections will drop, and the resulting loss of work "will decrease work hours and opportunities for [its] members, and either cost some members their jobs … or force them to re-train for other lines of work or to relocate their families." Ex.O (D.Ct.Dkt.70-16) ¶¶4-10. Likewise, the International Brotherhood of Electric Workers Local 1049 has roughly 560 members dedicated to gas transmission, distribution, and inspection work for whom "25% to 50% of their work is tied to new construction." Ex.P (D.Ct.Dkt.70-17) ¶¶4-5. "When the gas ban goes into effect in 2026, that new-construction work will be largely eliminated, threatening the work hours and opportunities, if not the jobs, of [Local 1049's] members." *Id.* ¶5. Plumbers Local Union No. 200, U.A., AFL-CIO, attests that when the ban goes into effect, it "will result in the loss of member jobs, lower hours worked by members, and the commensurate loss of hours to Local 200's associated fringe benefit funds." Ex.Q (D.Ct.Dkt.70-18) ¶¶4-5.

***

In sum, there is good cause to expedite this appeal so as to avoid or at least mitigate the irreparable harms Plaintiffs will suffer if New York's gas ban takes effect while this Court is considering this case on the merits. The longer the ban is in place, the greater the harm will be. Even months to a year of the ban being in effect will have devastating consequences that cannot be remedied monetarily, even if sovereign

13

immunity were not an obstacle. Many longstanding family businesses are threatened with closing their doors, and many workers with losing their jobs. Sales lost will not be regained, nor will relationships with customers, suppliers, or contractors easily be reestablished. Plaintiffs and their members will have to restructure business operations, sell assets, and lay off employees, and they will lose work opportunities, have training programs depleted, and potentially have to change jobs or relocate. This Court should act to minimize the damage.

## CONCLUSION

For these reasons, the Court should expedite this appeal, set an accelerated briefing schedule, and set the case for oral argument on the next available calendar after briefing is complete.

Respectfully submitted,

*/s/ Sarah O. Jorgensen*

Brian C. Baran
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

Sarah O. Jorgensen
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree Street,
  Suite 2300
Atlanta, GA 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Counsel for Plaintiffs-Appellants*

September 24, 2025

14

## CERTIFICATE OF COMPLIANCE

This motion complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Second Circuit Local Rules because it has been prepared using a proportionally spaced typeface and contains 3,298 words.

Dated:  September 24, 2025          */s/ Sarah O. Jorgensen*
                                    Sarah O. Jorgensen

# Exhibit A

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF NEW YORK

MULHERN GAS CO., INC., et al.,

               Plaintiffs,

      v.

WALTER T. MOSLEY, in his official
capacity as New York Secretary of State,

            Defendant.

Case No. 1:23-cv-01267 (GTS/CFH)

**DECLARATION OF STEPHEN
KAMINSKI IN SUPPORT OF
PLAINTIFFS' MOTION FOR
INJUNCTION PENDING APPEAL**

## DECLARATION OF STEPHEN KAMINSKI

1.     I, Stephen Kaminski, declare as follows:

2.     I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

3.     I am the President and Chief Executive Officer of the National Propane Gas Association.

4.     The National Propane Gas Association is a nonprofit corporation organized under the laws of New Jersey with its principal office in Washington, D.C. It represents the U.S. propane industry and has approximately 2,400 members across all fifty states, including more than 100 members in New York. Its members include propane retailers and equipment manufacturers. Its mission is to advance safety and increase the use of propane through public policy.

5.     The National Propane Gas Association has members who do business in New York and for whom the impending gas ban is already causing harm to profits and business operations, harm that will be dramatically accelerated if the ban goes into effect on January 1, 2026. These harms are existential for many of our members, and are harms that cannot be undone or unwound if the court of appeals were to hold that the ban is preempted. Mulhern Gas is a member of the National Propane Gas Association and has filed a separate declaration in support of Plaintiffs' motion. Other members are likewise harmed by the gas ban. Most of our members are small, family-owned businesses that employ fewer than 50 people. Many of these businesses have been in families for generations and have poured their life's work into supplying fuel that provides heat in the heart of cold New York winters.

1

6. Our members are already experiencing a decline in sales and losing business because of the impending gas ban—builders and consumers are anticipating the complete ban on gas appliances and systems and are therefore declining gas now. Once the ban goes into effect in January 2026, builders and consumers will no longer have a choice and will have to build all electric. This ban on gas systems and appliances in new construction will harm our members financially, impose operational burdens and reorganizations, and force many to try to shift to new lines of business, as well as having detrimental effects on their employees.

7. For example, one member writes that in 2026, the ban will "immediately cause a sharp decline in [its] business" and that it estimates a loss of "two million dollars a year in revenue from installations and service alone." The member also notes that the uncertainty has already affected its hiring plans, and that it has postponed bringing on additional staff and will be forced to reduce its workforce if the ban goes into effect.

8. Another member that has branches that have been operating in New York State for as long as 89 years reports that the ban would stymie new growth in New York, resulting in approximately $550,000 loss in revenue over the next ten years, which will necessitate canceling its plans to hire an estimated six additional employees in New York and may result in termination of six current employees. Additionally, the ban is already influencing existing customers to convert to 100% electricity in anticipation of being forced to do so, which the member projects will result in an additional $585,000 in revenue losses over the next ten years, totaling $1,135,000 in lost revenue.

9. Another member reports that 10% of its annual sales are for new construction that will be immediately affected by the impending ban, and noted that "the impact of CLPCA has begun. Builders have delayed projects, switched to alternative energy sources, and, in at least

2

one instance, a Westchester builder chose to build multi-family projects in Connecticut instead of New York." The member forecasts a loss of approximately $500,000 in revenue for this upcoming year as a result of the ban going into effect, with losses forecasted to grow to the millions in coming years. The member is also planning a reduction in workforce once the ban goes into effect in 2026, and notes that the "CLCPA legislation has had a chilling effect…resulting in a reduction of over $50 million in company value."

10.     Another member reported that installation of gas appliances in new construction accounts for 15% of the company's HVAC sales, and the impending ban, by immediately eliminating those sales in 2026, will reduce its workload and require laying off 20-25% of its employees.

11.     Another member reports that it has had to lay off a helper since there is a reduction in service and installments it is doing at this time. It also reports that hires are quicker to look for work, even after starting at the company.

12.     Another member reports that it has paused new hires in the wake of the impending ban, and will have to eliminate 4-5 positions of its 35-employee workforce if the ban goes into effect on January 1, 2026.

13.     Another member forecasts a loss of over $850,000 gross profit in New York in 2026. Its business also forecasts a loss of over $3.3M in new construction revenue, which will result in laying off multiple workers.

14.     Another member reports that a contract to supply gas to a nine-home subdivision in the Spring of 2026 has been cancelled, at a sunk cost of $31,500. The member further noted that it works with three different builders and would typically supply approximately 60 homes

a year.  If the ban goes into effect in 2026 and that work disappears, it will need to lay off a technician, will reduce its workload, and decrease its sales by $210,000 this coming year.

15.     Another member reports that 20% of its customers come from new constructions, and that it will lose revenue and be forced to lay off workforce if the ban is implemented.

16.     Another member reports that "due to the new NYS law, on January 1st, 2026, new home installation opportunities…will be non-existent, causing a 37% drop in our total HVAC income. Propane tank sales will drop 50%. Growth for our business will be greatly diminished if not wiped out."

17.     Another member reports that: "if implemented as currently planned, this ban will significantly impact our ability to operate. Based on our projections, we expect to lose approximately 50% of new customer sales due to the restrictions. This will result in an estimated 30% decrease in overall revenue, primarily due to the loss of new propane and other liquid fuel sales — products that currently make up the core of our business. In the first year of implementation alone, we will be forced to lay off approximately 30% of our workforce." The member further wrote that "Unless changes are made, we foresee being forced to close our doors entirely — ending a vital local service and eliminating dozens of good-paying jobs in the process."

18.     Members of the National Propane Gas Association accordingly will experience irreparable harm in the form of grave economic injuries, forced changes to business practices, and compliance burdens in 2026 if the New York gas ban goes into effect.

19.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

4

Executed this 2nd day of September 2025 in ___Washington,___ ___DC___ .

_____
Stephen Kaminski

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF RICK CUMMINGS IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF RICK CUMMINGS

I, Rick Cummings, declare as follows:

1.  I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.  I am the owner of Mulhern Gas Co., Inc. Additionally, I am the New York State Director of the New York Propane Gas Association.

3.  Mulhern Gas is a member of both the New York Propane Gas Association and National Propane Gas Association.

4.  Mulhern Gas Co., Inc. is a for-profit corporation organized under the laws of New York with its principal office in Columbia County, New York.

5.  The New York Propane Gas Association is a nonprofit corporation organized under the laws of New York with its principal office in the County of Rensselaer, New York. It represents the New York propane industry and has approximately 250 members, including propane retailers and delivery companies. Its members employ approximately 3,000 New York residents. Its mission is to educate people about and promote the propane industry in New York.

6.  The New York Propane Gas Association has one or more members, including Mulhern Gas, who do business in New York and for whom the impending gas ban is causing or will imminently cause harm to revenues and business operations.

7.  Mulhern Gas has been a small, family-owned business in New York for over a century and has delivered, installed, and serviced propane equipment and propane gas for local customers for more than fifty years. The impending gas ban is an existential crisis for the company—New York has outlawed much of our new business development and impacted our existing business.

8.  Mulhern Gas's propane delivery and installation sales have declined since New

1

York passed the gas ban. Beginning as early as October 28, 2024, the date of my prior affidavit in this case, I observed that, in anticipation of the gas ban, our customer base was increasingly turning to alternative energy sources for cooking and heating, which in turn was decreasing sales and diverting business. I therefore concluded that Mulhern Gas was experiencing or would imminently experience diminishing returns on its long-term equipment and property investments because of the impending gas ban, as well as disruptions to its business operations, investment decisions relating to fuel tanks, trucks, and other equipment, and ability to hire qualified service technicians. I stated that the ban threatened Mulhern Gas's viability as a going concern. *See* Oct. 28, 2024 Cummings Affidavit, Pars. 8-10.

9.      Since that time, Mulhern Gas has continued to see a rapid deterioration in our propane delivery and installation business as more and more newly constructed homes are turning to alternative energy sources for cooking and heating as the result of the impending gas ban. As an increasingly popular weekend and second home location, there is a significant amount of new home construction in our service area in the Hudson Valley of New York. But many of those new homes, in light of the impending ban, have decided in the past year not to use propane gas. As of January 1, 2026, there will no longer be a choice—all those new homes will be required to use all electric appliances and systems.

10.      As such, Mulhern Gas has been and will continue to be particularly affected by the ban. Roughly 20% of our propane system sales and installations are in new homes. That business will be entirely eliminated as of January 1, 2026, both the sales of tanks and piping and the related installation labor. And that also will have an increasing effect over time on our ongoing propane sales and service business—with an immediate drop in sales of roughly 10% expected in 2026 and then a continuing decline in sales and service thereafter.

11.     Mulhern Gas employs 11 installers and service technicians. When the ban becomes effective, we estimate a reduction in staff through layoffs and/or attrition of 20%.

12.     Mulhern Gas also owns 12 service and delivery vehicles. We will need to downsize or sell some of these assets. And we will have to change our business plans and operations going forward to adjust to the loss of business.

13.     These injuries cannot be undone. Lost sales cannot be recovered, and once an alternate energy source is installed, Mulhern Gas will not have the opportunity to make sales of propane or provide service, repair, or replacement. This means that immediate lost sales in 2026 will have long-term impacts.

14.     Mulhern Gas and members of the New York Propane Gas Association accordingly will be seriously and irreparably harmed if the ban goes into effect during the pendency of the appeal, including by lost sales, the loss of lines of business, altered business operations and investments, layoffs of employees, and compliance burdens. These harms have already begun but will accelerate dramatically when the ban goes into effect on January 1, 2026.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of August 2025 in Hudson, New York.

RICK CUMMINGS

3

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

MULHERN GAS CO., INC., et al.,

              Plaintiffs,

       v.

WALTER T. MOSLEY, in his official
capacity as New York Secretary of State,

              Defendant.

Case No. 1:23-cv-01267 (GTS/CFH)

**DECLARATION OF JOSHUA HOLMES
IN SUPPORT OF PLAINTIFFS' MOTION
FOR INJUNCTION PENDING APPEAL**

## DECLARATION OF JOSHUA HOLMES

I, Joshua Holmes, declare as follows:

1.     I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.  I previously filed a declaration in this case on October 28, 2024.

2.     I am the owner of Holmes Mech. LLC.

3.     Holmes Mech. LLC ("Holmes Mechanical") is a for-profit company organized under the laws of New York with its principal office in Franklin County, New York.  Holmes Mechanical is a leading HVAC and gas systems contractor serving Franklin, St. Lawrence, and Clinton Counties.  Our focus is on engineering and installation of high efficiency boilers, furnaces, and water heating equipment, including natural gas and propane appliances as well as heat pumps.  We also specialize in liquid propane gas systems ranging from small residential applications to large industrial design and installation.

4.     As I said in my prior declaration, New York's gas ban is already severely affecting our business, including by undermining our ability to sell propane heating equipment and systems and both natural gas and propane appliances.  The ban has caused customers to be concerned that fuel gas and the equipment and parts for their appliances will soon become unavailable, leading them purchase alternate appliances and systems instead of gas and propane appliances.  As a result, we have already seen declining sales and installation in our gas and propane business, and in particular high-efficiency gas furnaces and boilers.  This has led to considerable economic losses and hardship for our company, and to an effort to develop a new line of business in electric heat pumps.

2

5.      Once the New York ban goes into effect on January 1, 2026, Holmes Mechanical will not be able to sell or install any gas, propane or fuel oil appliances and associated systems into new construction homes or buildings under 7 stories. More than 20% of our business has been in fuel gas systems and appliances in new construction (and more than that just a couple of years ago). This part of our gas and propane business will be virtually eliminated starting in 2026, resulting in a significant loss to our revenues and business. We expect at least a 25% decrease in our overall sales, which will also lead to a decrease in installation, service and repair. And once a home or building is built all electric, particularly without gas infrastructure in place, it is much more likely that appliances will be replaced with similar appliances rather than trying to install fossil fuel systems and appliances after-the-fact.

6.      The ban is also impacting customer behavior for existing homes that are considering retrofits to fuel gas systems and appliances. Customers are less willing to consider propane and gas systems because the future of the industry is less certain in light of the New York ban. The retrofit portion of our business has thus seen more demand for partial-load heat pumps where before we had more demand for propane and gas systems.

7.      In an effort to adapt and maintain operations, we have begun offering heat pumps for full-load heating to homeowners. Heat pumps have now become a majority of our equipment sales and revenue. However, we have encountered significant challenges, in part because of the colder climate in our area. The installation cost for a full-load heat pump in a home, whether for new construction or HVAC replacement, is substantially higher—sometimes more than double—compared to a high-efficiency gas furnace or boiler. Additionally, it has proven almost impossible to install heat pump equipment for homes where we have designed heating systems for temperatures as low as -13°F, while also attempting to meet the New York State Clean Heat

3

program guidelines for customer rebates for full-load heating. Heat pump installation is too expensive for many consumers and is raising the cost of housing. Customers are also not informed on the risks and downsides with heat pumps, so it requires more education of the customer. And we have received complaints from customers who have installed heat pumps regarding the high cost of heating their homes due to rising electricity prices. New York's ban is depriving consumers of their choice of fuel and appliances and resulting in customer dissatisfaction, harming our business's goodwill.

8.     The higher home construction costs from having to use all electric installations, and the growing concerns with the ability of heat pump HVAC systems to provide adequate and affordable heating in upstate New York, are anticipated to reduce new home construction. Less home construction will also adversely affect our business and reduce opportunities for growth and expansion.

9.     Despite trying to expand the heat pump side of our business and shift our sales toward alternate products and systems, we have seen slowing sales, even during what is normally the busy season for heating equipment. It is hard for our business to plan for our growth and investment given the impact of the ban on our customers and the housing market. Holmes Mechanical is a small family-run business and has only 5 staff members. Introducing a new product is requiring us to re-train some of our employees, because heat pumps require a substantial level of training and expertise; heat pumps are more difficult and time-consuming to repair and service.

10.     The trajectory of our business is being impacted. We had been growing and were planning to buy a new service vehicle and hire another employee. But in light of the ban's

4

effective date of January 1, 2026, we have scrapped those plans. Our business is being disrupted and slowing to a crawl while we try to reorganize operations, sales, and employees.

11.    Despite our efforts to adapt, Holmes Mechanical will suffer significant harms in 2026 if the ban goes into effect as scheduled. We will lose additional sales, will lose customers and our business's goodwill, and will have to try to modify our lines of business in order to stay operational. These harms are irreversible and cannot be undone.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 28th day of August 2025 in ___Malone___, New York.

_____
JOSHUA HOLMES

5

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF MICHAEL FAZIO IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF MICHAEL FAZIO

I, Michael Fazio, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the Executive Vice President of the New York State Builders Association ("NYSBA").

3.      NYSBA is a nonprofit corporation organized under the laws of New York with its principal office in the County of Rensselaer, New York. NYSBA represents the New York residential building construction industry and has approximately 1,800 members, including construction companies, contractors, engineers, and architects. Our members employ tens of thousands of New York residents. Our mission is to create a strong business environment and ensure its members' ability to provide quality housing for all New Yorkers.

4.      The impending gas ban will cause significant and imminent harm to New York's residential construction industry. The harm is financial, competitive, and structural, and it will affect not only builders but also homebuyers, workers, and communities throughout the state.

5.      When New York's gas ban goes into effect on January 1, 2026, builders who have already invested in designs, engineering, and contracts premised on the use of natural gas infrastructure will be forced to absorb substantial sunk costs. For example, members who have engaged in costly working drawings and specifications with gas infrastructure now face the choice of abandoning those plans, incurring penalties, or delaying projects while re-designing and re-engineering the planned residential developments. In many cases, this adds thousands of dollars per home in additional expense and causes months, if not years, of delay. And it will

1

costs builders tens of thousands of dollars in sunk costs, slower home sales, and delayed and more costly developments.

6.     For example, I understand that a member has already started a building project involving gas infrastructure that cannot be completed before the ban's effective date. Before the gas ban was enacted, that member committed to costly working drawings and specifications that incorporate gas infrastructure. The member has also already contracted with a gas utility to install the project's gas infrastructure, consistent with the common practice in the industry. Prohibiting the member from delivering the promised customers to the utility will require the member to pay the cost of the infrastructure that the utility would otherwise bear. The impending gas ban is thus forcing the member to either proceed and risk penalties or otherwise delay its project timeline at great expense while making costly modifications to existing building and infrastructure plans.

7.     Additionally, I understand that when the ban goes into effect in 2026, another member will bear increased costs associated with having to use all electric residential construction, ownership, and maintenance arising from the prohibition of effective, available, and affordable fuel gas appliances.

8.     The financial harm extends directly to homebuyers. According to the National Association of Home Builders (NAHB), for every $1,000 increase in the cost of a home, nearly 7,000 New York families are priced out of homeownership. The all-electric mandate will add thousands of dollars in upfront construction costs per home and raise monthly utility bills, leaving many working families unable to afford new housing.

9.     The gas ban also places new homes at a significant competitive disadvantage compared to existing homes in the resale market. Existing homes with natural gas hookups will offer lower upfront purchase prices and lower operating costs than all-electric new homes,

2

especially as residential electricity rates continue to rise. This disparity will make it harder for builders to market and sell new all electric homes, further slowing new construction.

10.     The New York housing market is already in crisis, with a statewide shortage of housing. By making new homes more expensive and less attractive to buyers, the gas ban will ensure that fewer homes are built in New York. This not only worsens the housing crisis but also directly harms construction companies, subcontractors, and suppliers who depend on new home construction for their livelihoods.

11.     The gas ban also undermines the competitiveness of New York's building industry. Many builders have already begun to shift their operations to more business-friendly states that maintain energy choice. For example, a major upstate homebuilder recently put its New York projects on hold and purchased land in Tennessee, where construction will begin in late 2025. Other members have informed me they are considering similar moves to Pennsylvania, the Carolinas, and Florida. If this trend continues, New York will experience an exodus of construction jobs and investment.

12.     The ban also heightens systemic barriers within the industry. Builders are already facing utility transformer shortages, long delays in power capacity upgrades, and steep cost increases to obtain sufficient electricity for large residential projects. Moving to all-electric requirements without a functional grid and reliable supply chain will result in widespread project delays, higher carrying costs for builders, and ultimately fewer housing starts.

13.     Beyond builders, the impacts ripple outward: tradespeople, engineers, architects, real estate professionals, and the tens of thousands of workers employed by NYSBA's members will all feel the consequences of reduced housing production. Communities will lose out on tax revenue, school funding, and economic development that comes with residential construction.

3

14.     I want to emphasize that NYSBA shares the State's environmental goals, but the gas ban is a blunt, one-size-fits-all mandate that ignores the realities of housing affordability, infrastructure readiness, and consumer choice. Without balancing environmental goals with economic realities, New York risks deepening its housing crisis, pushing businesses and workers out of the state, and leaving New Yorkers with fewer, more expensive housing options.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9 day of September 2025 in New York, New York.

MICHAEL FAZIO

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF PHIL NANULA IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF PHIL NANULA

I, Phil Nanula, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the President and CEO of Essex Homes of WNY.

3.      Essex Homes is a for-profit company organized under the laws of New York with its principal office in Clarence, New York.  Essex Homes has operated for more than thirty years as a family business and is one of Western New York's leading residential home builders.

4.      Essex Homes is a member of both the New York State Builders Association and the National Association of Home Builders.

5.      As I explained in my declaration dated November 1, 2024, New York's gas ban is harming and will harm Essex Homes's revenues and business operations.  At that time in late 2024, Essex Homes had already started several building projects involving gas infrastructure that could not be completed before the ban's effective date, January 1, 2026.  Before the gas ban was enacted, Essex Homes committed to costly working drawings and specifications that incorporate gas infrastructure.  Essex Homes had already contracted with a gas utility to install the project's gas infrastructure, consistent with the common practice in the industry.  The gas prohibition will prevent us from delivering the promised customers to the utility, which will require us to pay the cost of the infrastructure that the utility would otherwise bear.

6.      Now that the ban's effective date is a mere four months away, it is clear that we cannot complete the projects, as I described previously.  On our overall projects, we will lose more than $80,000 in deposits due to not hooking up to gas within the stated time frame in our agreements with the gas providers.  And we will have to rework drawings and specifications for

1

the remaining homes in the project, which will not be able to have gas plumbing or appliances.

7.  Once the ban goes into effect January 1, 2026, our sales of new homes will drop because they will be all-electric and will have to compete with sales of existing homes that have gas. Most buyers in this area prefer to have gas service in a home. As noted above, some houses in our ongoing developments already have gas but houses built subsequently will not. Those all-electric homes will be harder to sell and as a result, we will either lose sales or make less profit on any sale.

8.  This also harms homebuyers, who lose their choice of energy source. Electric systems are more expensive to install and will cost consumers $8,000 more for a single system up to 2,300 square feet and $20,000 more for two systems over 2,300 square feet. Electricity is also more expensive than gas, raising consumers utility bills. And all-electric homes will have a more difficult time with resale, resulting in the need to reduce their price when competing with the gas houses that are for sale.

9.  The shift to all-electric in 2026 will raise the costs of homebuilding but at the same time make houses more difficult to sell, increasing our expenses while simultaneously hurting our sales and revenue. Being forced to build all-electric will slow sales in existing developments, which will result in fewer new developments being brought to market. If you already own land for future development, this slowness will increase carrying costs and negatively impact overall company sales projections. Essex Homes staff combined with its subcontractors represents over 2,000 employees. Some of these staff and subcontractors will be laid off or lose work when sales decline, and our relationship with our subcontractors will be affected.

10.  The lost sales, decreasing revenue, and slower housing market will decrease the overall value of our company and put a strain on our existing bank relationships. Given this market

reality, Essex Homes will have to adjust its business plans and strategy and may initiate less new residential building projects or may shift the type of housing it is building to ensure it can affordably build and price homes.

11.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this ___5___ day of September 2025 in _CLARENCE_ , New York.

PHIL NANULA

# Exhibit F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF LUKE MICHAELS IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF LUKE MICHAELS

I, Luke Michaels, declare as follows:

1. I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2. I am the owner and manager of a small homebuilding business located in Malta, New York. I am a third-generation owner of the family business. My grandfather started the homebuilding business in the 1960s. My father and uncle grew the business to the 2000s, and I took over the business in 2014. We are incredibly proud to be able to stay in business for as long as we have. Our mission through the years has been to create a new lifestyle for our homebuyers with a focus on value and customer satisfaction.

3. Over the past decades, we have built over 8,500 units in the Capital Region, including Albany, Rensselaer, Saratoga, and Warren County. While at one time our company was one of the top 500 builders in the U.S., we are much smaller these days. Currently, we employ 12 people, and build around 40 homes per year. Furthermore, we work with over 100 local subcontractors and suppliers in our area. We have not only built many new lifestyles for our owners, but we have employed thousands of workers in the construction industry locally for decades.

4. When New York's gas ban goes into effect on January 1, 2026, our third-generation homebuilding business will suffer major losses.

5. Currently, we have five active developments. We have paid roughly $475,000 to the natural gas suppliers for the installation of the natural gas utilities at these sites. Under our agreement with the gas utilities (which is standard for the industry), this amount will be refunded back to us as long as we hook up new homes to gas meters within five years of the site's

1

inception.  When the ban goes into effect on January 1, 2026, however, we will not be able to hook up the remaining new homes to be built to the gas mains we paid to install and will not receive a refund for those homes.  We estimate we will lose $250,000-$300,000 in investments we will not recoup. This is a significant financial loss for our business.  It also affects future buyers as well. Currently, we do not charge our customers for the gas install costs, because we will be made whole by the utility provider at the end of the project.  However, starting next year, we will have to consider changes in order to be able to operate viably.  We could charge new buyers a per home cost for some of the amounts we are unable to collect, but that will add to the price of the home without the corresponding benefit of having gas utility service, making it harder and slower to sell.  So even if I try to pass on some of that cost, I may have to drop the price of the home and realize a loss.

      6.      The New York ban also deprives our customers of something very important to them: choice of fuel for heating their homes, cooking, or fireplaces.  Maybe the number one unique value proposition our industry offers is choice. Our buyers love the opportunity to make their newly built home special to them and who they are. We allow our buyers to customize their homes in any way imaginable from floor plan, to materials, to utilities, to paint colors. Under the all-electric mandate, our customers no longer have the choice of how to heat their home. They will also no longer have a choice of a natural gas fireplace or natural gas cooking appliances.  In the last 20 years, we have had one customer opt for an all-electric home. Gas fuel has always been one of the most popular choices our buyers make because it offers convenient, reliable, and economical energy.  And as it relates to future user utility bills, we fully expect the monthly utility costs to increase for all-electric homes as compared to mixed-fuel homes.

2

7.    Our years of data tells us new home buyers do not choose electric homes. So when they are presented with the mandate that if they buy new, it has to be all-electric, they will seek re-sale homes that offer the ability for a natural gas furnace, natural gas fireplace, or natural gas stove.  To add salt to the wound, all-electric homes are more expensive to build than a home with electric and natural gas. As we prepare for sales this year and permitting next year, the cost to build the same home under 2,000 square feet will have almost a $20,000 increase next year to the buyer. If the home is over 3,000 square feet in size, the cost is going to jump to over $30,000 to the buyer. The larger the home, the larger the increase because we are forced to bring a 400 amp electric service to the home to handle the heat pump equipment versus today's standard 200 amp electric service.  Given these circumstances, we will be able to build and sell fewer new homes in 2026—higher costs and less attractive homes means slower sales.  We estimate that our sales numbers will drop by at least 50% with the all-electric mandate, with a substantial drop happening the first year in 2026.  The loss of sales will put more financial pressure on our company.

8.    We also anticipate that once the ban goes into effect, many new developments will be determined to not be feasible.  Just as with the gas utility, the cost to bring electric service to a new site falls on the developer.  If the site needs additional electric capacity and upgrades to the electrical grid to support the electric homes, the developer pays that.  As an example, I recently looked at a parcel of land for development. It happened to be right on the demarcation line of two local utility providers. The site had to be upgraded to a 3-phase electric capacity to handle the load. I had the option of working with either utility provider.  The first utility provider estimated $296,000 to upgrade the grid; the second utility provider did not offer a specific quote because they estimated it would have been significantly more to fully upgrade their local

3

substation to handle the additional load. These significant upgrade costs—$300,000 or more—to bring sufficient electrical load to new developments make it less likely they will happen.

9.     The question my company has is: Can we sell homes to buyers who are stripped of a choice at a higher price? My employees and hundreds of contractors and suppliers question if there will be enough work out there to support their families. The only answer we know is that the consumers will ultimately pay the price. They will have to pay for the grid upgrades, increased costs of home construction, and increased operational costs. And small family-owned builders such as ours will suffer from slower sales, lower margins, and sunk costs.

10.     I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __5th__ day of September 2025 in ___Malta___, New York.

LUKE MICHAELS

# Exhibit G

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF JOHN GRAZIOSE IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF JOHN GRAZIOSE

I, John Graziose, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the Owner of Gerber Homes and Additions LLC and Gerber Apartments and Property Management, located at 1260 Ridge Road, Ontario, NY 14519. Founded in 1981, Gerber Homes has been a long-time leader in the Greater Rochester area, regularly ranked among the "Top 5" home builders by the *Rochester Business Journal*. Gerber Apartments is a family-owned and operated business dedicated to providing a positive impact on the community through exceptional services, including diverse housing options in Ontario, Marion, Greece, and Palmyra.

3.      My companies build approximately 60 homes per year and 50 or more multifamily units per year and manage approximately 250 apartments, with multiple new subdivisions and multifamily projects across the region. We employee 25 direct employees, hire hundreds of trade partners to build our projects, and purchase millions of dollars in supplies from local building suppliers.

4.      New York's gas ban is causing and will continue to cause harm to my business in the form of financial losses, project delays, and lost business opportunities and will also create higher costs for future homebuyers. Once the ban goes into effect on January 1, 2026, it will put a complete halt to gas infrastructure and appliances in new homes and multifamily units. This will have a serious impact on our projects and our business.

5.      For example, one of our development projects, Fourmile Creek (Ontario, NY), is planned for 170 apartments, 50 townhomes, and 120 single-family homes. The project is currently stalled because, after completion of Phase 1 (with gas and electric), and approval of

1

Phase 2 (with gas and electric, contingent on building permits), we cannot begin Phase 3 because we cannot secure sufficient electric capacity to build all electric. Rochester Gas & Electric (RGE) has said that there is not enough electric capacity for us to build, but has not provided a cost, timeline, or solution. If gas were available, we could mitigate this issue. Without it, hundreds of units are stalled. And, as building all-electric adds $12,000–$15,000 per unit, across 340 units, moving forward will equate to $4–$5 million in additional cost. The ban is thus both delaying new building and increasing the expense to build significantly, and will harm our sales and revenues.

6.      Likewise, we had to extend the purchase contract timeline for our Shoecraft Road development project (40 apartments in Webster, NY) because RGE reported capacity issues, which has delayed closing and increased our risk. At that project, we anticipate an additional cost of $10,000–$12,000 per unit, so a total of $400,000–$480,000 extra cost. Similarly, RGE has stated that there are power issues in Ontario, NY, but has yet to provide a solution, which has led us to halt our 40-unit single family home development (Southbrook Estates) there, because without gas the project cannot move forward until capacity is added. The use of all-electric will equate to $12,000–$15,000 extra per home, with a total of $480,000–$600,000 in extra costs. For both these developments, the ban is causing delay and increased building costs, which will both harm our business and increase the availability and cost of housing for New York residents.

7.      We also have four other projects, Southgate Hills in Victor, and Ashton Place Amber North, and Amber South in Canandaigua, with which we cannot proceed because we have not received confirmation from RGE that power is available. Together, the cost impact of proceeding with all-electric at these developments could range from $1,700,860-$2,101,230.

8.      We also had to walk away from a 24-acre parcel in Ontario that could have delivered 120 units because we were uncertain that the residents would be able to obtain power.

2

9.      The gas ban will also have long-term effects on home buyers in the future. Across the housing projects we work on, the average additional cost for building all electric instead of mixed fuel is about $12,000-$15,000 per home or apartment.   With over 750 units in our pipeline, this equates to $9–$11 million in added costs.  And the costs from electric utility providers for new grid infrastructure is unpredictable and expensive.  Without gas as a backup, developers are forced to absorb some of the costs of building all-electric but ultimately will have to pass on increased costs to buyers and renters.  New homes will thus become more expensive, reducing supply and raising the price of existing homes as demand shifts to limited inventory.

10.      In sum, starting in 2026, the gas ban will immediately impose millions in added construction costs, including from cost-shifting by utilities, and will result in delays, uncertainty, and lost housing opportunities.  These burdens directly harm builders, developers, and future homebuyers, while worsening New York's housing affordability crisis.  The harm to our business will be substantial and cannot be easily undone.  In addition to higher costs, delayed or lost sales, and lost revenue, our business will have to make changes in our staffing, trade partners, suppliers, and equipment to adjust for the lost work.

11.      An injunction pending appeal is critical to prevent further damage while this case is decided.

3

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __9__ day of September 2025 in _Ontario_, New York.

JOHN GRAZIOSE

4

# Exhibit H

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF ROBERT F. DEFOREST III IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF ROBERT F. DEFOREST III

I, Robert F. DeForest III, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the President of Cordelle Development Corporation.  Cordelle Development Corporation is a land development and residential construction company located in Manlius, New York. We have been in business since 1967 and we are members of National Association of Home Builders, New York State Builders Association, and the Central New York Home Builders and Remodelers of Central New York. I was President of the Central New York Home Builders and Remodelers of Central New York in 2019 & 2020.

3.      We have started projects that are designed, planned, and permitted for gas infrastructure and appliances, and we have contracted with National Grid to install the gas infrastructure up to the meter.  We will not be able to complete our projects before the ban takes effect in January 2026.  Under our contract with National Grid, our company is liable for the cost of the gas infrastructure, but then receives credits against that cost as homes are connected to the infrastructure.  But in light of the ban, we will not be able to connect homes to the utility system after January 1, 2026.  We estimate that our liability will be in excess of $77,000 to National Grid for the cost of the infrastructure in our ongoing projects.  That is a substantial cost for our business.

4.      There is also a substantial cost to homebuyers.  Our customers want natural gas appliances, but they now will not have that choice.  Our company will now have to redesign our plans and specifications to all-electric to comply. We anticipate the cost could increase up to $20,000 for a typical 4 bedroom 2-1/2 bath home because electric appliances are more expensive

1

to buy and install.  That forces us to produce a product that is not desired in our market and that will make houses less affordable.

5.　　Rising costs will obviously have a negative impact on sales and our business. And in light of this, our company has delayed new investment and altered our plans for future projects.  From performance metrics to cost of the appliances, the haste that this ban is being implemented is causing an enormous amount of uncertainty and risk that our business must now undertake.

6.　　I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this ___ day of September 2025 in _MANLIUS_, New York.

_____
Robert F. DeForest III

2

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF KAREN ARPINO IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF KAREN ARPINO

I, Karen Arpino, declare as follows:

1.     I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.     I am the Executive Director of the Northeast Hearth, Patio and Barbecue Association.  I previously filed a declaration dated November 1, 2024 in this case.

3.     Northeast Hearth, Patio and Barbecue Association is a nonprofit corporation organized under the laws of New Hampshire with its principal office in Massachusetts.  Northeast Hearth has approximately 300 members and represents distributors and retailers in New York involved in the sale, service, and installation of stoves, ovens, spa and pool heaters, and gas chimney heating systems.  Our members in New York are local, small family-owned businesses.  Our mission is to promote all aspects of the hearth, patio, and barbecue industries; to educate consumers on the benefits, proper use and maintenance of all systems and products; and to communicate effectively with legislators and regulators regarding public policy.

4.     As I said previously, members of Northeast Hearth were already suffering harm to revenues and operations from the New York state gas ban.  As an example, the impending gas ban had compelled one member to delay or forgo long-term investments into products that would otherwise form the foundation for its long-term profits.  And other members had either already laid off or imminently planned to lay off 20% to 40% of their workforce in anticipation of the gas ban's adverse business impact.  Other members were facing labor shortages exacerbated by employees' concerns about the future of the industry in light of the impending gas ban.

5.     Now, with the ban going into effect on January 1, 2026, the impact on our New York members will be devastating.  It cannot be overstated. Most members sell a substantial

1

portion of their gas fireplaces and inserts, along with related installation and labor, for new construction. A vast majority of gas fireplaces are in new construction. Three members who are filing declarations in support—In Season Fireplaces, Best Fire, and Ocean Stone and Fire—have roughly 50%, 50%, and 35% of their revenues, respectively, that will be eliminated by the ban. There is no ability to recoup these losses from the State. And this financial blow has other associated consequences. These members anticipate having to lay off roughly one-third, one-half, and one-half of their employees from their sales and service and installation staff once the work disappears. They don't know if they will be able to adapt by reorganizing their businesses or starting new lines of business (remodeling, electric heat pumps) in order to keep their companies alive. The value of their businesses has been substantially diminished, making sale difficult or impossible.

6.      Many other members are in the same position as these three companies. The loss of sales and revenue and all the associated impacts, even during part or all of 2026, cannot be undone and will cause catastrophic damage.

7.      The harm from the New York ban is also already being felt on the association level. Northeast Hearth is already experiencing harm as a result of the impending gas ban in the form of reduced membership, resulting in decreased dues and program revenues. We have consistently had roughly 100 members in New York over the past decade. As an Association, we have grown 10% – 20% each year over the past seven years. This year, 2025, our membership overall is down roughly 15%. This drop in membership is largely due to losing about 25 members in New York alone—roughly one fourth of our membership there—the impact of which is not offset by nine new members joining from other states. This 15% drop in membership has adversely impacted our dues and event revenue. The decrease in revenue is

2

going to impact our ability to advocate and conduct government affairs activities across the region on behalf of our members, as well as our ability to conduct training and education for members and for building officials.  These effects will be felt not just in New York but in our regional activities as well.

8.      The loss of Northeast Hearth members and the individual harms to our members in New York struggling to survive are irreparable, and cannot be undone if the court were to find the ban preempted on appeal.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 4th day of September 2025 in    Sudbury , MA    .

KAREN ARPINO

3

# Exhibit J

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF LUCAS STRITSMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF LUCAS STRITSMAN

I, Lucas Stritsman, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the President and General Manager and a co-owner of Best Fire. Best Fire is a 48-year-old family-owned business located in Albany, New York. We sell and install gas fireplaces and heating stoves for indoor and outdoor use. We also sell wood / pellet stoves and outdoor furniture. Best Fire employs 36 full-time employees, which includes both sales personnel and installation and service technicians.

3.      Most gas fireplaces sold today are installed in new construction homes—roughly 90%. That makes new buildings critical for the gas fireplace market and business. Best Fire's sales of gas fireplaces for new construction is roughly 58% of our appliance sales and represents more than 50% of our top line revenue. Moreover, new construction sales has been a growth aspect of our business. From 2016 to 2024, home hearth sales revenue for existing homes has grown about 23% (which, adjusted for inflation, is roughly flat), while home hearth sales revenue for new construction homes has grown about 87% (about 65% when adjusted for inflation).

4.      When the New York ban on gas systems and appliances goes into effect on January 1, 2026, it will halt sales and installation of gas fireplaces and stoves for new construction. We will lose more than 50% of our sales of gas appliances, and along with that, the associated labor revenue. That will result in a more than 50% loss of revenue for our business. And it cuts off the faster-growing segment of our fireplace business. This is catastrophic for us.

1

5.     If we were to continue business as usual, without any changes, our annual profit would turn into an annual loss of over half a million dollars. So we will be forced to make drastic changes to our business in order to survive.

6.     We will need to layoff at least 10 employees to avoid operating at a loss in 2026. The employees we will have to lay off will include 4 installation technicians, 1 service technician, 3 fireplace design sales staff, and 1 on site project manager. All of these layoffs will be of highly skilled and trained fireplace professionals; it take years of training and investment to obtain the level of expertise required in the gas fireplace industry. We may end up laying off more than that to try to right-size our business operations for the available sales and work. For example, we employ 4 service technicians. Due to fewer installations and fewer gas appliances that require service, we will be required to lay off more service technicians as service calls decline.

7.     Best Fire also leases both a showroom building and warehouse space. With more than 50% of our business disappearing, these spaces will be too large and no longer needed. But Best Fire is in 5-year leases that it cannot break. And we would need to find alternative space and move our operations, which is a significant burden and expense in itself.

8.     In addition, Best Fire owns 6 installation trucks, costing roughly $75,000 each, and 5 service vans costing about $55,000 each. Starting in 2026, when the ban goes into effect, we will no longer need at least 2 of those installation trucks and 2 of the service vans and will have to get rid of them.

9.     The significant drop in sales of gas fireplaces and stoves will also affect our relationships with our suppliers, because our purchasing will decline.

2

10. Best Fire has considered trying to diversify its product lines to heat pumps, but it has not seen the demand for that, and introducing a new product line would require significant investigation and training, investment in new products, warehouse space, equipment, and operations, and an effort to build a business against established companies.

11. Best Fire is a long-standing business that has spent decades building its business and its reputation with builders and with customers. The loss of sales, customers, and good will will have devastating consequences on the business that cannot be easily undone or recovered.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 25th day of August 2025 in Albany , New York.

_Lucas Stritsman_

LUCAS STRITSMAN

3

# Exhibit K

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF TOM GIANNOVOLA IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF TOM GIANNOVOLA

I, Tom Giannovola, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the owner of In Season Fireplaces, Inc.  We are a local business in Henrietta, New York that provides gas fireplaces and fireplace inserts in new construction.  About half of our business is tied to new home construction.

3.      As I explained in a declaration dated October 31, 2024, New York's gas ban was already having an effect on our business because some consumers and builders were declining gas in anticipation of the ban.  Once the ban goes into effect on January 1, 2026, the consequences will be devastating for our business.

4.      Last year, in 2024, we did $1,082,000 for total sales of retail business and new construction installation of natural gas fireplaces.  Fifty percent of that was new construction.  This year, 2025, we have a projection of $1,250,000.  Fifty percent of that number is new builds again.  Next year, in 2026, if the gas ban goes into effect, we stand to lose sales of roughly $717,500.

5.      Once the ban goes into effect and eliminates half my sales, it will be a major struggle to keep the business going.  My expenses would surpass my total sales.  I possibly would have to sell the building I run my business in.  My buying power or discounts would decrease because I am not purchasing the same quantities.

6.      And I would probably have to cut my staff in half.  I have six employees counting myself.  The retail side of my business starts in September and ends around February.  The new construction side of the business is all year long, and keeps my employees busy all year and provides constant cash flow.  If we lose the builder side of our business, I will have much less work during the busy season and almost no work during the off season.  I will have to reduce my

staff by half all year long, but in addition, in the off season, I would have to lay off the rest of my employees. But those laid-off employees are going to find other jobs and then would not be available to work again the next busy season, making managing my business and my workforce extremely difficult.

7.　　　My In Season Fireplace Business has almost no value at this point. No one will buy this business the way it stands now.

8.　　　I am 59 years old. I have not worked for someone else since I was 20 years old. I have a thriving business that was growing each year. My son is 31 years old and he has been working with me since he was fifteen. At some point I had looked forward to him taking the business over. The future of my employees, my son and my business is unknown at this point.

9.　　　If I cannot create more business to replace the cash flow that will be lost from the new construction under New York's gas ban, I would most likely have to file for bankruptcy. Because of this, I am trying to find other lines of business to support me and my employees. I have started working for a builder on his payroll to develop a possible remodeling business. This is like starting all over.

10.　　　The ban is also bad for my customers and for New York homeowners in general. The cost of gas fuels is less than the cost of electricity. And close to 55% of the electric power provided in New York is created by natural gas, which provides only 40% efficiency. The fireplaces I install are roughly 75% to 80% efficient. And the natural gas furnaces installed in many new homes are 98% efficient. Banning these efficient gas appliances and systems and requiring all electric will cost roughly an additional $7,000.00 more to build each home, and will also result in higher utility bills for consumers. In addition, our local electric supplier, RG&E, has stated that the grid cannot handle the additional electric demand that will result from the ban. Particularly in our area of New York, which has a cold climate, denying people affordable and

reliable gas energy makes no sense.  And this forced transition to all-electric building will hurt

many businesses, owners, and employees.

11.     A court decision sometime in 2026 will come too late to help.  I may have already

had to shutter my business by then, once this year's busy season comes to an end.  The ban's

impact on my business this year will be devastating and irreversible.

Executed this _3rd_ day of September 2025 in _Henrietta_ , New York.

_Tom Giannovola_
Tom Giannovola

# Exhibit L

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | Case No. 1:23-cv-01267 (GTS/CFH) |
| Plaintiffs, | |
| v. | **DECLARATION OF DONNA KARATAS IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## DECLARATION OF DONNA KARATAS

I, Donna Karatas, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      Along with my husband, Joseph Karatas, I own Ocean Stone and Fireplace. We are a family owned business in Holtsville, New York. We have been in the stone and masonry business for 23 years, and in the fireplace business for 10 years.  Ocean Stone and Fireplace is a member of the Northeast Hearth, Patio and Barbecue Association.  I am also a member of the Board for the Northeast Hearth, Patio and Barbecue Association, and for the Board of the Long Island Builders Institute.

3.      Ocean Stone and Fireplace sells stone and provides the associated masonry work, sells and installs gas fireplaces, and also sells other appliances for outdoor kitchens and patios. Our stone and masonry work is about 65% of our overall business, and fireplace and outdoor kitchen sales and installation is about 35% of our business.

4.      I understand that when New York's new law goes into effect on January 1, 2026, no gas appliances or systems will be allowed in new buildings.  Once the law goes into effect and builders cannot put gas piping and appliances in, we will not be able to have a gas fireplace business.  Electric fireplaces are not a practical or affordable alternative and we do not them, so we will lose almost all of our fireplace sales and installation work.

5.      Builders with new developments represent about 85% of our overall income. Builders that we work with just finished three large developments, and are not planning further developments.  We know some developers and builders are leaving for other states, because the gas ban is going to make new developments too expensive to build and less attractive to

1

homebuyers. And even if builders do go forward with developments, those developments will not have any gas piping systems or appliances, so will not have gas fireplaces indoors or as part of outdoor patios or kitchens.

6.      The loss of our fireplace business will also seriously affect our stone and masonry business. A majority of the stonework that is done inside houses and for patios and outdoor kitchens is for chimneys.

7.      We have two installers for our fireplace work. We will have to lay off those two employees. We also have four salespeople that are primarily focused on fireplaces and the stone work relating to them, and will probably lay off three of these employees.

8.      We also sell other appliances for outdoor kitchens, including refrigerators, barbecue grills, and stoves. We will lose most of these sales as well, because builders will not plumb outdoor kitchens for gas. Some gas appliances may be able to use portable propane tanks, but that will not work well in many cases.

9.      We also have a large inventory of gas fireplaces in our warehouse. We are being forced already to try to sell these at steep discounts in light of the impending ban to try to clear out the inventory. There are two builders who have permits ready for new buildings, which we understand they will be able to complete in 2026, but that is only 80 fireplaces. Most of our fireplace inventory will become virtually unsellable after January 1, 2026, and may have to simply be dumped. And the same goes for fireplace accessories such as panels and remote controls and related construction materials such as venting, which we also sell as part of our fireplace business.

10.      Ocean Stone and Fireplace also employs nine masons. We will have to lay off four to five masons once the ban goes into effect, because there will be fewer fireplaces being

2

built and the amount of associated masonry work will decline. We also employ two sub-contractors, mainly for masonry work, who each have 9 or 10 masons. We will no longer need any sub-contractors, so they will lose that work—we will not even have enough masonry work for our own employed masons.

11.     The ban will also impact our relationship with suppliers. We have two gas fireplace suppliers, Napoleon and Majestic Hearth and Home. Their New York sales representative will lose virtually all of his sales.

12.     The New York ban will be a huge blow financially to our business. We are in better position than many fireplace businesses, because we also have the stone and masonry aspect of the business. Because of that, we think we will still be able to sell the business when we retire. But the loss of the fireplace business and the associated stonework has reduced the value of our business by more than two-thirds. So we estimate that if we sell the business, as a direct result of New York's gas ban, we will get less than one-third of the sales value we were anticipating only a couple of years ago.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3 day of September 2025 in Holtsville, New York.

DONNA KARATAS

# Exhibit M

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF RICH SCHAFFER IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

.

## DECLARATION OF RICH SCHAFFER

I, Rich Schaffer, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the Executive Director of the Plumbing Contractors Association of Long Island.

3.      Plumbing Contractors Association of Long Island is a nonprofit corporation organized under the laws of New York with its principal office in the County of Suffolk, New York. The Plumbing Contractors Association represents the interests of plumbing contractors in Suffolk County and Nassau County and has approximately 80 member companies. Our members employ about 600 New Yorkers. Our mission is to advance the plumbing industry and promote the overall welfare of Nassau and Suffolk County plumbing contractors.

4.      Members of the Plumbing Contractors Association are already suffering harm to revenues and operations in anticipation of New York's gas ban, and they will suffer additional and more serious harm once the ban goes into effect on January 1, 2026.

5.      In 2026, our members will not be able to sell or install any gas, propane or fuel oil appliances and associated systems into new construction homes or buildings under 7 stories.

6.      Gas plumbing projects represent about 30% of our members' business; New York's gas ban will eliminate much of that business. Our members currently anticipate a loss of 15% to 20% of their business in 2026 when the law becomes effective.

7.      Starting in 2026, all residential and low rise buildings will be constructed without covered gas appliances and without any gas infrastructure at all. If New York's ban is not enjoined over the next 12 to 18 months while the appeals court determines the validity of the

2

law, the resulting damage to our members will be irreparable. Lost sales and work opportunities cannot be recouped. And once houses or developments are built without gas appliances and systems—i.e., as all-electric—it is highly unlikely they will be retrofitted for gas, so there will be no opportunities for service, repair or replacement of gas appliances. In effect, that segment of the residential or low-rise residential / commercial building market will be foreclosed to our members for gas related work.

8.      The ban will also affect the decisions of customers who are considering retrofits to fuel systems and gas appliances, as they may be reluctant to consider gaseous fuel systems that could potentially be affected by future laws restricting their use or even requiring retrofits to all electric.

9.      This loss of work on gas infrastructure as a result of the ban will decrease work projects and opportunities for our members, and either cost some members their businesses or lines of business or force them to spend large amounts of capital in restructuring their business to focus on new product lines. This will include the burden and expense of training for their technicians on non-gas products, which require a substantial level of expertise. And some members may have to lay off employees or may stop hiring and training new employees if projects become all-electric and there is less plumbing work available.

10.     With less work, our members will also have to make difficult decisions on whether to sell assets such as vehicles or equipment, how to reconfigure relationships with suppliers, whether to modify owned or leased space, and how to compete in new lines of business for which they have not built up a reputation or established customer relationships.

11.     One member has already lost business opportunities because long-term residential construction projects—which often span 5 or more years—have begun to proceed without gas

3

infrastructure plans in preparation for compliance with the gas ban. This member initially submitted a bid on a large, long-term residential construction project involving gas infrastructure, but the developer eliminated the portion involving gas plumbing, which represented millions of dollars in revenue. With the gas plumbing work eliminated, the project will employ 30%-40% fewer plumbers. This type of lost work opportunity is happening to many of our members.

12.     These harms cannot be undone once they occur. As noted above, once built all-electric, the opportunity for further gas-related work has been foreclosed. And the lost revenues this year and in 2026 cannot be recouped. Nor can relationships with customers, suppliers, and employees be put back in place easily, if at all. The ban's harm to our members in 2025 and 2026 is both serious and irreversible.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 3rd day of September 2025 in _North Babylon_, New York.

_____

RICH SCHAFFER

# Exhibit N

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF ANTHONY CAIAZZO IN SUPPORT OF PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## <u>DECLARATION OF ANTHONY CAIAZZO</u>

I, Anthony Caiazzo, declare as follows:

1. I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2. I am the treasurer of the Board of the Directors of the Master Plumbers Council of the City of New York.

3. Licensed Plumbing Association of New York City, Inc. d/b/a Master Plumbers Council of the City of New York is a nonprofit corporation organized under the laws of New York with its principal office in Queens County, New York. The Master Plumbers Council is a professional trade association whose membership comprises licensed master plumbers and their affiliates in the City of New York, and it has been operating since 1889. It has more than 300 members, including nearly 250 licensed plumbers in New York City, along with associated businesses (such as supply houses, manufacturers, architects and other industry-related professionals). The Master Plumbers Council strives to promote the licensed plumbing industry and the benefits of hiring a licensed and insured firm, as well as providing education and clarification on a wide assortment of code issues.

4. I understand that one or more members of the Master Plumbers Council are suffering, or are imminently facing, lost business and related harms as a result of the New York ban on gas systems and appliances.

5. Gas plumbing projects in new buildings, including both gas piping and installation of appliances, represented on average about 30% percent of our members' business prior to 2024. When New York's gas ban goes into effect on January 1, 2026, it will preclude all or most of that business.

1

6.      This loss of project opportunities, work hours, and business revenue will harm our members.  Some members may have to lay off employees or may stop hiring and training new employees if projects become all electric and there is less plumbing work available.  It will also force some members to sell company assets such as vehicles or equipment, or to change plans for investing in assets going forward.  There will not be a commensurate increase in electric work, and most of our members and their employees are not trained in electric systems, installation, and service.

7.      All of our members have reported that contracts they had or had begun to negotiate for gas plumbing work were cancelled or downsized, or that they expect contracts in the next year to be cancelled or changed once the ban goes into effect.

8.      At least 200 members have experienced an overall reduction in business hours and work opportunities.

9.      Further, some members have reported that they intend to lay off employees in the next year as a result of reduced work and revenues once the New York ban goes into effect.

10.     The majority of our members anticipate that once the ban goes into effect, they will lose work, job opportunities, and revenues, and that this will have related impacts on employees, assets, and training.  These harms cannot be undone.  And the effects of the Rule will be long-lasting; new buildings that are constructed without gas piping or appliances will not provide subsequent opportunities for appliance service, repair or replacement.

11.     Further, some of our affiliate members such as suppliers or manufacturers will be harmed by the New York ban.  Some of those members will face lost sales and decreased revenues because of reduced demand for gas plumbing products, and as a result may have to lay off sales representative or other employees.  Some members have already reported a decline in sales of 20%

2

or more.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _9_ day of September 2025 in _BROOKLYN_ , New York.

ANTHONY CAIAZZO

# Exhibit O

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

MULHERN GAS CO., INC., et al.,

                  Plaintiffs,

     v.

WALTER T. MOSLEY, in his official
capacity as New York Secretary of State,

                  Defendant.

Case No. 1:23-cv-01267 (GTS/CFH)

**DECLARATION OF MIKE SHELBY IN
SUPPORT OF PLAINTIFFS' MOTION
FOR INJUNCTION PENDING APPEAL**

## DECLARATION OF MIKE SHELBY

I, Mike Shelby, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the President of the International Brotherhood of Electrical Workers Local Union 97.

3.      Local Union 97 is a labor union with its principal office in Syracuse, New York. Local Union 97 represents approximately 4,300 power professionals, many of whom will be affected by the gas ban.  Local Union 97's purpose includes organizing electrical and gas utility workers to promote reasonable methods of work, secure employment, reduce hours of daily labor, obtain adequate pay for work, and seek a higher standard of living and security for our members.

4.      More than 1,000 of our members work on gas infrastructure projects, both installation of gas piping systems from the main gas pipeline through the streets and to the meters of buildings, as well as the repair of existing gas pipeline systems.  Approximately 600 of these members work solely on gas utility projects.

5.      Once New York's ban on gas systems and equipment in buildings goes into effect on January 1, 2026, there will be an immediate decrease in the number of pipelines being extended from the street to building meters.  There will also be a decline, although perhaps more gradual, in the number of pipelines built from the gas main through streets, particularly as home builders and developers decide not to use gas infrastructure in new housing developments in order to comply with the ban.

1

6.     Further, we anticipate that over time there will be reduced maintenance work hours, as the remaining cast-iron pipelines are replaced with plastic.

7.     This loss of work on natural gas infrastructure as a result of the ban will decrease work hours and opportunities for our members, and either cost some members their jobs and chosen profession or force them to re-train for other lines of work or to relocate their families.

8.     Our union guarantees members forty hours of work a week.  However, when the ban goes into effect, we are unlikely to have forty hours of gas work available for all our dedicated gas utility workers and will have to downsize related departments.  When that happens, Local Union 97 will either have to bump people into other positions (such as moving them from gas work into an administrative position), or offer them positions in other locations, leaving members with the option of either accepting the offered spots and having to move their families or finding different jobs altogether.

9.     In addition, there are several hundred Local Union 97 members who have not yet completed ten years of continuous service and are vulnerable to being laid off.

10.     Even if members are not immediately laid off, the ban will result in a hiring freeze, as we will not be able to provide the requisite amount of gas infrastructure work to justify hiring new workers.  The ultimate impact of New York's ban will be to decimate the gas side union workers.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of September 2025 in ___Syracuse___, New York.

MIKE SHELBY

2

# Exhibit P

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MULHERN GAS CO., INC., et al., | |
| Plaintiffs, | Case No. 1:23-cv-01267 (GTS/CFH) |
| v. | **DECLARATION OF PATRICK GUIDICE IN SUPPORT OF PLAINTIFFS' MOTION INJUNCTION PENDING APPEAL** |
| WALTER T. MOSLEY, in his official capacity as New York Secretary of State, | |
| Defendant. | |

## <u>DECLARATION OF PATRICK GUIDICE</u>

I, Patrick Guidice, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am the Business Manager of the International Brotherhood of Electrical Workers Local 1049.

3.      International Brotherhood of Electrical Workers Local 1049 is a labor union with its principal office in Holtsville, New York.  IBEW Local 1049 represents about 4,000 union members who are employed in the electric and gas industry on Long Island and Far Rockaway, Queens, of whom approximately 1,500 are employed in the gas industry.

4.      We have already seen a loss of work on natural gas infrastructure as a result of the ban, as I stated in my prior declaration dated Oct. 31, 2024.  When the ban goes into effect on January 1, 2026, new construction under 7 stories will no longer have a choice to use or install any gas appliances and systems, so those buildings will not require any associated gas infrastructure.  Our gas industry members work on all aspects of the transmission and distribution system for gas utilities.  This includes both larger gas mains that are part of the transmission system and smaller gas mains that are part of the distribution system, including line extensions for neighborhoods and streets, service lines, and meters for new buildings.  The work on headers, service lines, and meters for new construction will be virtually eliminated when the ban goes into effect in 2026, and main extension lines and headers for new developments will also be eliminated.

5.      IBEW Local 1049 has about 500 members that work on gas transmission and distribution lines, and 60 additional members who work as inspectors for contractor work.  Of

1

those 500 workers, roughly half of them are on the gas field operations side, which works more on distribution piping including new mains for neighborhoods, service line connections, and meter installations. For those members, 50% of the gas work they do is for new construction. The remaining half of the workers are on what is called the gas craft and construction side, which refers to large diameter mains and other transmission-related work. For those members, roughly 25% of their work is related to new construction and expansion. Finally, for the 60 inspectors, 30%-40% of the inspections they do are for new work. So, for the roughly 560 members of Local 1049 dedicated to gas utility work, 25% to 50% of their work is tied to new construction. When the gas ban goes into effect in 2026, that new-construction work will be largely eliminated, threatening the work hours and opportunities, if not the jobs, of our members.

6.      The gas ban will also have longer term adverse effects on our members as it gradually leads to fewer people on the system. This will impact transmission infrastructure such as valving stations and pump stations. And it will make the system more expensive to operate and maintain for the remaining customers. This decline in customers on the existing system will erode the jobs and benefits of our members, leading not only to reduced work but also to cost pressures on the industry that will impact our members' salaries and benefits.

7.      The lost work hours and job opportunities that will occur imminently if the ban is allowed to go into effect cannot be regained and the harm undone if the appeals court later were to determine that the gas ban is invalid and unenforceable.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 9th day of September 2025 in Suffolk County, New York.

PATRICK GUIDICE

2

# Exhibit Q

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

MULHERN GAS CO., INC., et al.,

                    Plaintiffs,

      v.

WALTER T. MOSLEY, in his official
capacity as New York Secretary of State,

                Defendant.

Case No. 1:23-cv-01267 (GTS/CFH)

**DECLARATION OF RICHARD P.
BROOKS IN SUPPORT OF
PLAINTIFFS' MOTION FOR
INJUNCTION PENDING APPEAL**

## DECLARATION OF RICHARD P. BROOKS

I, Richard P. Brooks, declare as follows:

1.      I have personal knowledge of the following facts, and if called to testify, I could and would competently testify to their truth and accuracy.

2.      I am an Officer and Business Manager and Financial-Secretary Treasurer of the Plumbers Local Union No. 200, U.A., AFL-CIO.

3.      Plumbers Local Union No. 200 is a labor union with its principal office in Ronkonkoma, New York. Local 200 is a member of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada. Local 200 represents approximately 1,000 plumbing workers in Nassau and Suffolk Counties whose work includes plumbing and gas fitting for industrial, medical, and commercial facilities, municipal construction, alteration work, residential construction, and transportation fuel facilities.

4.      The loss of work on gas infrastructure construction for new buildings under 7 stories when the State's gas ban goes into effect in 2026, including new appliance and gas line installation and repair, will result in the loss of member jobs, lower hours worked by members, and the commensurate loss of hours to Local 200's associated fringe benefit funds, including pension and medical benefit funds.

5.      There is a major residential project on Long Island that has decided not to install natural gas services for the hundreds of units in that project based on the looming effective date of the New York ban. That single lost project has cost our members months and years of job opportunities and work hours. And there are other similar planned and pending projects that will be forced to go all electric if the ban is not enjoined while the court of appeals decides whether the ban is valid.

If the court were to later reverse the ban, without having interim relief, our members will

1

have been harmed and will have no way to recoup the lost work and income, nor will our union have any way to recoup the lost contributions to its pension and medical benefit funds.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _8_ day of September, 2025, in Ronkonkoma, New York.

RICHARD P. BROOKS

2