# 25-2041

## United States Court of Appeals

*for the*

## Second Circuit

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., dba Master Plumbers Council of the City of New York; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; and TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants,*

– v. –

WALTER T. MOSLEY, in his official capacity as New York Secretary of State and member of the State Fire Prevention and Building Code Council,

*Defendant-Appellee,*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, PUSH BUFFALO,

*Intervenor-Defendants-Appellees,*

On Appeal from the United States District Court for the Northern District of New York, No. 1:23-CV-01267 (Hon. Glenn T. Suddaby, District Judge)

## BRIEF FOR PLAINTIFFS-APPELLANTS

BRIAN C. BARAN
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

SARAH JORGENSEN
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree Street,
  Suite 2300
Atlanta, Georgia 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Attorneys for Plaintiffs-Appellants*

 COUNSEL PRESS    (800) 4-APPEAL • (385434)

NEW YORK DEPARTMENT OF STATE; NEW YORK STATE FIRE PREVENTION AND BUILDING CODE COUNCIL; and JAMES CABLE, RUTHANNE VISNAUSKAS, ROBERTA REARDON, ERIC ADAMS, MICHAEL SPANO, JOSEPH M. DESTEFANO, CLAUDIA BRAYMER, JOSEPH TOOMEY, SHAWN HAMLIN, TIMOTHY DERUYSCHER, ROBERT HUGHES, WILLIAM W. TUYN, PATRICK DOLAN, and DOMINIC MARINELLI, in their official capacities as members of the State Fire Prevention and Building Code Council,

*Defendants.*

## RULE 26.1 DISCLOSURE STATEMENT

Under Appellate Rule 26.1(a), Plaintiffs-Appellants state as follows:

Mulhern Gas Co., Inc. is a for-profit corporation organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

New York State Builders Association is a nonprofit corporation organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

National Association of Home Builders is a nonprofit 501(c)(6) corporation incorporated in Nevada. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock; it does not have any publicly traded stock.

New York Propane Gas Association is a nonprofit corporation organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

National Propane Gas Association is a national trade association organized under 501(c)(6). It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Northeast Hearth, Patio and Barbecue Association is a nonprofit corporation organized under the laws of New Hampshire. It does not

i

have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock.

Plumbing Contractors Association of Long Island is a nonprofit corporation organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

Licensed Plumbing Association of New York City, Inc., d/b/a Master Plumbers Council of the City of New York, is a nonprofit corporation organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock, as it does not issue stock.

Holmes Mech. LLC is a for-profit limited liability company organized under the laws of New York. It does not have a parent corporation, and no publicly held corporation holds a 10 percent or greater interest in the company.

International Brotherhood of Electrical Workers Local 1049 is a labor union. It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

Plumbers Local Union No. 200 is a labor union. It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

International Brotherhood of Electrical Workers Local Union 97 is a labor union. It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

Transport Workers Union Local 101, AFL-CIO is a labor union. It does not have a parent corporation, and no publicly held corporation owns a 10 percent or greater interest.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................1

JURISDICTIONAL STATEMENT ............................................3

ISSUE PRESENTED ............................................................3

STATEMENT OF THE CASE ................................................3

    A. Legal background ........................................................4

       1. In the Energy Policy and Conservation Act, Congress preempts local regulations concerning energy use. ................4

       2. The Ninth Circuit holds in *California Restaurant Ass'n* that EPCA preempts local gas bans...........................8

    B. Factual and procedural background...........................11

       1. New York bans gas appliances and infrastructure. ...............11

       2. Plaintiffs bring this preemption challenge, but the district court rejects the Ninth Circuit's view and upholds New York's gas ban. ..........................................13

SUMMARY OF ARGUMENT ...............................................23

STANDARD OF REVIEW....................................................26

ARGUMENT .....................................................................26

    I. EPCA Preempts New York's Gas Ban. .............................26

    A. EPCA's plain text preempts the ban—and the district court's contrary conclusion required a rewrite of the statute....................27

       1. The gas ban is a regulation concerning covered appliances' energy use because it sets their maximum energy use to zero. ..27

       2. Controlling precedent confirms that the gas ban is within §6297(c)'s preemptive scope given the ordinary meaning of "concerning."..............................30

       3. The district court's rewrite to "energy conservation standards or their equivalents" cannot be squared with the text and would roll back Congress's amendments. ..................34

       4. The district court's view of "energy use" and "point of use" cannot justify its interpretation. ...............................39

iv

B. EPCA's structure, purpose, and history confirm that New York's gas ban is preempted. ........................................ 42

   1. The building code exception confirms that preemption extends beyond the factory floor. ............................................. 42

   2. Context confirms that preemption is not limited to regulations that affect design and manufacturing choices— but regardless, New York's ban does just that. ........................ 46

   3. Allowing state and local appliance bans would gut the preemption provision and create the very patchwork of standards Congress sought to prevent. .................................... 49

   4. Recognizing that EPCA preempts New York's ban would not undermine ordinary health and safety regulations. .................. 53

II. The Ban Does Not Qualify for Any Exception to Preemption .......... 56

CONCLUSION ....................................................................... 57

CERTIFICATE OF COMPLIANCE ........................................ 58

STATUTORY ADDENDUM ............................................. Add.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health,*
    685 F.3d 174 (2d Cir. 2012) ...................................................26, 31, 55

*Air Conditioning & Refrigeration Inst. v. Energy Res.*
    *Conservation & Dev. Comm'n,*
    410 F.3d 492 (9th Cir. 2005)...............................................4-5, 37, 49

*Am. Trucking Ass'ns v. City of Los Angeles,*
    569 U.S. 641 (2013).......................................................................45, 52

*Arizona v. United States,*
    567 U.S. 387 (2012).............................................................................26

*Ass'n of Contracting Plumbers of New York v. City of New York,*
    2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), *appeal filed,*
    No. 25-977 (2d Cir. Apr. 17, 2025)............................................. *passim*

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council,*
    683 F.3d 1144 (9th Cir. 2012).........................................................44, 49

*Buono v. Tyco Fire Prods., LP,*
    78 F.4th 490 (2d Cir. 2023)...............................................................27

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr, N.A.,*
    519 U.S. 316 (1997).............................................................................54

*Cal. Rest. Ass'n v. City of Berkeley,*
    89 F.4th 1094 (9th Cir. 2024) .................................................... *passim*

*Coventry Health Care of Mo., Inc. v. Nevils,*
    581 U.S. 87 (2017)..........................................................................29-30

*Dan's City Used Cars, Inc. v. Pelkey,*
    569 U.S. 251 (2013).............................................................................54

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
    144 S. Ct. 457 (2024)..........................................................................38

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004) ............................................................32-33, 39, 53

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
554 U.S. 33 (2008) ........................................................................ 35

*Gobeille v. Liberty Mut. Ins. Co.*,
577 U.S. 312 (2016) ....................................................................32-33

*Lamar, Archer & Cofrin, LLP v. Appling*,
138 S. Ct. 1752 (2018) ................................................................28-30

*Metro. Taxicab Bd. of Trade v. City of New York*,
615 F.3d 152 (2d Cir. 2010) ....................................................27, 31-32

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ................................................................28-29, 55

*Nat. Res. Def. Council v. Abraham*,
355 F.3d 179 (2d Cir. 2004) ........................................................... 5

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ...................................................................... 56

*Nat'l Rifle Ass'n of Am. v. Vullo*,
144 S. Ct. 1316 (2024) .................................................................. 53

*Obduskey v. McCarthy & Holthus LLP*,
139 S. Ct. 1029 (2019) .................................................................. 34

*Pa. Dep't of Corr. v. Yeskey*,
524 U.S. 206 (1998) ...................................................................... 36

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) ...................................................................... 27

*Pulsifer v. United States*,
144 S. Ct. 718 (2024) .................................................................... 46

*Rajah v. Mukasey*,
544 F.3d 427 (2d Cir. 2008) ........................................................35-36

*Rowe v. New Hampshire Motor Transport Ass'n*,
552 U.S. 364 (2008) ................................................................ *passim*

*Simmons v. Himmelreich*,
578 U.S. 621 (2016) ........................................................................ 34

*Sturgeon v. Frost*,
577 U.S. 424 (2016) ........................................................................ 27

*Van Buren v. United States*,
141 S. Ct. 1648 (2021) .................................................................... 38

*Yates v. United States*,
574 U.S. 528 (2015) ........................................................................ 35

*Ex Parte Young*,
209 U.S. 123 (1908) ........................................................................ 18

*Ysleta del Sur Pueblo v. Texas*,
142 S. Ct. 1929 (2022) .................................................................... 35

**Constitutional Provisions**

U.S. Const. art.VI, cl.2 ................................................................. 26

**Statutes**

28 U.S.C. §1291 .............................................................................. 3

28 U.S.C. §1331 .............................................................................. 3

28 U.S.C. §2107(a) .......................................................................... 3

Energy Policy and Conservation Act,
42 U.S.C. §§ 6201-6422 ........................................................... *passim*

§6201 .......................................................................................... 49

§6291(1)-(2) ............................................................................ 6, 28

§6291(3) ..................................................................................... 28

§6291(4) ......................................................................... 28-29, 35

§6291(5) ..................................................................................... 35

§6291(6) ................................................................................. 35, 37

§6292 ...................................................................................... 6

§6292(a) ............................................................................... 28

§6292(a)(12) ........................................................................ 51

§6293 .................................................................................... 28

§6293(b)(3) ............................................................... 28, 40, 47

§6295 ................................................................................. 6, 27

§6295(o)(4) .......................................................... 40, 47, 51-52

§6295(q)(1) .......................................................................... 52

§6295(q)(1)(A) .................................................................... 50

§6295(q)(1)(B) .................................................................... 50

§6297(a)(2)(A) .................................................................... 28

§6297(c) ....................................................................... passim

§6297(c)(2) ............................................................................ 6

§6297(c)(3) ............................................................................ 6

§6297(d) ................................................... 6, 10, 22, 26, 47

§6297(d)(1)(A)-(B) ............................................................... 7

§6297(d)(3) ................................................................... passim

§6297(d)(4) ................................................................... passim

§6297(f)(3) .................................................................... passim

§6297(f)(3)(A) .............................................................. 7, 43

§6297(f)(3)(B) .......................................................... 7, 43-45

§6297(f)(3)(C) .............................................................. 7, 49

§6297(f)(3)(F) ........................................................... 7, 43-44

§6297(f)(3)(G) ............................................................ 44

§6311(4) .................................................................... 8

§6311(7) .................................................................... 8

§6313 ........................................................................ 6

§6316(b)(2)(A) ........................................................... 8

2023 N.Y. Laws c.56, pt.RR, §§1, 3 ............................. 12

Energy Policy Act of 1992,
    Pub. L. No. 102-486, §123(h)(3), 106 Stat. 2776, 2830 ...................... 6

Energy Policy Act of 2005,
    Pub. L. No. 109-58, §135(d), 119 Stat. 594, 634 .................................. 6

Energy Policy and Conservation Act,
    Pub. L. No. 94-163, 89 Stat. 871 (1975) ....................................... 36-37

§321(6) .................................................................... 37

§327(a)(2) ................................................................ 36

National Appliance Energy Conservation Act of 1987,
    Pub. L. No. 100-12, 101 Stat. 103 .................................................. 5, 37

§2(a) ...................................................................... 37

§7 ........................................................................... 5, 37

National Energy Conservation Policy Act,
    Pub. L. No. 95-619, §424(b), 92 Stat. 3206, 3264 (1978) ................... 37

N.Y. Energy §11-104(6)-(8) .................................... 3, 12

N.Y. Energy §11-104(6)(b) ......................................... 48

N.Y. Energy §11-104(8)(a) .......................................... 12

N.Y. Energy §11-107 ................................................. 13

N.Y. Exec. §377(1) ..................................................... 13

N.Y. Exec. §378(19) ............................................................... 3, 12

N.Y. Exec. §378(19)(a) ............................................................ 48

N.Y. Exec. §378(19)(g)(i) ........................................................ 12

N.Y. Exec. §381 ..................................................................... 13

**Rules**

Fed. R. App. P. 4(a)(1)(A) ....................................................... 3

Fed. R. Civ. P. 12(b)(1) .......................................................... 17

**Other Authorities**

Brief for the United States as Amicus Curiae Supporting
Appellants, *Ass'n of Contracting Plumbers of N.Y. v. City of
New York*, No. 25-977 (2d Cir. Aug. 7, 2025), Dkt.26.1 ..................... 11

Brief of Amici Curiae California et al. in Support of Rehearing
En Banc, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094
(No. 21-16278), Dkt.112 ........................................................ 41

Brief of California et al. as Amici Curiae in Support of
Defendant-Appellee City of Berkeley, *Cal. Rest. Ass'n v. City
of Berkeley*, 89 F.4th 1094 (No. 21-16278), 2022 WL 433154 ........... 41

Energy Conservation Program for Consumer Products,
47 Fed. Reg. 14,424 (Apr. 2, 1982) (proposed rule) ........................... 38

Energy Conservation Program for Consumer Products,
47 Fed. Reg. 57,198 (Dec. 22, 1982) ....................................... 38

H.R. Rep. No. 94-340 (1975) .................................................... 49

H.R. Rep. No. 100-11 (1987) .................................................... 51

N.Y. Dep't of State, Draft Code Council Meeting Minutes
(July 25, 2025), https://dos.ny.gov/system/files/documents/2025
/08/2025-07-25_meetingminutes_draft.pdf; ................................. 13

S. Rep. No. 94-516 (1975) (Conf. Rep.) ..................................... 49

S. Rep. No. 100-6 (1987) ...........................................................5, 7, 49-51

*State Fire Prevention and Building Code Council Meeting – July 2025*, N.Y. Dep't of State, https://dos.ny.gov/event/state-fire-prevention-and-building-code-council-meeting-july-2025 (last visited Oct. 2, 2025) ....................................................................13

## INTRODUCTION

This case presents the same question of federal preemption that is already before this Court in *Association of Contracting Plumbers of New York v. City of New York*, No. 25-977 (2d Cir.). The district court in that case allowed New York City to ban gas appliances by banning combustion. The district court here allowed New York State to ban gas appliances outright along with gas infrastructure. Affirming either decision would create a circuit split about the scope of preemption under an important federal statute.

The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§6201-6422, expressly preempts state and local "regulation[s] concerning" certain appliances' "energy use," *id.* §6297(c). The Ninth Circuit—the only circuit to have considered the preemption provision's scope—held last year that EPCA preempts local bans on gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). That makes sense: Banning an appliance from using any energy—and thus setting its maximum energy use to zero—concerns that appliance's energy use and is therefore preempted. And it did not matter that Berkeley reached that preempted result indirectly by banning gas piping; it is not so easy to evade broad preemption provisions like EPCA's.

The district court here expressly rejected the Ninth Circuit's holding and instead allowed New York to ban gas appliances. The court adopted the *Contracting Plumbers* district court decision, which rewrote EPCA's

1

preemption provision, ignored crucial context that refutes its view, and failed to engage with the bulk of the Ninth Circuit's analysis. The handful of additional arguments the district court made here provide no better reason to create a circuit split. This Court should reject the invitation to do so in both cases.

These cases present a question of preemption, not policy. The Constitution makes federal law the supreme law of the land, and in so doing it empowers Congress to displace state and local law on matters within its authority. That is what Congress did here. Congress chose to create a national energy policy that pursued several complementary goals, including energy security, energy independence, and energy conservation. And it chose not to let state and local governments pursue a patchwork of policies on many of these issues. Congress was well within its rights to decide that energy policy is a national issue requiring a cohesive approach—to choose uniformity over local experimentation.

A coalition of small businesses, trade associations, and labor unions that collectively represent or employ tens of thousands of New Yorkers brought this suit to vindicate the federal right created by Congress's choice. Plaintiffs and their members' livelihoods depend on the continued availability of gas appliances, and New York's unlawful ban is harming them. This Court should hold that EPCA preempts the ban and reverse.

2

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' federal preemption claim under 28 U.S.C. §1331. It entered final judgment on August 21, 2025. JA-197-99. Plaintiffs timely appealed on August 22, 2025. JA-201-02; *see* 28 U.S.C. §2107(a); Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUE PRESENTED

Is a state law that prohibits EPCA-covered gas or fuel oil appliances from consuming any energy a preempted "regulation concerning the … energy use" of those products, 42 U.S.C. §6297(c), as the Ninth Circuit held in *California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024)?

## STATEMENT OF THE CASE

This case concerns New York State's ban on gas, propane, and fuel oil appliances and infrastructure in most new buildings beginning December 31, 2025. N.Y. Energy §11-104(6)-(8); N.Y. Exec. §378(19). Plaintiffs brought this suit for declaratory and injunctive relief in the Northern District of New York, contending that the gas ban is expressly preempted by the federal Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§6201-6422,[1] because it concerns the energy use of covered appliances. JA-23-27 ¶¶1-7. The sole remaining defendant is Walter T.

---

[1] All further statutory references are to Title 42 of the U.S. Code unless otherwise noted.

3

Mosley, in his official capacity as New York Secretary of State and chair of the State Fire Prevention and Building Code Council (the "Secretary").

The district court (Suddaby, J.) denied summary judgment for Plaintiffs and, after notice and an opportunity to respond, granted summary judgment for the Secretary, concluding that EPCA does not preempt New York's gas ban. JA-189-99. The decision is unreported but is available at 2025 WL 2062194.

## A. Legal background

### 1. In the Energy Policy and Conservation Act, Congress preempts local regulations concerning energy use.

Responding to the early 1970s oil crisis, Congress enacted EPCA in 1975 to create a "comprehensive energy policy" addressing "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005). To that end, EPCA both encouraged domestic supply and promoted energy conservation. One component of Congress's national policy is EPCA's regulation of many appliances' energy efficiency and energy use.

EPCA's appliance provisions originally focused on labeling, on the theory that well-informed consumers would choose more efficient appliances. *Air Conditioning*, 410 F.3d at 498-99. But over time, Congress shifted toward mandating federal standards while limiting

4

state and local governments' role. *Id.* at 499; *see also Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185-86 (2d Cir. 2004). In 1978, Congress amended EPCA to require the Department of Energy to prescribe federal standards, while also strengthening preemption. *Air Conditioning*, 410 F.3d at 499. The Department refused, instead "initiat[ing] a general policy of granting petitions from States requesting waivers from preemption." *Id.* (attribution omitted).

So Congress amended EPCA again in 1987, prescribing standards for many common household appliances and adopting the preemption provision at issue here. *Air Conditioning*, 410 F.3d at 499-500; *see* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, §7, 101 Stat. 103, 117-22. The Department's abdication of its standard-setting responsibility and its freewheeling waiver policy had created "a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Congress thus expanded preemption and restricted Department waivers, including by barring waivers "likely to result in the unavailability in the State of a product type or of products of a particular performance class." *Id.* at 2; §6297(d)(4).

5

The preemption provision for consumer products now reads in pertinent part:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [§6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product … .

§6297(c) (emphasis added).[2] "[C]overed product[s]" include many common household and commercial appliances, including furnaces, boilers, water heaters, stoves, ovens, dishwashers, dryers, and pool heaters. *See* §§6291(1)-(2), 6292, 6313.

The preemption provision has several narrow exceptions. As relevant here, regulations that would otherwise be preempted are allowed if they are in a building code for new construction that satisfies certain criteria, §6297(c)(3), (f)(3), or if the Department of Energy waives preemption, §6297(c)(2), (d).

To qualify for the building code exception, a building code must satisfy a series of strict requirements. §6297(f)(3). The thrust of these requirements is that the code must set a general energy conservation objective, allow builders the freedom to choose a mix of products to meet

---

[2] The current version of §6297(c) reflects a handful of minor amendments since 1987, none of which are relevant here. *See, e.g.*, Energy Policy Act of 1992, Pub. L. No. 102-486, §123(h)(3), 106 Stat. 2776, 2830 (adding "water use"); Energy Policy Act of 2005, Pub. L. No. 109-58, §135(d), 119 Stat. 594, 634 (exempting certain enumerated California regulations).

6

that objective, and treat products evenhandedly without requiring them to exceed federal standards. *See, e.g.*, §6297(f)(3)(A) (must "permit[] a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective"); §6297(f)(3)(B) (must not require covered products to exceed the applicable standards); §6297(f)(3)(C) (must provide credits "on a one-for-one equivalent energy use or equivalent cost basis" for products that exceed the applicable standards); §6297(f)(3)(F) (must specify an "energy consumption or conservation objective … in terms of an estimated total consumption of energy"). *See also* S. Rep. No. 100-6, at 10-11 (explaining that Congress meant to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met").

As for the waiver exception, Congress carefully cabined the Department's ability to waive preemption. A regulation that "provides for any energy conservation standard or other requirement with respect to energy use" is eligible for a waiver only if it is "needed to meet unusual and compelling State or local energy … interests." §6297(d)(1)(A)-(B). Even then, waivers of preemption are prohibited when the "regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis," §6297(d)(3), or is

7

"likely to result in the unavailability" of appliance types, classes, or features that were generally available before the regulation, §6297(d)(4).[3]

### 2. The Ninth Circuit holds in *California Restaurant Ass'n* that EPCA preempts local gas bans.

Only one court of appeals has weighed in on the scope of preemption under §6297(c). When Berkeley, California effectively banned gas appliances by "prohibit[ing] natural gas piping in [new] buildings from the point of delivery at a gas meter, rendering the gas appliances useless," a unanimous panel of the Ninth Circuit held that §6297(c)'s plain text preempted that ban. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1098 (9th Cir. 2024) (emphasis omitted).

The Ninth Circuit recognized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest.*, 89 F.4th at 1107. It did not

---

[3] A separate preemption provision governs industrial equipment. *See* §6316(b)(2)(A) (preempting "any State or local regulation concerning the energy efficiency or energy use of a product for which" there is a federal standard); *see also* §6311(4), (7) (defining "energy" and "energy use" in essentially the same way as the consumer provision). Because the parties agree that the consumer and industrial provisions work the same way as relevant here, this brief will focus on the consumer provisions for simplicity. *See* D.Ct.Dkt.48 at 5 n.2 (Secretary: "EPCA regulates consumer products and industrial equipment in a substantially similar manner." (citations omitted)); D.Ct.Dkt.49 at 14 (Intervenors discussing industrial equipment without suggesting that it is handled differently); JA-189-95 (district court addressing only the consumer provisions).

"D.Ct.Dkt." refers to entries on the district court's docket. Pincites refer to the document's original pagination, not the ECF pagination.

8

matter that Berkeley took a "more circuitous route to the same result" by prohibiting the piping necessary to use those appliances. *Id.* at 1098. After all, it is well established that "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Id.* at 1107. "And a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas 'concerns' the energy use of those products as much as a direct ban on the products themselves." *Id.* at 1103. Likewise, it was no excuse that Berkeley's ban "lower[ed] the quantity of energy consumed to zero," as opposed to some nonzero number; rather, "a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source." *Id.* at 1102 (cleaned up).

The Ninth Circuit grounded its holding in the text of §6297(c). The court explained that "rather than limit[ing] preemption to facial regulations of" covered appliances, "Congress expressly expanded EPCA's reach to regulations that 'concern[]'" those appliances. *Cal. Rest.*, 89 F.4th at 1103 (alteration in original) (quoting §6297(c)). Congress's chosen term "concerning," the court recognized, "has a broadening effect" that "[a]t a minimum" indicates that "Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Id.* (cleaned up).

9

The Ninth Circuit further explained how statutory context and structure confirm the broad scope of preemption under §6297(c). To start, the court explained that §6297(f)(3)'s building code exception is of "critical importance" because it confirms that §6297(c) reaches building code requirements—and thus cannot be limited to design requirements that operate on the manufacturer's factory floor. *Cal. Rest.*, 89 F.4th at 1101-02.

Continuing to the waiver provision, the Ninth Circuit concluded that §6297(d) "likewise shows the extensive scope of the preemption clause." *Cal. Rest.*, 89 F.4th at 1103-04. By prohibiting the Department from waiving preemption if a regulation "will significantly burden manufacturing, marketing, distribution, sale, or servicing" of covered products, §6297(d)(3), the waiver provision requires the federal government to "consider the complete lifecycle of an appliance." *Cal. Rest.*, 89 F.4th at 1103-04. The Ninth Circuit reasoned that "[s]uch a provision would make little sense if the scope of EPCA's preemption end[ed] with the design or manufacture of the product." *Id.* at 1104. Said differently, the provision demonstrates EPCA's concern with regulations that burden any part of the distribution chain—not just manufacturing. *See id.* at 1103-04.

The Ninth Circuit likewise rejected what was then the federal government's view that only "energy conservation standards" or their equivalent were preempted. *Cal. Rest.*, 89 F.4th at 1105. Among other

10

problems, the court explained, that interpretation would require giving different statutory terms the same meaning—including when those different terms were used together in the same sentence. *See id.* The federal government has since reconsidered its position and accepted the Ninth Circuit's view. Brief for the United States as Amicus Curiae Supporting Appellants at 1-2 & n.1, *Ass'n of Contracting Plumbers of N.Y. v. City of New York*, No. 25-977 (2d Cir. Aug. 7, 2025), Dkt.26.1.

Ultimately, the Ninth Circuit concluded that confining preemption to the equivalent of energy conservation standards or regulations affecting appliances on the factory floor would "engraft[] a limiting component onto the statute"—an approach the Supreme Court has rejected. *Cal. Rest.*, 89 F.4th at 1106-07 (cleaned up) (collecting cases). The Ninth Circuit therefore held that Berkeley's gas piping ban was preempted. *Id.* at 1098-99, 1107.

An overwhelming majority of the full court declined to reconsider the issue en banc. *Cal. Rest.*, 89 F.4th at 1098, 1119 (only 8 of 28 non-recused, active judges dissenting from the denial of rehearing).

### B. Factual and procedural background

#### 1. New York bans gas appliances and infrastructure.

In May 2023, just weeks after the Ninth Circuit first held that Berkeley's ban was preempted, New York followed Berkeley's unlawful lead by prohibiting the installation of gas, propane, and fuel oil appliances and infrastructure in most new buildings beginning

11

December 31, 2025.  2023 N.Y. Laws c.56, pt.RR, §§1, 3; *see* JA-169-70.[4] New York's gas ban is contained in two substantively identical statutory provisions that require a state agency, the New York State Fire Prevention and Building Code Council, to implement the prohibition by adding it to the state's Uniform Fire Prevention and Building Code and Energy Conservation Construction Code (together, the "Codes").  N.Y. Energy §11-104(6)-(8); N.Y. Exec. §378(19); *see* JA-170 n.3.

The gas ban required the Council to amend the Codes to prohibit "the installation of fossil-fuel equipment and building systems" in new buildings (with limited exceptions) beginning December 31, 2025.  N.Y. Energy §11-104(6)-(8); N.Y. Exec. §378(19).  "Fossil-fuel equipment and building systems" means "(i) equipment … that uses fossil-fuel for combustion; or (ii) systems … associated with a building that will be used for or to support the supply, distribution, or delivery of fossil-fuel for any purpose, other than for use by motor vehicles."  N.Y. Energy §11-104(8)(a); N.Y. Exec. §378(19)(g)(i).  As a result, the statute both "directly prohibits" gas appliances and bans the infrastructure needed to supply energy to them, "rendering [any] gas appliances useless."  *Cal. Rest.*, 89 F.4th at 1098, 1107.

---

[4] Because the exact fuel makes no legal difference, this brief refers to the ban as a "gas ban" and the banned appliances and infrastructure as "gas appliances" and "gas infrastructure" for simplicity.

The statute compelled the Council to implement these prohibitions by adopting Code provisions; the Council had no discretion as to that duty. *See* JA-183-84, JA-187-89. At the time of the district court's decision in July 2025, the Council was well on the way to complying. JA-171-72, JA-184; *see* JA-78-79, JA-85-86. Two days later, the Council discharged its statutory duty by adopting final amendments to the Codes implementing the gas ban.[5] The Council's amendments are subject to the Secretary's review for compliance with the governing statute and can take effect only with the Secretary's approval. JA-64-65; *see* N.Y. Exec. §377(1). The Secretary has informed the district court that he approved the amendments. D.Ct.Dkt.71-1 ¶26. Once the Code provisions take effect, the Secretary and local governments across New York are responsible for enforcing them. JA-63; *see* N.Y. Exec. §381; N.Y. Energy §11-107.

### 2. Plaintiffs bring this preemption challenge, but the district court rejects the Ninth Circuit's view and upholds New York's gas ban.

**a.** Plaintiffs are small businesses, trade associations, and labor unions that collectively represent or employ tens of thousands of New

---

[5] N.Y. Dep't of State, Draft Code Council Meeting Minutes at 4-6 (July 25, 2025), https://dos.ny.gov/system/files/documents/2025/08/2025-07-25_meetingminutes_draft.pdf; *see also State Fire Prevention and Building Code Council Meeting – July 2025*, N.Y. Dep't of State, https://dos.ny.gov/event/state-fire-prevention-and-building-code-council-meeting-july-2025 (last visited Oct. 2, 2025) (meeting materials, including proposed notices of adoption of final code amendments).

Yorkers. Plaintiffs and their members rely on the availability of gas appliances and systems for their livelihoods. JA-141-51 ¶¶7-31. Though the ban's effective date has not yet arrived, preparation for and anticipation of the ban is already wreaking havoc on Plaintiffs and their members. It is harming business revenues and profits in multiple industries, jeopardizing jobs, disrupting long-term business strategy and asset planning, and hampering the development of industry labor pools. *Id.* Once the ban takes effect, it will exacerbate those injuries, including by outlawing some of Plaintiffs' businesses or lines of business. *Id.* Many small businesses' survival is at stake. *Id.*

For example, Mulhern Gas is a small, family-owned business that has delivered, installed, and serviced propane equipment and propane gas in upstate New York for more than fifty years. JA-93 ¶7. The gas ban "is an existential crisis for the company." *Id.* Mulhern Gas is "struggling to hire qualified service technicians" to maintain its business "given concerns about the future of the propane service industry." JA-94 ¶9. It has been forced to "forgo or delay planned investments into fuel tanks, trucks, and other equipment." *Id.* And in anticipation of the ban, customers are already turning away from propane, harming Mulhern Gas's sales and undermining the value of its long-term equipment and property investments. JA-94 ¶8. When the ban takes effect December 31, customers will no longer have any choice in the matter; New York "has outlawed much of [Mulhern Gas's] new business

14

development." JA-93 ¶7; *see also* D.Ct.Dkt.70-3 ¶10 (estimating that 20% of the company's sales and installations are in new homes). That will lead to declining sales and service over time and will force Mulhern Gas to lay off skilled technicians. D.Ct.Dkt.70-3 ¶¶10-11.

The ban has put Holmes Mech. LLC, a family-run HVAC and gas systems business in upstate New York, in a similar position. JA-124 ¶¶3-4; D.Ct.Dkt.70-4 ¶¶3-5, 9. Much of Holmes Mechanical's business is likewise associated with new construction, and it expects "at least a 25% decrease in [its] overall sales" when the ban takes effect, "which will also lead to a decrease in installation, service and repair." D.Ct.Dkt.70-4 ¶5. The company "had been growing," but the imminent ban has "slowed [its business] to a crawl." *Id.* ¶10.

Those are just two examples of what the propane gas industry faces. Most of the National Propane Gas Association's 100 New York members "are small, family-owned businesses that employ fewer than 50 people." D.Ct.Dkt.70-2 ¶5. Those members are experiencing harms similar to those faced by Mulhern Gas and Holmes Mechanical. *See* JA-93 ¶¶5-6; JA-97-98 ¶4; D.Ct.Dkt.70-2 ¶17 ("Unless changes are made, we foresee being forced to close our doors entirely—ending a vital local service and eliminating dozens of good-paying jobs in the process.").

New York homebuilders are also suffering from the ban. The New York State Builders Association represents the residential building construction industry and has about 1800 members employing tens of

15

thousands of New York residents. JA-101 ¶3. Those members face disruptions to ongoing projects along with long-term costs and compliance burdens. JA-101-02 ¶¶3-5. For example, one member testified that his company, Essex Homes, had "already started several building projects involving gas infrastructure that cannot be completed before the ban's effective date." JA-109 ¶¶3-5. Essex Homes had "committed to costly working drawings and specifications" and "contracted with a gas utility to install [a] project's gas infrastructure, consistent with the common practice in the industry." JA-109 ¶5. When the ban takes effect and prevents Essex Homes "from delivering the promised customers to the utility," it will be on the hook for "the cost of the infrastructure that the utility would otherwise bear." *Id.*

The ban will be even more catastrophic for the members of Northeast Hearth, Patio & Barbecue Association, many of which earn the majority of their revenue from gas fireplace installation in new construction—a line of business New York's ban will extinguish, forcing layoffs and threatening small businesses' viability. *See* JA-113 ¶¶3-4; JA-117 ¶¶3-6 (about half of In Season Fireplaces' business is in new homes); D.Ct.Dkt.70-12 ¶¶3-9 (updated numbers confirming that the ban may well drive In Season Fireplaces into bankruptcy); *see also* D.Ct.Dkt.70-10 ¶¶3-6 (overview of harms to the industry); D.Ct.Dkt.70-11 ¶¶2-11 (Best Fire, another family-owned business, faces the loss of more than half its

revenue and all its profits); D.Ct.Dkt.70-13 ¶¶2-12 (similar harms to Ocean Stone and Fireplace).

Plumbers, pipefitters, and gas utility workers will lose work and, in many cases, their jobs. Gas plumbing projects make up about 30% of the business of members of Plumbing Contractors Association of Long Island. JA-120 ¶3. Because "eliminating gas piping reduces the amount of plumbing work a project requires," plumbers have seen and will continue to see declines in their business as contracts are "downsized or canceled." JA-136 ¶¶3-4. Likewise, the gas ban will lead to lost work hours and layoffs for the members of International Brotherhood of Electrical Workers Local 1049, JA-127 ¶¶3-4, International Brotherhood of Electrical Workers Local Union 97, JA-130 ¶¶3-4, and Plumbers Local Union No. 200, JA-133 ¶¶3-4. *Accord* D.Ct.Dkt.70-17 ¶5 (25-50% of Local 1049 members' work "is tied to new construction").

To put a stop to the irreparable harms caused by New York's preempted gas ban, Plaintiffs brought this suit for declaratory and injunctive relief in October 2023. JA-23-48. In addition to the Secretary, Plaintiffs originally named as defendants the New York Department of State, the Council, and the members of the Council in their official capacities. JA-34-35 ¶¶35-38.

**b.** The defendants moved to dismiss under Civil Rule 12(b)(1) for lack of subject-matter jurisdiction, asserting sovereign immunity. JA-51-52. Without objection, the district court dismissed the claims against the

17

Department and Council because they are state agencies and declined to waive their immunity. JA-54, JA-65. And over Plaintiffs' objection, the court dismissed the claims against the Council members other than the Secretary (who chairs the Council), reasoning that their role in amending the Codes to implement the statute lacked "a sufficient connection to the [statute's] enforcement" to support an *Ex Parte Young* suit. JA-60-61; *see Ex Parte Young*, 209 U.S. 123 (1908). Because they were based on sovereign immunity, the dismissals were without prejudice. JA-65-68. Those dismissals are not at issue in this appeal.

The Secretary, for his part, conceded that he could be sued for prospective relief under *Ex Parte Young*. JA-53.

**c.** After answering, the Secretary moved for judgment on the pleadings, arguing that the district court lacked Article III jurisdiction and the case was not prudentially ripe. JA-164, JA-166. Plaintiffs moved for summary judgment on the merits, declaratory relief, and a permanent injunction. JA-163-64, JA-172-73.[6]

---

[6] The district court allowed New York Geothermal Energy Organization and PUSH Buffalo to intervene as defendants for the limited purpose of opposing summary judgment. D.Ct.Dkt.42. It accepted an amicus brief in support of Plaintiffs' motion from the Air-Conditioning, Heating, and Refrigeration Institute, D.Ct.Dkt.43-1, and amicus briefs in opposition from Sierra Club, D.Ct.Dkt.57, and the Guarini Center on Environmental, Energy and Land Use Law, D.Ct.Dkt.59. JA-19-20 (D.Ct.Dkts.47, 56, 58).

The district court denied both motions. JA-164. First, the court found that Plaintiffs have Article III standing and that this dispute is ripe. JA-181-89. The court recognized that although the challenged statutory provisions do not themselves impose an enforceable gas ban, they do injure Plaintiffs by requiring the Council "to implement that prohibition through amendment of the Codes." JA-181-87. It found that the Secretary's role in enforcing the Codes satisfied Article III's traceability and redressability requirements. JA-187-88. And as to ripeness, it found no relevant contingency; the Council "ha[d] no discretion to refuse to" implement the gas ban or to delay the effective date, and there was "no question" that the Code amendments would "contain the relevant prohibition on fossil-fuel equipment" given the statutory mandate that they do so. JA-188-89.

On the merits, the district court concluded that EPCA does not preempt New York's gas ban. JA-189-95. Rather than articulating its own view of §6297(c)'s preemptive scope, the district court variously adopted the Secretary's and Intervenors' arguments, JA-189, Judge Friedland's dissent from denial of rehearing en banc in the Ninth Circuit, JA-191, and the district court decision in *Association of Contracting Plumbers of New York v. City of New York*, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), *appeal filed*, No. 25-977 (2d Cir. Apr. 17, 2025), that rejected an EPCA preemption challenge to New York City's gas ban, JA-191.

19

Those four sources each advance slightly different interpretations, all of which coalesce around the idea that §6297(c) preempts only "energy conservation standards" or their equivalents:

- According to the Secretary, §6297(c) is limited "to just state regulations … that would require appliance manufacturers to design their products to meet anything other than the applicable [federal] standard." D.Ct.Dkt.48 at 2; *see also id.* at 12 ("regulations that prescribe the equivalent of an energy conservation standard for a covered product").

- According to Intervenors, preemption is limited to "state and local energy conservation standards that compete with federal standards." D.Ct.Dkt.49 at 1; *see also id.* at 2 ("EPCA's preemption clause is directed at state and local laws that compete with [the Department's] federal standards by regulating excessive or inefficient energy use at a local level.").

- According to Judge Friedland, §6297(c) preempts "regulations that directly set energy efficiency or energy use standards" and might also preempt "indirect regulations" that "aim to require consumers to use products with higher efficiency standards than those prescribed by [the Department] and may ultimately cause manufacturers to change the design of their products to meet those higher standards." *Cal. Rest.*, 89 F.4th at 1125 (Friedland, J., dissenting from the denial of rehearing en banc).

- According to the *Contracting Plumbers* district court, §6297(c) preempts only "state regulations that act as energy conservation standards, *i.e.*, requirements that bear on the performance of a product as manufactured"—or regulations that at least "focus on the performance standards applicable to covered products." 2025 WL 843619, at *6 (cleaned up); *see also id.* at *6-7 (holding that EPCA does not preempt regulations unless they force manufacturers to redesign appliances in a way that changes their lab-tested and labeled energy use).

The district court did not engage with the differences among these views.

The district court nowhere acknowledged that these views of EPCA's preemptive scope are essentially identical to the interpretation the federal government unsuccessfully advanced in the Ninth Circuit (and has since abandoned). *Compare, e.g.*, *Contracting Plumbers*, 2025 WL 843619, at *6 ("regulations that act as energy conservation standards"), *with Cal. Rest.*, 89 F.4th at 1105 (panel opinion) ("regulations that are the equivalent of 'energy conservation standards'"). Nor did it engage with the Ninth Circuit's textual reasons for rejecting that interpretation. *Compare Cal. Rest.*, 89 F.4th at 1105 (explaining why EPCA's text refutes this reading), *and* D.Ct.Dkt.54 at 2-4 (Plaintiffs making these points); *with* JA-189-95 (no response).

In addition to incorporating others' views, the district court offered a handful of its own arguments. JA-192-95. The court focused on the meaning of the term "energy use," which it interpreted to refer to "a static assessment of the typical quantity of energy consumed by [a covered] product." JA-194. Given that understanding of "energy use," the court asserted that the gas ban "neither directly regulate[s] energy use of any covered equipment" nor "in any way concern[s] the energy use of a covered product"; instead, it "merely prohibit[s] the installation of *any* fossil-fuel equipment or system in new buildings, regardless of the energy use of such equipment or systems." JA-192.

Turning to the exceptions from preemption, the district court rejected Plaintiffs' argument that the Secretary's view would make §6297(f)(3)'s

21

building code exception superfluous. JA-192-93. The court considered a hypothetical regulation that "sets a maximum-building-wide [*sic*] energy consumption" limit but does not require any appliance to exceed federal standards. JA-192-93. The court contended that without §6297(f)(3), such a regulation would "be clearly preempted" under its interpretation because it "would be an indirect regulation concerning the energy use of the covered products that could be used in that building." JA-193.

Finally, the district court dismissed §6297(d)'s waiver provision as "irrelevant" because "there is simply no connection between what the Secretary [of Energy] is made to consider when assessing whether to grant a waiver for a regulation that is preempted and what actually renders a regulation preempted in the first place." JA-193-95.

Given its decision on preemption, the district court denied summary judgment for Plaintiffs and, after notice and an opportunity to respond, granted summary judgment for the Secretary. JA-195-96; JA-21 (D.Ct.Dkt.66).

**d.** The district court entered final judgment on August 21, 2025. JA-197-99. Plaintiffs timely appealed the next day. JA-201-02.

22

## SUMMARY OF ARGUMENT

**I.** EPCA expressly preempts New York's gas ban, and the district court's contrary conclusion was legal error.

**A.** This case should begin and end with EPCA's plain text. Because New York's ban effectively sets covered gas appliances' maximum energy use to zero—and thus regulates the quantity of energy they use—it is a "State regulation" concerning covered products' "energy use," and it is therefore preempted.

A long line of cases confirms the broad scope of preemption here. "Concerning" means "relating to" and signals expansive preemption. Under EPCA's plain text, New York cannot ban gas appliances directly, yet it did just that. Nor can New York ban gas appliances indirectly by moving its regulations one step up the energy chain to prohibit the infrastructure needed to fuel them. Both this Court and the Supreme Court have rejected similar attempts to end-run broad preemption provisions.

Applying the "connection with or reference to" test developed for similar "relating to" preemption provisions helps illustrate the point. New York's ban readily satisfies the "connection with" prong; it undermines Congress's national approach in favor of a patchwork of standards and bans. And even on a design-and-manufacturing-centric view of EPCA's objectives, the ban still has a significant impact on, and thus a "connection with," the preempted subject matter.

23

The district court, for its part, seemed to think EPCA preempted only energy conservation standards or their equivalents. Not so. That reading is irreconcilable with the text, which distinguishes between "energy conservation standard" and "regulation concerning … energy use" in the very sentence at issue. §6297(c). Had Congress meant to preempt only "energy conservation standards" and the like, it could easily have said so. In fact, it did say so—in 1975, and then again in 1978. But no longer; Congress amended the statute to expand preemption by rewriting the text at issue. The district court had no power to unwind that amendment.

Finally, the district court's focus on the definitions of "energy use" and "point of use" is a distraction. Nothing turns on its dispute with the Ninth Circuit on that score. Even assuming that "energy use" is only the static value the district court thought it was, New York's ban still concerns "energy use" because it effectively sets that static value to zero, and so it is preempted. EPCA is full of textual and contextual evidence demonstrating that its preemptive concern does not stop at the end of the assembly line.

**B.** EPCA's structure, history, and purpose all confirm this plain-text reading. Most revealing is §6297(f)(3)'s building code exception, which not only reinforces that preemption extends beyond the factory floor but also presents an insurmountable superfluity problem for the Secretary's interpretation. Congress would not have created an exception unless it

24

thought it would spare some otherwise preempted regulations. What, on the Secretary's view, is both preempted under §6297(c) *and* eligible for §6297(f)(3)'s exception? The Secretary has never provided a satisfactory answer, and the district court's attempt to do so makes no sense.

Additional context in the statute, including the restrictions on the Department's waiver authority, also undermines the Secretary's insistence that only regulations affecting design and manufacturing choices are preempted. Regardless, New York's ban does, in fact, affect those choices. To access the market for new construction in New York, manufacturers must design their appliances to use electricity, not gas.

What's more, allowing state and local appliance bans would wreak havoc on Congress's carefully calibrated statutory scheme. The district court's approach would gut EPCA's preemption provision by making it trivially easy to evade, leading to exactly the patchwork of state and local regulations Congress sought to prevent. Consumers' options would vary from town to town and state to state, and manufacturers would need to navigate a patchwork of bans when deciding what to design and produce and where to sell.

None of this endangers local health and safety regulations that have long coexisted with EPCA. Incidental impacts do not trigger preemption. But at the same time, simply declaring that a regulation serves some purpose other than energy conservation does not avoid preemption. Congress could have created an exception based on the purposes a

25

regulation serves (or says it serves), including health and safety. But it chose not to do so.

**II.** It is undisputed that New York's ban does not qualify for any of the statutory exceptions to preemption. New York has not sought, and in any event could not obtain, a waiver under §6297(d). Nor could it come anywhere near satisfying §6297(f)(3)'s building code exception.

This Court should therefore hold that New York's gas ban is preempted and reverse.

## STANDARD OF REVIEW

This Court reviews de novo whether federal law preempts a state law. *23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 180 (2d Cir. 2012).

## ARGUMENT

### I. EPCA Preempts New York's Gas Ban.

Under the Supremacy Clause, federal law is "the supreme Law of the Land" and is binding on the states, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art.VI, cl.2. "Under this principle, Congress has the power to pre-empt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). One way Congress can do so is "by enacting a statute containing an express preemption provision." *Id.*

Just like any other question of statutory interpretation, express preemption is analyzed by beginning with the text—and ending there

26

when the text is unambiguous. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023). That is because the statute's plain text "necessarily contains the best evidence of Congress' preemptive intent." *Franklin Cal.*, 579 U.S. at 125 (attribution omitted). Courts "do not invoke any presumption against preemption" when interpreting express preemption provisions. *Id.*; *accord Buono*, 78 F.4th at 495 (same). Of course, like any other statutory text, preemption provisions must be read in context. *See, e.g.*, *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016); *see also Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010) (considering "the structure and purpose of the Act in which [the preemption provision] occurs" (attribution omitted)).

## A. EPCA's plain text preempts the ban—and the district court's contrary conclusion required a rewrite of the statute.

### 1. The gas ban is a regulation concerning covered appliances' energy use because it sets their maximum energy use to zero.

EPCA's plain text is the beginning and end of the preemption inquiry here. Once again, §6297(c) states in pertinent part:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under [§6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product … .

§6297(c) (emphasis added). Because New York's ban effectively sets covered gas appliances' maximum energy use to zero—and thus regulates

the quantity of energy they use—it is a "State regulation concerning" the "energy use" of "covered product[s]," *id.*, and is therefore preempted.

To see why, take the statutory terms step by step. "State regulation" includes any "law, regulation, or other requirement of a State or its political subdivisions." §6297(a)(2)(A). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." §6291(4). The test procedures must be "reasonably designed" to measure energy use "during a representative average use cycle or period of use." §6293(b)(3). "[E]nergy" includes "fossil fuels," such as natural gas, propane, and fuel oil. §6291(3). And "covered products" include a wide range of consumer appliances, such as water heaters, furnaces, dishwashers, and stoves. §§6291(1)-(2), 6292(a).

Perhaps the most important term, though, is "concerning," which carries a well-established meaning in preemption provisions. "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759-60 (2018) (attribution omitted) (collecting dictionary definitions and noting the "overlapping and circular" meanings of these terms); *accord Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (recognizing that the "ordinary meaning" of "relating to" is "to stand in some relation; *to have bearing or concern*; to pertain; refer; to

28

bring into association with or connection with" (emphasis added) (attribution omitted)).

Those terms "express[] a broad pre-emptive purpose," *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95-96 (2017) (attribution omitted), "ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," *Lamar*, 138 S. Ct. at 1760. *See also Morales*, 504 U.S. at 383-84 ("relating to" is "broad," "deliberately expansive" language, "conspicuous for its breadth" (attribution omitted)). At the very least, "by using the term 'concerning,' Congress meant to expand preemption beyond direct or facial regulations of covered appliances." *Cal. Rest.*, 89 F.4th at 1103. Congress could have preempted regulation "of" appliances' energy use, but instead it preempted regulation "concerning" appliances' energy use. *See, e.g.*, *Lamar*, 138 S. Ct. at 1761 (contrasting Congress's broad term "statement respecting" with the narrower "statement of").

Taking these definitions together, New York's gas ban is a "State regulation concerning the … energy use" of "covered product[s]." §6297(c). By banning both gas appliances themselves and the infrastructure necessary to use them, the regulation "concern[s]" "the quantity of energy" consumed by gas appliances because it prohibits those products from using any energy. §§6291(4), 6297(c). Said another way, the gas ban effectively limits the maximum energy use for all gas appliances in new buildings in New York to zero.

29

As the Ninth Circuit recognized, "it is well accepted in ordinary usage that 'zero' is a 'quantity.'" *Cal. Rest.*, 89 F.4th at 1102. And there is nothing special about "zero" that excuses a "regulation that imposes a total ban on natural gas" from preemption. *Id.* Had New York expressly set a maximum energy use for all gas appliances of 0.0001 Btu per year, it is undisputed—indeed, beyond dispute—that its law would be preempted. Setting the maximum to zero instead is equally preempted—and so is achieving the same result indirectly. *See id.* (holding that a ban on gas piping "necessarily regulates" how much energy gas appliances consume); *id.* at 1106-07 (states and localities cannot "evade preemption" by doing indirectly what they cannot do directly).

New York's gas ban is therefore preempted under a straightforward reading of EPCA's plain text.

### 2. Controlling precedent confirms that the gas ban is within §6297(c)'s preemptive scope given the ordinary meaning of "concerning."

The rich body of cases addressing "relating to" preemption provisions confirms Plaintiffs' plain-text reading of §6297(c). As noted, Congress uses "concerning"—like "relating to"—to "express[] a broad pre-emptive purpose." *Coventry*, 581 U.S. at 95-96 (attribution omitted); *accord Lamar*, 138 S. Ct. at 1759-60. These terms, while not unbounded, are not easily evaded.

**a.** For example, in *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364 (2008), the Supreme Court held that at the very least, laws

with "a significant impact related to Congress' deregulatory and preemption-related objectives" are preempted by a "related to" provision, *id.* at 370-71 (cleaned up). Specifically, the Court concluded that a state law was impermissibly "related to" the prices of motor carriers because, although the law did not directly regulate trucking companies, it accomplished the same result by prohibiting retailers from accepting deliveries from trucking companies that did not follow certain rules. *See id.* at 368-69, 372. That the state law was "less 'direct' than it might be" could not save it from preemption because it "produce[d] the very effect that the federal law sought to avoid." *Id.* at 372; *see also id.* at 373 (noting that allowing this type of law "could easily lead to a patchwork of state" laws, which would be "inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace"). Put another way, state and local governments cannot evade preemption "concerning" or "related to" a subject of federal regulation just by taking an indirect route to the destination they are prohibited from reaching directly. *See Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases).

This Court has rejected similar attempts to end-run preemption provisions. *See, e.g.*, *Metro. Taxicab*, 615 F.3d at 156-58 (holding that EPCA's provision preempting regulations "related to fuel economy standards" could not be evaded by using "hybrid" as a "proxy for 'greater fuel efficiency'"); *23-34 94th St. Grocery*, 685 F.3d at 183 (rejecting the

argument that a local law did not "explicitly" regulate preempted activity as "ignor[ing] the practical effect" of the law).

Just as in those cases, New York's ban is preempted. If a state cannot impose otherwise preempted regulations on trucking companies by moving the regulations one step down the distribution chain to retailers, then neither can New York evade preemption by framing its regulation as an outright ban on all gas appliances—or the infrastructure needed to fuel them—rather than a series of product-specific standards. Nor can New York evade the undisputed prohibition on imposing energy conservation standards on manufacturers by banning its residents from installing appliances whose energy use (or energy efficiency) it dislikes. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) ("The manufacturer's right to sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them.").

**b.** The "connection with or reference to" test the Supreme Court has applied to similar "related to" preemption provisions confirms the point. That test finds preemption when a state law either "has a reference to" or "an impermissible connection with" the preempted subject matter. *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016) (cleaned up). The "reference to" prong asks "whether the challenged law contains a reference to the preempted subject matter or makes the existence of the preempted subject matter essential to the law's operation." *Metro. Taxicab*, 615 F.3d at 156 (cleaned up). The "connection with" prong is

32

broader and considers "the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive," as well as "the nature of the effect of the state law on" the preempted subject matter. *Gobeille*, 577 U.S. at 320 (attribution omitted).

New York's ban easily satisfies at least the "connection with" prong. The ban would "have a significant impact" on—indeed, is inextricably intertwined with—covered appliances' energy use. *See Rowe*, 552 U.S. at 371 (cleaned up). And it would "produce[] the very effect that the federal law sought to avoid," *id.* at 372, by banning a type of appliance at the state level and thus fraying Congress's national approach into a patchwork.

That New York's ban "do[es] not eliminate all demand for covered gas appliances nationwide does not make its impact any less significant. *See Engine Mfrs.*, 541 U.S. at 255; *contra Contracting Plumbers*, 2025 WL 843619, at *7 (suggesting that "reduced demand for certain products" is an inconsequential effect). The New York market is significant in its own right. And in any event, "if one State or political subdivision may enact such rules, then so may any other; and the end result would undo Congress's carefully calibrated regulatory scheme." *Engine Mfrs.*, 541 U.S. at 255.

### 3. The district court's rewrite to "energy conservation standards or their equivalents" cannot be squared with the text and would roll back Congress's amendments.

Rejecting the Ninth Circuit's and Plaintiffs' straightforward reading of the text, the district court instead adopted four slightly different interpretations, all of which center on the idea that §6297(c) preempts only energy conservation standards or their equivalents. *Supra* pp.19-20. That view is irreconcilable with the text of the statute today. And adopting it would roll the provision back to its original 1975 version, nullifying Congress's amendments expanding the scope of preemption.

**a.** Start with the text. When the federal government advanced a functionally identical interpretation to the district court's here—limiting preemption to "regulations that are the equivalent of 'energy conservation standards'"—the Ninth Circuit disagreed, holding that EPCA's plain text said otherwise. *Cal. Rest.*, 89 F.4th at 1105. The Ninth Circuit got it right.

Limiting preemption to "energy conservation standards" would rewrite the statutory text. Had Congress wanted to preempt only regulations that are or "act as energy conservation standards," *Contracting Plumbers*, 2025 WL 843619, at *6, "it could have said so." *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1038 (2019); *accord Simmons v. Himmelreich*, 578 U.S. 621, 627 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says."). Congress chose instead to preempt

34

"regulation[s] concerning" covered appliances' "energy use." §6297(c). And it consistently distinguished between that phrase and the term "energy conservation standards." In the very sentence at issue in §6297(c), Congress used "energy conservation standard" as the trigger for preemption, while using "regulation concerning … energy use" to describe what is preempted. *Id.* That Congress used these phrases together "shows that they aren't simply interchangeable." *Cal. Rest.*, 89 F.4th at 1105; *see also id.* (recognizing that Congress gave "energy use" and "energy conservation standard" distinct definitions (citing §6291(4)-(6))). The "usual presumption that differences in language like this convey differences in meaning" holds true here. *See Ysleta del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (cleaned up).

Appeals to §6297(c)'s title cannot overcome these obstacles. *Contra Contracting Plumbers*, 2025 WL 843619, at *6; D.Ct.Dkt.48 at 13-14 (Secretary's brief); D.Ct.Dkt.49 at 3-4 (Intervenors' brief). True, the provision is titled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product." §6297(c). But "§6297(c)'s heading cannot supersede its plain text." *Cal. Rest.*, 89 F.4th at 1105. It is black-letter law that headings, though sometimes helpful, "cannot substitute for the operative text of [a] statute." *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008); *accord Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality opinion) (headings "are not commanding"); *Rajah v. Mukasey*,

35

544 F.3d 427, 436 (2d Cir. 2008) ("[T]he title of a statute cannot limit the plain meaning of the text." (alteration incorporated) (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998))). Replacing the operative statutory phrase with a phrase from the heading—let alone one Congress used elsewhere in the same operative sentence—would be rewriting the statute, not clarifying an "ambiguous word or phrase," *Yeskey*, 524 U.S. at 212 (attribution omitted).

The district court offered no answer to these points. The only objection to the Ninth Circuit's analysis that made it into the district court's opinion is the court's disagreement with the Ninth Circuit's reading of "point of use" and thus "energy use." JA-190-92. But the Ninth Circuit did not even mention "point of use," much less rely on it, in explaining the textual problems with the interpretation the district court adopted. *Cal. Rest.*, 89 F.4th at 1105. Even accepting the district court's view of "point of use," the problems with limiting preemption to energy conservation standards remain just as potent.

**b.** Congress's changes to the text over time confirm the point. The preemption provision used to say almost exactly what the district court concluded that it means now.

The original 1975 provision that would later become §6297(c) preempted "*any energy efficiency standard or similar requirement* with respect to energy efficiency or energy use of a covered product." Energy Policy and Conservation Act, Pub. L. No. 94-163, §327(a)(2), 89 Stat. 871,

36

926-27 (1975) (emphasis added); *see also id.* §321(6), 89 Stat. at 917 (defining "energy efficiency standard" similarly to the current definition of "energy conservation standard"). Congress strengthened preemption in 1978 by changing "similar requirement" to "other requirement." National Energy Conservation Policy Act, Pub. L. No. 95-619, §424(b), 92 Stat. 3206, 3264 (1978). Those provisions arguably limited preemption to energy conservation standards or their equivalents.

But then Congress decided that a rewrite was needed. After the Department of Energy refused to follow Congress's instructions to set federal standards and instead freely granted waivers from preemption, Congress amended the statute to set standards directly, expand preemption, and restrict the Department's ability to waive it. *Air Conditioning*, 410 F.3d at 499-500; *supra* pp.4-6. In its 1987 amendments, Congress deleted the term "energy efficiency standard" and replaced it with "energy conservation standard" throughout the statute. National Appliance Energy Conservation Act, §2(a), 101 Stat. at 103 (codified as amended at 42 U.S.C. §6291(6)). Had Congress wanted to keep the same scope of preemption, it could have simply swapped in the new term in the preemption provision too, leaving it to read "energy conservation standard or other requirement." Instead, Congress overhauled the provision to expand preemption to "regulation[s] concerning … energy use." *Id.* §7, 101 Stat. at 117-22.

37

It makes no sense to assume that Congress, frustrated with the Department's approach to preemption, would have rewritten the provision's words while intending to leave essentially the same meaning in place. "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *See Van Buren v. United States*, 141 S. Ct. 1648, 1660-61 (2021) (attribution omitted) (rejecting the government's argument that Congress carried forward the meaning of an earlier version of a statute despite changing its language).

In sum, whatever the merits of the district court's interpretation in 1975 or 1978, today it would require erasing decades of statutory history and rewriting the text. That is not an available option. *See, e.g.*, *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 144 S. Ct. 457, 474 (2024) (courts' "role is to apply the law, not rewrite it").[7]

---

[7] It is by no means a given that New York's ban would have escaped preemption under the narrower 1978 provision. Indeed, much of what the Department of Energy said at the time supports preemption here. *See* 47 Fed. Reg. 14,424, 14,434 (Apr. 2, 1982) (proposed rule) (noting that "[t]he statute is clear … in providing that" "effectively ban[ning] appliances using certain types of fuel" "should not be the consequence of standards"); 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982) (suggesting that a rule prohibiting "hook-ups for appliances with less than a certain efficiency would be subject to preemption").

### 4. The district court's view of "energy use" and "point of use" cannot justify its interpretation.

The district court's justification for rejecting the Ninth Circuit's view seems to have centered on its disagreement with that court's interpretation of EPCA's definition of "energy use" and, in particular, the term "point of use" used in that definition. JA-190-95; *see Cal. Rest.*, 89 F.4th at 1121-25 (Friedland, J., dissenting from the denial of rehearing en banc); *Contracting Plumbers*, 2025 WL 843619, at *4-5. But nothing about that disagreement changes the result in this case; New York's gas ban is preempted either way.

Even under the district court's definition of "energy use" as "a static assessment of the typical quantity of energy consumed by [a covered] product," JA-194, New York's ban concerns covered products' energy use. With the ban in place, covered gas appliances with a "static" value for energy use exceeding zero are banned in most new construction. *Supra* pp.11-12. The gas ban of course does not change the "static" value for any individual appliance after it is manufactured, but it does prevent builders and consumers from installing or using gas appliances with the prohibited values—which in turn forces manufacturers to change what appliances they design and produce for the New York market. *Cf. Engine Mfrs.*, 541 U.S. at 255.

Put another way, even if "energy use" is only ever calculated in the lab, EPCA nonetheless preempts regulations that operate in the real world. EPCA does not say it is preempting "regulations requiring

39

recalculation of a product's energy use"; it says "regulation[s] concerning … energy use." Laws that, like New York's, categorically prohibit gas appliances' energy use (or viewed differently, ban gas appliances whenever their energy use exceeds zero) "concern[]" those appliances' energy use. *Cal. Rest.*, 89 F.4th at 1102-03 (panel opinion). That understanding of §6297(c) aligns with the well-settled meaning of "concerning" and with the statutory context—including the building code exception, §6297(f)(3), and Congress's repeated indications that it did not want to make types of products unavailable or burden manufacturing, distribution, sales, or service of products, §§6295(o)(4), 6297(d)(3)-(4).

Nor do the statute's instructions to use particular test procedures establish that Congress cared only about regulations on appliances' theoretical energy use (at a lab) and gave free rein to state and local governments to regulate their energy use in practice. *Contra* JA-195; *Contracting Plumbers*, 2025 WL 843619, at *4-5. Reinforcing its concern with real-world conditions, Congress required test procedures to measure "a representative average use cycle or period of use." §6293(b)(3). The fact that representative energy use is calculated in a lab does not mean regulations that work outside the lab cannot concern energy use.

Neither does anything in this case turn on whether "point of use" takes its ordinary meaning of the "place where something is used," as the Ninth Circuit held, *Cal. Rest.*, 89 F.4th at 1101 (attribution omitted), or distinguishes "site energy" from "source energy," as Judge Friedland and

the *Contracting Plumbers* court thought, *see id.* at 1123-25 (Friedland, J., dissenting from the denial of rehearing en banc); *Contracting Plumbers*, 2025 WL 843619, at *5. Contrary to the district court's apparent view that the Ninth Circuit's decision rested on its reading of the term "point of use," *see* JA-190-95, the Ninth Circuit understood that term as just one of many statutory cues demonstrating that EPCA extends beyond the factory floor. *See Cal. Rest.*, 89 F.4th at 1101-04 (panel opinion). The waiver provision, the building code exception, and Congress's choice of "concerning" in §6297(c) all reinforced that point. *See id.*

That the conflicting definitions of "point of use" make no difference should come as no surprise. Until the dissent from denial of rehearing en banc seized on it, "point of use" played little role in the Ninth Circuit litigation. The "site energy" argument was nowhere to be found in the merits briefing—not in Berkeley's brief, not in the federal government's brief, and not in any of the other amicus briefs. It showed up only in a single paragraph of an amicus brief supporting rehearing—in what represented an about-face from most of its signatories' panel-stage views. *Compare* Brief of Amici Curiae California et al. in Support of Rehearing En Banc at 16-17, *Cal. Rest.*, 89 F.4th 1094 (No. 21-16278), Dkt.112 (introducing the "site energy" reading), *with* Brief of California et al. as Amici Curiae in Support of Defendant-Appellee City of Berkeley at 13, *Cal. Rest.*, 89 F.4th 1094 (No. 21-16278), 2022 WL 433154 (arguing that an appliance that will "never be used … has no 'point of use' at all"). The

41

district court's criticism of the Ninth Circuit panel's purported failure to "explain[] why it was rejecting" this late-breaking view, JA-195, thus rings hollow.

In short, none of the arguments attributing "technical definition[s]" to "energy use" and "point of use," JA-195, supports limiting §6297(c) to energy conservation standards or their equivalents.

## B. EPCA's structure, purpose, and history confirm that New York's gas ban is preempted.

EPCA's structure, purpose, and history reinforce the breadth of its preemption provision and confirm that its concern does not stop at the end of the assembly line or when an energy use label is affixed.

### 1. The building code exception confirms that preemption extends beyond the factory floor.

As discussed, EPCA begins with a broad rule of preemption covering any "State regulation concerning the energy efficiency, energy use, or water use" of a covered product. §6297(c). It then returns limited authority to the states through specific exceptions, including §6297(f)(3), which exempts building codes for new construction that satisfy certain requirements. *See supra* pp.6-8. When, as here, Congress "explicitly lists a set of exceptions" to preemption, those exceptions are helpful in determining Congress's intent. *See Rowe*, 552 U.S. at 374.

The building code exception dooms the district court's reading of §6297(c). Recall that §6297(f)(3) sets seven strict requirements to qualify for its exception. Among other requirements, building codes must set an

42

overall conservation objective for the building and allow builders to "select[] items whose combined energy efficiencies meet the objective," without requiring any covered product to exceed federal standards. §6297(f)(3)(A)-(B), (F); *see supra* pp.6-7.

Right out of the gate, the building code exception confirms that Congress meant to preempt more than just direct regulations of covered products. *Cal. Rest.*, 89 F.4th at 1101. Congress is not in the habit of making pointless exceptions. It would not have written an exception for certain building codes unless it thought building codes were subject to preemption in the first place. *Id.* And to take the point just a step further, Congress would not have included this exception unless it thought §6297(c) was broad enough to preempt at least some regulations that could satisfy all seven requirements for the exception.

That is where the district court's interpretation runs into trouble. The very features a regulation needs for it to trigger preemption in the district court's view would also disqualify it from the exception. According to the district court, Congress preempted only energy conservation standards or their equivalent—or said another way, only requirements that affect a product's fixed energy use or efficiency as manufactured. *Supra* pp.19-20. As the *Contracting Plumbers* court put it, it is not enough for a regulation to "reduce[] demand for certain products"; a regulation must "require [some]thing of manufacturers [or] constrain their activities." 2025 WL 843619, at *7. To be preempted under the district court's

43

interpretation, then, a regulation must directly or indirectly require a covered product to exceed federal standards "as manufactured," *id.* at *6. *Accord Cal. Rest.*, 89 F.4th at 1125 (Friedland, J., dissenting from the denial of rehearing en banc).  But requiring a product to exceed federal standards disqualifies a building code from the exception.  §6297(f)(3)(B). So if the district court were right, there would be nothing preempted in the first place that could qualify for the building code exception.

For example, suppose a building code sets a maximum building-wide energy consumption objective, §6297(f)(3)(F), that is calculated by adding up all the appliances' off-the-rack, lab-tested "estimated energy use" values, §6297(f)(3)(G).  So long as no appliance is required to exceed federal standards, §6297(f)(3)(B), such a building code could qualify for the exception.  *See Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1145-46, 1148-49 (9th Cir. 2012) (code requiring a "15% reduction in new buildings' energy consumption" and satisfying all other requirements qualified for the exception).

But under the interpretations the district court adopted, such a regulation would not be preempted in the first place:  No product would need to be redesigned to have a different "fixed value" for energy use "as manufactured."  *Contracting Plumbers*, 2025 WL 843619, at *5, *7.  No consumer would be "require[d] … to use products with higher efficiency standards than those prescribed by" the Department of Energy.  *Cal. Rest.*, 89 F.4th at 1125 (Friedland, J., dissenting from the denial of

rehearing en banc). And while "[m]anufacturers [might] see reduced demand for certain products as a result of the" code, they would "remain subject to a single, nationally uniform set of energy conservation standards." *Contracting Plumbers*, 2025 WL 843619, at *7.

To be sure, the district court insisted that such a regulation would be preempted under its interpretation. JA-192-93. How so? It is not at all clear. A building-wide limit says nothing about any individual product's energy use. And because the exception expressly prohibits regulations requiring products to exceed federal standards, §6297(f)(3)(B), a qualifying building code could neither indirectly impose an energy conservation standard nor require manufacturers to redesign any product. At best, the district court seems to be saying that §6297(f)(3) allows regulators to "explicitly" mention energy when setting building-wide limits, even though they still cannot force changes in any product's lab-tested, labeled "energy use" value. JA-193. But allowing preemption to turn on whether a regulation uses or avoids certain words would be contrary to the long line of cases making clear that states cannot avoid preemption by doing indirectly what they cannot do directly. *See, e.g.*, *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013); *Rowe*, 552 U.S. at 372-73.

Think of §6297(f)(3) as setting up a crucial question for any proposed interpretation of §6297(c): Would any regulation both (i) be preempted by §6297(c), and (ii) be able to satisfy all seven requirements for the

45

building code exception?  If the answer is no, the interpretation must be wrong; if nothing saved by §6297(f)(3) would have been preempted without it, then Congress would not have included the exception.

No proponent of any interpretation of §6297(c) that allows New York's ban has been able to show that the answer is yes.  Nobody has identified any regulation—real or hypothetical—that falls within the scope of §6297(c) as the Secretary, Intervenors, and district court read it but is spared from preemption by §6297(f)(3).  The district court tried but could not, and neither could the Secretary, Intervenors, or their amici.

That is a fundamental problem.  The district court's interpretation would leave an entire paragraph, §6297(f)(3), with no work to do.  "[T]hat kind of superfluity, in and of itself, refutes [the court's] reading."  *See Pulsifer v. United States*, 144 S. Ct. 718, 731-32 (2024) ("When a statutory construction thus renders an entire subparagraph meaningless, … the canon against surplusage applies with special force." (cleaned up)).

### 2. Context confirms that preemption is not limited to regulations that affect design and manufacturing choices—but regardless, New York's ban does just that.

Beyond the building code exception, the statutory context confirms that preemption under §6297(c) is not restricted to regulations that force manufacturers to redesign appliances to a different energy conservation standard.  *Contra Cal. Rest.*, 89 F.4th at 1125 (Friedland, J., dissenting from the denial of rehearing en banc); *Contracting Plumbers*, 2025 WL

46

843619, at *7; JA-191 (adopting these views).  But even if it were, that is exactly what the challenged statute does.

a.  Section 6297(d)'s waiver provision sheds light on the breadth of Congress's preemptive intent.  Alongside its expansion of preemption in 1987, Congress narrowed the Department's waiver authority.  *Supra* pp.5-8.  Among other restrictions, Congress prohibited waivers for any regulation that "will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." §6297(d)(3).  "So the federal government must consider the complete lifecycle of an appliance—from manufacturing to servicing—in reviewing a waiver petition.  Such a provision would make little sense if the scope of EPCA's preemption ends with the design or manufacture of the product." *Cal. Rest.*, 89 F.4th at 1104 (panel opinion).

Likewise, in the waiver provision and elsewhere, Congress consistently signaled that it was concerned with consumer choice and appliance availability, not merely with what happened on the factory floor.  *See* §§6295(o)(4), 6297(d)(4) (standards and waivers cannot make appliance performance characteristics or features unavailable); *see also* §6293(b)(3) (test procedures must be designed to measure a "representative average use cycle").

Fair enough, as the district court pointed out, a regulation's ineligibility for a waiver does not itself establish that the regulation is preempted.  JA-193-95.  But nobody said it did.  The point is that the

47

waiver provision—and plenty more statutory context to boot—sheds light on Congress's "pre-emption-related objectives" and thus on the scope of preemption. *See Rowe*, 552 U.S. at 370-71.

In short, EPCA is not limited to regulations requiring manufacturers to redesign appliances, and it does not ignore what happens after "products roll off the factory floor," *Cal. Rest.*, 89 F.4th at 1103.

**b.** Even if EPCA preemption were limited to regulations affecting manufacturers' design decisions on the factory floor, New York's ban would still be preempted. To be sure, once a manufacturer decides to make a gas appliance, the statute has nothing more to say about its design. But New York's ban kicks in a step earlier, when manufacturers are deciding what kind(s) of energy their appliances should run on. Manufacturers who wish to sell to customers for new construction in New York must design appliances around a prohibition on gas appliances and infrastructure. Likewise, manufacturers make production decisions—including how many appliances to build and where to build them—based on which appliances they will be able to sell in which markets.

Driving a change to all-electric design and production is the point of New York's ban. *See* N.Y. Energy §11-104(6)(b) (stated purpose was "to support the goal of zero on-site greenhouse gas emissions"); N.Y. Exec. §378(19)(a) (same). EPCA prohibits New York from forcing manufacturers and builders down that path. *See Cal. Rest.*, 89 F.4th at 1104 ("[N]o doubt Berkeley's ban, if adopted by States and localities

48

throughout the country, would 'significantly burden' the 'sale' of covered products 'on a national basis.'" (quoting §6297(d)(3))).

### 3. Allowing state and local appliance bans would gut the preemption provision and create the very patchwork of standards Congress sought to prevent.

The district court's decision reflects a misunderstanding of EPCA as pursuing only a narrow objective: establishing federal standards for appliances and preempting conflicting state standards. *See* JA-189-95; *see also Contracting Plumbers*, 2025 WL 843619, at *7. Under a more complete understanding of what Congress set out to accomplish, it should come as no surprise that New York's ban is preempted.

**a.** Taken as a whole, EPCA is a sweeping national energy policy that includes a policy regarding appliances. *See, e.g.*, §6201 (listing purposes). Its impetus was rising fuel prices and energy security concerns with dependency on imported oil. *Air Conditioning*, 410 F.3d at 498. The resulting policy was deliberately neutral as to the type of fuel; Congress chose to encourage diverse energy sources and rely on neutral energy consumption and conservation objectives. *See* S. Rep. No. 94-516, at 116-18 (1975) (Conf. Rep.); H.R. Rep. No. 94-340, at 1, 10-11 (1975); *see also Bldg. Indus.*, 683 F.3d at 1153 (regulations cannot discriminate among or favor "particular products or methods" (citing §6297(f)(3)(C)).

Later, Congress expanded the federal role to include creating uniform standards for appliance manufacturers to help achieve the nation's energy independence goals. *E.g.*, S. Rep. No. 100-6, at 4. In doing so,

49

Congress struck a careful balance. Rather than sacrificing consumer choice for maximum conservation, Congress chose to prohibit standards that would make existing product types, performance characteristics, or features unavailable. *See id.* at 8-9 (noting, for example, that EPCA "would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product"); *Cal. Rest.*, 89 F.4th at 1103 ("Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses."). In other words, Congress wanted to reduce the energy use of the kinds of appliances already on the market without taking choices away from consumers. Just as manufacturers would have only one uniform set of standards to follow, consumers nationwide would have access to the same types of products.

Congress also recognized that regulations in populous jurisdictions (like New York) might carry national weight, S. Rep. No. 100-6, at 4, and therefore prohibited any attempt by state and local governments to supplant its policy. *See* §6297(d)(3).

Congress acted on its concern for consumer choice throughout the statute. Congress required the Department to set different standards for products that use "different kind[s] of energy." §6295(q)(1)(A); *see also* §6295(q)(1)(B) (requiring a different standard wherever "justified" by "a capacity or other performance-related feature" that other products in the

50

same type or class do not share). And it barred the Department from either setting standards or granting waivers "likely to result in the unavailability … in any covered product type (or class)" of generally available "performance characteristics (including reliability), features, sizes, capacities, and volumes." §6295(o)(4) (standards); *accord* §6297(d)(4) (waivers).

**b.** State and local bans on certain types of appliances or fuels are incompatible with EPCA's history and purpose. As just discussed, Congress did not want to constrain consumer choice. And it did not want a "patchwork" of regulations under which appliances would be legal in some places but not others. S. Rep. No. 100-6, at 4; *accord* H.R. Rep. No. 100-11, at 24 (1987).

A patchwork of banned products is just as disruptive as a patchwork of different standards. Both make certain appliances unavailable for consumers in some areas but not others. A consumer might move across a city or state line only to find that her television is now banned. *See* §6292(a)(12) (listing "[t]elevision sets" as covered products). And both impose burdens on manufacturers to adjust their design, production, distribution, and marketing strategies based on what they can and cannot sell in each jurisdiction, from the smallest towns to the largest states. Indeed, a patchwork of energy conservation standards can be expressed as a patchwork of bans; appliances are banned wherever they do not meet state or local standards.

51

All in all, New York's gas ban does exactly what Congress wanted to prevent: It burdens manufacturers' decisions regarding design, production, distribution, sales, and servicing; deprives builders and consumers of choice of appliances; and leads to a patchwork approach in which certain appliances that meet federal standards are unavailable in certain areas. *See, e.g.*, §6295(o)(4), (q)(1); §6297(d)(3)-(4), (f)(3).

**c.** The district court's contrary approach would gut EPCA's preemption provision by making it trivially easy to evade. The crux of the district court's position is that EPCA has nothing to say about banning any particular covered appliance. So if New York wanted to impose a particular energy conservation standard more stringent than the federal standard—which is undeniably preempted if done expressly— all it would need to do is make a list of appliances that do not meet its standard and ban them. Conversely, it could make a list of appliances that satisfy its requirements and ban all others. Either approach is fair game under the district court's interpretation, and neither is distinguishable from what New York has done here: ban all appliances that use disfavored energy sources.

Nothing in EPCA's text, structure, or purpose suggests that it is so easy to evade. To the contrary, Congress had every reason to expect that it would not "make[] any difference" for preemption purposes if a state were to "select[] an indirect but wholly effective means" of achieving a prohibited result. *Am. Trucking*, 569 U.S. at 652 (collecting cases

52

rejecting states' attempts to end-run preemption provisions); *Engine Mfrs.*, 541 U.S. at 253-55 (rejecting an interpretation that "would undo Congress's carefully calibrated regulatory scheme"). As case after case makes clear, "[s]tates and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*." *Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases); *cf. Nat'l Rifle Ass'n of Am. v. Vullo*, 144 S. Ct. 1316, 1328 (2024) (reiterating "the principle that a government official cannot do indirectly what she is barred from doing directly").

If Congress's choices in §6297(c) are to be respected, then New York cannot be allowed to end-run preemption by framing its regulation as a ban on appliances using a particular fuel type or related infrastructure. Regardless of the framing, the effect of the challenged statute is to set the maximum energy use for all EPCA-covered gas appliances to zero. And that is precisely what Congress said states could not do.

### 4. Recognizing that EPCA preempts New York's ban would not undermine ordinary health and safety regulations.

Many of the views the district court adopted rest on a fear that unless §6297(c) is read narrowly, "absurd and expansive results" that endanger state and local health and safety regulations will follow. *See* JA-174-75 (summarizing Intervenors' argument); *Contracting Plumbers*, 2025 WL 843619, at *6; *Cal. Rest.*, 89 F.4th at 1120, 1125-26 (Friedland, J., dissenting from the denial of rehearing en banc). That fear is misplaced.

As with similarly broad preemption provisions, Congress's intent—as understood through the statute it wrote—provides a suitable limiting principle. *See, e.g.*, *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr, N.A.*, 519 U.S. 316, 325 (1997). Nothing about applying EPCA's plain text to hold that New York's ban is preempted endangers state and local health and safety regulations that have long coexisted with EPCA.

As Judge Baker explained in the Ninth Circuit, EPCA is "unlikely" to preempt the "host of state and local regulations" that only "incidentally impact" covered products' energy consumption, such as "state and local taxes" (think carbon taxes) or a decision not to extend a utility distribution system. *Cal. Rest.*, 89 F.4th at 1117 (Baker, J., concurring); *accord Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 263-64 (2013) (regulations with only a tangential effect would not be preempted). Or to take some of the *Contracting Plumbers* court's examples, a regulation prohibiting the use of an appliance in certain unsuitable spaces—"in close proximity to gas station pumps, or in sleeping rooms, bathrooms, toilet rooms, storage closets or surgical rooms," 2025 WL 843619, at *6 (cleaned up)—regulates where and how that appliance is used. That some individuals may have no suitable place to install it does not automatically transform the regulation into one concerning the appliance's energy use, rather than one having an incidental effect.

New York's gas ban, by contrast, "cuts to the heart of what Congress sought to prevent." *Cal. Rest.*, 89 F.4th at 1119 (Baker, J., concurring).

Its effect on covered gas appliances' energy use is anything but incidental—the statute bans both gas appliances themselves and the systems necessary to use them. The ban is preempted because its purpose and "practical effect" is to categorically prohibit covered gas appliances from using any energy. *See, e.g.*, *23-34 94th St. Grocery*, 685 F.3d at 183 (rejecting the argument that a local law did not "explicitly" regulate preempted activity because that "ignore[d] the practical effect" of the law).

To be clear, merely invoking health and safety purposes cannot switch off preemption. *Contra Cal. Rest.*, 89 F.4th at 1126 (Friedland, J., dissenting from the denial of rehearing en banc) (suggesting that preemption should not apply where a regulation's stated purpose is acceptable). "Despite the importance of [those] objective[s]," EPCA does not "create[] an exception on that basis." *Rowe*, 552 U.S. at 373-74.

The point here is simply that applying EPCA's plain text to New York's ban will not spell disaster—just as it hasn't in the Ninth Circuit in the two years since that court reached the same result. This Court need not and should not decide today what will happen in cases about other regulations that are not yet and may never be before it. Broad preemption provisions like EPCA's are ill suited to bright-line rules. No single case can map the outer boundaries of EPCA preemption, much less one that, as here, "does not present a borderline question." *Morales*, 504 U.S. at 390 (attribution omitted). That future cases may present tricky

55

line-drawing problems is no reason to refuse to recognize that New York's law lies well within the borders of what EPCA preempts. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) (opinion of Roberts, C.J.) ("It is enough for today that wherever that line may be, this statute is surely beyond it.").

## II. The Ban Does Not Qualify for Any Exception to Preemption.

The Secretary does not contend that any statutory exception to preemption applies. *See* D.Ct.Dkt.48 at 23-24. Nor could he. The Secretary admits that New York has not applied for a waiver from the Department of Energy. D.Ct.Dkt.29 ¶76. And New York could not lawfully obtain a waiver because its ban would make types of appliances unavailable and would "significantly burden manufacturing, marketing, distribution, sale, or servicing" of the banned appliances. §6297(d)(3)-(4). Nor could the ban qualify for the building code exception. It does not, among other things, provide credit on a one-for-one basis for installing appliances that exceed federal standards or set an energy consumption objective that allows builders choice in how to meet it. §6297(f)(3).

***

This Court should not create a circuit split. Under the plain language of EPCA's preemption provision, and as the statute's structure, purpose, and history confirm, New York's ban is a "regulation concerning … the energy use" of covered appliances and is therefore preempted.

56

## CONCLUSION

For these reasons, this Court should reverse.

Respectfully submitted,

/s/ Sarah O. Jorgensen

Brian C. Baran
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

Sarah O. Jorgensen
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree Street,
  Suite 2300
Atlanta, GA 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Counsel for Plaintiffs-Appellants*

October 3, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 13,091 words.

Dated: October 3, 2025          */s/ Sarah O. Jorgensen*
                                Sarah O. Jorgensen

# STATUTORY ADDENDUM

FEDERAL STATUTES ..................................................................2

  42 U.S.C. §6291 .............................................................. 2

  42 U.S.C. §6292 .............................................................. 3

  42 U.S.C. §6293 .............................................................. 5

  42 U.S.C. §6295 .............................................................. 6

  42 U.S.C. §6297 .............................................................. 10

  42 U.S.C. §6311 .............................................................. 21

  42 U.S.C. §6316 .............................................................. 24

NEW YORK STATUTES .......................................................... 32

  N.Y. Energy §11-104 ....................................................... 32

  N.Y. Exec. §378 .............................................................. 35

# FEDERAL STATUTES

## 42 U.S.C. §6291

### §6291. Definitions

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of title 49) of a type—

    (A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

    (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

(6) The term "energy conservation standard" means—

(A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

[...]

(8) The term "measure of energy consumption" means energy use, energy efficiency, estimated annual operating cost, or other measure of energy consumption.

(9) The term "class of covered products" means a group of covered products, the functions or intended uses of which are similar (as determined by the Secretary).

[...]

**42 U.S.C. §6292**

**§6292. Coverage**

**(a) In general**

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding—

(A) any type designed to be used without doors; and

(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

(2) Room air conditioners.

Add.3

(3) Central air conditioners and central air conditioning heat pumps.

(4) Water heaters.

(5) Furnaces.

(6) Dishwashers.

(7) Clothes washers.

(8) Clothes dryers.

(9) Direct heating equipment.

(10) Kitchen ranges and ovens.

(11) Pool heaters.

(12) Television sets.

(13) Fluorescent lamp ballasts.

(14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

## (b) Special classification of consumer product

(1) The Secretary may classify a type of consumer product as a covered product if he determines that—

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

## 42 U.S.C. §6293

## §6293. Test procedures

[…]

## (b) Amended and new procedures

[…]

(3) Any test procedures prescribed or amended under this section shall be reasonably designed to produce test results which measure energy efficiency, energy use, water use (in the case of showerheads, faucets, water closets and urinals), or estimated annual operating cost of a covered product during a representative average use cycle or period of use, as determined by the Secretary, and shall not be unduly burdensome to conduct.

[…]

Add.5

## 42 U.S.C. §6295

**§6295. Energy conservation standards**

[…]

**(*l*) Standards for other covered products**

(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph (20) of section 6292(a) of this title if the requirements of subsections (*o*) and (p) are met and the Secretary determines that—

(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination;

(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

(D) the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

[…]

[…]

**(*o*) Criteria for prescribing new or amended standards**

(1) The Secretary may not prescribe any amended standard which increases the maximum allowable energy use, or, in the case of showerheads, faucets, water closets, or urinals, water use, or

decreases the minimum required energy efficiency, of a covered product.

(2)(A) Any new or amended energy conservation standard prescribed by the Secretary under this section for any type (or class) of covered product shall be designed to achieve the maximum improvement in energy efficiency, or, in the case of showerheads, faucets, water closets, or urinals, water efficiency, which the Secretary determines is technologically feasible and economically justified.

(B)(i) In determining whether a standard is economically justified, the Secretary shall, after receiving views and comments furnished with respect to the proposed standard, determine whether the benefits of the standard exceed its burdens by, to the greatest extent practicable, considering—

(I) the economic impact of the standard on the manufacturers and on the consumers of the products subject to such standard;

(II) the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;

(III) the total projected amount of energy, or as applicable, water, savings likely to result directly from the imposition of the standard;

(IV) any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;

(V) the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard;

(VI) the need for national energy and water conservation; and

(VII) other factors the Secretary considers relevant.

(ii) For purposes of clause (i)(V), the Attorney General shall make a determination of the impact, if any, of any lessening of competition likely to result from such standard and shall transmit such determination, not later than 60 days after the publication of a proposed rule prescribing or amending an energy conservation standard, in writing to the Secretary, together with an analysis of the nature and extent of such impact. Any such determination and analysis shall be published by the Secretary in the Federal Register.

(iii) If the Secretary finds that the additional cost to the consumer of purchasing a product complying with an energy conservation standard level will be less than three times the value of the energy, and as applicable, water, savings during the first year that the consumer will receive as a result of the standard, as calculated under the applicable test procedure, there shall be a rebuttable presumption that such standard level is economically justified. A determination by the Secretary that such criterion is not met shall not be taken into consideration in the Secretary's determination of whether a standard is economically justified.

(3) The Secretary may not prescribe an amended or new standard under this section for a type (or class) of covered product if—

(A) for products other than dishwashers, clothes washers, clothes dryers, and kitchen ranges and ovens, a test procedure has not been prescribed pursuant to section 6293 of this title with respect to that type (or class) of product; or

(B) the Secretary determines, by rule, that the establishment of such standard will not result in significant conservation of energy or, in the case of showerheads, faucets, water closets, or urinals, water, or that the establishment of such standard is not technologically feasible or economically justified.

For purposes of section 6297 of this title, a determination under subparagraph (B) with respect to any type (or class) of covered products shall have the same effect as would a standard prescribed for such type (or class).

Add.8

(4) The Secretary may not prescribe an amended or new standard under this section if the Secretary finds (and publishes such finding) that interested persons have established by a preponderance of the evidence that the standard is likely to result in the unavailability in the United States in any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the United States at the time of the Secretary's finding. The failure of some types (or classes) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a standard for other types (or classes).

[…]

[…]

## (q) Special rule for certain types or classes of products

(1) A rule prescribing an energy conservation standard for a type (or class) of covered products shall specify a level of energy use or efficiency higher or lower than that which applies (or would apply) for such type (or class) for any group of covered products which have the same function or intended use, if the Secretary determines that covered products within such group—

(A) consume a different kind of energy from that consumed by other covered products within such type (or class); or

(B) have a capacity or other performance-related feature which other products within such type (or class) do not have and such feature justifies a higher or lower standard from that which applies (or will apply) to other products within such type (or class).

In making a determination under this paragraph concerning whether a performance-related feature justifies the establishment of a higher or lower standard, the Secretary shall consider such factors as the utility to the consumer of such a feature, and such other factors as the Secretary deems appropriate.

(2) Any rule prescribing a higher or lower level of energy use or efficiency under paragraph (1) shall include an explanation of the basis on which such higher or lower level was established.

[...]

## 42 U.S.C. §6297

### §6297. Effect on other law

### (a) Preemption of testing and labeling requirements

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

**(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product**

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

(1)(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

## (c)  General rule of preemption for energy conservation standards when Federal standard becomes effective for product

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until

the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)(A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

  (B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

(8)(A) is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

  (B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes

in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

(A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

(i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

(ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

**(d) Waiver of Federal preemption**

(1)(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

(i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

(ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing, or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction—

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect

the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

(i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

Add.17

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

**(e) Exception for certain State procurement standards**

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

**(f) Exception for certain building code requirements**

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed—

(A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but

Add.19

does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the

building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

## (g) No warranty

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

(Pub. L. 94–163, title III, §327, Dec. 22, 1975, 89 Stat. 926; Pub. L. 95–619, title IV, §424, Nov. 9, 1978, 92 Stat. 3263; Pub. L. 100–12, §7, Mar. 17, 1987, 101 Stat. 117; Pub. L. 100–357, §2(f), June 28, 1988, 102 Stat. 674; Pub. L. 102–486, title I, §123(h), Oct. 24, 1992, 106 Stat. 2829; Pub. L. 109–58, title I, §135(d), Aug. 8, 2005, 119 Stat. 634; Pub. L. 110–140, title III, §§321(d), 324(f), Dec. 19, 2007, 121 Stat. 1585, 1594; Pub. L. 112–210, §10(a)(9), Dec. 18, 2012, 126 Stat. 1524.)

## 42 U.S.C. §6311

## §6311. Definitions

For purposes of this part—

(1) The term "covered equipment" means one of the following types of industrial equipment:

(A) Electric motors and pumps.

(B) Small commercial package air conditioning and heating equipment.

(C) Large commercial package air conditioning and heating equipment.

(D) Very large commercial package air conditioning and heating equipment.

(E) Commercial refrigerators, freezers, and refrigerator-freezers.

(F) Automatic commercial ice makers.

(G) Walk-in coolers and walk-in freezers.

(H) Commercial clothes washers.

(I) Packaged terminal air-conditioners and packaged terminal heat pumps.

(J) Warm air furnaces and packaged boilers.

(K) Storage water heaters, instantaneous water heaters, and unfired hot water storage tanks.

(L) Any other type of industrial equipment which the Secretary classifies as covered equipment under section 6312(b) of this title.

(2)(A) The term "industrial equipment" means any article of equipment referred to in subparagraph (B) of a type—

(i) which in operation consumes, or is designed to consume, energy;

(ii) which, to any significant extent, is distributed in commerce for industrial or commercial use; and

(iii) which is not a "covered product" as defined in section 6291(a)(2) of this title, other than a component of a covered product with respect to which there is in effect a determination under section 6312(c) of this title;

without regard to whether such article is in fact distributed in commerce for industrial or commercial use.

(B) The types of equipment referred to in this subparagraph (in addition to electric motors and pumps, commercial package air conditioning and heating equipment, commercial refrigerators, freezers, and refrigerator-freezers, automatic commercial ice makers, commercial clothes washers, packaged terminal air-conditioners, packaged terminal heat pumps, warm air furnaces, packaged boilers, storage water heaters, instantaneous water heaters, and unfired hot water storage tanks) are as follows:

(i) compressors;

(ii) fans;

(iii) blowers;

(iv) refrigeration equipment;

(v) electric lights and lighting power supply circuits;

(vi) electrolytic equipment;

(vii) electric arc equipment;

(viii) steam boilers;

(ix) ovens;

(x) kilns;

(xi) evaporators;

(xii) dryers; and

(xiii) other motors.

(3) The term "energy efficiency" means the ratio of the useful output of services from an article of industrial equipment to the energy use by such article, determined in accordance with test procedures under section 6314 of this title.

(4) The term "energy use" means the quantity of energy directly consumed by an article of industrial equipment at the point of use, determined in accordance with test procedures established under section 6314 of this title.

[...]

(7) The terms "energy", "manufacture", "import", "importation", "consumer product", "distribute in commerce", "distribution in commerce", and "commerce" have the same meaning as is given such terms in section 6291 of this title.

[...]

(18) The term "energy conservation standard" means—

(A) a performance standard that prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a product; or

(B) a design requirement for a product.

[…]

## 42 U.S.C. §6316

## §6316. Administration, penalties, enforcement, and preemption

(a) The provisions of section 6296(a), (b), and (d) of this title, the provisions of subsections (l) through (s) of section 6295 of this title, and section [1] 6297 through 6306 of this title shall apply with respect to this part (other than the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title) to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of this part—

(1) references to sections 6293, 6294, and 6295 of this title shall be considered as references to sections 6314, 6315, and 6313 of this title, respectively;

(2) references to "this part" shall be treated as referring to part A-1;

(3) the term "equipment" shall be substituted for the term "product";

(4) the term "Secretary" shall be substituted for "Commission" each place it appears (other than in section 6303(c) of title);

(5) section 6297(a) of this title shall be applied, in the case of electric motors, as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 1992;

(6) section 6297(b)(1) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if the National Appliance Energy Conservation Amendments of 1988 were the Energy Policy Act of 1992;

---

[1] So in original. Probably should be "sections".

Add.24

(7) section 6297(b)(4) of this title shall be applied as if electric motors were fluorescent lamp ballasts and as if paragraph (5) of section 6295(g) of this title were section 6313 of this title;

(8) notwithstanding any other provision of law, a regulation or other requirement adopted by a State or subdivision of a State contained in a State or local building code for new construction concerning the energy efficiency or energy use of an electric motor covered under this part is not superseded by the standards for such electric motor established or prescribed under section 6313(b) of this title if such regulation or requirement is identical to the standards established or prescribed under such section;

(9) in the case of commercial clothes washers, section 6297(b)(1) of this title shall be applied as if the National Appliance Energy Conservation Act of 1987 was the Energy Policy Act of 2005; and

(10) section 6297 of this title shall apply with respect to the equipment described in section 6311(1)(L) of this title beginning on the date on which a final rule establishing an energy conservation standard is issued by the Secretary, except that any State or local standard prescribed or enacted for the equipment before the date on which the final rule is issued shall not be preempted until the energy conservation standard established by the Secretary for the equipment takes effect.

(b)(1) The provisions of section 6295(p)(4) of this title, section 6296(a), (b), and (d) of this title, section 6297(a) of this title, and sections 6298 through 6306 of this title shall apply with respect to the equipment specified in subparagraphs (B), (C), (D), (I), (J), and (K) of section 6311(1) of this title to the same extent and in the same manner as they apply in part A. In applying such provisions for the purposes of such equipment, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)(A) A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section.

(B) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede

a standard for such a product contained in a State or local building code for new construction if—

(i) the standard in the building code does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1; and

(ii) the standard in the building code does not take effect prior to the effective date of the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1.

(C) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede the standards established by the State of California set forth in Table C-6, California Code of Regulations, Title 24, Part 2, Chapter 2-53, for water-source heat pumps below 135,000 Btu per hour (cooling capacity) that become effective on January 1, 1993.

(D) Notwithstanding subparagraph (A), a standard prescribed or established under section 6313(a) of this title shall not supersede a State regulation which has been granted a waiver by the Secretary. The Secretary may grant a waiver pursuant to the terms, conditions, criteria, procedures, and other requirements specified in section 6297(d) of this title.

(c) With respect to any electric motor to which standards are applicable under section 6313(b) of this title, the Secretary shall require manufacturers to certify, through an independent testing or certification program nationally recognized in the United States, that such motor meets the applicable standard.

(d)(1) Except as provided in paragraphs (2) and (3), section 6297 of this title shall apply with respect to very large commercial package air conditioning and heating equipment to the same extent and in the same manner as section 6297 of this title applies under part A on August 8, 2005.

(2) Any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(a)(9) of this title take effect on January 1, 2010.

Add.26

(e)(1)(A) Subsections (a), (b), and (d) of section 6296 of this title, subsections (m) through (s) of section 6295 of this title, and sections 6298 through 6306 of this title shall apply with respect to commercial refrigerators, freezers, and refrigerator-freezers to the same extent and in the same manner as those provisions apply under part A.

> (B) In applying those provisions to commercial refrigerators, freezers, and refrigerator-freezers, paragraphs (1), (2), (3), and (4) of subsection (a) shall apply.

(2)(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under paragraphs (2) and (3) of section 6313(c) of this title to the same extent and in the same manner as those provisions apply under part A on August 8, 2005, except that any State or local standard issued before August 8, 2005, shall not be preempted until the standards established under paragraphs (2) and (3) of section 6313(c) of this title take effect.

> (B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)(A) Section 6297 of this title shall apply to commercial refrigerators, freezers, and refrigerator-freezers for which standards are established under section 6313(c)(4) of this title to the same extent and in the same manner as the provisions apply under part A on the date of publication of the final rule by the Secretary, except that any State or local standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards take effect.

> (B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(4)(A) If the Secretary does not issue a final rule for a specific type of commercial refrigerator, freezer, or refrigerator-freezer within the time frame specified in section 6313(c)(5) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to that specific type of refrigerator, freezer, or refrigerator-freezer for the period beginning on the date that is 2 years after the scheduled date for a

Add.27

final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of refrigerator, freezer, or refrigerator-freezer.

(B) Any State or local standard issued before the date of publication of the final rule shall not be preempted until the final rule takes effect.

(5)(A) In the case of any commercial refrigerator, freezer, or refrigerator-freezer to which standards are applicable under paragraphs (2) and (3) of section 6313(c) of this title, the Secretary shall require manufacturers to certify, through an independent, nationally recognized testing or certification program, that the commercial refrigerator, freezer, or refrigerator-freezer meets the applicable standard.

(B) The Secretary shall, to the maximum extent practicable, encourage the establishment of at least 2 independent testing and certification programs.

(C) As part of certification, information on equipment energy use and interior volume shall be made available to the Secretary.

(f)(1)(A)(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(1) of this title to the same extent and in the same manner as the section applies under part A on August 8, 2005.

(ii) Any State standard issued before August 8, 2005, shall not be preempted until the standards established under section 6313(d)(1) of this title take effect.

(B) In applying section 6297 of this title to the equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(2)(A)(i) Except as provided in clause (ii), section 6297 of this title shall apply to automatic commercial ice makers for which standards have been established under section 6313(d)(2) of this title to the same extent and in the same manner as the section applies under part A on the date of publication of the final rule by the Secretary.

Add.28

(ii) Any State standard issued before the date of publication of the final rule by the Secretary shall not be preempted until the standards established under section 6313(d)(2) of this title take effect.

(B) In applying section 6297 of this title in accordance with subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(3)(A) If the Secretary does not issue a final rule for a specific type of automatic commercial ice maker within the time frame specified in section 6313(d) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of automatic commercial ice maker for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering the specific type of automatic commercial ice maker.

(B) Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

(4)(A) The Secretary shall monitor whether manufacturers are reducing harvest rates below tested values for the purpose of bringing non-complying equipment into compliance.

(B) If the Secretary finds that there has been a substantial amount of manipulation with respect to harvest rates under subparagraph (A), the Secretary shall take steps to minimize the manipulation, such as requiring harvest rates to be within 5 percent of tested values.

(g)(1)(A) If the Secretary does not issue a final rule for commercial clothes washers within the timeframe specified in section 6313(e)(2) of this title, subsections (b) and (c) of section 6297 of this title shall not apply to commercial clothes washers for the period beginning on the day after the scheduled date for a final rule and ending on the date on which the Secretary publishes a final rule covering commercial clothes washers.

(B) Any State or local standard issued before the date on which the Secretary publishes a final rule shall not be preempted until

the standards established under section 6313(e)(2) of this title take effect.

(2) The Secretary shall undertake an educational program to inform owners of laundromats, multifamily housing, and other sites where commercial clothes washers are located about the new standard, including impacts on washer purchase costs and options for recovering those costs through coin collection.

(h) WALK-IN COOLERS AND WALK-IN FREEZERS.—

(1) COVERED TYPES.—

(A) RELATIONSHIP TO OTHER LAW.—

(i) IN GENERAL.—Except as otherwise provided in this subsection, section 6297 of this title shall apply to walk-in coolers and walk-in freezers for which standards have been established under paragraphs (1), (2), and (3) of section 6313(f) of this title to the same extent and in the same manner as the section applies under part A on December 19, 2007.

(ii) STATE STANDARDS.—Any State standard prescribed before December 19, 2007, shall not be preempted until the standards established under paragraphs (1) and (2) of section 6313(f) of this title take effect.

(B) ADMINISTRATION.—In applying section 6297 of this title to equipment under subparagraph (A), paragraphs (1), (2), and (3) of subsection (a) shall apply.

(2) FINAL RULE NOT TIMELY.—

(A) IN GENERAL.—If the Secretary does not issue a final rule for a specific type of walk-in cooler or walk-in freezer within the timeframe established under paragraph (4) or (5) of section 6313(f) of this title, subsections (b) and (c) of section 6297 of this title shall no longer apply to the specific type of walk-in cooler or walk-in freezer during the period—

(i) beginning on the day after the scheduled date for a final rule; and

Add.30

(ii) ending on the date on which the Secretary publishes a final rule covering the specific type of walk-in cooler or walk-in freezer.

(B) STATE STANDARDS.—Any State standard issued before the publication of the final rule shall not be preempted until the standards established in the final rule take effect.

(3) CALIFORNIA.—Any standard issued in the State of California before January 1, 2011, under title 20 of the California Code of Regulations, that refers to walk-in coolers and walk-in freezers, for which standards have been established under paragraphs (1), (2), and (3) of section 6313(f) of this title, shall not be preempted until the standards established under section 6313(f)(4) of this title take effect.

# NEW YORK STATUTES

## N.Y. Energy §11-104

### §11-104. State energy conservation construction code

In addition to meeting the purposes set forth in section 11-101 of this article, the code shall be designed to satisfy the following specific criteria:

[…]

6. (a) To the fullest extent feasible, the standards for construction of buildings in the code shall be designed to help achieve the state's clean energy and climate agenda, including but not limited to greenhouse gas reduction, set forth within chapter one hundred six of the laws of two thousand nineteen, also known as the New York state climate leadership and community protection act, and as further identified by the New York state climate action council established pursuant to section 75-0103 of the environmental conservation law.

(b) In addition to the foregoing, to support the goal of zero on-site greenhouse gas emissions and help achieve the state's clean energy and climate agenda, including but not limited to greenhouse gas reduction requirements set forth within chapter one hundred six of the laws of two thousand nineteen, also known as the New York state climate leadership and community protection act, the code shall prohibit the installation of fossil-fuel equipment and building systems, in any new building not more than seven stories in height, except for a new commercial or industrial building greater than one hundred thousand square feet in conditioned floor area, on or after December thirty-first, two thousand twenty-five, and the code shall prohibit the installation of fossil-fuel equipment and building systems, in all new buildings after December thirty-first, two thousand twenty-eight.

7. (a) The provisions set forth in paragraph (b) of subdivision six of this section shall not be construed as applying to buildings existing prior to the effective date of the applicable prohibition, including to:

(i) the repair, alteration, addition, relocation, or change of occupancy or use of such buildings; and

(ii) the installation or continued use and maintenance of fossil-fuel equipment and building systems, including as related to cooking equipment, in any such buildings.

(b) In addition, in effectuating the provisions set forth in paragraph (b) of subdivision six of this section the code shall include exemptions for the purposes of allowing the installation and use of fossil-fuel equipment and building systems where such are installed and used:

(i) for generation of emergency back-up power and standby power systems;

(ii) in a manufactured home as defined in subdivision seven of section six hundred one of the executive law; or

(iii) in a building or part of a building that is used as a manufacturing facility, commercial food establishment, laboratory, car wash, laundromat, hospital, other medical facility, critical infrastructure, including but not limited to emergency management facilities, wastewater treatment facilities, and water treatment and pumping facilities, agricultural building, fuel cell system, or crematorium, as such terms are defined by the code council.

(c) Where the code includes an allowed exemption pursuant to subparagraph (i) or (iii) of paragraph (b) of this subdivision, other than agricultural buildings as defined by the council, such exemption shall include provisions that, to the fullest extent feasible, limit the use of fossil-fuel equipment and building systems to the system and area of the building for which a prohibition on fossil-fuel equipment and building systems is infeasible; require the area or service within a new building where fossil-fuel equipment and building systems are installed be electrification ready, except with respect to servicing manufacturing or industrial processes; and minimize emissions from the fossil-fuel equipment and building systems that are allowed to be used, provided that the provisions set forth in this paragraph do not adversely affect health, safety, security, or fire protection. Financial considerations shall not be sufficient basis to determine physical or technical infeasibility.

(d) Exemptions included in the code pursuant to this subdivision shall be periodically reviewed by the state fire prevention and building code council to assure that they continue to effectuate the purposes of subdivision six of this section to the fullest extent feasible.

(e) The code shall allow for exemption of a new building construction project that requires an application for new or expanded electric service, pursuant to subdivision one of section thirty-one of the public service law and/or section twelve of the transportation corporations law, when electric service cannot be reasonably provided by the grid as operated by the local electric corporation or municipality pursuant to subdivision one of section sixty-five of the public service law; provided, however, that the public service commission shall determine reasonableness for purposes of this exemption. For the purposes of this paragraph, "grid" shall have the same meaning as electric plant, as defined in subdivision twelve of section two of the public service law.

8. For the purposes of this section:

(a) "Fossil-fuel equipment and building systems" shall mean (i) equipment, as such term is defined in section 11-102 of this article, that uses fossil-fuel for combustion; or (ii) systems, other than items supporting an industrial or commercial process as referred to in the definition of equipment in section 11-102 of the energy law, associated with a building that will be used for or to support the supply, distribution, or delivery of fossil-fuel for any purpose, other than for use by motor vehicles.

(b) "Electrification ready" means the new building or portion thereof where fossil-fuel equipment and building systems are allowed to be used which contains electrical systems and designs that provide sufficient capacity for a future replacement of such fossil-fuel equipment and building systems with electric-powered equipment, including but not limited to sufficient space, drainage, electrical conductors or raceways, bus bar capacity, and overcurrent protective devices for such electric-powered equipment.

[...]

Add.34

## N.Y. Exec. §378

### §378. Standards for New York state uniform fire prevention and building code

The uniform code shall address the following subjects:

19. a. To support the goal of zero on-site greenhouse gas emissions and help achieve the state's clean energy and climate agenda, including but not limited to greenhouse gas reduction requirements set forth within chapter one hundred six of the laws of two thousand nineteen, also known as the New York state climate leadership and community protection act, the uniform code shall prohibit the installation of fossil-fuel equipment and building systems, in any new building not more than seven stories in height, except for a new commercial or industrial building greater than one hundred thousand square feet in conditioned floor area, on or after December thirty-first, two thousand twenty-five, and the uniform code shall prohibit the installation of fossil-fuel equipment and building systems, in all new buildings on or after December thirty-first, two thousand twenty-eight.

b. The provisions set forth in paragraph a of this subdivision shall not be construed as applying to buildings existing prior to the effective date of the applicable prohibition, including to:

(i) the repair, alteration, addition, relocation, or change of occupancy or use of such buildings; and

(ii) the installation or continued use and maintenance of fossil-fuel equipment and building systems, including as related to cooking equipment, in any such buildings.

c. In addition, in effectuating the provisions set forth in paragraph a of this subdivision the code shall include exemptions for the purposes of allowing the installation and use of fossil-fuel equipment and building systems where such systems are installed and used:

(i) for generation of emergency back-up power and standby power systems;

(ii) in a manufactured home as defined in subdivision seven of section six hundred one of the executive law; or

Add.35

(iii) in a building or part of a building that is used as a manufacturing facility, commercial food establishment, laboratory, car wash, laundromat, hospital, other medical facility, critical infrastructure, including but not limited to emergency management facilities, wastewater treatment facilities, and water treatment and pumping facilities, agricultural building, fuel cell system, or crematorium, as such terms are defined by the code council.

d. Where the uniform code includes an allowed exemption pursuant to subparagraph (i) or (iii) of paragraph c of this subdivision, other than agricultural buildings as defined by the council, such exemption shall include provisions that, to the fullest extent feasible, limit the use of fossil-fuel equipment and building systems to the system and area of the building for which a prohibition on fossil-fuel equipment and building systems is infeasible; except with respect to servicing manufacturing or industrial processes, require the area or service within a new building where fossil-fuel equipment and building systems are installed be electrification ready; and minimize emissions from the fossil-fuel equipment and building systems that are allowed to be used, provided that such provisions do not adversely affect health, safety, security, or fire protection. Financial considerations shall not be sufficient basis to determine physical or technical infeasibility.

e. Exemptions included in the uniform code pursuant to this subdivision shall be periodically reviewed by the code council to assure that they continue to effectuate the purposes of paragraph a of this subdivision and subparagraph three of paragraph b of subdivision two of section three hundred seventy-one of this article to the fullest extent feasible.

f. The code shall allow for exemption of a new building construction project that requires an application for new or expanded electric service, pursuant to subdivision one of section thirty-one of the public service law and/or section twelve of the transportation corporations law, when electric service cannot be reasonably provided by the grid as operated by the local electric corporation or municipality pursuant to subdivision one of section sixty-five of the public service law; provided, however, that the public service commission shall determine reasonableness for purposes of this exemption. For the

Add.36

purposes of this paragraph, "grid" shall have the same meaning as electric plant, as defined in subdivision twelve of section two of the public service law.

g. For the purposes of this subdivision:

(i) "Fossil-fuel equipment and building systems" shall mean (A) equipment, as such term is defined in section 11-102 of the energy law, that uses fossil-fuel for combustion; or (B) systems, other than items supporting an industrial or commercial process as referred to in the definition of equipment in section 11-102 of the energy law, associated with a building that will be used for or to support the supply, distribution, or delivery of fossil-fuel for any purpose, other than for use by motor vehicles.

(ii) "Electrification ready" means the new building or portion thereof where fossil-fuel equipment and building systems are allowed to be used which contains electrical systems and designs that provide sufficient capacity for a future replacement of such fossil-fuel equipment and building systems with electric-powered equipment, including but not limited to sufficient space, drainage, electrical conductors or raceways, bus bar capacity, and overcurrent protective devices for such electric-powered equipment.

[...]