# No. 25-2041

**IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION;
NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS
ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH,
PATIO, and BARBEQUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION
OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY,
INC., doing business as Master Plumbers Council of the City of New York; HOLMES
MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS
LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL
BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; and TRANSPORT
WORKERS LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants,*

v.

WALTER T. MOSLEY, in his official capacity as New York Secretary of State and member
of the State Fire Prevention and Building Code Council,

*Defendant-Appellee,*

and

NEW YORK GEOTHERMAL ENERGY ORGANIZATION; and PUSH BUFFALO,

*Intervenor Defendants.*

On Appeal from the United States District Court
for the Northern District of New York

**AMICUS CURIAE BRIEF OF PACIFIC LEGAL FOUNDATION
AND AMERICAN TIMBER WORKS IN SUPPORT OF
PLAINTIFF-APPELLANT AND REVERSAL**

NATHAN W. HOTES
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (202) 888-6881
Facsimile: (916) 419-7747
Nhotes@pacificlegal.org

MARK MILLER
Pacific Legal Foundation
4440 PGA Blvd., Suite 307
Palm Beach Gardens, FL 33410
Telephone: (561) 691-5000
Facsimile: (916) 419-7747
Mark@pacificlegal.org

*Attorneys for Amicus Curiae, Pacific Legal Foundation
and American Timber Works*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Pacific Legal Foundation, by and through its undersigned attorney, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, American Timber Works, by and through its undersigned attorney, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

/s/ *Mark Miller*
MARK MILLER
   *Counsel of Record*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111

i

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................i

TABLE OF AUTHORITIES ..............................................................iii

STATEMENT OF IDENTIFICATION AND INTEREST ......................................1

INTRODUCTION ..........................................................................2

ARGUMENT ..............................................................................4

    I.     The EPCA Preempts New York's Ban on Using Covered Products ....4

          A.     The EPCA's Text, Structure, and History Support Preemption ..................................................5

          B.     The Best Arguments for the Technical Definition Are Flawed ........................................................9

    II.    New York's Ban Will Not Increase Energy Abundance ..................11

    III.   EPCA Preemption Will Not Affect Local Nuisance Laws ...............13

CONCLUSION ............................................................................15

CERTIFICATE OF COMPLIANCE ....................................................16

CERTIFICATE OF SERVICE ..........................................................17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation &*
*Dev. Comm'n*,
410 F.3d 492 (9th Cir., 2005) ....................................................................2

*Air Conditioning, Heating & Refrigeration Inst. v.*
*City of Albuquerque*,
835 F.Supp.2d 1133 (D.N.M. 2010) ..........................................................2

*Ass'n of Contracting Plumbers of the City of New York, Inc. v.*
*City of N.Y.*,
2025 WL 843619 (S.D.N.Y. 2025) .....................................................*passim*

*Bove v. Donner-Hanna Coke Corp.*,
258 N.Y.S. 229 (N.Y. App. Div. 1932) .....................................................14

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ..............................................................*passim*

*Groff v. DeJoy*,
600 U.S. 447 (2023) .....................................................................................5

*Isbrandtsen Co. v. Johnson*,
343 U.S. 779 (1952) ...............................................................................13–14

*Matar v. Dichter*,
563 F.3d 9 (2d Cir. 2009) ..........................................................................14

*Mulhern Gas Co., Inc. v. Mosley*,
2025 WL 2062194 (N.D.N.Y. 2025) ...........................................3, 5, 8–9, 13

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018) .....................................................................................5

*Price Trucking Corp. v. Norampac Indus.*,
748 F.3d 75 (2d Cir. 2014) ........................................................................14

*Resol. Tr. Corp. v. Miramon*,
22 F.3d 1357 (5th Cir. 1994) ...................................................................14

*Ross v. Blake*,
578 U.S. 632 (2016) ...................................................................................8

*S. Utah Wilderness All. v. Bureau of Land Mgmt.*,
425 F.3d 735 (10th Cir. 2005) ................................................................14

*SAS Inst., Inc. v. Iancu*,
584 U.S. 357 (2018) ...................................................................................8

*U.S. v. Texas*,
507 U.S. 529 (1993) .................................................................................14

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ...............................................................................7–8

*Van Buren v. United States*,
593 U.S. 374 (2021) ...................................................................................8

## Statutes

42 U.S.C. § 6201(5) .........................................................................................2

42 U.S.C. § 6291(4) ...............................................................................4, 6, 9

42 U.S.C. § 6291(5) .........................................................................................7

42 U.S.C. § 6291(6) .........................................................................................7

42 U.S.C. § 6291(6)(A) ...................................................................................7

42 U.S.C. § 6291(8) .........................................................................................7

42 U.S.C. § 6293(e)(3) ....................................................................................7

42 U.S.C. § 6294(a)(2)(I)(i) ...........................................................................9

42 U.S.C. § 6294(a)(6) ....................................................................................9

42 U.S.C. § 6295(f)(3)(D) ...............................................................................7

iv

42 U.S.C. § 6297(a)(1)(B) ..................................................7

42 U.S.C. § 6297(c) ..............................................4, 6–8, 9

42 U.S.C. § 6297(b) ............................................................7

42 U.S.C. § 6297(b)(6) ......................................................7

42 U.S.C. § 6297(d)(1)(A) ................................................7

42 U.S.C. § 6297(d)(1)(B) ................................................8

42 U.S.C. § 6297(f)(1)–(3) ................................................7

42 U.S.C. § 6297(g) ............................................................7

N.Y. Energy § 11-104(6)–(8) ............................................3

Pub. L. No. 95-619, 92 Stat. 3206 (1978) ........................8

## Regulations

10 C.F.R. § 430 (2008) ....................................................11

69 Fed. Reg. 45 ................................................................11

75 Fed. Reg. 51,423 (Aug. 20, 2010) ........................10–11

## Rules

Fed. R. App. P. 29(a) ........................................................1

## Other Authorities

44 Cong. Rec. S2706–07 (Oct. 20, 1998) ......................10

Am. Gas Found., *Pub. Pol'y and Real Energy Efficiency* (2005) ............................10

Costello, Kenneth W., *Why Kill Nat. Gas?*, CATO INST.
  (Spring 2022), https://tinyurl.com/56w9wh3x ................13

Energy Resources Conservation and Dev. Comm'n, Staff Rep.,
  *Energy Conservation Standards for Nonresidential Buildings*
  (May 27, 1977) ..............................................................10

FOREST SERV., *Today* (accessed Sept. 23, 2025),
     https://tinyurl.com/dhs9mdbc ...................................................................12

Friedman, Milton & Rose, *Free to Choose: Four Ways to Spend
     Money,* FREE TO CHOOSE NETWORK (accessed Sep. 23, 2025),
     https://tinyurl.com/bdhjevft .....................................................................12

GOV'T ACCOUNTABILITY OFF., FOREST SERV.: TIMBER SALES IN
     FISCAL YEARS 2014-2023 (2024)...........................................................12

Miller, Mark and Jenkins, Megan, *Nat. Res. And Hum. Flourishing:
     Toward a More Abundant Future*, PACIFIC LEGAL FOUND.
     (July 2025), https://tinyurl.com/m9hdca7r .........................................12

NAT'L RENEWABLE ENERGY LAB'Y, ELECTRIFICATION FUTURES STUD.:
     SCENARIOS OF ELEC. TECH. ADOPTION AND POWER CONSUMPTION
     FOR THE U.S. (2018) ...................................................................................13

Nat'l Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-
     Cycle Measurement Approaches to DOE/EERE Building
     Appliance Energy-Efficiency Standards: Letter Rep.* (2009) ..............10

Ortiz, David Santana & Bernstein, Mark Allen, RAND, *Measures of
     residential energy consumption and their relationships to DOE
     policy* (1999) ..............................................................................................10

Oxford English Dictionary Online (2022) ...........................................5–6

S. Rep. No. 100-6.......................................................................................2

Shelley Ross Saxer, et al., CONTEMP. PROP. 967
     (West Acad. Publ'g, 5th ed. 2019) ..........................................................14

Stark, Kevin, *Berkeley, Calif., repeals its first-in-the-nation ban on
     natural gas in new homes*, NAT'L PUB. RADIO (Mar. 29, 2024 5:14
     AM), https://tinyurl.com/2hst4rd3 ...........................................................3

U.S. DEPT. OF ENERGY, APPLIANCE AND EQUIPMENT STANDARDS:
     HISTORY AND IMPACTS (2025) ....................................................................2

*What's impeding the US from mining minor metals effectively*, QUEST
     METALS (Feb. 13, 2025), https://tinyurl.com/3vcxwerc .....................12

vi

## STATEMENT OF IDENTIFICATION AND INTEREST[1]

Founded in 1973, the Pacific Legal Foundation (PLF) is a nonprofit, tax exempt corporation formed under California state law, dedicated to litigating public interest cases. This case aligns with PLF's mission, as it promotes the responsible use of natural resources to produce, innovate, and build. PLF considers New York's ban an onerous and unlawful regulatory obstacle that hampers productivity and should be invalidated.

American Timber Works (ATW) is a family-owned construction company formed under New York law, specializing in the design and construction of custom homes. If upheld, the All-Electric Building Act (AEBA) will require ATW to alter its construction methods, which ATW worries will have significant negative economic implications. ATW hopes to protect itself and other businesses from unlawful state restrictions.

PLF files this brief pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure. All parties to the appeal have consented to the filing of this brief.

---

[1] No party's counsel authored this brief in whole or in part. No party contributed financial support intended to fund the preparation or submission of this brief. No individual or organization other than PLF and its counsel contributed funding for the preparation or submission of this brief.

1

## INTRODUCTION

Congress passed the Energy Policy and Conservation Act (EPCA) partly "to provide for improved energy efficiency of motor vehicles, major appliances, and certain other consumer products."[2] A decade later, frustrated by "a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans," Congress added broader preemption standards to counteract the systems of "separate state appliance standards." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n,* 410 F.3d 492, 500 (9th Cir., 2005) (citing S. Rep. No. 100-6, at 4 (1987)). The EPCA has "improv[ed] energy efficiency" and reduced "utility bills for American households and businesses by $105 billion in 2024 alone."[3]

The judiciary's broad interpretation of EPCA preemption has been crucial to the law's success. Court rulings over the decades, even when not finding laws preempted, acknowledged the extensive scope of EPCA preemption. *See Air Conditioning,* 410 F.3d at 500; *see also Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque,* 835 F.Supp.2d 1133, 1136 (D.N.M. 2010). Relying on the EPCA's plain meaning, an en banc panel of the Ninth Circuit concluded that the

---

[2] 42 U.S.C. § 6201(5). The constitutionality of the EPCA was not challenged in this case and is not addressed in this amicus.

[3] U.S. DEPT. OF ENERGY, APPLIANCE AND EQUIPMENT STANDARDS: HISTORY AND IMPACTS (2025).

2

EPCA preempted the City of Berkeley's first-in-the-nation building code banning natural gas in new buildings.[4] *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024).

The lower court here, addressing statewide EPCA preemption, followed a different path. New York's AEBA requires most new buildings to be all-electric—effectively disallowing the installation of fossil-fuel equipment, including natural gas and propane infrastructure.[5] A group of companies, trade associations, and unions (Mulhern) sued, arguing that the EPCA preempted the state law and highlighting the similarities between New York's ban and the ban struck down in *California Restaurant Ass'n*. *See Mulhern Gas Co., Inc. v. Mosley*, 2025 WL 2062194, at *13 (N.D.N.Y. 2025). Despite acknowledging that the two cases are nearly identical, the lower court was "skeptical of the conclusions reached by the Ninth Circuit panel" in *California Restaurant Ass'n*. *Id.* at *14. The policy and textual arguments made by the lower court in *Mulhern* echoed the dissent in *California Restaurant Ass'n* and match the rationale in *Ass'n of Contracting Plumbers*, a recent Southern District Court of New York (Southern District) decision allowing New York City to ban natural gas. *Id.*; *see also Ass'n of Contracting*

---

[4] *See also* Kevin Stark, *Berkeley, Calif., repeals its first-in-the-nation ban on natural gas in new homes*, NAT'L PUB. RADIO (Mar. 29, 2024, 5:14 AM), https://tinyurl.com/2hst4rd3.
[5] *See* N.Y. Energy § 11-104(6)–(8).

3

*Plumbers of the City of New York, Inc. v. City of N.Y.*, 2025 WL 843619 (S.D.N.Y. 2025); *see also Cal. Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting).

This Court should correct the error made by the lower court and adopt the correct interpretation of EPCA preemption. A decision by this Court upholding the AEBA would add unintended technical definitions into the EPCA contrary to its text and context. A ruling in Mulhern's favor would be consistent with the statutory text and correct the flawed policy arguments advanced by the opponents of EPCA preemption, guiding future courts to focus on the EPCA itself.

## ARGUMENT

## I.  The EPCA Preempts New York's Ban on Using Covered Products

The EPCA preempts most "[s]tate regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product."[6] It defines energy use as "the quantity of energy directly consumed by a consumer product at point of use."[7] The EPCA does not define the term "point of use." The Ninth Circuit in *California Restaurant Ass'n* defined "point of use" by its dictionary definition of "the 'place where something is used,'"[8] to conclude the EPCA expressly preempts regulations preventing EPCA-covered appliances from consuming any energy at

---

[6] 42 U.S.C. § 6297(c). All involved agree no exception applies hereto.
[7] 42 U.S.C. § 6291(4).
[8] The definition adopted by the Ninth Circuit is hereinafter called the "colloquial definition."

4

their final destinations. *See Cal. Rest. Ass'n*, 89 F.4th at 1101 (citing Oxford English Dictionary Online (2022)). The lower court adopted a separate view, accepting the "relevant technical definition discussed by Judge Friedland" in *California Restaurant Ass'n. Mulhern*, 2025 WL 2062194, at *15.[9] In her dissent, Judge Friedland defined point of use as "a technical way of measuring energy consumption" based on documents produced by external sources. *Cal. Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting).

The lower court's narrow reading of EPCA preemption is incorrect. The language of the clause regarding point of use, other references to energy use throughout the EPCA, and the history of the EPCA all illustrate a Congressional intent to preempt regulations prohibiting the installation of necessary natural gas infrastructure where covered appliances are used.

## A. The EPCA's Text, Structure, and History Support Preemption

The lower court's mistake begins with the text of the defining clause. It is axiomatic that statutory interpretation always begins with the plain text of the statute. *See Groff v. DeJoy*, 600 U.S. 447, 468 (2023) ("[S]tatutory interpretation must 'begi[n]' with,' and ultimately heed, what a statute actually says.") (quoting *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 127 (2018)). Here, the plain text of the

---

[9] This definition is hereinafter called the "technical definition."

statute supports *California Restaurant Ass'n*'s conclusion. The EPCA section at issue states: "for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective," absent certain exceptions not at issue here. 42 U.S.C. § 6297(c). The EPCA further defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(4). The Ninth Circuit, defining "point of use" with its dictionary definition of "the 'place where something is used,'" concluded the EPCA expressly preempts regulations that prevent EPCA-covered appliances from consuming any energy at their final destinations. *See Cal. Rest. Ass'n*, 89 F.4th at 1101 (citing Oxford English Dictionary Online (2022)). This Court should hold the same.

The definition of "point of use" adopted by the Ninth Circuit gives full effect to the words used by Congress. Indeed, Congress's choice to use 'at' before 'point of use' makes sense only if paired with this colloquial definition. The EPCA's definition of energy use as "the quantity of energy directly consumed by a consumer product at" the point where the consumer product is used flows naturally. 42 U.S.C. § 6291(4).

By contrast, the definition advanced by the lower court would define energy use as "the quantity of energy directly consumed by a consumer product at" specific

amount of energy consumption.[10] This definition is awkward, requiring a word change to fit. Because "Congress's choice of words is presumed to be deliberate," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013), the lower court erred in adopting a reading that contorts the statutory language.

Second, the recurring distinction between energy use, energy efficiency, and energy conservation standards within the EPCA further supports the Ninth Circuit's reading of the statute. Congress contrasted "energy use" with "energy efficiency," defined as "the ratio of the useful output of services from a consumer product to the energy use of such product," twelve times.[11] The EPCA distinguishes "energy conservation standards," defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use," from "energy use" in four instances.[12] The definition advanced by the lower court— treating energy use as a subset of energy conservation standards—interferes with Congress's intentional choice to separate energy use, energy efficiency, and energy conservation standards. "And '[j]ust as Congress' choice of words is presumed to be

---

[10] A charitable reading, since quoting directly leaves energy use incoherent as 'the quantity of energy directly consumed by a consumer product at *a technical way of measuring energy consumption*.'

[11] 42 U.S.C. § 6291(5). *See* 42 U.S.C. § 6291(5), (6)(A), (8); 42 U.S.C. § 6297(a)(1)(B), (b), (b)(6), (c), (d)(1)(A), (f)(1)–(3), (g) . This excludes identical references in the industrial equipment section.

[12] 42 U.S.C. § 6291(6). *See* 42 U.S.C. § 6297(c), (d)(1)(A); 42 U.S.C. § 6293(e)(3); 42 U.S.C. § 6295(f)(3)(D). This number excludes the identical references in the section covering industrial equipment.

deliberate' and deserving of judicial respect, 'so too are its structural choices.'" *SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018) (quoting *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 353). The lower court failed to give effect to Congress's intentional choice to differentiate between energy use and energy conservation standards.

Finally, the EPCA's statutory history supports preemption. Congress broadened the EPCA's preemption clause in 1987, expanding its application from when a "regulated party . . . petition[s] for preemption" to an automatic ban on regulations concerning energy use.[13] It is well settled that "[w]hen Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Van Buren v. United States*, 593 U.S. 374, 393 (2021) (quoting *Ross v. Blake*, 578 U.S. 632, 641–42 (2016)). Congress also made it harder for states to obtain waivers, replacing requirements that allowed waivers for state regulations stricter than the federal code with rules limiting waivers to "unusual and compelling State . . . energy interests."[14] Both changes intentionally restrict state action, implementing Congress' uncontested historical goal of stopping variance in energy policy.[15] The lower court did not engage with the EPCA's history, which supports preemption.

---

[13] Pub. L. No. 95-619, 92 Stat. 3206, 3263–64 (1978); 42 U.S.C. § 6297(c).

[14] 92 Stat. at 3264; 42 U.S.C. § 6297(d)(1)(B).

[15] *See Cal. Rest. Ass'n*, 89 F. 4th at 1120–21 (Friedland, J., dissenting); *see also Ass'n of Contracting Plumbers*, 2025 WL 843619, at *4; *Mulhern*, 2025 WL 2062194, at *14 (adopting the "history and purpose of the EPCA" of the prior opinions).

## B.  The Best Arguments for the Technical Definition Are Flawed

The arguments for the technical definition crumble when scrutinized. The lower court relied in part on Judge Friedland, who used an EPCA provision requiring the "labeling or other disclosure requirements for the of" covered products to question how the Department of Energy (DOE) could enforce the provision if energy use is determined at a product's final location.[16] *See Mulhern*, 2025 WL 2062194, at *14 ("Judge Friedland . . . point[s] out . . . multiple reasons to be skeptical of . . . the Ninth Circuit panel"); *see also Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J., dissenting). Judge Friedland, and the lower court by extension, also contend manufacturers cannot measure a number that changes after a device leaves the factory. *Id.* These arguments misrepresent the colloquial definition as limiting testing to final locations. The 'place where something is used' changes with its location and includes when the product *is used* in laboratory testing. Congress regulated how manufacturers test a product's energy use in the factory.[17] That requirement does not contradict Congress' assertion of a limited authority to test and regulate the same product's energy use after it enters commerce through the preemption clause.[18] Both goals can be achieved through measurements of energy use, since those measurements can be done at different times and locations.

---

[16] 42 U.S.C. § 6294(a)(2)(I)(i), (a)(6).

[17] *Id.*

[18] 42 U.S.C. § 6297(c); 42 U.S.C. § 6291(4).

Moreover, the case for the technical definition does not justify straying from the common usage. Evidence for the technical definition from outside the executive branch includes: a research paper from a nonprofit,[19] a letter from senators a decade after Congress passed the EPCA,[20] a report from California,[21] and studies from Congress and the private sector two decades after the EPCA's enactment.[22] *Cal. Rest. Ass'n*, 89 F.4th at 1123–25 (Friedland, J., dissenting); *see Ass'n of Contracting Plumbers*, 2025 WL 843619, at \*4. These sources are either suspiciously distant in time from the EPCA or too disconnected from Congress to be trustworthy.

The sources inside the executive branch, where any technical definition would be used habitually, are similarly underwhelming. One source, cited because it impairs point-of-use calculations with an "on-site" primary energy calculation, never confirms that the on-site nature of the primary calculation is what differentiates that number from point-of-use.[23] In fact, this source rebuts the lower court by explaining

---

[19] *See* David Santana Ortiz & Mark Allen Bernstein, RAND, *Measures of residential energy consumption and their relationships to DOE policy* xiii–xiv, 6–7 (1999).
[20] *See* 44 Cong. Rec. S2706–07 (Oct. 20, 1998).
[21] *See* Energy Resources Conservation and Dev. Comm'n, Staff Rep., *Energy Conservation Standards for Nonresidential Buildings* 5 (May 27, 1977).
[22] *See* Am. Gas Found., *Pub. Pol'y and Real Energy Efficiency* i, v, 7, 14 (2005); Nat'l Rsch. Council, *Review of Site (Point-of-Use) and Full-Fuel-Cycle Measurement Approaches to DOE/EERE Building Appliance Energy-Efficiency Standards: Letter Rep.* 1, 3–4, 6 (2009).
[23] *See* Energy Conservation Program for Consumer Prod. and Certain Com. and Indus. Equip.: Pub. Meeting and Availability of Statement of Pol'y for Adopting Full-Fuel-Cycle Analyses Into Energy Conservation Standards Program, 75 Fed.

that "point-of-use considers the use of electricity, natural gas, propane, and/or fuel oil . . . at the site where the appliance is *operated*."[24] "Operated" is synonymous with the colloquial "used", but "operated" has no connection to specific methods of calculating energy consumption. The other source, a 2004 notice of proposed rulemaking, does distinguish point-of-use testing from end-use testing.[25] This source (1) was issued decades after the EPCA, (2) is a brief two-sentence comment in the miscellaneous section, (3) is limited to furnace and boiler regulations, and (4) was cut in the final rule.[26] This document reflects the understanding of one DOE official, which is far too limited to validate Judge Friedland's claims of a "well-established" and "consistently used" definition. *Cal. Rest. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting).

## II. New York's Ban Will Not Increase Energy Abundance

New York's EPCA opinions speculate that the natural gas ban may increase overall energy consumption and increase energy innovation. *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *7. But resource bans, like the one at issue in the instant case, will only "sacrifice gains in future prosperity, a higher standard of

---

Reg. 51,423 (Aug. 20, 2010). (Introducing multiple differences between primary and point of use calculations, including how they calculate energy loss).
[24] *Id.*
[25] Energy Conservation Program for Consumer Products: Energy Conservation Standards for Residential Furnaces and Boilers, 69 Fed. Reg. 45 (proposed July 29, 2004).
[26] *Id. See* 10 C.F.R. § 430 (2008).

living, innovation that could tackle pressing problems, and the ability to build the basic infrastructure."[27] This theory stems from free-market economics, which teaches that one's inspiration to spend efficiently is tied to both whether the person directly receives the benefit of the spending and whether they are spending money they earned.[28] Resources, a form of wealth, are optimized by people with a stake in their use. At bottom, you cannot regulate into innovation or efficiency.

This is evident in the consistent failures of central control over natural resources. For example, timber harvesting is completely barred on roughly two-thirds of the Forest Service's forests and is limited to just half of one percent of all trees in the remaining third.[29] Yet the Forest Service questions why it has not met its timber sales target in any year from 2014 to 2023.[30] Mineral development is subject to "rigorous environmental assessments" that make the American permitting process take five to ten years in the United States, compared to one to three years internationally.[31] The impacts of gas bans on overall energy use follow this pattern. For example, one study found gas bans "lower[] energy efficiency when accounting

---

[27] Mark Miller and Megan Jenkins, *Nat. Res. And Hum. Flourishing: Toward a More Abundant Future*, PACIFIC LEGAL FOUND. (July 2025), https://tinyurl.com/m9hdca7r.

[28] *See* Milton & Rose Friedman, *Free to Choose: Four Ways to Spend Money,* FREE TO CHOOSE NETWORK (accessed Sep. 23, 2025), https://tinyurl.com/bdhjevft.

[29] FOREST SERV., *Today* (accessed Sept. 23, 2025), https://tinyurl.com/dhs9mdbc.

[30] GOV'T ACCOUNTABILITY OFF., FOREST SERV.: TIMBER SALES IN FISCAL YEARS 2014-2023, 7 (2024).

[31] *What's impeding the US from mining minor metals effectively*, QUEST METALS (Feb. 13, 2025), https://tinyurl.com/3vcxwerc.

for the full fuel cycle."[32] And a government report confirmed that in "medium and high electrification scenarios . . . total energy consumption declines."[33]

## III. EPCA Preemption Will Not Affect Local Nuisance Laws

Moving from one mistaken claim to another, the opponents of broad EPCA preemption posit that it would endanger "vital safety regulations," such as fire safety.[34] *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *6. Calling this an "absurd result that the Court must avoid," the Southern District concluded that public safety weighs against preemption. *Id.* Extending the EPCA to local nuisance laws would be barred by the presumption against the implicit repeal of the common law. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("Statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except where a statutory purpose to the contrary is evident."). Common law protections explain why no effort to upend nuisance laws has emerged. The Southern District erred in accepting this alarmist and incorrect claim.

---

[32] Kenneth W. Costello, *Why Kill Nat. Gas?*, CATO INST. (Spring 2022), https://tinyurl.com/56w9wh3x.

[33] NAT'L RENEWABLE ENERGY LAB'Y, ELECTRIFICATION FUTURES STUD.: SCENARIOS OF ELEC. TECH. ADOPTION AND POWER CONSUMPTION FOR THE U.S., 50 (2018).

[34] Accepted by *Mulhern*, 2025 WL 2062194, at *14 ("Given the thorough analysis of . . . how the terms 'energy use' and 'point of use' should be interpreted . . . [is] highly similar to [the previous EPCA Preemption cases] . . . the Court will not reiterate all those points.").

State and local nuisance laws are universally understood to originate from common law. Scholars begin discussions of nuisance law by acknowledging its "long use."[35] Courts have long recognized nuisance as a common law right: "the old and familiar maxim, that one must so use his property as not to injure that of another (sic utere tuo ut alienum non laedas), is deeply imbedded in our law." *Bove v. Donner-Hanna Coke Corp.*, 258 N.Y.S. 229, 231–32 (N.Y. App. Div. 1932).

Courts routinely interpret statutes to avoid implicitly infringing on common law. *See, e.g.*, *Isbrandtsen Co.*, 343 U.S. at 783. Other cases specify that "the statute must speak directly to the question addressed by the common law" to make the contrary purpose evident. *U.S. v. Texas*, 507 U.S. 529, 534 (1993) (citations omitted). The principle has been cited in decisions by this Court[36] and other appellate courts.[37] Courts cannot assume that Congress intended to overturn nuisance laws unless the statute explicitly states such an intent. *Id.* The EPCA does not directly aim to violate nuisance laws. The EPCA merely fails to mention nuisance laws at all.

EPCA preemption history supports this view. Parties have not challenged state nuisance laws in the Ninth Circuit since the court decided *California Restaurant Ass'n*. The Department of Justice reports they have "not received any new waiver

---

[35] Shelley Ross Saxer, et al., CONTEMP. PROP. 967 (West Acad. Publ'g, 5th ed. 2019).
[36] *See Price Trucking Corp. v. Norampac Indus.*, 748 F.3d 75, 84 (2d Cir. 2014); *Matar v. Dichter*, 563 F.3d 9, *13–14 (2d Cir. 2009).
[37] *See S. Utah Wilderness All. v. Bureau of Land Mgmt.*, 425 F.3d 735, 763 (10th Cir. 2005); *see also Resol. Tr. Corp. v. Miramon*, 22 F.3d 1357, 1360 (5th Cir. 1994).

requests" since *California Restaurant Ass'n*, suggesting that state governments nationwide remain unconcerned about potential nuisance lawsuits.[38] This Court should dismiss as alarmist the argument that anything will be different in the Second Circuit.

## CONCLUSION

For the foregoing reasons, this Court should reverse the lower court's denial of relief for Appellant and strike down New York's ban on fossil fuel use.

Respectfully submitted,

/s/ *Mark Miller*
MARK MILLER
 *Counsel of Record*
NATHAN W. HOTES
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
Mark@pacificlegal.org
NHotes@pacificlegal.org
*Counsel for Amicus Curiae*
*Pacific Legal Foundation and*
*American Timber Works*

DATED: OCTOBER 10, 2025.

---

[38] Brief for the Dept. of Just. as Amicus Curiae Supporting Appellants, p. 31, *Ass'n of Contracting Plumbers*, 2025 WL at 843619 (No. 123).

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rules 29.1(c) and 32.1(a)(4) because this brief contains 3,539 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word for Microsoft 365 in Times New Roman 14-point font.

DATED: October 10, 2025.

/s/ *Mark Miller*
MARK MILLER
*Counsel of Record*

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ *Mark Miller*
MARK MILLER
   *Counsel of Record*
