# 25-2041

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION;
NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE
GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION;
NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION;
PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND;
LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., dba
MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; HOLMES
MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200;
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL
UNION 97; and TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants,*

– v. –

WALTER T. MOSLEY, in his official capacity as New York Secretary of State
and member of the State Fire Prevention and Building Code Council,

*Defendant-Appellee,*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, PUSH BUFFALO,

*Intervenor-Defendants-Appellees.*

_____

On Appeal from the United States District Court for the Northern District of
New York, No. 1:23-CV-01267 (Hon. Glenn T. Suddaby, District Judge)

_____

## BRIEF OF *AMICUS CURIAE* AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE IN SUPPORT OF PLAINTIFFS-APPELLANTS, FEDERAL PREEMPTION, AND REVERSAL

---

NEW YORK DEPARTMENT OF STATE; NEW YORK STATE FIRE
PREVENTION AND BUILDING CODE COUNCIL; and JAMES CABLE,
RUTHANNE VISNAUSKAS, ROBERTA REARDON, ERIC ADAMS,
MICHAEL SPANO, JOSEPH M. DESTEFANO, CLAUDIA BRAYMER,
JOSEPH TOOMEY, SHAWN HAMLIN, TIMOTHY DERUYSCHER, ROBERT
HUGHES, WILLIAM W. TUYN, PATRICK DOLAN, and DOMINIC
MARINELLI, in their official capacities as members of the State Fire Prevention
and Building Code Council,

*Defendants.*

---

BAKER BOTTS L.L.P.
J. Mark Little
910 Louisiana Street
Houston, TX 77002
Tel: (713) 229-1234
Fax: (713) 229-1522

*Counsel for Amicus Curiae Air-Conditioning, Heating, and Refrigeration Institute*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, *Amicus Curiae* Air-Conditioning, Heating, and Refrigeration Institute it a nonprofit 501(c)(6) corporation incorporated in the Commonwealth of Virginia. It does not have a parent corporation, and no publicly held corporation owns 10 percent or more of its stock. It does not have any publicly traded stock.

Dated: October 10, 2025                                         */s/ J. Mark Little*
                                                                                      J. Mark Little

iv

# TABLE OF CONTENTS

**Page**

Tables of Authorities.................................................................v

Identity and Interest of *Amicus Curiae* .................................1

Summary of Argument ............................................................2

Argument.................................................................................3

    I.    EPCA's preemption provisions are sweeping because Congress recognized the need for uniform regulatory standards for consumer products and commercial equipment....................................3

    II.    Congress empowered the U.S. Department of Energy to establish nationally applicable energy conservation standards that benefit consumers and manufacturers. ......................................5

    III.    The plain text of EPCA preempts New York's law, and this Court should align itself with the Ninth Circuit in saying so........................10

Conclusion ............................................................................13

Certificate of Service ...........................................................14

Certificate of Compliance .....................................................14

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Air Conditioning and Refrigeration Inst. v. Energy Resources Conservation and Dev. Comm'n*,
410 F.3d 492 (9th Cir. 2005) ............................................................... 3

*California Restaurant Association v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2023) ............................................... 1, 11, 12

*Ind. Harbor Belt R. Co. v. Gen. Am. Transp.*,
577 F.2d 394 (7th Cir. 1978) ............................................................ 8

*Lozada v. United States*,
107 F.3d 1011 (2d Cir. 1997) .......................................................... 12

*Marine Recreational Opportunities v. Berman*,
15 F.3d 270 (2d Cir. 1994) .............................................................. 12

*McCarty v. S. Farm Bureau Cas. Ins. Co.*,
758 F.3d 969 (8th Cir. 2014) .......................................................... 12

*Nat'l Pork Producers Council v. Ross*,
598 U.S. 356 (2023)........................................................................... 8

## STATUTES, RULES, AND REGULATIONS

42 U.S.C. § 6201 ................................................................................... 3

42 U.S.C. § 6291 ............................................................................. 4, 10

42 U.S.C. § 6295 .............................................................................. 5, 7

42 U.S.C. § 6297 ............................................................................. 2, 10

42 U.S.C. § 6313 ................................................................................... 5

Pub. L. No. 94-163, 89 Stat. 871 (1975) .............................................. 4

Pub. L. No. 100-12, 101 Stat. 103 (1987).............................................. 4

vi

10 C.F.R. § 430 App. A ........................................................................5, 7

10 C.F.R. § 430.21. ...............................................................................5

Fed. R. App. P. 29 ..................................................................................1

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 100-11 (1987)..............................................................4, 5

S. Rep. No. 100-6 (1987) ......................................................................4

N.Y. Bill Jacket, 2019, S.B. 6599, ch. 106 ...........................................9

**OTHER AUTHORITIES**

Community Climate Collaborative, *Lessons in Residential Electrification Project and Report* (Aug. 2021) ........................................................................8, 9

### IDENTITY AND INTEREST OF *AMICUS CURIAE*[1]

*Amicus Curiae* Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is a North American trade association. It consists of more than 330 member companies that manufacture residential and commercial heating, ventilation, air conditioning, refrigeration (HVACR) and water heating equipment for sale around the world. Together, their products—which are regulated by the Energy Policy and Conservation Act ("EPCA")—account for more than 90 percent of HVACR and water heating equipment manufactured and sold in North America.

AHRI advances its members' interests by promoting the industry's technological innovation, environmental stewardship, and economic contribution to society. AHRI also advocates for its members at all levels of state and federal government. For example, AHRI, along with other interested associations, filed an amicus brief in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2023), a case that considered whether an ordinance similar to New York's law was preempted by EPCA. AHRI also filed an amicus brief in the district court below.

---

[1] All parties consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2). No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amicus curiae*, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(2).

1

AHRI's members manufacture the consumer products and commercial equipment that will be outlawed by New York's law. AHRI therefore has a substantial interest in the resolution of this case and, more specifically, in ensuring the federal uniformity of law regulating the HVACR and water heating equipment industry.

## SUMMARY OF ARGUMENT

In promulgating the Energy Policy and Conservation Act and its broad preemption provisions, Congress sought to establish a uniform regulatory regime for HVACR and water heating equipment. Congress understood that subjecting equipment manufacturers to a patchwork of disparate state requirements would result in higher appliance costs for consumers. So it empowered the U.S. Department of Energy to establish uniform, nationally applicable energy conservation standards that benefit consumers by facilitating the cost-effective manufacture, distribution, and sale of consumer products and commercial equipment. The plain text of EPCA makes clear that New York's law, which regulates the "energy use" of covered products, cannot coexist with federal law. 42 U.S.C. § 6297(c).

AHRI lauds New York's goals of reducing greenhouse gas emissions and combatting climate change. But New York cannot do so by thwarting Congressional intent and upending the nationally uniform product and equipment standards EPCA is meant to preserve. This Court should follow the Ninth Circuit's thoughtful and

2

well-reasoned opinion, hold that EPCA preempts New York's law, and reverse the district court's judgment.

**ARGUMENT**

## I. EPCA's preemption provisions are sweeping because Congress recognized the need for uniform regulatory standards for consumer products and commercial equipment.

EPCA and its broad preemption provisions arose from Congress's clear intent to create a centralized regulatory framework for consumer products and commercial equipment and avoid disparate state and local regulations, much like the one New York has now passed.

In response to the oil crisis that the United States faced in the early 1970s, Congress sought to create a "comprehensive energy policy" and address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy sources." *Air Conditioning and Refrigeration Inst. v. Energy Resources Conservation and Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005). The foremost goals of EPCA as originally enacted were to increase energy production and supply, reduce energy demand, increase energy efficiency, and give the executive branch additional powers to respond to the energy crisis. *See id.* at 498-99.

To those ends, EPCA established the Energy Conservation Program for Consumer Products, which regulates (among other things) the energy use and energy

3

efficiency of certain consumer products and commercial equipment. *See* 42 U.S.C. § 6201(4). As originally drafted, EPCA contained a preemption provision but still permitted significant state involvement in appliance regulation. Pub. L. No. 94-163, § 327, 89 Stat. 871, 927 (1975). In fact, during the 1970s and 80s, many states requested, and were granted, waivers from EPCA preemption, thus freeing them to set their own unique standards. *See* S. Rep. No. 100-6, at 4 (1987). Consequently, "a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." *Id.* The "design, production, and marketing plans" of manufacturers, in turn, became "increasingly complicate[d]." *Id.* Predictably, the fragmented regulatory regime became unworkable.

Congress responded by amending EPCA and passing the National Appliance Energy Conservation Act ("NAECA"), tightening EPCA's preemption provisions and clamping down on state deviation. Pub. L. No. 100-12, 101 Stat. 103 (1987) (codified at 42 U.S.C. § 6291-6309). For decades, Congress had recognized that the appliance manufacturing industry was part of a national market that required consistent and workable federal regulations to achieve the energy conservation standards envisioned by EPCA. The purpose of the NAECA amendment was to "reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of energy conservation standards" and to protect that industry from "a growing patchwork of differing State regulations which would

4

increasingly complicate their design, production, and marketing plans." S. Rep. No. 100-6, at 2, 4; *see also* H.R. Rep. No. 100-11, at 24 (1987) (the NAECA amendment was "designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements").

## II.    Congress empowered the U.S. Department of Energy to establish nationally applicable energy conservation standards that benefit consumers and manufacturers.

To stop the proliferation of disparate state and local requirements, Congress vested the U.S. Department of Energy with the authority to develop, amend, and implement EPCA's minimum energy conservation standards. *See* 42 U.S.C. §§ 6295(m), 6313(a)(6)(A)(ii), (B)(i), (C), 6313(c)(6)(B), (f)(5). EPCA authorizes the Department to establish energy conservation standards for covered consumer products and commercial equipment that are both "technologically feasible" and "economically justified," while also yielding a "significant conservation of energy." 42 U.S.C. §§ 6295(o)(3)(B), 6313(d)(4).

In exercising its responsibility to establish these standards, the Department engages in a comprehensive preliminary assessment and rulemaking process. 10 C.F.R. § 430.21, *et seq*. It begins the process by (1) publishing notice in the Federal Register that it is considering rulemaking with respect to a covered consumer product or commercial equipment and then (2) soliciting comments from stakeholders on whether to proceed with the rulemaking. 10 C.F.R. § 430 App.

A(6)(a). If the Department decides that a rulemaking is appropriate based on the information and comments provided during the early assessment, its subsequent rulemaking process proceeds in four phases:

- *Framework*. The Department publishes a framework document that presents the basic analytical and procedural principles and legal authorities that will guide the rulemaking. The framework document also typically solicits feedback in the form of requests for information or notices of data availability.

- *Preliminary Analysis*. The Department gathers available data about the product's technical, economic, and market characteristics. This includes undertaking an energy-savings analysis, conducting an engineering analysis of design options, selecting candidate standard levels, and engaging stakeholders.

- *Notice of Proposed Rulemaking*. In the notice of proposed rulemaking phase, the Department considers public comments, revises the assessment, and proposes standards determined to result in the maximum technologically feasible *and* economically justified improvement in energy efficiency.

- *Final Rule*. The Department considers public input, further revises its assessment where appropriate, and issues the final rule, which

6

establishes any mandatory minimum energy conservation standards. Generally, final rules require that manufacturers comply with the standard within three to five years, providing time to make any investments required.

10 C.F.R. § 430 App. A6(a)-(h).

During each of these phases, the Department conducts a rigorous assessment of the technological feasibility of, and economic justification for, the proposed standard. *See, e.g.*, *id.* A(6)(b). The Department considers, for example, (1) "the economic impact of the standard on the manufacturers and on the consumers"; (2) "the savings in operating costs throughout the estimated average life of the covered product" as compared to increases in prices, charges, and maintenance expenses likely to result from the standard; (3) "the total projected amount of energy . . . savings likely to result directly" from the standard; (4) "any lessening of the utility or the performance of the covered products likely to result" from the standard; (5) "the impact of any lessening of competition, as determined in writing by the Attorney General," likely to result from the standard; (6) "the need for national energy . . . conservation"; and (7) "other factors the [Department] Secretary considers relevant." 42 U.S.C. § 6295(o)(2)(B)(i).

The depth of analysis that the Department undertakes when establishing national standards underscores exactly why Congress vested it with such authority.

7

The impacts of the regulatory scheme on regulated markets are so complex that they must be thoroughly assessed at the federal level with a nationwide lens. *Cf. Ind. Harbor Belt R. Co. v. Gen. Am. Transp.*, 577 F.2d 394, 402 (7th Cir. 1978) ("[A] national problem requir[es] a national solution."). States and municipalities, by contrast, have no reason to consider how their regulations might affect manufacturers outside state lines, *see, e.g.*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 364 (2023), and even if they did, they are typically ill-equipped to do so.

A pilot residential electrification program conducted in the Commonwealth of Virginia provides a prime example of why the Department is best equipped to promulgate these standards. In their report of the program, the Community Climate Collaborate (C3) and Local Energy Alliance Program (LEAP) found that electrification retrofits on eight low- to moderate-income homes generally reduced energy consumption and greenhouse gas emissions—but, importantly, did not necessarily cut costs or carbon emissions across the board. Community Climate Collaborative, *Lessons in Residential Electrification Project and Report* (Aug. 2021) at 10, available at https://perma.cc/WZ5P-849Z.

LEAP provided home energy-efficiency upgrades and replaced natural gas heating and cooking appliances with electric appliances in all the households. *Id.* at 2. C3 then tracked and analyzed the energy usage of the households over the course

8

of two winters. *Id.* Among the key findings were that emissions reductions for homes that formerly used natural gas did not follow a clear trend, with some even seeing a small *increase* in emissions. *Id.* at 10. Savings on monthly energy bills also varied across the participating homes, with some seeing savings and others modest increases. *Id.* at 3, 10. The report concludes that individual energy-use patterns and other unique factors will need to be further analyzed. *Id.* at 3.

The Virginia study demonstrates that when municipalities approach energy conservation programs with faulty assumptions and underdeveloped analytical methodologies, the results are inconclusive, and potentially even damaging. Unfortunately, similar shortcomings attend New York's climate legislation—which, according to observers, contained requirements for reducing greenhouse gas emissions that never had "any evaluation of their technical and economic feasibility." N.Y. Bill Jacket, 2019, S.B. 6599, ch. 106, at 14. Nor was there any sense of how the legislation would affect the State's budget. *Id.* at 10. The uncertainties plaguing New York's law, along with the Virginia study's unanticipated results, exemplify why Congress created a comprehensive energy conservation policy implemented through regulatory processes that consider economic impacts, technical feasibility, sustainability, and the quantitative results that the given policy has on energy conservation.

9

The reality is that states and municipalities do not consider the many factors and nationwide implications of their laws as they relate to EPCA's federal preemption provision. New York appears to be no exception. It thus proves Congress's wisdom in charging the U.S. Department of Energy to set uniform, federal standards, informed by a broad swath of stakeholders who have considered virtually every angle of a particular rule and its consequences.

III.  **The plain text of EPCA preempts New York's law, and this Court should align itself with the Ninth Circuit in saying so.**

In EPCA, Congress spoke clearly and directly to the issue of federal preemption. EPCA expressly preempts any state and local "regulation concerning" certain appliances' "energy use." 42 U.S.C. § 6297(c). New York's law, which prohibits "the installation of fossil-fuel equipment and building systems" in new buildings, N.Y. Energy § 11-104(6)(b); N.Y. Exec. § 378(19), undoubtedly falls within the zone of preemption. That is because New York's law effectively brings "the quantity of energy directly consumed by a consumer product at point of use" down to zero. 42 U.S.C. § 6291(4).

Indeed, although New York's law does not speak in the language of kilowatt-hours ("kWh"), British thermal units ("Btus"), or any other technical "energy use" measurement, it nevertheless sets a "maximum quantity of energy use" standard for

10

gas appliances just as a more traditional energy conservation standard would.[2] By prohibiting gas use entirely, New York's law sets that value at zero. And that is true whether an appliance's "energy use" is determined on the factory floor using test procedures or where consumers actually use the appliances in the real world. Either way, under New York's law, gas appliances cannot use any gas energy. Framed in terms of the parties' differing views of the preemption provision, that means both prohibiting gas appliances that have a figure greater than zero specified on their kBtu/year energy use labels *and* barring the actual use of gas appliances in practice. So however "energy use" may be defined and measured for the particular EPCA-covered gas appliance at issue, the New York law dials back the maximum quantity of energy it may use to zero.

New York's law is, in short, a heavy-handed way of achieving the equivalent of a stringent energy conservation standard. For example, a State could not impose a backdoor energy conservation standard that sets a "maximum quantity of energy use" for gas stoves at, say, 1,000 kBtu/year. The same goes for the 0 kBtu/year standard the State sets in the law at issue here. That backdoor energy conservation standard must therefore fall to EPCA preemption.

---

[2] EPCA defines "energy conservation standard" as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title." 42 U.S.C. § 6291(6).

The Ninth Circuit confirmed this plain and straightforward understanding of EPCA preemption. In *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), the Ninth Circuit held that EPCA preempted the City of Berkeley's ban on natural gas piping in new buildings. In so holding, the court rejected the City's argument that its ordinance had only "indirectly" regulated energy from appliances and thus fell outside EPCA's preemptive scope. *Id.* at 1107. "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings," the Ninth Circuit noted, "[s]o Berkeley can't evade preemption by merely moving up one step in the energy chain and banning natural gas piping within those buildings." *Id.*

Here, New York's law falls within the "no doubt" level of preemption. Because it *directly* regulates EPCA-covered consumer products and commercial equipment that use fossil fuels, it cannot evade EPCA's preemption provision. This Court should align itself with the Ninth Circuit in saying so. *Berkeley*, of course, does not bind this Court. But this Court is generally wary of creating circuit splits. *See Marine Recreational Opportunities, Inc. v. Berman*, 15 F.3d 270, 272 (2d Cir. 1994) ("[A] contrary ruling would create a conflict among the circuits without our having any compelling reason to depart from the precedents of other circuits."). And that is especially true when, as here, the Ninth Circuit "thoughtfully and comprehensively [addressed] the issue," *Lozada v. United States*, 107 F.3d 1011,

12

1016 (2d Cir. 1997), and federal "uniformity is the goal," *McCarty v. S. Farm Bureau Cas. Ins. Co.*, 758 F.3d 969, 974 (8th Cir. 2014). Agreement amongst the circuits will promote the national uniformity for HVACR and water heating equipment manufacturers that EPCA is meant to preserve.

### CONCLUSION

For these reasons, the Court should reverse the judgment below.

October 10, 2025                          Respectfully submitted,


By:  */s/ J. Mark Little*
     BAKER BOTTS L.L.P.
     J. Mark Little
     910 Louisiana Street
     Houston, TX 77002
     Tel: (713) 229-1234
     Fax: (713) 229-1522

     *Counsel for Amicus Curiae Air-Conditioning, Heating, and Refrigeration Institute*

13

## CERTIFICATE OF SERVICE

On October 10, 2025, a true and correct copy of the foregoing was filed with the electronic case filing (ECF) system of the U.S. Court of Appeals for the Second Circuit, which currently provides electronic service on all counsel of record.

*/s/ J. Mark Little*
J. Mark Little

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and this Court's Local R. 29.1(c) because this brief contains 2,647 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with this Court's Local Rule 32.1(a)(2), the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman font, size 14.

*/s/ J. Mark Little*
J. Mark Little

14