# 25-2041

# United States Court of Appeals for the Second Circuit

MULHERN GAS CO., INC., et al.,

*Plaintiffs-Appellants,*

v.

WALTER T. MOSLEY, in his official capacity as New York Secretary of State and Member of the State Fire Prevention and Building Code Council,

*Defendant-Appellee,*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, et al.,

*Intervenors-Defendants-Appellees,*

*(For full caption, see inside front cover.)*

On Appeal from the United States District Court for the Northern District of New York

## BRIEF FOR DEFENDANT-APPELLEE

|  |  |
|---|---|
| | LETITIA JAMES |
| | *Attorney General* |
| BARBARA D. UNDERWOOD | *State of New York* |
| *Solicitor General* | Attorney for Defendant-Appellee |
| JEFFREY W. LANG | The Capitol |
| *Deputy Solicitor General* | Albany, New York 12224 |
| DUSTIN J. BROCKNER | (518) 776-2017 |
| *Assistant Solicitor General* | |
| *of Counsel* | Dated: December 3, 2025 |

MULHERN GAS CO., INC., ET AL., NEW YORK STATE BUILDERS ASSOCIATION;NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., dba Master Plumbers Council of the City of New York; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; and TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants*,

v.

WALTER T. MOSLEY, in his official capacity as New York Secretary of State and Member of the State Fire Prevention and Building Code Council,

*Defendant-Appellee*,

-and-

NEW YORK GEOTHERMAL ENERGY ORGANIZATION; PUSH BUFFALO,

*Intervenors-Defendants-Appellees,*

-and-

NEW YORK DEPARTMENT OF STATE; NEW YORK STATE FIRE PREVENTION AND BUILDING CODE COUNCIL; and JAMES CABLE, RUTHANNE VISNAUSKAS, ROBERTA REARDON, ERIC ADAMS, MICHAEL SPANO, JOSEPH M. DESTEFANO, CLAUDIA BRAYMER, JOSEPH TOOMEY, SHAWN HAMLIN, TIMOTHY DERUYSCHER, ROBERT HUGHES, WILLIAM W. TUYN, PATRICK DOLAN, and DOMINIC MARINELLI, in their Official Capacities as Members of the State Fire Prevention and Building Code Council,

*Defendants.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................iii

PRELIMINARY STATEMENT ............................................................ 1

QUESTIONS PRESENTED ................................................................ 3

STATEMENT OF THE CASE ............................................................. 4

    A.   Legal Background ................................................................ 4

        1.   The Federal Energy Policy and Conservation Act's Regime of Appliance Performance Standards ................. 4

        2.   New York's Law Requiring the State Building Codes to Prohibit Fossil Fuel Equipment in Certain New Buildings ................................................................ 10

    B.   Proceedings Below ............................................................ 12

    C.   Subsequent Developments ................................................ 20

STANDARD OF REVIEW ............................................................... 21

SUMMARY OF ARGUMENT ........................................................... 21

ARGUMENT .................................................................................. 24

POINT I

EPCA DOES NOT PREEMPT NEW YORK STATE'S FOSSIL FUEL PROHIBITION ............................................................................... 26

    A.   EPCA Only Preempts State Laws that Concern Products' Energy Consumption ....................................... 26

i

**Page**

1. EPCA's Text Shows That It Does Not Preempt State Laws that Regulate the Type of Energy a Product Uses Without Regard to the Quantity Used. ....27

2. EPCA's Structure Confirms That It Does Not Preempt State Regulations that Regulate Solely Energy Type..................................................31

3. EPCA's Legislative History Further Supports Its Limited Preemptive Scope...............................................36

B. EPCA Does Not Enshrine a Consumer Right to Use Any Product Subject to a Federal Energy Conservation Standard..............................................................................43

1. "Energy Use" under EPCA Refers to a Product's Energy Performance as Designed, Not the Ability to Use a Product..................................................44

2. EPCA's Exceptions to Preemption Fail to Support Plaintiffs' Broad View of Preemption............................48

C. New York's Prohibition Does Not Concern "Energy Use" Because It Regulates Appliances Regardless of Their Energy Performance. ............................................................55

POINT II

ALTERNATIVELY, PLAINTIFFS' CLAIM FAILS BECAUSE THEY FAILED TO SHOW NEW YORK'S PROHIBITION IS PREEMPTED IN EVERY APPLICATION. .................................................................................66

CONCLUSION .........................................................................69

CERTIFICATE OF COMPLIANCE

ii

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*23-34 94th St. Grocery Corp. v. New York City Bd. of Health,*
685 F.3d 174 (2d Cir. 2012) ............................................................... 59

*Air Conditioning & Refrigeration Inst. v. Energy Res.*
*Conservation & Dev. Comm'n,*
410 F.3d 492 (9th Cir. 2005) ....................................................... 6, 36-38

*Art & Antique Dealers League of Am., Inc. v. Seggos,*
121 F.4th 423 (2d Cir. 2024) ....................................................... 25, 36

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra,*
870 F.3d 1140 (9th Cir. 2017) ............................................................ 61

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City*
*of New York,*
No. 23-CV-11292, 2025 WL 843619
(S.D.N.Y. Mar. 18, 2025) ................................................... 16-18, 30, 63

*Bldg. Indus. Ass'n of Wash. v. Washington State Bldg. Code*
*Council,*
683 F.3d 1144 (9th Cir. 2012) ...................................................... 52-54

*Buono v. Tyco Fire Prods., LP,*
78 F.4th 490 (2d Cir. 2023) ............................................................... 56

*California Restaurant Association v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024) ................................... 15-18, 30, 44-46

*Cavel International, Inc. v. Madigan,*
500 F.3d 551 (7th Cir. 2007) ............................................................. 60

*Council for Responsible Nutrition v. James,*
-- F.4th --, 2025 WL 3165673 (2d Cir. Nov. 13, 2025) ....................... 25

*Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund,*
583 U.S. 416 (2018) .......................................................................... 50

| Cases | Page(s) |
|---|---|

*Dan's City Used Cars, Inc. v. Pelkey,*
569 U.S. 251 (2013).................................................................. 25, 49

*Digital Realty Trust, Inc. v. Somers,*
583 U.S. 149 (2018).......................................................................28

*Dubin v. United States,*
599 U.S. 110 (2023).................................................................. 25, 32

*Egelhoff v. Egelhoff ex rel. Breiner,*
532 U.S. 141 (2001).......................................................................57

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,*
476 F.3d 326 (5th Cir. 2007)...........................................................60

*Geier v. American Honda Motor Co.,*
529 U.S. 861 (2000).......................................................................24

*Hayes v. Dahlke,*
976 F.3d 259 (2d Cir. 2020) ..........................................................21

*INS v. National Ctr. for Immigrants' Rights, Inc.,*
502 U.S. 183 (1991).......................................................................26

*Metro. Life Ins. Co. v. Massachusetts,*
471 U.S. 724 (1985).......................................................................56

*Monsalvo Velazquez v. Bondi,*
145 S. Ct. 1232 (2025)............................................................. 41, 43

*Nat. Res. Def. Council, Inc. v. Herrington,*
768 F.2d 1355 (D.C. Cir. 1985).....................................................4-5

*Nat. Res. Def. Council v. Abraham,*
355 F.3d 179 (2d Cir. 2004) ...................................................4-5, 36

*Nat'l Shooting Sports Found., Inc. v. James,*
144 F.4th 98 (2d Cir. 2025).....................................................26, 67

iv

**Cases**                                                    **Page(s)**

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
514 U.S. 645 (1995) ...................................................................... 24

*Off. Create Corp. v. Planet Ent., LLC*,
140 F.4th 96 (2d Cir. 2025) ......................................................... 24

*Puerto Rico v. Franklin California Tax-free Tr.*,
579 U.S. 115 (2016) ...................................................................... 25

*Rest. L. Ctr. v. City of New York*,
90 F.4th 101 (2d Cir. 2024) ......................................................... 26

*Rudisill v. McDonough*,
601 U.S. 294 (2024) ...................................................................... 32

*Rutledge v. Pharm. Care Mgmt. Ass'n*,
592 U.S. 80 (2020) ........................................................................ 57

*United States v. Salerno*,
481 U.S. 739 (1987) ...................................................................... 68

*Van Buren v. United States*,
593 U.S. 374 (2021) ...................................................... 28, 44-45, 48

*Virginia Uranium, Inc. v. Warren*,
587 U.S. 761 (2019) ...................................................................... 60

**Federal Statutes**

Pub. L. No. 94-163, 89 Stat. 871 (1975) ........................................ 4

Pub. L. No. 95-619, 92 Stat. 3206 (1978) ...................................... 4
    § 422 ............................................................................................ 5
    § 424 ............................................................................................ 5

Pub. L. No. 100-12, 101 Stat. 103 (1987) ...................................... 6
    § 2(a) ...................................................................................... 39, 40
    § 7 .............................................................................................. 38

**Federal Statutes**                                                     **Page(s)**

Pub. L. No. 102-486, 106 Stat. 2776 (1992)

§§ 122-123 ............................................................................ 6

§ 123(f)(2) ........................................................................... 35

§ 123(h)(3)(E) ..................................................................... 35

12 U.S.C.

§ 25b(b)(1)(B) ...................................................................... 49

42 U.S.C.

§ 6291(4) ........................................................................ 7, 28

§ 6291(5) ........................................................................ 7, 28

§ 6291(6) ........................................................................ 7, 33

§ 6291(8) ........................................................................ 7, 47

§§ 6291-6309 ........................................................................ 6

§ 6291(a)(6) (1982) ............................................................ 39

§ 6292(a)-(b) .................................................................... 9, 67

§ 6292(b) ............................................................................. 33

§ 6293(b)(1) .......................................................................... 7

§ 6293(b)(3) ..................................................................... 7, 28

§ 6294 ................................................................................. 30

§ 6294(a) ......................................................................... 8, 30

§ 6294(c) ............................................................................... 8

§ 6294(c)(1) ........................................................................... 8

§ 6295(a)(2) .......................................................................... 6

§ 6295(b)(1) ........................................................................... 8

§ 6295(c)(1) ........................................................................... 8

§ 6295(o)(2)(A) ..................................................................... 7

§ 6295(o)(3)(B) ..................................................................... 7

§ 6295(o)(4) ......................................................................... 51

§ 6296(d) ............................................................................... 8

§ 6296(d)(1) ......................................................................... 29

**Federal Statutes**                                                 **Page(s)**

42 U.S.C. (cont'd)

§ 6297(a)(2) (1982) ....................................................................... 38

§ 6297(b)(1) .................................................................................... 29

§ 6297(c) ..................................................... 9, 22, 27, 32-33, 67

§ 6297(c)(1) .................................................................................... 29

§ 6297(d)(1)-(6) ............................................................................. 37

§ 6297(d)(1)(B) ............................................................................. 34

§ 6297(d)(1)(C)(ii) ........................................................................ 34

§ 6297(d)(3) ............................................................................. 19, 49

§ 6297(d)(3)(D) ............................................................................. 50

§ 6297(d)(4) ............................................................................. 19, 49

§ 6297(f)(3)(b) ............................................................................... 52

§ 6297(g) ........................................................................................ 30

§ 6297(l) ......................................................................................... 29

§§ 6311-6317 ................................................................................... 6

§ 6316(b)(2)(A) .............................................................................. 67

**State Statutes**

1991 Ga. Laws 987 ......................................................................... 35

Ch. 517, 1957 N.Y. Laws 1241 ..................................................... 40

Ch. 424, 1989 N.Y. Laws 2646 ..................................................... 35

Ch. 56, 2023 N.Y. Laws 138 .......................................................... 11

Ch. 293, 1990 R.I. Pub. Laws 905 ................................................ 35

vii

**State Statutes**                                                                   **Page(s)**

N.Y. A.P.A.
   § 203 ........................................................................................... 21

N.Y. Energy Law
   § 11-102(8) ................................................................................. 12
   § 11-103(1)(b) ............................................................................ 11
   § 11-104 ..................................................................................... 11
   § 11-104(6)-(8) .......................................................................... 66
   § 11-104(6)(b) ........................................................................... 12
   § 11-104(7)(a)-(b) .............................................................. 12, 64
   § 11-104(8) ................................................................................. 12

N.Y. Exec. Law
   § 90 ............................................................................................ 13
   § 371(2)(b) ................................................................................. 11
   § 374(1) ................................................................................ 11, 13
   § 377 .......................................................................................... 11
   § 378(1)-(2) ............................................................................... 11
   § 378(19) ................................................................................... 66

N.Y. Real Prop. Law
   § 239-e ...................................................................................... 63

**Federal Regulations**

10 C.F.R.
   § 430.32(a)(1) .............................................................................. 8
   § 430.32(b)(1) .............................................................................. 8
   § 430.32(h)(3)(iii)-(vi) .............................................................. 59

16 C.F.R.
   pt. 305 .......................................................................................... 8
   § 305.17 ..................................................................................... 30

**State Regulations**                                             **Page(s)**

19 N.Y.C.R.R.
§ 1240.6(c)(1)(iv)..................................................................... 68
§ 1240.6(e)(3)(i) ...................................................................... 68

**Miscellaneous Authorities**

47 Fed. Reg. 14,424 (Apr. 2, 1982) ................................................ 41, 43

69 Fed. Reg. 45,420 (July 29, 2004) ...................................................... 47

71 Fed. Reg. 45,371 (Aug. 9, 2006)........................................................ 30

75 Fed. Reg. 59,470 (Sept. 27, 2010)...................................................... 42

90 Fed. Reg. 19,250 (May 7, 2025) .................................................... 10, 67

144 Cong. Rec. 27,193 (Oct. 20, 1998)...................................................... 46

2025 Residential Code of N.Y. St. § M1416.1 ......................................... 63

Brief for the United States as Amicus Curiae in Support of
Petition for Rehearing, *Cal. Rest. Ass'n v. City of Berkeley*,
No. 21-16278 (9th Cir. June 12, 2023) ............................................... 42

Brief for the United States as *Amicus Curiae* Supporting
Appellants, *Ass'n of Contracting Plumbers of the City of New
York v. City of New York*, No. 25-977 (2d Cir. Aug. 7, 2025) ............. 42

Brief for the United States in Support of Appellee, *Cal. Rest.
Ass'n v. City of Berkeley*, No. 21-16278 (9th Cir. Feb. 2, 2022).......... 42

Federal Energy Management Program, U.S. Dep't of Energy,
*Reporting Guidance for Federal Agency Annual Report on
Energy Management* (Oct. 2024),
https://www.energy.gov/sites/default/files/2024-10/fy24-
annual-energy-reporting-guidance.pdf ............................................. 47

ix

**Miscellaneous Authorities**                                                   **Page(s)**

Governor Kathy Hochul, *Governor Hochul Announces FY 2024 Budget Investments in Energy Affordability, Sustainable Buildings, and Clean Energy* (May 3, 2023), https://www.governor.ny.gov/news/governor-hochul-announces-fy-2024-budget-investments-energy-affordability-sustainable ................................................................................... 10

H.R. Rep. No. 100-11 (1987) .............................................. 37, 38, 43, 52

N.Y.C. Admin Code
§ 27-2034 ..................................................................................... 63
§ 27-2035(a) ................................................................................. 63

N.Y.C. Mechanical Code
§ 917.1 .......................................................................................... 63

N.Y. Reg., vol. 47, issue 39 (Oct. 1, 2025), https://dos.ny.gov/system/files/documents/2025/09/100125.pdf .................................................................................... 21

New York State Climate Action Council, *Scoping Plan: Full Report* (Dec. 2022) ........................................................................... 11

The Random House Dictionary of the English Language (2d ed. 1987) .............................................................................................. 56

S. Rep. 100-6 (1987) ................................................... 5, 36, 37, 38, 51, 52

S. Rep. 105-227 (1998) ......................................................................... 47

U.S. Dep't of Energy, Standards and Test Procedures, https://www.energy.gov/eere/buildings/standards-and-test-procedures ...................................................................................... 68

**Miscellaneous Authorities**                                    **Page(s)**

U.S. Energy Information Admin., *Energy and the Environment Explained: Where Greenhouse Gases Come From*, https://www.eia.gov/energyexplained/energy-and-the-environment/where-greenhouse-gases-come-from.php ....................... 10

Webster's Ninth New Collegiate Dictionary (1985) ............................... 56

xi

## PRELIMINARY STATEMENT

In 2023, New York State enacted a law requiring the New York Department of State to amend the statewide building codes to prohibit the use of appliances that burn fossil fuels in certain new buildings, in order to reduce greenhouse gas emissions and improve indoor air quality. Plaintiffs are propane companies, trade associations, and unions whose members install fossil fuel systems and appliances. They brought this action alleging that New York's fossil fuel prohibition is expressly preempted by the federal Energy Policy and Conservation Act ("EPCA"). The U.S. District Court for the Northern District of New York (Suddaby, J.) rejected plaintiffs' claim on the merits and entered summary judgment in the State's favor.

This Court should affirm. As the district court correctly held, EPCA and New York's prohibition regulate distinct domains. EPCA directs the U.S. Department of Energy ("DOE") to enforce nationwide energy performance standards for covered appliances—meaning standards addressed to manufacturers that limit the quantity of energy those appliances are designed to consume. To spare manufacturers from conflicting obligations, EPCA expressly preempts state regulations that would

impose competing performance-related requirements, whether in form or function.

That is not what New York's prohibition does. It says nothing about the *quantity* of energy that any appliance is designed to consume or how efficiently it uses energy. The prohibition regulates solely the *type* of energy used, forbidding fossil fuel equipment and infrastructure without regard to how much energy any appliance may use. Because New York's law regulates based solely on energy type and location, rather than any product's energy consumption, it is not preempted.

Plaintiffs fail to demonstrate otherwise. Their argument at its core hinges on giving a key statutory term a colloquial interpretation that conflicts with the technical definition that EPCA expressly provides. By that maneuver, they seek to transform EPCA's preemption of state regulations about energy conservation into a sweeping guarantee that covered products meeting federal standards cannot be regulated on grounds entirely unrelated to the quantity of energy they are designed to consume. To be sure, as plaintiffs emphasize, a panel on the Ninth Circuit accepted their view of EPCA's technical provisions. The dissent from the

2

denial of rehearing en banc in that case, which was supported by eleven judges, rejected the panel's view. And so should this Court.

In any event, plaintiffs' claim fails for the separate reason that they asserted only a facial challenge yet failed to plausibly allege that New York's prohibition is preempted in every application. It is undisputed that the prohibition can be validly applied to forbid commercially available appliances, such as decorative gas fireplaces, that do not qualify as a "covered product" within the meaning of EPCA or lack a federal energy conservation standard.

## QUESTIONS PRESENTED

1.    Whether New York State's prohibition on fossil fuel appliances in certain new buildings is outside the scope of preemption by EPCA's appliance standard regime, because the New York law regulates only the specific fuel that may be used by appliances, and not the energy consumption of any appliances regulated by EPCA.

2.    Alternatively, whether plaintiffs' facial challenge to the New York's law fails because they have not shown that the prohibition is preempted in every application.

## STATEMENT OF THE CASE

### A.    Legal Background

#### 1.    The Federal Energy Policy and Conservation Act's Regime of Appliance Performance Standards

In response to the energy crisis caused by the oil embargo in the early 1970s, Congress enacted the Energy Policy and Conservation Act ("EPCA") in 1975. *See* Pub. L. No. 94-163, 89 Stat. 871 (1975); *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). EPCA aimed to reduce the Nation's vulnerability to future import disruptions by, among other measures, reducing the demand for energy through the improved energy efficiency of consumer products. *See Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985) (citing, e.g., H.R. Rep. 94-340, at 20 (1975)). To pursue that goal, Congress initially required manufacturers to disclose to consumers the energy efficiency of certain household appliances (called "covered products"), hoping that such disclosures would prompt manufacturers to redesign their products to consume less energy. *See Abraham*, 355 F.3d at 185.

Three years later, Congress amended EPCA by requiring the U.S. Department of Energy ("DOE") to prescribe energy efficiency standards for 13 covered products. *Id.* at 186; *see* Pub. L. No. 95-619, 92 Stat. 3206

4

(1978). If DOE issued a standard, or determined that no standard was warranted, then any state-law efficiency requirement for that product would be preempted; states, however, could apply to DOE for an exemption from the preemption provision. *See Herrington*, 768 F.2d at 1363; Pub. L. No. 95-619, §§ 422, 424, 92 Stat. at 3259-62, 3263-64.

DOE largely determined that no standards were appropriate and implemented a "general policy of granting petitions from States requesting waivers from preemption." S. Rep. 100-6, at 4 (1987). Due to DOE's liberal waiver policy, appliance manufacturers faced by the mid-1980s a "'growing patchwork' of state efficiency standards." *Abraham*, 355 F.3d at 186 n.3 (quoting S. Rep. 100-6, at 4). That patchwork increasingly complicated manufacturers' "design, production and marketing plans." S. Rep. 100-6, at 4.

In 1987, Congress responded by adopting legislation negotiated by industry trade groups and the Natural Resources Defense Council. *Abraham*, 355 F.3d at 186 (citing S. Rep. No. 100-6, at 3-4). The law, known as the National Appliance Energy Conservation Act, required national energy conservation standards that aimed to improve products' energy performance while also imposing new limits on DOE that made it

"more difficult for states to obtain waivers of preemption for more stringent state efficiency standards." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005); *see* Pub. L. No. 100-12, 101 Stat. 103 (1987). Later EPCA amendments added conservation standards for certain industrial equipment and plumbing fixtures, the latter of which limit water use. *See* Pub. L. No. 102-486, §§ 122-123, 106 Stat. 2776, 2806-2832 (1992).[1]

In its current form, EPCA establishes "energy conservation standards" for "covered products" and authorizes DOE to prescribe amended or new standards. 42 U.S.C. § 6295(a)(2). These standards limit the quantity of energy or water a covered product is designed to use. Specifically, an "energy conservation standard" is defined as either (1) "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" or "water use, for a covered product, determined in accordance with test procedures

---

[1] EPCA addresses consumer and industrial appliances in different provisions. *See* 42 U.S.C. §§ 6291-6309 (consumer); *id.* §§ 6311-6317 (industrial). The provisions are substantially similar and, for convenience, this brief, like the district court's decision, will cite the provisions that govern consumer products, unless otherwise noted.

prescribed under [42 U.S.C. § 6293]," or (2) "a design requirement" for a certain enumerated covered products, such as dishwashers and ovens. *Id.* § 6291(6). DOE may not impose or amend an "energy conservation standard" unless it finds that the standard will significantly reduce energy or water use. *Id.* § 6295(o)(3)(B); *see also id.* § 6295(o)(2)(A).

EPCA defines two key components of a performance standard—"energy efficiency" and "energy use"—which are mirrored in EPCA's preemption clause. Each term refers to a fixed quantity that measures the amount of energy a product is designed to consume. "Energy efficiency" means "the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under [§ 6293]." *Id.* § 6291(5). "[E]nergy use" means "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under [§ 6293]." *Id.* § 6291(4). The test procedures, which DOE prescribes, must measure energy consumption "of a covered product during a representative average use cycle or period of use." *Id.* § 6293(b)(1), (3); *see id.* § 6291(8) (defining the term "measure of energy consumption" to include "energy use" and "energy efficiency").

7

EPCA employs "energy use" as the appropriate performance metric for some products, and "energy efficiency" as the metric for others. Refrigerators, for instance, operate continuously and are subject to an "energy use" standard, which makes sense because they lack a discrete use cycle. *See id.* § 6295(b)(1); 10 C.F.R. § 430.32(a)(1). By contrast, room air conditioners, which operate only periodically when cooling a room, are subject to "energy efficiency" ratios. *See* 42 U.S.C. § 6295(c)(1); 10 C.F.R. § 430.32(b)(1). In either case, the "energy use" or "energy efficiency" describes the quantity of energy a product is designed to consume, which may or may not be reflected in the product's actual performance after purchase.

Further, once manufacturers have conducted the requisite testing, they generally must label the product with energy efficiency and energy use information in accordance with product-specific regulations. 42 U.S.C. § 6294(a), (c). That information constitutes a fixed value that specifies the product's energy consumption and estimated annual operating cost. *See id.* § 6294(c)(1); *see generally* 16 C.F.R. pt. 305 (energy labeling rules). Manufacturers must also provide to DOE, upon the agency's request, information relating to energy efficiency or use. 42 U.S.C. § 6296(d).

EPCA contains an express preemption clause that displaces state and local performance-based regulations. *Id.* § 6297(c). The clause is entitled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product." *Id.* It provides, in relevant part, that "effective on the effective date of an energy conservation standard established or prescribed under [§ 6295] for any covered product*, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective* with respect to such product unless the regulation" falls into one of certain exceptions. *Id.* (emphasis added).

The principal dispute in this case is over what it means for a regulation to be "concerning the energy efficiency, energy use, or water use" of a product. It is undisputed, however, that EPCA's preemption clause applies *only* to state regulations of a "covered product" for which an "energy conservation standard" is in effect. Not every commercially available consumer appliance constitutes a "covered product." Rather, a product qualifies as "covered" only if it is expressly classified as such by EPCA or by DOE in a separate rulemaking. *Id.* § 6292(a)-(b). EPCA therefore does not preempt state restrictions on appliances that do not

9

qualify as a "covered product" or that lack a federal energy conservation standard. A decorative gas-powered fireplace, among other commercially available appliances, is not a "covered product" and thus falls outside EPCA's preemptive scope. *See* 90 Fed. Reg. 19,250, 19,253 (May 7, 2025) (withdrawing "covered product" classification for gas-fired decorative hearth products and outdoor heaters).

### 2. New York's Law Requiring the State Building Codes to Prohibit Fossil Fuel Equipment in Certain New Buildings.

Burning fossil fuels is the principal source of greenhouse gas emissions, and, in New York alone, buildings are responsible for over 30% of emissions.[2] Burning fossil fuels also adversely affects indoor environments. Fossil fuel appliances and systems emit pollutants that reduce indoor air quality and pose health concerns, including an

---

[2] U.S. Energy Information Admin., *Energy and the Environment Explained: Where Greenhouse Gases Come From*; Governor Kathy Hochul, *Governor Hochul Announces FY 2024 Budget Investments in Energy Affordability, Sustainable Buildings, and Clean Energy* (May 3, 2023). (For sources available on the internet, full URLs appear in the Table of Authorities. All URLs were last visited on December 3, 2025.)

increased risk of asthma. *See* New York State Climate Action Council, *Scoping Plan: Full Report*, 114-115 (Dec. 2022).

Against this backdrop, in May 2023, New York State enacted a law to reduce statewide emissions of greenhouse gases and improve indoor air quality. The law directed the State Fire Prevention and Building Code Council ("Code Council")—a multi-member body within New York's Department of State—to adopt regulations that would generally prohibit the installation of appliances that burn fossil fuel in new buildings. *See* Ch. 56, pt. RR, §§ 1, 3, 2023 N.Y. Laws 138, 244-48 (codified at N.Y. Energy Law § 11-104(6)-(8), N.Y. Exec. Law § 378(19)).

The Code Council is responsible for promulgating regulations that comprise two building codes that generally apply statewide.[3] *See* N.Y. Exec. Law §§ 374(1), 377; N.Y. Energy Law § 11-104. The May 2023 law directed the Code Council to amend the codes to prohibit the "installation of fossil-fuel equipment and building systems" in new buildings of a

---

[3] The first code is known as the Uniform Fire Prevention and Building Code, which sets fire prevention and building safety requirements for various buildings. *See* N.Y. Exec. Law §§ 371(2)(b), 378(1)-(2). The other code is the Energy Conservation Construction Code, which sets energy conservation and clean energy requirements for new buildings. *See* N.Y. Energy Law § 11-103(1)(b).

certain size on or after December 31, 2025, as well new buildings of any size after December 31, 2028. *E.g.*, N.Y. Energy Law § 11-104(6)(b). The term "fossil-fuel equipment and building systems" includes (1) appliances that use fossil fuel for combustion and (2) infrastructure, such as piping, that deliver fossil fuels to or from these appliances. *Id.* §§ 11-102(8), 11-104(8). The prohibition applies without regard to the quantity of fuel any appliance consumes or how efficiently it consumes that fuel.

The May 2023 law did not direct the Council to promulgate an across-the-board prohibition. Existing buildings are not covered by this directive; nor are certain types of new buildings, such as manufactured homes (a type of prefabricated housing largely assembled in factories). *Id.* § 11-104(7)(a)-(b).

## B. Proceedings Below

Plaintiffs are propane companies, trade associations involved in residential construction, and unions whose members install fossil fuel systems and appliances. (Joint Appendix ["J.A."] 25.) In October 2023, they filed this lawsuit in the U.S. District Court for the Northern District of New York against the New York Secretary of State Walter D. Mosley

12

("Secretary"), who is a member of the Code Council and head of the New York Department of State. N.Y. Exec. Law §§ 90, 374(1).[4]

Plaintiff asserted a single claim. They alleged that EPCA expressly preempts New York's "gas ban," a term plaintiffs use to describe the May 2023 law that required the Code Council to amend the building codes to include the fossil fuel prohibition. (JA 37, 47-48 [citing N.Y. Energy Law § 11-104(6)-(8); N.Y. Exec. Law § 378(19)].) As plaintiffs made clear, they challenged the May 2023 law's "facial validity." (JA 35.) They alleged that there was "no set of circumstances under which New York's gas ban would be valid under federal law." (JA 36.) Plaintiffs sought a declaratory judgment that "the gas ban" is preempted by EPCA and a permanent injunction to enjoin the Secretary from enforcing the gas ban, including by approving regulations that would impose the fossil fuel prohibition. (JA 47-48.)

---

[4] Although plaintiffs also originally named as defendants the New York Department of State, the Code Council, as well as the Code Council's other members (JA 34-35), the district court dismissed those defendants, and plaintiffs do not challenge that dismissal on appeal (Plaintiffs' Br. ["Pl. Br."] at 17-18).

13

In November 2024, plaintiffs moved for summary judgment on their claim. (JA 18.) The Secretary moved for judgment on the pleadings based on lack of standing and ripeness. (JA 18.) He argued that the May 2023 law did not impose the fossil fuel prohibition directly but required the adoption of implementing regulations, and it was not sufficiently certain when the Code Council would adopt those regulations. (ECF No. 38-1, at 1-2.)[5] Two entities—the New York Geothermal Energy Organization and PUSH Buffalo—intervened as defendants for the purpose of opposing plaintiffs' motion for summary judgment. (JA 19.)

In July 2025, the district court (Suddaby, J.) denied both motions, holding that plaintiffs' claim was justiciable but failed on the merits.[6] The court noted that plaintiffs had standing, and their claim was ripe, because it was sufficiently likely that the Secretary would approve the regulations that will impose the fossil fuel prohibition. (JA 184-185.)

---

[5] References to "ECF No." are to entries on the district court's docket.

[6] As noted below, after giving plaintiffs' notice and opportunity to respond, the district court granted summary judgment in the Secretary's favor. (*See* JA 195 [citing Fed. R. Civ. P. 56(f)(1).)

14

Turning to the merits, the district court held that EPCA did not preempt that fossil fuel prohibition. (JA 189-196.) The court noted that plaintiffs argued that the prohibition is a regulation "concerning" the "energy use" of covered products, and thus preempted, because the energy use of fossil fuel equipment in new buildings "will necessarily be zero (given that they cannot be installed or used at all)." (JA 190.) That argument, the court explained, failed because it relied on plaintiffs' own colloquial definition of the term "energy use" that conflicted with EPCA's express definition for that term. (JA 194.) Under EPCA, the "energy use" of a covered product did not refer to "how much energy a specific product actually uses at any given time in a real-world location." (JA 194.) Rather, the term is defined to refer to a "static assessment of the typical quantity of energy" that a product is designed to consume, as determined under testing procedures. (JA 194-195.)

The district court acknowledged that a Ninth Circuit panel had adopted plaintiffs' reading in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). (JA 190-191.) There, the Ninth Circuit focused on the fact that EPCA's definition of "energy use" states that energy consumption is measured "at point of use"—a term the Ninth

15

Circuit construed to mean "the place where something is used." (JA 191 [quoting *Cal. Rest. Ass'n*, 89 F.4th at 1101-02].) Based on this definition, the Ninth Circuit concluded that EPCA protects the "end-user's ability to use installed covered products at their intended final destinations." (JA 191 [quoting *Cal. Rest. Ass'n*, 89 F.4th at 1102].)

The district court here explained that it found more persuasive two opinions that rejected the Ninth Circuit's understanding of EPCA's technical provisions. Specifically, the district court explained it agreed with the reasoning set forth in (1) the dissent from the denial of rehearing en banc in *California Restaurant Association*, which was authored by Judge Friedland and joined or supported by ten other judges, 89 F.4th at 1119-26, and (2) a decision from a district court in the Southern District of New York, authored by Judge Abrams, that rejected a preemption challenge to New York City's law that prohibits fossil fuel combustion in certain new buildings, *Ass'n of Contracting Plumbers of City of New York,*

16

*Inc. v. City of New York*, No. 23-CV-11292, 2025 WL 843619, at \*4-7 (S.D.N.Y. Mar. 18, 2025), *appeal pending*, No. 25-977 (2d Cir.).[7]

Those two opinions reasoned that EPCA's preemption provision "guarantees uniform appliance efficiency standards" but does "not create a consumer right to use any covered appliance." *California Rest. Ass'n*, 89 F.4th at 1121*; see Ass'n of Contracting Plumbers*, 2025 WL 843619, at \*5. As those opinions explained, the Ninth Circuit panel, in reaching a contrary conclusion, overlooked that EPCA is a technical statute, and the term "point of use" has a specialized meaning in the context of energy consumption. *California Rest. Ass'n*, 89 F.4th at 1121, 1123. The term is used to distinguish measuring "site energy"—meaning the energy that the appliance directly consumes at its "point of use", i.e., its pipe or outlet—from measurements that also account for "source energy"— meaning energy consumed at point of use *plus* the energy consumed in extracting, producing, and delivering usable energy to that point of use. *Id.* at 1123; *accord Ass'n of Contracting Plumbers*, 2025 WL 843619, at

---

[7] This Court has ordered that the appeal in this case will be heard in tandem with the appeal from the district court's decision in *Association of Contracting Plumbers*.

17

*5. Thus, neither the term "energy use" or "point of use" meant that EPCA protects "the actual use of covered products" or grants consumers "an absolute right to use such products." *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5; *Cal. Rest. Ass'n*, 89 F.4th at 1122-24 (Friedland, J.).

The district court adopted the above reasoning and explained further that plaintiffs' reliance on the term "concerning" in EPCA's preemption provision—i.e., the preemption of state regulations "concerning" energy use or efficiency—did not compel a different outcome. (JA 192.) That term does not "create a limitless preemption." (JA 192.) Under EPCA, a state regulation must still "relate to or be about" a product's "energy use"—a term that is defined as the fixed measure of the typical amount of energy a product is designed to consume. (JA 192, 194.) New York's fossil fuel prohibition did not concern "energy use" because it regulates based solely on fuel type. It "merely prohibit[s] the installation of *any* fossil-fuel equipment or system in new buildings, regardless of the energy use of such equipment or systems." (JA 192.)

The district court also found unavailing plaintiffs' reliance on two exceptions to preemption under EPCA that they argued favored their

18

view of the scope of preemption. First, the court rejected plaintiffs' reliance on the waiver provision. (JA 194.) That provision allows DOE to grant a waiver to preemption for a state regulation in certain circumstances, unless, among other factors, an interested person establishes that the state regulation would render that product unavailable or burden its marketing, distribution, sale, or servicing nationwide. *See* 42 U.S.C. § 6297(d)(3), (4). The district court noted that the factors that DOE must consider in deciding whether to grant a waiver—such as potential downstream burdens—do not define or clarify "whether preemption is warranted in the first place." (JA 194-195.) Nor could these factors expand the statutory definition for the term "energy use," which did not mean a "real-world, ever-changing measurement," but instead a "static assessment." (JA 194-195.)

Second, the court rejected plaintiffs' claim that the Secretary's interpretation of EPCA would render superfluous the preemption exception for state building codes that meet specified criteria. (JA 193.) According to plaintiffs, under the Secretary's reading, the exception would be meaningless because a code that imposes a limit on a building's total energy consumption that was calculated by adding up the "energy

19

use" values of various appliances would not trigger preemption in the first instance. (JA 193.) The district court held that plaintiffs' assertion had no merit because such a building-wide limit on energy consumption would be an "indirect regulation concerning the energy use" of covered products and thus preempted unless it otherwise qualified for the exception. (JA 193.) New York's prohibition, by contrast, did not trigger preemption in the first instance. It did not regulate based on any product's measure of energy consumption and did not impose any building-wide energy conservation objectives.

The court ruled that because EPCA does not expressly preempt New York's fossil fuel prohibition, plaintiffs' claim failed on the merits. (JA 195.) After giving plaintiffs notice and opportunity to respond, the court entered summary judgment in the Secretary's favor (ECF No. 65), and plaintiffs appealed (JA 198-199).

## C. Subsequent Developments

In September 2025, the Secretary approved the regulations that amend the building codes to impose the fossil fuel prohibition. (ECF No. 71-1, at 9-10.) On October 1, 2025, a notice of adoption was published in the New York State Register that confirmed those regulations had been

promulgated and their effective date was December 31, 2025. N.Y. Reg., vol. 47, at 18-22 (Oct. 1, 2025) (adopting 19 N.Y.C.R.R. §§ 1229-2.1–2.5, 1240.6). The publication of the notice of adoption was the final step required in the rulemaking process. *See* N.Y. A.P.A. § 203.

After filing their notice of appeal, plaintiffs moved for an injunction pending appeal in the district court. (ECF No. 70-1.) The Secretary and plaintiffs resolved that motion by reaching an agreement, memorialized in a stipulation and order that was endorsed by the district court, pursuant to which the court required the Secretary to "take such action as necessary to suspend or delay" pending appeal the regulations' effective date. (ECF No. 75, at 2.)

## STANDARD OF REVIEW

This Court reviews summary judgment decisions de novo. *Hayes v. Dahlke,* 976 F.3d 259, 267 (2d Cir. 2020).

## SUMMARY OF ARGUMENT

Plaintiffs' preemption challenge fails as a matter of law. EPCA's narrow preemption provision displaces only state regulations "concerning the energy efficiency, energy use, or water use" of a covered

21

product. 42 U.S.C. § 6297(c). The term "energy use," in context, refers to a product's performance in consuming energy, not to the choice of which fuel will provide that energy. This is clear from the fact that EPCA expressly defines the term "energy use" as a performance metric that describes the quantity of a product's energy consumption, and not the choice of fuel to provide that energy. That definition of "energy use" is further supported by the statutory structure and legislative history of EPCA, which show that, in drafting the preemption clause, Congress was concerned with protecting manufacturers from the need to design their products to meet competing state regulations of the products' energy performance.

New York's fossil fuel prohibition, by contrast, does not concern "energy use," or "energy efficiency," within the meaning of EPCA because it does not regulate the quantity of energy consumed by the product or the efficiency with which the product consumes energy. Instead, the New York prohibition forbids the use of particular fuel sources in a subset of local buildings, regardless of how much fuel a particular product would consume through its operation, and regardless of how efficiently or inefficiently the fuel is used. Nothing in the New York's prohibition calls

22

for manufacturers to meet performance-based requirements for energy consumption—indeed, no reduction in energy use or increase in efficiency would make appliances that burn fossil fuels permissible in new construction under New York's prohibition.

Plaintiffs' effort to force a connection between these two disparate regulatory regimes simply disregards the meaning of "energy use" in EPCA. Plaintiffs assert that New York's prohibition sets a maximum "energy use" of zero for gas appliances because it prohibits their use in certain locations. But this argument ignores that "energy use" in EPCA's preemption clause refers to a performance characteristic of the product as designed—to the quantity and efficiency of the product's energy consumption, regardless of its source. The Ninth Circuit's decision in *California Restaurant Association*, is unpersuasive because it rests on the same mistake.

New York's prohibition forbids the use of appliances that burn fossil fuels without regard to how much fuel the product is designed to consume or how efficiently the product consumes the fuel. This decision not to regulate the subject matter that EPCA governs demonstrates that New

23

York's prohibition does not "concern" the subject of EPCA's preemption clause, and so is not preempted.

In any event, plaintiffs' claim fails for the independent reason that they have brought a facial challenge but failed to establish that New York's prohibition is preempted in every application. EPCA preemption indisputably does not extend to state regulations of appliances that either do not qualify as a "covered product" under EPCA or are not subject to a federal "energy conservation standard." Thus, New York's prohibition is plainly not preempted as applied to forbid the use of fossil fuel appliances that are not "covered products," such as decorative gas fireplaces and any infrastructure to support those appliances.

## ARGUMENT

Preemption "fundamentally is a question of congressional intent." *Geier v. American Honda Motor Co.*, 529 U.S. 861, 884 (2000) (quotation marks omitted). But courts have not "assumed lightly that Congress has derogated state regulation." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995); *see, e.g., Off. Create Corp. v. Planet Ent., LLC*, 140 F.4th 96, 102 (2d Cir. 2025).

24

When a federal law contains an express preemption clause, a court's "task is to identify the domain expressly pre-empted." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quotation marks omitted). To do so, a court considers that clause's text and its surrounding context, including the overall statutory scheme. *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 429 (2d Cir. 2024). Legislative history may also serve as a guide to Congress's intent. *Id.* at 432. Further, as with any question of statutory interpretation, a statute's meaning "does not always turn solely on the broadest imaginable definitions of its component words." *Dubin v. United States*, 599 U.S. 110, 120 (2023) (quotation marks omitted).[8]

---

[8] Although the U.S. Supreme Court has refused to invoke "any presumption against preemption" when construing an express preemption provision, *Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 125 (2016), this Court has recently explained that the presumption is inapplicable only "insofar as the text of that [express preemption] provision is 'plain.'" *Council for Responsible Nutrition v. James*, -- F.4th --, 2025 WL 3165673, at *10 & n.8 (2d Cir. Nov. 13, 2025) (quoting *Franklin*, 579 U.S. at 125). If, however, the text of the express preemption provision is ambiguous, a court must "accept the reading that disfavors pre-emption." *Id.* at *10 (quotation marks omitted). As detailed below, this Court need not rely on any anti-preemption presumption to resolve this case because EPCA's text, structure, and history demonstrate that the best reading of its preemption provision is that the provision does not preempt New York's fossil fuel prohibition.

Further, because plaintiffs assert a facial preemption challenge, they must show that the fossil fuel prohibition cannot be validly "applied against anyone in any situation.*" Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 108, 111-12 (2d Cir. 2025) (applying facial standard to preemption challenge); *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 117-18 (2d Cir. 2024) (same). The possibility that a "regulation may be invalid as applied" in some cases "does not mean that the regulation is facially invalid." *INS v. National Ctr. for Immigrants' Rights, Inc.*, 502 U.S. 183, 188 (1991).

As explained below, plaintiffs' preemption claim fails because they failed to demonstrate that EPCA expressly preempts New York's fossil fuel prohibition in any application, much less in every application.

## POINT I

### EPCA DOES NOT PREEMPT NEW YORK STATE'S FOSSIL FUEL PROHIBITION

### A. EPCA Only Preempts State Laws that Concern Products' Energy Consumption

EPCA does not create a federal right to use a covered product in the location of a consumer's choosing. Rather, as EPCA's text, structure, and history demonstrate, the statute preempts only state laws that concern a

26

product's energy performance, meaning laws that regulate based on the *quantity* of energy a product is designed to consume. New York's fossil fuel prohibition is not preempted, because it is neutral as to any product's energy performance. The prohibition regulates based solely on the *type* of energy used in certain locations, regardless of how much of that energy any product is designed to consume.

1. **EPCA's Text Shows That It Does Not Preempt State Laws that Regulate the Type of Energy a Product Uses Without Regard to the Quantity Used.**

Starting with the text, EPCA's preemption clause states that once an "energy conservation standard" for "a covered product" takes effect, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," unless an exception applies. 42 U.S.C. § 6297(c). Read in context, this provision does not preempt any state law merely because it may affect where a product can "use" energy in the broadest sense of that term or affect what kind of energy the product may use. Rather, EPCA preempts only state laws that regulate based on a product's energy performance and thereby disrupt EPCA's regime of uniform standards of performance for each product.

27

This conclusion follows from the statutory definition of the preemption clause's two key terms—"energy use" and "energy efficiency." A statute's definition for a term must be followed, even if it varies from the term's ordinary meaning. *Van Buren v. United States*, 593 U.S. 374, 387 (2021); *accord Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149, 160 (2018). EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance" with DOE test procedures. 42 U.S.C. § 6291(4). And the term "energy efficiency" is defined as the "ratio of the useful output of services from a consumer product to the energy use of such product," also "determined in accordance with" DOE test procedures. *Id.* § 6291(5). The test procedures must measure the energy consumption "of a covered product during a representative average use cycle or period of use." *Id.* § 6293(b)(3).

As the district court correctly noted (JA 192), the term "energy use" and "energy efficiency" each refer to a fixed value that reflects the product's typical energy consumption under testing conditions *before* a

28

product enters the market.[9] Each term estimates and describes the product's energy performance, meaning the quantity of energy a product is designed to consume. And because that quantity is determined under DOE test procedures, a product's "energy use" or "energy efficiency" does not reflect or depend on any consumer's actual use of a product. The "energy use" of a covered product is the same whether it is sitting unused in a consumer's garage or installed and used daily.

Several other provisions of EPCA confirm that the terms "energy use" and "energy efficiency" constitute performance metrics that are independent of a product's actual use of energy after purchase. DOE may require manufacturers to submit information with respect to "energy use" and "energy efficiency" of covered products to ensure compliance with the federal standards and facilitate DOE's administration of the statute. 42 U.S.C. § 6296(d)(1). As Judge Friedland noted, and as plaintiffs do not dispute, this provision does not require manufacturers to monitor the quantity of energy any product actually uses once in the

---

[9] The "energy use" under EPCA is expressed as a numerical unit, such as kilowatts per hour or the equivalent in British thermal units per hour. *See* 42 U.S.C. § 6297(b)(1), (c)(1), (*l*).

hands of consumers. *Cal. Rest. Ass'n*, 89 F.4th at 1123; *see also Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5.

Similarly, before a manufacturer may distribute a covered product, it must label the product with a fixed value that reflects the product's "energy use" or "energy efficiency" information. *See* 42 U.S.C. § 6294. That value populates a blank field on a government-prescribed label that is affixed to the product before it is sold. *Id.* § 6294(a); 16 C.F.R. § 305.17. As one sample template advised, the information allows a consumer to "Compare the Energy Use of this [Covered Product] with Others *Before You Buy*." 71 Fed. Reg. 45,371, 45,374 (Aug. 9, 2006) (emphasis added). The fact that consumers may never be able to use an appliance "does not mean that the appliance's label should list 'zero' as its energy use." *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J.).

Further, EPCA distinguishes between a product's "energy use" and its "actual use." Section 6297(g) specifies that any disclosure a manufacturer must make "with respect to energy use" for a product does not create a warranty that such energy use will not be exceeded "under conditions of *actual use*." 42 U.S.C. § 6297(g) (emphasis added). The "energy use" of a product therefore does not provide any guarantee about

30

its actual use, much less any guarantee that consumers will be able to use that product in the location of their choosing.

At every turn, EPCA makes clear that the "energy use" of a product, like its "energy efficiency," constitutes a performance-focused metric that is unaffected by how, where, or even whether a consumer uses a product. Thus, by preempting state laws "concerning the energy efficiency or energy use" of covered products, EPCA displaces only those laws that regulate a products' energy performance, meaning the quantity of energy a product is designed to consume.

New York's fossil fuel prohibition, by contrast, is indifferent to a covered product's energy performance. The prohibition forbids a particular source of fuel and takes no view on how much, or how little, fuel a product consumes when operated, whether under testing conditions or elsewhere. New York's prohibition is therefore not preempted by EPCA.

### 2. EPCA's Structure Confirms That It Does Not Preempt State Regulations that Regulate Solely Energy Type.

EPCA's statutory structure confirms that it preempts only performance-based regulations that, unlike New York's prohibition,

31

distinguish among products based on the amount of energy that a product is designed to consume.

First, the preemption clause's heading supports this understanding. The heading states, in boldface, that the provision sets forth a "[g]eneral rule of preemption for energy conservation standards when Federal standard becomes effective for product." 42 U.S.C. § 6297(c). Although headings are not dispositive, they "supply cues as to what Congress intended." *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (quotation marks omitted). After all, statutory text must be construed in light of the terms surrounding them, and "the title Congress chose is among those terms." *Dubin*, 599 U.S. at 121. Here, the heading suggests that the preemption provision displaces only regulations that aim to reduce the amount of energy a product is designed to consume when operated. Indeed, plaintiffs offer no explanation for why Congress would choose this heading, but intend to preempt any state law that has an effect on where any covered product may be used, or what kind of fuel it may use, even if those laws do not regulate based on a product's level of energy consumption.

32

Second, EPCA employs the same key terms—"energy efficiency," "energy use," as well as "water use"—to define both an "energy conservation standard" set by DOE and the scope of preemption. An "energy conservation standard" includes "a performance standard which prescribes a minimum level of *energy efficiency* or a maximum quantity of *energy use*, or, [for certain fixtures], *water use*, for a covered product." 42 U.S.C. § 6291(6) (emphases added). And Congress used those same three terms to define the domain expressly preempted, which is state laws that concern these three performance metrics. *Id.* § 6297(c). This textual symmetry confirms that the preemption clause is tailored to prevent states from adopting regulations that would encroach upon DOE's statutory mandate by setting performance-based conditions that interfere with DOE's standards.

To read the preemption clause more broadly would create a serious mismatch between DOE's authority to establish energy performance standards and the preemption clause. On plaintiffs' view, once DOE classifies an appliance as a "covered product," 42 U.S.C. § 6292(b), and sets a standard for that product, then states cannot enact requirements that affect a product's "use" of "energy" in the broadest sense. But nothing

in EPCA's text suggests that DOE's narrow authority to regulate a covered product's energy performance encompasses the broad power to create a consumer right to use that product in various ways and locations.

Third, EPCA's exceptions to preemption support this conclusion. One exception allows DOE to waive preemption, but only if, among other things, a state proves that the "*energy or water savings* resulting from the State regulation" outweigh the regulation's overall costs, broadly defined. 42 U.S.C. § 6297(d)(1)(B), (C)(ii) (emphasis added). Congress tailored the waiver standard to match the kind of state regulations that EPCA would otherwise preempt: State laws that call for manufacturers to design their products to use *less* energy or water when operated. By contrast, state regulations aimed at health and safety goals, such as fire safety or pollution reduction, may produce little to no energy or water savings, because that is not their purpose. It is implausible that Congress would intend to preempt health and safety laws—a core exercise of states' police powers—yet provide no viable pathway for the waiver of preemption for such laws in appropriate circumstances.

Another exception further supports EPCA preemption's targeted reach. That exception, enacted in October 1992, exempts from preemption

34

any "regulation concerning the water use" of certain faucets if that regulation had already been adopted by New York, Georgia, or Rhode Island. *See* Pub. L. No. 102-486, § 123(h)(3)(E), 106 Stat. at 2830-31 (codified at 42 U.S.C. § 6297(c)(4)-(5)). When the exception was enacted, each of the three states had recently adopted performance standards governing water use that were more stringent than the corresponding federal standard (i.e., 2 gallons/minute rather than 2.5 gallons/minute).[10] This context suggests that Congress intended the phrase "regulation concerning the water use"—like the phrase "regulation concerning the energy use"—to refer to state laws that impose performance-based requirements.

Together, these statutory components underscore what the text of the preemption provision makes clear: Congress intended to ensure that

---

[10] *Compare* Pub. L. No. 102-486, § 123(f)(2), 106 Stat. at 2826 (codified at 42 U.S.C. § 6295(j)(2)) (setting federal conservation standard of 2.5 gallons per minute for lavatory and kitchen faucets), *with* § 1(b)(4), 1991 Ga. Laws 987, 988 (setting Georgia standard of 2 gallons per minute for lavatory faucets); Ch. 293, § 1(b)(2), 1990 R.I. Pub. Laws 905, 906 (setting Rhode Island standard of 2 gallons per minute for lavatory and kitchen faucets); *and* Ch. 424, § 1(2)(a), 1989 N.Y. Laws 2646, 2647 (setting New York standard of 2 gallons per minute for lavatory faucets).

35

manufacturers need only comply with one uniform performance standard for a given covered product, and therefore Congress preempted only those state laws that would impose competing performance-based obligations.

### 3. EPCA's Legislative History Further Supports Its Limited Preemptive Scope.

The legislative history of EPCA, which can serve as a useful interpretive guide, *Art & Antique Dealers League of Am.*, 121 F.4th at 432, shows that Congress did not intend to broadly confer on consumers a federal right to use products in their preferred locations, or with their preferred energy sources. EPCA's history instead makes clear that its preemption provision was tailored to address a specific problem: a "'growing patchwork' of state efficiency standards." *Abraham*, 355 F.3d at 186 n.3 (quoting S. Rep. 100-6, at 4).

By the mid-1980s, DOE had failed to set performance standards and adopted "a general policy of granting petitions from States requesting waivers from preemption." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499 (quoting S. Rep. No. 100-6, at 4). As a result, appliance manufacturers were burdened by conflicting state-level "appliance efficiency standards," S. Rep. No. 100-6, at 4, that complicated

36

manufacturers' "design, production, and marketing plans," *id.* In 1987, Congress responded by amending EPCA to set federal standards and impose new limits on DOE's waiver authority that "made it more difficult for states to obtain waivers of preemption for more stringent state efficiency standards." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500; *see* 42 U.S.C. § 6297(d)(1)-(6) (new limits on DOE).

Nothing in the legislative history suggests that, in 1987, Congress sought to counteract the patchwork of state efficiency standards not only by narrowing DOE's waiver authority but also by *expanding* the general rule of preemption. The Senate and House committee reports accompanying the 1987 amendments do not suggest that Congress believed that the scope of EPCA's pre-existing preemption provision was too limited. On the contrary, each report stated that the general rule of preemption would follow the rule as "provided under current law." S. Rep. 100-6, at 9; H.R. Rep. No. 100-11, at 23-24 (1987) ("In overall form, the section follows substantially the preemption requirements in current EPCA.").

The committee reports further confirmed that the 1987 amendments were understood to embody a fundamental symmetry. The

37

amendments would require the establishment of federal standards and the preemption of state regulations governing the same domain. *See* S. Rep. 100-6, at 2 (noting that "national standards would preempt all State standards"); H.R. Rep. No. 100-11, at 23-24. Thus, the legislative history "demonstrates that Congress intended to preempt state energy efficiency standards," *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500, rather than any state regulation that restricts where a consumer may use a product, or what fuel that product may use, regardless of the reason for that restriction.

Contrary to plaintiffs' argument (Pl. Br. at 37), the 1987 amendments did not substantively expand the general rule of preemption. Before the 1987 amendments, the relevant preemption provision displaced any state regulation that provided "any energy efficiency standard or other requirement with respect to energy use or energy efficiency." 42 U.S.C. § 6297(a)(2) (1982). The 1987 amendments retained the essential components: The preemption provision displaces any state regulation "concerning the energy efficiency or energy use" under a subsection heading that referred to "energy conservation standards." Pub. L. No. 100-12, § 7, 101 Stat. at 118. Under either version, EPCA

38

preempts state regulations "with respect to" (before 1987) or "concerning" (after 1987) a covered product's "energy use" or "energy efficiency"—the core components of a performance standard.

Granted, as plaintiffs note (Pl. Br. at 37), the preemption provision, as amended in 1987, does not expressly state that it preempts any state regulation that provides an "energy conservation standard or other requirement." But plaintiffs fail to show that, by that omission, Congress intended to expand EPCA's preemption to displace all state laws that regulate covered products but are indifferent to a product's energy performance.

On the contrary, the broader statutory context suggests that Congress' drafting choice was intended to avoid unduly expanding EPCA's preemption. This is because, when Congress amended EPCA in 1987, it replaced the term "energy efficiency standard" with the term "energy conservation standard." *See* Pub. L. No. 100-12, § 2(a), 101 Stat. at 103. Whereas "energy efficiency standard" was generally defined as a "performance standard," 42 U.S.C. § 6291(a)(6) (1982), the new term, "energy conservation standard," was broader: It was defined to include a

39

"performance standard" and, for certain covered products, a "design requirement." Pub. L. No. 100-12, § 2(a), 101 Stat. at 103.

Given this new definition, if—as plaintiffs posit (Br. at 37)—Congress drafted the preemption provision to displace any state "energy conservation standard or other requirement," Congress would have risked preempting state health and safety laws that impose a design requirement but are neutral as to energy performance. This includes, for instance, longstanding state laws that require products to be designed to shut off automatically in certain dangerous circumstances. *See, e.g.*, Ch. 517, § 1, 1957 N.Y. Laws 1241, 1241 (codified at N.Y. Mult. Dwelling Law § 64(3)) (requiring certain appliances to have device that automatically shuts off gas supply if ignition mechanism fails).

Congress instead crafted a narrower rule of preemption, one that targets state laws that concern the core elements of a performance standard—"energy use" and "energy efficiency," and "water use." To be sure, preemption extends beyond state regulations that directly set competing performance standards. But, as EPCA's statutory definitions of those key terms make clear, the preemption provision does not sweep

40

so broadly to displace any state regulation simply because it may limit where a product may "use" energy, or what fuel may provide that energy.

The history of EPCA's regulatory implementation confirms the limited scope of its preemption provision. DOE, the agency charged with implementing the statute, had for decades consistently construed the statute to preempt only state laws that regulate product's energy consumption as designed. In 1982, for instance, DOE proposed rules to govern state petitions that sought a preemption waiver; the agency indicated that it would "review only State regulations that are appliance *efficiency* standards," not "State or local regulations that have only a peripheral effect on the energy efficiency of a covered product." 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982) (emphasis added). DOE explained that a state rule "whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Id.*

Tellingly, if Congress intended for the 1987 amendments to overrule DOE's interpretation, and expand EPCA's preemptive scope, "the government itself seems not to have noticed." *Monsalvo Velazquez v.*

41

*Bondi*, 145 S. Ct. 1232, 1243 (2025). After the 1987 amendments, DOE maintained that it "interprets 'regulation concerning energy use' to be equivalent to 'energy conservation standard,'" which it explained entails laws that impose "a performance-based standard." 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010).

The federal government adhered to DOE's long-held understanding of EPCA throughout the recent Ninth Circuit appeal in *California Restaurant Association*. To be sure, after the change in administrations, the federal government reversed course in a brief filed a few months ago in the appeal from the dismissal of the EPCA challenge to New York City's law restricting fossil fuel appliances.[11] The federal government's newfound reading, however, is meritless for the reasons discussed below

---

[11] *Compare* Brief for the United States as Amicus Curiae in Support of Petition for Rehearing, *Cal. Rest. Ass'n v. City of Berkeley*, No. 21-16278 (9th Cir. June 12, 2023) (arguing that EPCA does not preempt a local law that prevents use of gas appliances); *and* Brief for the United States in Support of Appellee, *Cal. Rest. Ass'n v. City of Berkeley*, No. 21-16278 (9th Cir. Feb. 2, 2022) (same), *with* Brief for the United States as *Amicus Curiae* Supporting Appellants, *Ass'n of Contracting Plumbers of the City of New York v. City of New York*, No. 25-977 (2d Cir. Aug. 7, 2025) (arguing that EPCA would preempt such a local law).

42

at 48-54 and in New York City's brief filed in that appeal. *See* Brief for Defendant-Appellee at 25-26, 31-40, No. 25-977 (2d Cir. Oct. 20, 2025).

In any event, the federal government's recent about-face is entitled to little weight in interpreting the meaning of EPCA amendments that were passed in 1987; what matters instead is the regulatory context at the time of their passage. When Congress adopts a law against the backdrop of longstanding administrative construction, it is presumed that "the new provision should be understood to work in harmony with what has come before." *Monsalvo Velazquez*, 145 S. Ct. at 1242. Here, by 1987, DOE had for years interpreted the statute to preempt only state regulations that are "appliance efficiency standards." 47 Fed. Reg. at 14,456. And Congress chose to "continue the basic concept of preempting State energy efficiency standards," H.R. Rep. No. 100-11, at 24, rather than expand that concept to supersede state laws, such as the one here, that are neutral as to a product's energy efficiency or energy use.

## B. EPCA Does Not Enshrine a Consumer Right to Use Any Product Subject to a Federal Energy Conservation Standard

Plaintiffs' claim rests on an overly broad understanding of the term "energy use" that is inconsistent with EPCA's text, structure, and

43

purpose. They assert that because New York's prohibition will prevent gas-fueled products from operating in certain locations, it concerns those products' "energy use," given that a product's operation uses energy. But when a statute expressly defines a term, that definition supersedes the term's "common parlance" meaning. *Van Buren*, 593 U.S. at 387. The district court correctly held that plaintiffs' claim fails because their reading of the term "energy use" contravenes EPCA's express, technical definition of that term.

1. **"Energy Use" under EPCA Refers to a Product's Energy Performance as Designed, Not the Ability to Use a Product.**

As explained above, EPCA defines the term "energy use" to mean the quantity of energy that a product consumes during test procedures that measure the product's typical level of energy consumption. The term therefore describes the product's energy performance as designed; it does not refer to the consumer's actual use of the product.

This is where the Ninth Circuit erred in holding that EPCA preempts a local ordinance prohibiting gas infrastructure in certain new buildings. *See Cal. Rest. Ass'n*, 89 F.4th at 1101-03. Although the Ninth Circuit noted that EPCA defined "energy use," it failed to mention that

44

the definition referred to a quantity of energy "determined in accordance with test procedures" prescribed under EPCA. *Id.* at 1101. The panel instead focused on how the definition states that the quantity be measured "at point of use." *Id.* According to the panel, the term "point of use" must be given its "ordinary meaning," which, according to a single online nontechnical dictionary from 2022, "means the 'place where something is used.'" *Id.* (quoting Oxford English Dictionary Online (2022)). The panel then reasoned that this definition showed that EPCA protects "the end-user's ability to *use* installed covered products at their intended final destinations." *Id.* at 1101-1102.

That conclusion was unsound. When interpreting statutes, especially technical statutes like EPCA, courts "take note of terms that carry technical meanings." *Van Buren*, 593 U.S. at 388. As Judge Friedland explained, the term "point of use" has a specialized meaning in the context of energy consumption. *See Cal. Rest. Ass'n*, 89 F.4th at 1123-24. The term refers to one method for measuring an appliance's energy use that contrasts with a different, broader method: Specifically, measuring energy at "point of use" accounts for an appliance's "site energy" as opposed to its "source" or "full-fuel-cycle" energy. *Id.* "Site energy"

45

refers to the amount of energy directly consumed at the site where the appliance is operated—i.e., its "point of use." *Id.* By contrast, "source energy" or "full-fuel-cycle energy" refers to the energy consumed at point of use (the "site energy") *plus* the energy consumed in extracting, producing, and delivering energy to the point of use. *Id.* In support of this view, Judge Friedland catalogued the congressional, regulatory, and industry sources that confirm that the term "point of use" describes a method for measuring energy consumption, not the physical location where a consumer hopes to use the product. *Id.*

Congress has recognized the distinction between site and source energy in debating which one should form the basis for performance standards. As a group of Senators noted in 1998, while "others believe that DOE's standards should be based upon a more expansive definition of energy use, one that included exogenous factors like 'total fuel cycle' costs, emissions and externalities," "Congress and the President wisely rejected that approach both in 1975 [i.e., when it enacted EPCA] and in succeeding debates" by directing that "the energy use of an appliance at its point-of-use" is the proper measurement. 144 Cong. Rec. 27,193, 27,194 (Oct. 20, 1998). A report from the Senate Appropriations

Committee that same year confirms this view. The Committee noted that it understood that DOE's appliance efficiency standards "presently reflect only the energy consumed at the point of use," a method that "ignores the total energy consumed over the full fuel cycle and costs." S. Rep. 105-227, at 100 (1998); *see id.* (noting that DOE's funds activities "based on point-of-use energy consumption").

DOE has construed EPCA the same way. The agency has explained that EPCA does not allow "regulation of source energy" because it specifies "that efficiency must be based on the energy consumption at the point of use." 69 Fed. Reg. 45,420, 45,426 (July 29, 2004) (citing 42 U.S.C. § 6291(c)). And DOE continues to define "site energy" as "energy measured at the point of use." Federal Energy Management Program, U.S. Dep't of Energy, *Reporting Guidance for Federal Agency Annual Report on Energy Management*, at 9 (Oct. 2024).

The statutory structure confirms this understanding. EPCA defines the term "measure of energy consumption" to include "energy use." 42 U.S.C. § 6291(8). The term "point of use" describes how "energy use" is measured and is therefore a component of a "measure of energy consumption." And, as context makes plain, this measure accounts solely

47

for the point-of-use energy consumption and thus excludes the energy consumed by generating and transmitting usable energy—whether it be electricity or gas—to the point of use.

Although plaintiffs note that the Ninth Circuit read "point of use" to have its "ordinary meaning," they fail to explain why this Court should follow that reading. (Pl. Br. at 40-41.) They instead contend that EPCA's other provisions support their reading. But that assertion is unavailing for the reasons explained below at 49-58. And, for the reasons noted above, an "appropriately informed speaker," *Van Buren*, 593 U.S. at 388 (quotation marks omitted), would understand that "point of use" is a term of art that prescribes a method of measuring energy consumption.

### 2. EPCA's Exceptions to Preemption Fail to Support Plaintiffs' Broad View of Preemption.

Plaintiffs, and the federal government in *Association of Contracting Plumbers*, try unsuccessfully to find evidence of a sweeping preemptive intent in two of EPCA's exceptions to preemption. They first cite the waiver exception, which empowers DOE to waive preemption for a state regulation if certain conditions are met. (*See* Pl. Br. at 47, 51; U.S. Br. at 18-22, *Ass'n of Contracting Plumbers*, No. 25-977.) Plaintiffs note that the

48

statute bars DOE from granting a waiver if an interested party opposed to the waiver establishes that the regulation is "likely to result in the unavailability in the State" of a covered product type or "will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." 42 U.S.C. § 6297(d)(3), (4). These provisions, plaintiffs contend (Pl. Br. 47), show that Congress wanted to protect "consumer choice" and "appliance availability" and therefore intended for EPCA to grant consumers a federal right to use covered products in the locations of their choosing.

Their reading is unpersuasive. To start, although exceptions to a general rule may provide a helpful interpretive guide, they "do not in themselves delineate the scope of the rule." *Dan's City Used Cars*, 569 U.S. at 264. Thus, as the district court correctly noted (JA 195), the factors that DOE must consider before granting a preemption waiver do not themselves define whether preemption is triggered in the first place.

Plaintiffs' reading of the limitations on DOE's waiver authority also goes too far. If Congress intended to broadly preempt all state laws that interfered with the availability or use of covered products, it would have drafted the preemption provision to say so directly. *See, e.g.*, 12 U.S.C.

49

§ 25b(b)(1)(B) (expressly preempting, in the national bank context, any state law that "prevents or significantly interferes with the exercise by the national bank of its powers"). EPCA's general rule of preemption contains no such language. Because Congress "does not hide elephants in mouseholes," it would not have created a federal right to use covered products in the "ancillary provisions" cited by plaintiffs, especially provisions that merely govern one of several preemption exceptions. *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 583 U.S. 416, 431 (2018) (quotation marks omitted).

The provisions cited by plaintiffs, which limit DOE's exercise of its waiver power, serve a far more limited role. They show that Congress wanted to prevent DOE from granting waivers to state performance-based requirements that would impose significant burdens on manufacturers or others in the supply chain. That is why, in assessing whether an interested party opposing waiver has shown a sufficient burden were the waiver to be granted, DOE must consider whether the state regulation is likely to lead to a proliferation of other "State appliance *efficiency* requirements." 42 U.S.C. § 6297(d)(3)(D) (emphasis added). And when Congress added this provision in 1987, it understood that

50

competing state performance standards can require a product redesign, or the development of multiple product lines, which in turn could impose downstream burdens, including on national marketing or distribution plans. *See* S. Rep. 100-6, at 4. Congress thus wanted to prevent DOE from reimplementing its prior liberal waiver policy that had permitted state performance standards that imposed those burdens.

This understanding is confirmed by the provision that bars DOE from waiving preemption if it has been shown that the state regulation is likely to lead to a product's "unavailability." EPCA imposes the same limit for federal energy conservation standards. DOE may not prescribe a standard that is "likely to result in the unavailability" of that product. 42 U.S.C. § 6295(o)(4). By imposing the same restriction on both DOE's standard-setting authority and its waiver authority, Congress made clear that it wanted to prevent *performance standards*—whether federal *or* state—that were so stringent that they could result in a product's unavailability. These limits on DOE, however, fail to evince any intent to broaden EPCA to preempt *any* state law that restricts where and under what circumstances a product may be available on grounds unrelated to its energy performance.

51

Nor does the preemption exception for building codes support the reading proposed by plaintiffs and the federal government. (Pl Br. at 42-46; U.S. Br. at 21-22.) Congress recognized that building codes could be used as a means of "setting mandatory State appliance standards in excess of the Federal standards." H.R. Rep. No. 100-11, at 26; *see* S. Rep. No. 100-6, at 11. The exception allows states to adopt codes that set energy consumption or conservation objectives for buildings, provided they satisfy several conditions, including that the code does not "require" a covered product to have an "energy efficiency exceeding" the applicable federal standard. 42 U.S.C. § 6297(f)(3)(b); *see Bldg. Indus. Ass'n of Wash. v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1148, 1151-52 (9th Cir. 2012).

Plaintiffs assert that the district court's interpretation of § 6297(c)'s general rule of preemption would render the building code exception superfluous. (Pl. Br. at 44.) Under the court's interpretation, plaintiffs insist, any building code that could fit within the exception would not be preempted in the first place. Plaintiffs misconstrue the district court's interpretation. The court did not hold that EPCA preempts only state regulations that compel products "be redesigned to have a different fixed

52

value for energy use as manufactured." (Pl. Br. at 44 [citations omitted].) Rather, as the district court explained in rejecting this argument, EPCA preempts "*indirect regulation* concerning the energy use of the covered products that could be used" in a building (JA 193), including a building code that imposes performance-based conditions.

The building code at issue in the Ninth Circuit's decision in *Building Industry Association* is an instructive example of a code that could trigger preemption yet fit within the exception. *See* 683 F.3d at 1148-49. There, the code required a 15% reduction in new buildings' overall energy consumption and permitted several pathways for builders to achieve the reduction; some pathways involved installing high efficiency covered products while other pathways did not involve appliances at all—for instance, a pathway that involved insulating the buildings' shell, i.e., its roof and walls. *See id.* at 1150-51.

The code in that case did not *legally require* covered products to satisfy a more stringent state-level performance standard because higher efficiency performance was only one among a menu of options for reducing energy consumption. The code nonetheless concerned "energy efficiency" or "energy use" of covered products because it incorporated

53

performance-based criteria that "call for higher efficiency covered products." *Id.* Indeed, under that code, an appliance's energy performance was relevant and even determinative. If a builder decided to forego the other energy-reduction pathways, that builder had to choose a pathway that involved using products whose energy performance exceeded the federal standard. Although the code triggered preemption, it nonetheless qualified for the building code exception because it did "not require higher efficiency products as the only way to comply with the code." *Id.* at 1152. Accordingly, the district court's interpretation of § 6297(c)'s general rule of preemption in this case does not render the building code exception a dead letter.

Moreover, under that interpretation, New York's fossil fuel prohibition does not trigger preemption in the first place. The prohibition does not impose or incorporate any performance-based criteria. And there is no circumstance in which New York's prohibition "call[s] for higher efficiency covered products." *Id.* at 1151. Rather, a product's energy performance is wholly irrelevant under the prohibition because it regulates an entirely different domain—namely, fuel type.

54

**C.    New York's Prohibition Does Not Concern "Energy Use" Because It Regulates Appliances Regardless of Their Energy Performance.**

New York's fossil fuel prohibition is not a regulation "concerning" EPCA's preempted domain, which is a product's "energy use" and "energy efficiency" as those terms are defined. New York's prohibition is indifferent as to any product's level of energy performance and instead regulates the type of energy that appliances may use without regard to the quantity of energy used.

Plaintiffs' reliance on the term "concerning" fails to salvage their claim. They argue (Pl. Br. at 32-33) that the term "concerning" has the same breadth as the term "relating to," and that New York's prohibition "relates to" energy use under the caselaw that governs preemption provisions that use the term "relates to." But, as the district court explained, plaintiffs' reliance on the term "concerning" is unpersuasive because it requires adopting plaintiffs' own view of the term "energy use" that contradicts EPCA's express, technical definition of that term. (JA 192.) The word "concerning" cannot transform the meaning of the term "energy use."

55

More specifically, plaintiffs' reliance on the caselaw on the term "relates to" is misplaced for two reasons. First, although the term "relates to" was a familiar phrase with an accepted judicial construction when EPCA was amended in 1987, *see, e.g.*, *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 739 (1985), Congress did not use that term for preemption provision at issue. Rather, it used a different term— "concerning." And plaintiffs fail to cite a single case in which a court evaluating a preemption provision has held the term "concerning" should be analyzed to have the same preemptive scope as the term "relating to."

Indeed, although the term "concerning" could mean "relating to," it could also mean "regarding," "about," "of," or "in reference to." *Webster's Ninth New Collegiate Dictionary* 272 (1985); *The Random House Dictionary of the English Language* 423 (2d ed. 1987). The term most naturally means "about"; to give an example, one could say that Title VII is a statute concerning employment discrimination. *See Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 497 (2d Cir. 2023) (holding that a law that preempts state-law claims "about" certain enumerated subjects preempts claims that "concern[ed]" those subjects). In this case, New York's fossil fuel prohibition is not about "energy use" within the meaning of EPCA

56

because the quantity of energy a product consumes is irrelevant to the law's application.

Second, and in any event, New York's prohibition does not "relate to" the energy use of a product any more than it "concern[s]" it. Under caselaw construing the term "relate to" in preemption clauses, a state law "relates to" a subject "if it has a connection with or reference to" that subject. *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020) (quotation marks omitted). Plaintiffs invoke solely the "connection with" part of the inquiry. (Pl. Br. at 33.) But the Supreme Court has acknowledged that the phrase "'connection with' is scarcely more restrictive than 'relate to,'" and "cautioned against an uncritical literalism that would make pre-emption turn on infinite connections." *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (quotation marks omitted). Not "every state law that affects" the preempted subject or even "causes some disuniformity" has an impermissible connection. *Rutledge*, 592 U.S. at 87. Rather, a court must consider a statute's "objectives as a guide to the scope of the state law that Congress understood would survive." *Id.* at 86. (quotation marks omitted).

57

New York's fossil prohibition lacks an impermissible connection with EPCA's objectives. As explained above, EPCA's text, structure, and history reflect that EPCA sets uniform energy conservation standards in order to improve products' energy performance, and in turn help reduce the Nation's reliance on foreign energy sources. Thus, its preemption clause only displaces competing state performance-based requirements that would interfere with the uniform standards. New York's prohibition, by contrast, does not draw any distinctions, directly or indirectly, based on any product's energy performance. The regulation regulates solely the *type* of energy that may be used by appliances in certain locations, in order to reduce greenhouse gas emissions and improve local air quality.

Although plaintiffs assert (Pl. Br. at 52-53) that EPCA prevents states from doing indirectly what they cannot do directly, that principle has no force here. Prohibiting appliances that burn fossil fuels does not impose a performance standard by proxy or, as one amicus put it, "a backdoor energy conservation standard." (Amicus Br. for Air-Conditioning, Heating, and Refrigeration Inst. ["ACHRI Amicus Br."] at 11.) This is because prohibiting appliances from burning fossil fuels does not have "practically the same effect" as requiring appliances to consume

less energy yet provide the same service. *23-34 94th St. Grocery Corp. v. New York City Bd. of Health*, 685 F.3d 174, 183 (2d Cir. 2012). Indeed, it is undisputed that fossil fuel appliances may sometimes be more efficient, or consume less energy, than their electric counterparts. *See, e.g.*, 10 C.F.R. § 430.32(h)(3)(iii)-(vi) (setting more stringent performance standard for gas clothes dryers than for electric dryers). And, unlike performance-based regulations, nothing in New York's prohibition turns on whether a product can be designed to improve its energy efficiency or reduce its energy use. If a product burns fossil fuels, no change in that product's measure of energy consumption would make it permissible in the new buildings that are covered by New York's prohibition.

After the prohibition takes effect, then, every covered product will still be subject to a single, nationally uniform federal performance standard. New York's prohibition simply restricts where fossil fuel products may be used, on grounds entirely unrelated to the product's energy performance, meaning the level of energy consumption inherent in the product's design.

Contrary to plaintiffs' argument (Pl. Br. at 50), Congress' intent to enact uniform energy conservation standards for covered products does

59

not suggest, much less establish, that Congress intended to guarantee to consumers nationwide access to those products. EPCA's regulation of *one* aspect of covered products—i.e., their energy performance—does not imply that Congress sought to preempt *all* state regulations of those products. Federal regulation of certain activities does not necessarily preempt state bans of related activities that are upstream or downstream from those federally regulated; "[f]or example, federal regulation of nuclear powerplants does not demand that States allow the construction of such powerplants in the first place." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 790-91 & n.4, 793 (2019) (Ginsburg, J., concurring in the judgment).

Numerous courts have held that a federal law that regulates a product's manufacturing and production, and preempts conflicting state requirements, does not prohibit states from banning that product entirely. For instance, the Fifth and Seventh Circuits have held that a federal law that displaces state requirements for meat processing does not expressly or impliedly preempt a state law banning the sale of horsemeat. *See Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333-34 (5th Cir. 2007); *Cavel International, Inc. v.*

60

*Madigan*, 500 F.3d 551, 553-54 (7th Cir. 2007). The Ninth Circuit has likewise held that a federal law displacing conflicting state requirements on the processing of poultry products does not preempt a state law banning foie gras. *See Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1149-51 (9th Cir. 2017). As that court explained, nothing in the federal law "limits a state's ability to regulate the *types* of poultry that may be sold for human consumption." *Id.* at 1150. And, likewise here, nothing in EPCA's regime of energy conservation standards limits a state's ability to regulate the *types* of energy that may be available in new buildings.

Equally unfounded is the claim that New York's prohibition concerns EPCA's subject matter because it "effectively sets covered gas appliances' maximum energy use to zero." (Pl. Br. at 27, 28; ACHRI Amicus Br. at 11.) EPCA's definition of "energy use" makes clear that New York's prohibition is not reasonably understood that way. The "energy use" of a product refers to a characteristic of that product, and not to its actual operation. Specifically, the term means a fixed *value* that describes the quantity of energy a product consumes when operated under DOE-approved testing procedures. New York's prohibition,

61

however, is unconcerned with the value determined under testing conditions; it prohibits the installation in certain buildings of an appliance that directly burns fossil fuels, no matter how energy-efficient that appliance may be.

Plaintiffs argue that EPCA's preemption should turn solely on whether a state regulation has the *effect* of restricting where a product may be used after purchase, but they are mistaken. *How* a regulation operates matters. For instance, a state law that prohibits in new buildings a certain covered product if it is designed to consume more than 300 kilowatts per year would be preempted under EPCA, as a regulation of performance. But that is *not* because, by prohibiting non-conforming appliances from using energy, the law sets the "maximum energy use to zero" for those appliances. (Pl. Br. at 27.) Rather, that law would be preempted because it regulates based on the quantity of energy the product is designed to consume and thus concerns the product's "energy use" within EPCA's definition of that term.

New York's prohibition fundamentally differs from that kind of law. The prohibition regulates based solely on the *type* of energy and in no

62

way is concerned with the quantity of energy any product consumes, either under testing conditions or elsewhere.

If, as plaintiffs suggest, prohibiting the use of certain fuel types necessarily constituted a maximum energy use standard, then a broad swath of health and safety regulations would be at risk of preemption. As the district court noted in *Association of Contracting Plumbers*, "regulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral to municipal construction and fire codes." 2025 WL 843619, at *6. These restrictions prohibit products not because they are inefficient, or consume too much energy, but because they create risks of fire or indoor pollution. For instance, New York State prohibits the use of kerosene-powered portable heaters in multi-family dwellings, N.Y. Real Prop. Law § 239-e; 2025 Residential Code of N.Y. St. § M1416.1, and New York City prohibits "oil-fired cooking appliances" and certain gas-fired appliances, such as space heaters, N.Y.C. Admin Code §§ 27-2034, 27-2035(a); N.Y.C. Mechanical Code § 917.1. Numerous state and local regulations elsewhere restrict where products can be placed, or what safety measures must be in place, for reasons that are entirely unrelated to energy

63

performance or efficiency. Under plaintiffs' effects-based view of EPCA, any regulation that has the effect of restricting products from operating in certain locations, regardless of the reason, would set a "maximum energy use of zero" in those locations, and thereby trigger preemption.

To avoid such untenable consequences, plaintiffs suggest that longstanding health and safety restrictions would not be preempted, even though they prohibit appliances from using energy in certain locations. This is so, plaintiffs insist, because those restrictions only "incidentally impact" an appliance's energy consumption whereas the impact of New York's prohibition is "anything but incidental" because it "categorically prohibit[s] covered gas appliances from using any energy." (Pl. Br. at 55.)

That purported distinction is analytically flawed. As a threshold matter, fossil fuel powered appliances are *not* categorically prohibited throughout New York. The prohibition does not apply to existing buildings, or to any new buildings that fit within an exemption. *See* N.Y. Energy Law § 11-104(7)(a)-(b). New York's prohibition instead merely limits where those products can be installed, with the goal of reducing emissions that harm both the outdoor climate and indoor air quality.

64

Equally important, plaintiffs' distinction suffers from the same basic defect as its other arguments. Plaintiffs construe the term "energy use" to refer to the energy a product may use once in the hands of consumers. But, as explained above, the mere fact that a law may affect where a product may operate does not transform that law into one concerning "energy use" within the meaning of EPCA.

Ultimately, plaintiffs' reading is at odds with ECPA's text, structure, and history. EPCA embodies a fundamentally symmetrical objective: It imposes performance standards to reduce covered products' energy consumption, and preempts state regulations that would impose or incorporate competing performance-based requirements. The statute, however, does not sweep more broadly and create a federal right for consumers to use covered products free from any state restrictions based on energy type, let alone a right to use appliances that burn fossil fuels in any building the consumer wishes. Accordingly, EPCA does not preempt laws, like New York's prohibition and other location-based health and safety laws, that take no view about the quantity of energy a product is designed to consume.

65

## POINT II

**ALTERNATIVELY, PLAINTIFFS' CLAIM FAILS BECAUSE THEY FAILED TO SHOW NEW YORK'S PROHIBITION IS PREEMPTED IN EVERY APPLICATION.**

This Court can also affirm on the alternative ground that plaintiffs assert a facial challenge but failed to establish that New York's prohibition is preempted in every application. As the complaint made clear (JA 35), plaintiffs challenged the "facial validity" of the May 2023 law—the so-called "gas ban"—which required the adoption of regulations that would impose the fossil fuel prohibition. *See* N.Y. Energy Law § 11-104(6)-(8); N.Y. Exec. Law § 378(19). The complaint alleged that there is no "set of circumstances under which New York's gas ban would be valid under federal law." (JA 35-36.) Consistent with their facial challenge, plaintiffs' motion for summary judgment sought a declaratory judgment that New York's gas ban "is preempted by EPCA" and an injunction barring the Secretary from approving any regulations to implement the ban. (ECF Nos. 37; 37-1, at 17.)

Having asserted a facial challenge only, and sought relief commensurate with that challenge, plaintiffs' claim fails as a matter of law because they failed to establish that New York's prohibition "cannot

66

be constitutionally applied against anyone in any situation." *Nat'l Shooting Sports Found.*, 144 F.4th at 108, 111-12 (applying facial standard to preemption challenge). EPCA preemption displaces state regulations of consumer appliances *only* with respect to (1) a "covered product" for which (2) a federal "energy conservation standard" has taken an effect. 42 U.S.C. § 6297(c). To qualify as a "covered product," an appliance must be expressly classified as such either by EPCA or by DOE in a separate rulemaking. *See id.* § 6292(a)-(b). Similarly, for industrial equipment, EPCA preemption only applies once a standard has taken effect. *Id.* § 6316(b)(2)(A). EPCA necessarily does not preempt state restrictions on appliances that are either not a "covered product" or lack an energy conservation standard.

New York's prohibition has myriad unpreempted applications and is therefore not facially invalid. For instance, companies that are members of one plaintiff trade association allegedly install gas fireplaces in new construction (Pl. Br. at 16), yet decorative gas fireplaces are not a "covered product" and also lack any federal "energy conservation standard." *See* 90 Fed. Reg. at 19,253 (withdrawing covered product classification for gas-fired decorative hearth products and outdoor

67

heaters). New York's prohibition validly forbids the installation of such fireplaces and related infrastructure, such as piping for those fireplaces.

New York's prohibition also validly forbids other kinds of gas-powered appliances, and related infrastructure, that are less common but nonetheless lack a federal energy conservation standard. This includes gas-powered lighting, such as lanterns; gas-fired dehumidifiers; and gas-fired kilns. *See* U.S. Dep't of Energy, Standards and Test Procedures (listing covered products and existing energy conservation standards). And there are no energy conservation standards for commercial cooking appliances. *See id.* Although New York's prohibition does not regulate such appliances in commercial food establishments, that prohibition nonetheless can be validly applied to forbid the installation of gas-powered commercial cooking appliances elsewhere, such as in residential contexts. *See* 19 N.Y.C.R.R. § 1240.6(c)(1)(iv), (e)(3)(i).

Accordingly, plaintiffs' facial challenge fails as a matter of law because they failed to establish that "no set of circumstances" exists in which that the fossil fuel prohibition can be applied without violating EPCA. *United States v. Salerno*, 481 U.S. 739, 745 (1987). The Secretary is entitled to judgment as a matter of law on this basis alone.

68

## CONCLUSION

This Court should affirm the district court's judgment.

Dated:  Albany, New York
        December 3, 2025

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Defendant-Appellee

By:   */s/ Dustin J. Brockner*

BARBARA D. UNDERWOOD             DUSTIN J. BROCKNER
  *Solicitor General*                 Assistant Solicitor General
JEFFREY W. LANG
  *Deputy Solicitor General*       The Capitol
DUSTIN J. BROCKNER                Albany, New York 12224
  *Assistant Solicitor General*    (518) 776-2017
     *of Counsel*

69

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Dustin J. Brockner, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,324 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Dustin J. Brockner*