# 25-2041

## United States Court of Appeals
*for the*
### Second Circuit

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., dba Master Plumbers Council of the City of New York; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; and TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants,*

– v. –

WALTER T. MOSLEY, in his official capacity as New York Secretary of State and member of the State Fire Prevention and Building Code Council,

*Defendant-Appellee,*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, PUSH BUFFALO,

*Intervenor-Defendants-Appellees,*

On Appeal from the United States District Court for the Northern District of New York, No. 1:23-CV-01267 (Hon. Glenn T. Suddaby, District Judge)

## BRIEF OF INTERVENORS-DEFENDANTS-APPELLEES NEW YORK GEOTHERMAL ORGANIZATION AND PUSH BUFFALO

DROR LADIN
MEAGAN BURTON
(917) 410-8701
dladin@earthjustice.org
mburton@earthjustice.org

EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005

*Attorneys for Intervenors-Defendants-Appellees*

NEW YORK DEPARTMENT OF STATE; NEW YORK STATE FIRE PREVENTION AND BUILDING CODE COUNCIL; and JAMES CABLE, RUTHANNE VISNAUSKAS, ROBERTA REARDON, ERIC ADAMS, MICHAEL SPANO, JOSEPH M. DESTEFANO, CLAUDIA BRAYMER, JOSEPH TOOMEY, SHAWN HAMLIN, TIMOTHY DERUYSCHER, ROBERT HUGHES, WILLIAM W. TUYN, PATRICK DOLAN, and DOMINIC MARINELLI, in their official capacities as members of the State Fire Prevention and Building Code Council,

*Defendants*.

**RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Intervenor-Defendant-Appellees state that New York Geothermal Organization is a not-for-profit trade association and PUSH Buffalo is a nonprofit 501(c)(3) corporation incorporated in New York State. Neither New York Geothermal Organization nor PUSH Buffalo has a parent corporation, nor do they have any publicly traded stock.

Dated: December 3, 2025

/s/ *Dror Ladin*
Dror Ladin

i

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................. iv

PRELIMINARY STATEMENT.............................................................................1

ISSUE PRESENTED .............................................................................................2

STATEMENT OF THE CASE...............................................................................2

SUMMARY OF ARGUMENT.............................................................................13

ARGUMENT .......................................................................................................17

    I.     EPCA Preempts Only Laws Concerning Appliance Energy
         Performance Standards.....................................................................17

         A.     EPCA Preempts Local Laws Concerning Appliances' Excessive
              Energy Use. ..........................................................................17

         B.     New York's Code Amendments Do Not Relate to Excessive
              Energy Use. ..........................................................................21

    II.    Appellants' Arguments Highlight the Weaknesses of Their
         Interpretation of EPCA....................................................................23

         A.     Appellants Mischaracterize the Ninth Circuit Panel's
              Reasoning, Even as They Urge This Court to Follow it. ..........23

         B.     The District Court's Interpretation of EPCA Does Not Render
              the Building Code Exception Superfluous...............................25

         C.     EPCA's Waiver Provision Confirms That Congress Preempted
              Only Regulations That Concern Excessive or Inefficient Energy
              and Water Use. ......................................................................31

         D.     The Word "Concerning" Does not Transform Congress's
              Definition of "Energy Use." ..................................................34

         E.     Prohibitions on Appliance Operation are not "Maximum Energy
              Use" Standards.....................................................................38

         F.     Appellants Misunderstand Congress's 1987 EPCA
              Amendments. .......................................................................43

         G.     Appellants' Policy Concerns Should Be Addressed to Congress.
              .............................................................................................46

CONCLUSION ..................................................................................................48

CERTIFICATE OF COMPLIANCE .................................................................49

iii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Air Conditioning & Refrigeration Institute v. Energy Res.
Conservation & Dev't Comm'n,*
89 F.4th 1094 (9th Cir. 2024) ........................................................................4

*Ass'n of Contracting Plumbers of City of New York, Inc. v. City of
New York*, No. 23-CV-11292 (RA), 2025 WL 843619
(S.D.N.Y. Mar. 18, 2025) .................................................................12, 13, 19

*Cal. Rest. Ass'n v. City of Berkeley,*
89 F.4th 1094 (9th Cir. 2024) .................................................................*passim*

*CSX Transp., Inc. v. Easterwood,*
507 U.S. 658 (1993)........................................................................................18

*Dan's City Used Cars, Inc. v. Pelkey,*
569 U.S. 251 (2013)........................................................................................40

*FDA v Brown & Williamson Tobacco Corp.,*
529 U.S. 120 (2000).................................................................................22, 34

*Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie,*
508 F. Supp. 2d 295 (D. Vt. 2007) ................................................................34

*In re Nine W. LBO Sec. Litig.,*
87 F.4th 130 (2d Cir. 2023) ...........................................................................44

*Medtronic, Inc. v. Lohr,*
518 U.S. 470 (1996)........................................................................................18

*Metro. Taxicab Bd. of Trade v. City of New York,*
615 F.3d 152 (2d Cir. 2010) .....................................................................37, 38

*Nat. Res. Def. Council v. Abraham,*
355 F.3d 179 (2d Cir. 2004) ........................................................................4, 6

*Nat. Res. Def. Council, Inc. v. Herrington*,
   768 F.2d 1355 (D.C. Cir. 1985)..............................................................5, 19

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
   894 F.3d 95 (2d Cir. 2018) ........................................................................3

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995)..................................................................................34

*Zero Zone, Inc. v. DOE*,
   832 F.3d 654 (7th Cir. 2016) ....................................................................20

**FEDERAL STATUTES**

Energy Policy and Conservation Act,
   42 U.S.C. §§ 6291–6315................................................................*passim*

   § 6291(1)...................................................................................................20

   § 6291(4) ............................................................................................14, 19

   § 6291(6)...................................................................................................20

   § 6291(6)(A) .............................................................................................21

   § 6293................................................................................................20, 21

   § 6293(b)(3) ..............................................................................................19

   § 6294.................................................................................................20, 21

   § 6295.............................................................................................20, 21, 30

   § 6297(c) ..............................................................................................*passim*

   § 6297(d)....................................................................................................7

   § 6297(d)(1)(B)..........................................................................................33

   § 6297(d)(1)(C)..........................................................................................33

   § 6297(d)(1)(C)(ii)......................................................................................34

v

§ 6297(e)–(f) .................................................................................7

§ 6297(f)(3) ...............................................................................30

§ 6297(f)(3)(B) ..........................................................................28

§ 6297(f)(3)(D) ..........................................................................28

§ 6297(f)(3)(E) ..........................................................................28

§ 6314 ..................................................................................20, 21

§ 6315 ..................................................................................20, 21

Energy Policy and Conservation Act,
  Pub. L. No. 94-163, 89 Stat. 871 (1975) ................................4

§ 321(a)(4) ...................................................................................4

§ 321(a)(5) ...................................................................................5

§ 322(a) ........................................................................................5

§ 325(a)(1)(A) ..............................................................................5

§ 327(a) .....................................................................................4, 7

§ 327 (b) .......................................................................................5

National Appliance Energy Conservation Act of 1987,
  Pub. L. No. 100-12, 101 Stat. 103 .........................................6

§ 2 ..............................................................................................46

§ 5 ................................................................................................6

National Energy Conservation and Policy Act,
  Pub. L. No. 95-619, 92 Stat. 3206 (1978) ..............................5

§ 325 .............................................................................................5

§ 424(a) ........................................................................................5

§ 424(b)(1)–(3) .............................................................................7

vi

## FEDERAL REGULATIONS

10 C.F.R. § 429.12 ............................................................................20, 21

10 C.F.R. §§ 430–31 ..............................................................................20

16 C.F.R. § 305.17 ................................................................................20

76 Fed. Reg. 51281 (Aug. 18, 2011).....................................................19

86 Fed. Reg. 66403 (Nov. 23, 2021)......................................................41

## STATE STATUTES

Climate Leadership and Community Protection Act,
   2019 N.Y. Sess. Laws Ch. 106 (S. 6599)

   CLCPA § 1(1)..................................................................................7

   CLCPA § 1(2)(a) .............................................................................7

   ECL 75-0103................................................................................7, 8

N.Y. Energy Law § 11-104(6)(b) ...........................................................8

N.Y. Exec. Law § 378(19)(a)..................................................................8

## STATE REGULATIONS

2020 Energy Conservation Construction Code of New York State,
   19 NYCRR § 1240.4........................................................................27

   § C401.2.........................................................................................29

   § C406.1(4) ....................................................................................29

   § C406.2.........................................................................................28

   § C406.8.........................................................................................29

## OTHER AUTHORITIES

133 Cong. Rec. 3070 (1987)...................................................................46

H.R. 6089, 118th Cong. (2023)........................................................48

H.R. Rep. No. 94-340 (1975)............................................................3

H.R. Rep. No. 95-1751 (1978) (Conf. Rep.) ..........................................5

H.R. Rep. No. 100-11 (1987)...........................................................46

Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990), https://www.nytimes.com/1990/12/28/nyregion/fire-kills-4-and-burns-2-in-a-home-in-brooklyn.html.................................................41

S. Rep. No. 100-6 (1987) ...............................................................6

## PRELIMINARY STATEMENT

It is rarely a good sign when a litigant in a statutory dispute dismisses the operative text as "a distraction." Appellants nonetheless choose to hitch their argument to this extraordinary claim. They urge this Court to follow a Ninth Circuit decision regardless of any qualms about its reasoning, professing that it doesn't matter if that decision erred in interpreting the key terms Congress used to establish the preemptive scope of the Energy Policy and Conservation Act ("EPCA"). But as the district court below recognized, the text of the statute matters—and the interpretation that Appellants ask this Court to adopt is fatally flawed. Eleven judges on the Ninth Circuit have rejected it, as have trial courts in New York's Southern and Northen Districts.

As confirmed time and again by EPCA's definitions, structure, and history, Congress restricted EPCA's preemption of appliance regulation to state and local laws that relate to energy conservation standards. Appellants' arguments to the contrary depart from the text that Congress chose and clash with the structure Congress established. In place of the logical preemptive regime that Congress crafted, Appellants would have this Court create an arbitrary wrecking ball, with absurd and dangerous results. The district court was correct to reject Appellants' theory, and this Court should affirm.

1

## ISSUE PRESENTED

Whether the district court correctly concluded that EPCA does not preempt a state law that prohibits the use of appliances in certain buildings without regard to how much energy the appliances are designed to consume.

## STATEMENT OF THE CASE

### A. The Energy Policy and Conservation Act

Congress enacted EPCA to reduce the country's energy consumption "in the immediate wake of the 1973–74 oil crisis." *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 100–01 (2d Cir. 2018). The law's "purpose was to reduce the likelihood of another severe energy crisis through the creation of programs focused on energy regulation, energy conservation, and, most relevant to this case, 'improved energy efficiency of motor vehicles, major appliances, and certain other consumer products.'" *Id.* (quoting 42 U.S.C. § 6201(5)). Because residential energy represented some 17% of the nation's energy use, Congress sought to improve the efficiency of household appliances, hoping to "reduc[e] the[ir] energy usage . . . relative to their output." H.R. Rep. No. 94-340, at 94–95 (1975).

Key to EPCA's effective implementation was "improving the energy efficiency of thirteen named home appliances that Congress determined contributed significantly to domestic energy demand, as well as any additional

ones that the administrator of the Federal Energy Administration ("FEA," a precursor to [the Department of Energy]), in his discretion, determined similarly contributed to energy demand." *Nat. Res. Def. Council v. Abraham*, 355 F.3d 179, 185 (2d Cir. 2004). This improved efficiency was to be accomplished by the promulgation of federal energy conservation standards that barred products that used too much energy in absolute terms (an "energy use" standard), or that produced too little useful output in relation to the energy they consumed (an "energy efficiency" standard). As a corollary to the federal energy conservation standards mandated by EPCA, the law also includes a preemption clause expressly displacing competing state and local standards. *See* Energy Policy and Conservation Act, Pub. L. No. 94-163, § 327(a), 89 Stat. 871 (1975).

At first, Congress sought these energy savings through labeling. Believing that "better informed consumers" would make mandatory standards "unnecessary," it required manufacturers to label appliances with measures of their "energy use" and "energy efficiency." *Air Conditioning & Refrigeration Institute v. Energy Res. Conservation & Dev't Comm'n*, 410 F.3d 492, 499 (9th Cir. 2005). By "energy use," it meant "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with" prescribed "test procedures." Pub. L. No. 94-163, § 321(a)(4), 89 Stat. at 917. And it defined "energy efficiency" as "the ratio of the useful output of services from a consumer product to the energy use of

3

such product, determined" by similar means. *Id.* § 321(a)(5). To guide these standards, Congress called for what would later become the Department of Energy ("DOE") to set "energy efficiency improvement target[s]" for the covered products. *Id.* § 325(a)(1)(A). It also preempted state laws that imposed different testing or labeling obligations or differed from any federal efficiency standards. *Id.* § 327(a)–(b).

In 1978, to move more "expeditiously," Congress jettisoned the labeling approach and required DOE to set mandatory energy use and efficiency standards. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362 (D.C. Cir. 1985) (citation modified); *see* National Energy Conservation and Policy Act, Pub. L. No. 95-619, § 325, 92 Stat. 3206, 3259 (1978). In its 1978 amendment, Congress temporarily barred any new state or local efficiency standards for products that could be subject to federal standards under EPCA, not just those already standardized, a status termed "automatic preemption." H.R. Rep. No. 95-1751, at 117 (1978) (Conf. Rep.). The 1978 law thus preempted any regulation "respecting energy use or energy efficiency of a . . . covered product[]," Pub. L. No. 95-619, § 424(a), 92 Stat. at 3206, where "covered product" referred to an appliance that could be regulated under EPCA, *see* Pub. L. 94-163, § 322(a) (current version at 42 U.S.C. § 6292(a)).

4

Because the DOE failed to expeditiously establish national standards, local authorities resorted to issuing their own standards, which DOE permitted through issuing preemption waivers. This produced precisely the results that Congress had sought to avoid: First, DOE's failure to act meant that a "significant amount of the nation's energy demand . . . continued to be attributable to home appliances." *Abraham*, 355 F.3d at 187 n.3. At the same time, "Congress also was concerned with the 'growing patchwork' of state efficiency standards that had developed as the result of the absence of national standards in conjunction with DOE's policy of granting states exemptions from the EPCA's preemption provision." *Id.* (citing S. Rep. No. 100-6, at 4 (1987), *reprinted in* 1987 U.S.C.C.A.N. 52, 54–55).

Displeased with DOE's failure to set standards and with the emerging patchwork of "state efficiency standards" that set competing efficiency requirements for the same appliances, Congress amended EPCA once more. *See* National Appliance Energy Conservation Act of 1987, Pub. L. No. 100-12, § 5, 101 Stat. 103. The amended statute adopted a set of uniform standards and required DOE to keep them updated. *See id.* And to counteract the problem of "separate State appliance standards," S. Rep. No. 100-6, at 4, Congress revised EPCA's preemption regime. It made modest changes to the preemption clause, which now provides that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product."

5

42 U.S.C. § 6297(c).[1] But Congress made it much more difficult for states to obtain a waiver. *See id.* § 6297(d). It also created various exceptions. *See id.* § 6297(e)–(f).

**B. New York's Legislature Addresses the State's Greenhouse Gas Emissions.**

In 2019, the Legislature passed, and the Governor signed, the landmark Climate Leadership and Community Protection Act, 2019 N.Y. Sess. Laws Ch. 106 (S. 6599) ("CLCPA"). Recognizing that "[c]limate change is adversely affecting economic well-being, public health, natural resources, and the environment of New York," the Legislature enacted the CLCPA to set statewide mandates for greenhouse gas emissions reductions. *Id.* § 1(1). The Legislature determined that "[t]he severity of current climate change and the threat of additional and more severe change will be affected by the actions undertaken by New York and other jurisdictions to reduce greenhouse gas emissions." *Id.* § 1(2)(a). The CLCPA established the Climate Action Council, an official body consisting of state leaders charged with developing a roadmap to achieve the state's climate targets. *See* ECL

---

[1] Before the 1987 amendments, the relevant preemption provision covered any "energy efficiency standard or other requirement respecting energy use or energy efficiency" of a covered product absent a waiver." Pub. L. No. 95-619, § 424(b)(1)–(3); *see also* Pub. L. No. 94-163, § 327(a)(2) (covering "any energy efficiency standard or similar requirement with respect to energy efficiency or energy use of a covered product").

75-0103. That official body in turn developed the Final Scoping Plan, which outlines the necessary measures for emissions reductions in all sectors of the state economy. *Id*. After holding 32 meetings and receiving over 35,000 public comments, the Climate Action Council voted in December 2022 to advance its Final Scoping Plan. Because New York's buildings are the single largest source of greenhouse gas emissions, the state's plan calls for changes to building codes to require a rapid increase in the use of heat pumps and a significant reduction in the use of fossil fuel appliances.

In May 2023, the New York Legislature enacted amendments to the Energy Law and Executive Law, directing that the New York State Uniform Fire Prevention and Building Code and Energy Conservation Construction Code be amended "to support the goal of zero on-site greenhouse gas emissions and help achieve the state's clean energy and climate agenda." N.Y. Energy Law § 11-104(6)(b), N.Y. Exec. Law § 378(19)(a). The amendments include a prohibition on "the installation of fossil-fuel equipment and building systems" in certain buildings. N.Y. Energy Law § 11-104(6)(b), N.Y. Exec. Law § 378(19)(a).

### C. This Litigation

Appellants filed this lawsuit in October 2023, seeking to block New York's law. Appellants originally named numerous state agencies and Code Council members as defendants in addition to the Secretary of State, and those defendants

moved to dismiss all claims against them. In August 2024, the district court granted the motion, determining that all defendants besides the Secretary of State were protected from suit by sovereign immunity under the Eleventh Amendment. JA-49–68.

The Secretary of State moved for judgment on the pleadings with respect to jurisdiction, while Appellants cross-moved for summary judgment on the merits question of the scope of EPCA's preemption clause. Intervenor-Defendants-Appellees NY-GEO[2] and PUSH Buffalo[3] sought and were granted permission to intervene as defendants with respect to the merits. JA-166, JA-174–175.

The district court concluded that it had jurisdiction over this dispute, and rejected Appellants' claims on the merits. JA-189. The court observed that Appellants "rely heavily on the Ninth Circuit's recent decision in *California Restaurant Assoc. v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024)." JA-190. That

---

[2] New York Geothermal Organization is a not-for-profit trade association which represents the geothermal heat pump industry in New York State. NY-GEO's members and others involved in the heat pump industry represent a quickly growing sector of the State economy, and are responsible for jobs that will remain in-state and cannot be outsourced.

[3] PUSH Buffalo is a member-based community organization located on the West Side of Buffalo, New York. It is dedicated to increasing the supply of affordable housing that provides residents with cleaner, healthier air through the use of electric appliances, and to increasing local employment opportunities in the transition to a clean and renewable energy economy. PUSH Buffalo develops affordable, all-electric housing and provides job training in fields including renewable energy installation and maintenance.

decision concluded that EPCA's preemption clause is "concerned with the end-user's ability to *use* installed covered products at their intended final destinations," and that Congress employed the term "energy use" in EPCA to refer to the energy actually consumed by appliances once they are installed and operating in a particular location. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1102 (9th Cir. 2024). The Ninth Circuit panel derived this conclusion in part from its understanding that "point of use" in EPCA means the place where appliances are ultimately installed, like an apartment, factory, or school. *Id.*

The district court observed that "there are multiple reasons to be skeptical of the conclusions reached by the Ninth Circuit panel." JA-191. The district court "disagree[d] with the panel's interpretations of both the statutory definition of 'energy use' and the term 'point of use,'" which led to the panel's "understanding of energy use as being a real-world, ever-changing measurement as opposed to a static assessment of the typical quantity of energy consumed by such a product." JA-194.

The district court concluded that the Ninth Circuit's premise could not be squared with "the more reasoned analysis outlined" in Judge Friedland's dissenting opinion from the Ninth Circuit's denial of rehearing en banc, and in Judge Abrams's opinion in *Ass'n of Contracting Plumbers of the City of New York, Inc.*,

which the district court expressly adopted. JA-191. Because the district court adopted the opinions, we briefly describe them here.

Ten judges of the Ninth Circuit agreed with Judge Friedland in "urg[ing] any future court that interprets the Energy Policy and Conservation Act not to repeat the panel opinion's mistakes." *Cal. Rest. Ass'n*, 89 F.4th at 1119 (Friedland, J., dissenting from denial of rehearing en banc).[4] Judge Friedland explained that the panel misunderstood both the statutory definition of "energy use" and the technical term "point of use," leading to a decision that cannot be squared with the text or structure of EPCA. First, rather than describing the energy a particular appliance actually uses or is allowed to use in practice, the "energy use" of an appliance under EPCA "is a fixed number that measures the efficiency of an appliance as manufactured." *Id*. at 1121 (Friedland, J., dissenting). While the panel opinion interpreted EPCA's definition of "energy use" as referring to the amount of energy an appliance ultimately consumes when it is actually installed and operated in a particular consumer's home, Judge Friedland explained that Congress defined and

---

[4] Judge Friedland's dissenting opinion was joined by Chief Judge Murguia, Judges Wardlaw, Gould, Koh, Sung, Sanchez, and Mendoza. *See Cal. Rest. Ass'n*, 89 F.4th at 1119. Judge Berzon, joined by Judges Paez, and Fletcher, wrote to "agree with Judge Friedland's dissent from the denial of rehearing en banc, including her explanation as to why this is the type of case in which dissent from denial of rehearing en banc is appropriate." *Id*. at 1126.

used the term throughout EPCA to refer to a "fixed number that measures the efficiency of an appliance as manufactured." *Id.* at 1121 (Friedland, J., dissenting). As Judge Friedland explained, "[l]ooking at the statute as a whole, this interpretation is the only one that makes sense," because EPCA includes numerous references to "energy use" that can refer only to a fixed value that obtains regardless of how much or how little any appliance is actually operated by an end user. *Id.* at 1121–22 (Friedland, J., dissenting). Moreover, as Judge Friedland's dissenting opinion explains, the reference to "point of use" has a longstanding technical definition that is contrary to the panel's colloquial interpretation, and "[i]ndustry and regulatory sources consistently use the term 'point of use' in this technical sense, and many expressly recognize that EPCA does so as well." *Id.* at 1123 (Friedland, J., dissenting) (citing examples).

The trial court in *Association of Contracting Plumbers* likewise faulted the Ninth Circuit panel for failing to recognize that Congress used the phrase "energy use" in EPCA to refer to "a product's characteristics as manufactured," rather than "energy actually used by covered products in the hands of consumers." *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025). And the court further observed that an interpretation of EPCA's preemption clause that swept in state and local laws "prohibiting the use of certain types of fuels and appliances in

11

residential, commercial, and industrial settings" would jeopardize "vital safety regulations" and lead to absurd results. *Id.* at *6.

Because EPCA defines "energy use" as a static value set at the time of device manufacture and reflecting the amount of energy an appliance has been designed to consume over a specific time period, the district court concluded that New York's law fell outside the statute's preemptive scope: "[T]he challenged statutes neither directly regulate energy use of any covered equipment, nor do they in any way concern the energy use of a covered product – rather, they merely prohibit the installation of *any* fossil-fuel equipment or system in new buildings, regardless of the energy use of such equipment or systems." JA-192. The district court also rejected the argument that Congress's use of the word "concerning" in EPCA's preemption clause somehow expanded the scope of the clause to areas unrelated to "energy use" as defined under EPCA. JA-192. Finally, the district court explained that its interpretation of EPCA's preemption clause neither rendered the statute's exception for certain building codes superfluous, nor contradicted the scope of the statute's waiver authority. JA-193–195.

12

**SUMMARY OF ARGUMENT**

Because this case is about express preemption, the paramount question is what meaning Congress assigned the words "regulation concerning . . . energy use" as used in EPCA's preemption clause, 42 U.S.C. § 6297(c). Congress did not require guesswork: it provided an explicit definition of "energy use" that refers to a standardized design characteristic assessed under controlled testing conditions. *Id*. § 6291(4). According to the definition Congress has used consistently since EPCA's enactment in 1975, "energy use," like "energy efficiency," is a characteristic of an energy conservation design standard—it expresses how much energy an appliance is designed to consume over a period of time. That definition aligns with the rest of EPCA's structure, and leads to a straightforward rule: once DOE establishes, for example, the maximum amount of energy that walk-in freezers may use per year, New York cannot establish a different design standard for walk-in freezers in the state. But nothing about the definition of "energy use" that Congress used in EPCA suggests that once DOE establishes an energy conservation standard, New York loses all ability to regulate appliances on grounds unrelated to their maximum energy consumption.

Although they continue to urge the Court to follow the Ninth Circuit panel decision in *California Restaurant Association*, Appellants no longer offer a full-throated defense of its reasoning. Much of the preceding litigation focused on the

13

meanings of "energy use" and "point of use," which the Ninth Circuit panel concluded referred to an appliance's actual consumption of an energy when used by an individual consumer. But Appellants now maintain that "the district court's focus on the definitions of 'energy use' and 'point of use' is a distraction." App. Br. 24. In their view, "[n]othing turns" on the meanings of these words, or on whether the district court was correct to reject the Ninth Circuit panel's interpretation. App. Br. 24.

Largely abandoning the text of EPCA's preemption clause, Appellants instead offer a grab bag of arguments that they believe provide alternative support for the Ninth Circuit's rule. Appellants maintain that a sweeping interpretation of EPCA's preemptive scope is justified by series of "statutory cues," including EPCA's waiver provision, building code exception, and the word "concerning." App. Br. 41. They also argue that any regulation that prohibits appliance operation for any reason is actually a "maximum energy use" standard in disguise. App. Br. 27. Finally, Appellants argue that EPCA's 1987 amendment reflects a significant shift in Congressional policy that sought to expand preemption far beyond energy conservation standards. App. Br. 36–38. According to their account, Congress enacted a nationwide energy access guarantee, effectively requiring that consumers everywhere in the United States be provided with the option of running any appliance, on any fuel source, in any building. App. Br. 49–53.

14

Appellants' miscellaneous arguments are even less compelling than the Ninth Circuit's interpretation of "energy use." Appellants misunderstand EPCA's building code exception, arguing at length that the exception would be superfluous unless their sweeping theory of EPCA's preemption clause were true. They confidently assert no one can interpret EPCA's preemption provision as the district court correctly did here while also finding a role for EPCA's building code exception. But Appellants' reach exceeds their grasp: It is not difficult to describe building code provisions that would be preempted but for the exception. We provide several examples below.

Appellants' reliance on EPCA's waiver provision is similarly misplaced. Appellants fail to recognize that the waiver provision undermines their theory of EPCA's preemptive scope, because it establishes a symmetrical framework for the conservation standards EPCA preempts and the grounds on which DOE can waive preemption. EPCA's waiver authority allows DOE to consider energy and water savings when deciding whether to waive preemption, but DOE has no similar ability to consider the fire safety, health, or environmental benefits of the many laws that Appellants maintain are also within EPCA's preemptive scope. Rather than a symmetrical preemptive framework, Appellants' view is that Congress made the nonsensical and unexplained decision to preempt both state energy conservation standards as well as health and safety laws, but only authorized DOE

15

to waive preemption of conservation standards. The waiver provision thus highlights the mismatch between Appellants' sweeping theory of "energy use" and Congress's use of the term to refer to an energy conservation design standard.

Appellants also argue that regardless of the specific words Congress chose to use in the preemption clause, the only word that really counts is "concerning." But this argument fails because Appellants are still stuck with the meaning that Congress assigned to the phrase "energy use." The word "concerning" cannot bear the weight Appellants seek to place on it.

Appellants' remaining arguments are no more substantial. They suggest that any prohibition on an appliance's use is best understood as "setting its maximum energy use to zero." App. Br. 1. But this reading conflicts with Congress's definition of "energy use" as a static design standard. And because Appellants mistake every appliance prohibition for a "maximum energy use" standard, their theory would insulate EPCA-covered appliances from virtually all zoning, fire safety, and air pollution legislation.

Finally, Appellants' account of EPCA's 1987 amendments studiously ignores the actual historical record, and their policy arguments extend far beyond the rationales that Congress has endorsed. There is no indication in EPCA's text or history that Congress intended EPCA to force every state and city to make all potential sources of energy available to every consumer in every building.

16

## ARGUMENT

### I.  EPCA Preempts Only Laws Concerning Appliance Energy Performance Standards.

As with any question of statutory interpretation, the express preemption inquiry starts with EPCA's "text and structure." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (citation modified). For Congress to preempt state or local law, its intent to do so must be discernible "from the language of the preemption statute and the statutory framework surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996) (citation modified). Here, the text of EPCA's preemption clause, the meaning of its technical terms, and its broader statutory framework make plain that EPCA preempts only state regulations that concern the equivalent of a federal energy conservation standard for a covered product. Because New York's code amendments do no such thing, operating independently of how much energy appliances consume or conserve, they are not preempted.

### A.  EPCA Preempts Local Laws Concerning Appliances' Excessive Energy Use.

EPCA's preemption provision states that, "effective on the effective date of an energy conservation standard," "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c). Appellants' theory turns on what a "regulation concerning . . . energy use" is. *Id*.

17

On that score, EPCA is clear. It provides an explicit definition of "energy use" that refers to a standardized design characteristic assessed under controlled testing conditions. *Id*. § 6291(4). Under EPCA, "energy use" is "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under [42 U.S.C. §] 6293." *Id*. Section 6293, in turn, provides for test procedures that "measure . . . energy use . . . of a covered product during a representative average use cycle or period of use, as determined by [the DOE]." *Id.* § 6293(b)(3). And "point of use" is a technical term to describe a measurement taken "without adjustment for any energy loss in the generation, transmission, and distribution of that energy." *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5 (quoting Energy Intensity Indicators: Terminology and Definitions, U.S. Dep't of Energy, http://bit.ly/3I7L8yP); *see also, e.g.*, 76 Fed. Reg. 51281, 51283 (Aug. 18, 2011) (term assesses how much "electricity, natural gas, propane, and/or fuel oil an appliance uses where it is operated," omitting "the energy losses associated with" steps like "transmission[] and distribution of electricity"). In sum, "energy use" is a representative measure of how much energy a product typically consumes per use cycle, or over a given period, measured under controlled conditions "simulating actual use." *Herrington*, 768 F.2d at 1404. It is a design characteristic of a product, and a function of how it is manufactured, supplying a fixed value to estimate and describe its performance.

This concept is an essential component of EPCA's statutory framework. EPCA establishes (or requires DOE to establish) "energy conservation standards" that restrict how manufacturers may design covered products by "prescrib[ing] a minimum level of energy efficiency" or a "maximum quantity of energy [or water] use" before those products may be "distributed in commerce." 42 U.S.C. §§ 6291(1), (6), 6295. In other words, depending on the product, DOE must either restrict how much energy it may consume in absolute terms (an "energy use" standard) or bar it from producing too little usable output relative to that energy consumption (a standard concerning "energy efficiency"). Once DOE has set such a standard, manufacturers may use whatever "design path[]" they wish to "attain the performance levels required." *Zero Zone, Inc. v. DOE*, 832 F.3d 654, 666 (7th Cir. 2016) (citation modified). Whatever they choose, before they may distribute a product, manufacturers must test it under representative conditions, 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 430–31; certify to DOE that it meets the standard, 10 C.F.R. § 429.12; and label the product with its energy use, *see* 42 U.S.C. §§ 6294, 6315; 16 C.F.R. § 305.17.

EPCA's definition of "energy use" thus unmistakably refers to a fixed value reflecting a design characteristic—not a changing value that measures how much or how little a consumer actually uses a product. The statute explains how DOE sets energy conservation standards (by setting a maximum "energy use" value that

19

products may not exceed). 42 U.S.C. §§ 6291(6)(A), 6295. It tells manufacturers how to design their products (to consume no more than the specified amount of energy), and how to discern whether a product meets such a standard (by testing the product under representative conditions before it may be sold). *Id.* at §§ 6293, 6314. And it informs what manufacturers must certify to DOE before putting a product on the market (that the product meets the standard), 10 C.F.R. § 429.12, as well as how to label products for consumers at the point of sale (by specifying how much energy they may use), *see* 42 U.S.C. §§ 6294, 6315.

EPCA's preemption clause fits neatly into this statutory framework. When an "energy conservation standard" has been established for a particular covered product, the preemption clause ensures that no state or local regulation that likewise "concern[s]" the "energy use" of "such covered product" may "be effective with respect to such product." *Id.* § 6297(c). And by doing this, EPCA ensures that, when manufacturers design and produce their products, they need not juggle competing state and federal energy conservation standards and are subject to a single set of rules, governed by specified test procedures.

Reading EPCA in this straightforward manner leads to a straightforward rule: once DOE establishes, for example, a maximum amount of energy that gas-burning boilers may use to output a particular level of heat, New York cannot adopt—directly or indirectly—a different efficiency standard for gas-burning

20

boilers. But the mere existence of a DOE-established design standard does not require New York to allow the unrestricted "use" of any particular appliance.

### B. New York's Code Amendments Do Not Relate to Excessive Energy Use.

EPCA's consistent technical definition of "energy use" as a design characteristic, and that definition's role in EPCA's "coherent regulatory scheme," *FDA v Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000), together foreclose Appellants' challenge. New York's law does not set an energy conservation standard. It does not restrict how much energy a covered appliance may be designed to consume. The law at issue here is indifferent to whether an appliance guzzles energy or requires just a small amount. Instead, it restricts most new buildings from using particular fuel sources: fossil fuels. And it does so to protect New York residents from the emissions generated by fossil fuel combustion and the consequences of climate change.

While EPCA is concerned with standards for energy conservation, New York's restriction on any combustion of greenhouse-gas-emitting fuels bears no inherent relationship to the quantity of energy used by New York appliances. Where the law's restrictions apply, they bar all fossil fuel combustion. The code amendments do not prescribe standards for any appliance's energy use or energy efficiency. In fact, some electric appliances used in new buildings consume more

energy or perform less efficiently than the gas-burning alternatives available in older construction. Thus, "[t]ransitioning from fossil fuels to non-greenhouse-gas-producing energy sources may not decrease total energy consumption." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting).

In the buildings in which the code amendments apply, they do not require that products be redesigned to consume less energy. They direct builders and consumers to deploy "one set of products with one set of federal efficiency standards (electric appliances)" rather than "another set of products with different federal efficiency standards (gas appliances)." *Id.* Indeed, in some instances, the code's focus on emissions may cause new buildings (or appliances within them) to consume more energy, not less. *See id.* (citing 10 C.F.R. § 430.32(e)(1)(ii)) (setting a more stringent standard for gas furnaces than for electric ones). The amendments—like virtually every building and fire code—bar the use of certain appliances in certain locations for environmental and welfare reasons. But they do not require that the appliance achieve a reduction in energy use or an improvement in energy conservation, and are not preempted.

22

## II. Appellants' Arguments Highlight the Weaknesses of Their Interpretation of EPCA.

### A. Appellants Mischaracterize the Ninth Circuit Panel's Reasoning, Even as They Urge This Court to Follow it.

As the district court observed, the Ninth Circuit made critical mistakes in interpreting EPCA's preemption clause: The panel misunderstood "both the statutory definition of 'energy use' and the term 'point of use,'" which led to the panel's "understanding of energy use as being a real-world, ever-changing measurement as opposed to a static assessment of the typical quantity of energy consumed by such a product." JA-194. These decisions led directly to the panel's erroneous conclusion that a prohibition on "using natural gas–powered appliances in newly constructed buildings necessarily regulates" the "energy use" of appliances at their "point of use"—i.e. the appliances' actual consumption of energy "on premises where covered appliances are used." *Cal. Rest. Ass'n*, 89 F.4th at 1101.

To reach the conclusion that EPCA's definition of "energy use" refers not to a static value but to an appliance's actual use by a consumer, the Ninth Circuit panel employed a colloquial definition of "point of use" to mean "the 'place where those appliances are used.'" JA-191 (quoting *Cal. Rest. Ass'n*, 89 F.4th at 1101). That definition is central to the panel's decision: the court expressly relied on it to

23

conclude that "by its plain language, EPCA preempts Berkeley's regulation here because it prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used." *Cal. Rest. Ass'n*, 89 F.4th at 1102. But the panel's use of a colloquial definition is "clearly contrary to the technical nature of the statute," and the panel did not attempt to "explain[] why it was rejecting the relevant technical definition discussed in detail by Judge Friedland." JA-195.[5]

Appellants seek to minimize the Ninth Circuit's error, arguing that the panel's decision did not rest "on its reading of the term 'point of use.'" App. Br. 41. Appellants now claim that the Ninth Circuit "understood that term as just one of many statutory cues" and largely based its interpretation of the preemption provision on the text of other provisions. App. Br. 41 (suggesting Ninth Circuit actually focused on EPCA's "waiver provision," "building code exception," and "Congress's choice of 'concerning'"). Appellant's complaint, however, provides the more honest account of the Ninth Circuit's reasoning. Although the complaint does not cite the panel's discussion of EPCA's waiver provision or building code

---

[5] Like the Ninth Circuit panel, Appellants also relied from the outset of this litigation on the colloquial interpretation of "point of use" as "the place where those appliances are used." *See, e.g.* JA-43 (Compl. ¶¶ 68, 70) (employing colloquial definition of "point of use" in support of claim that EPCA is concerned with the operation of "covered consumer appliances at the place where those appliances are used").

exceptions, its brief summary of the Ninth Circuit panel's decision states three times in three sentences that the panel concluded that "point of use" means "the place where those products are used." JA- 44 ¶ 73. And the panel decision, of course, speaks for itself in acknowledging that "our focus is on the plain meaning of the preemption provision"—rather than the separate waiver and building code provisions. *Cal. Rest. Ass'n*, 89 F.4th at 1101.

In any event, even if the Ninth Circuit panel had focused chiefly on the building code exception, the waiver provision, and the word "concerning," it would make little difference. As discussed below, these additional "statutory cues" do not confirm Appellants' theory. On the contrary, they refute it.

### B. The District Court's Interpretation of EPCA Does Not Render the Building Code Exception Superfluous.

Appellants stake a great deal of their argument on EPCA's building code exception, § 6297(f)(3), asserting that it establishes a "crucial question" about the scope of EPCA's preemption clause that only their theory can satisfactorily answer. App. Br. 45–46. They make the bold claim that "[n]obody has identified any regulation—real or hypothetical—that falls within the scope of §6297(c) as the Secretary, Intervenors, and district court read it but is spared from preemption by §6297(f)(3)." App. Br. 46. But it is not difficult to identify both real and

hypothetical regulations that fit these requirements, and we describe two examples below.

First, take an existing regulation: Section C406.2 of the 2020 New York Energy Conservation Construction Code ("NYECCC"), applicable to commercial buildings.[6] The Code as a whole includes multiple pathways for commercial buildings to achieve compliance, including the "Prescriptive Compliance Path" identified in Section C401.2(2). Selecting that path, in turn, triggers an obligation to comply with Section C406, which provides a menu of eight options, "Additional Efficiency Packages," from which the builder must select at least one package. The first package, C406.2, requires the energy efficiency ratings of the building's heating and air conditioning appliances to *exceed* the federal energy conservation standards set by DOE by 10%.

On the face of it, this section of the existing building code regulation would clearly "fall within the scope of §6297(c) as the Secretary, Intervenors, and district court read it." App. Br. 46. As Appellants concede, under the district court's interpretation (and that of the Secretary and Intervenors), "Congress preempted . . . only requirements that affect a product's fixed energy use or efficiency as

---

[6] *See* 19 NYCRR § 1240.4, incorporating by reference the commercial provisions of the 2020 Energy Conservation Construction Code of New York State (Nov. 2019), available at https://codes.iccsafe.org/content/NYSECC2020P1.

26

manufactured." App. Br. 43. And Section C406.2 clearly creates a requirement that affects the fixed efficiency of covered heating and air conditioning appliances as manufactured, requiring that specific appliances "shall exceed the minimum efficiency requirements"—the federal standards set by DOE—"by 10 percent." NYECCC § C406.2. The building code section thus directly relates to the subject matter of EPCA, as it can be met only if manufacturers design specific air conditioning appliances to be more efficient than DOE's standards mandate. Section C406.2 falls within the scope of EPCA's preemption clause.

But this is where EPCA's building code exception, Section 6297(f)(3), comes into play. Section 6297(f)(3) requires evaluating the building code as a whole, rather than looking at individual sections in isolation. The building code exception allows for code provisions that directly relate to energy conservation standards by regulating appliances' energy efficiency and energy use. But to qualify for the exception, the code as a whole must offer builders at least one path to compliance that does not require the installation of appliances that exceed federal standards. *See* 42 U.S.C. §§ 6297(f)(3)(B), 6297(f)(3)(D), 6297(f)(3)(E). While barring state building codes from absolutely requiring the use of appliances that exceed federal standards, the building code exception nonetheless permits individual code provisions that concern energy efficiency or energy use and incentivize the manufacture and use of products with efficiency exceeding federal

27

standards. Such provisions—like Energy Conservation Construction Code Section C406.2—can survive EPCA preemption if the code as a whole provides alternative pathways for compliance.

New York's Section C406.2 is saved from preemption because the Energy Conservation Construction Code as a whole meets the requirements of EPCA's building code exception. While New York has chosen through Section C406.2 of its Energy Conservation Code to incentivize the manufacture of specific appliances built to a more rigorous standard than DOE requires, it has also provided alternate ways for commercial buildings to achieve compliance using only appliances meeting minimum federal requirements. For example, builders can choose alternative packages such as an "on-site supply of renewable energy," NYECCC § C406.1(4), or better thermal insulation through "enhanced envelope performance," *id*. § C406.8. Or builders can select a different path than the "Prescriptive Appliance Path," and meet a different set of requirements. *See id*. § C401.2. A builder selecting one of these alternative pathways would not be bound by the requirements of Section C406.2, and could choose to use an air conditioner that met DOE's minimum standards.

The Energy Conservation Construction Code's inclusion of alternate pathways to compliance saves the requirement of Section C406.2, which would otherwise be within the scope of EPCA's preemption clause. Because New York's

28

code provides alternate pathways to compliance, the code as a whole does not *require* the installation of devices that are more efficient than the federal minimum—even as it *relates* to appliances' energy efficiency. And New York's Energy Conservation Construction Code meets the remaining code requirements set out in EPCA's building code exception. *See* 42 U.S.C. § 6297(f)(3). But in the absence of Congress establishing EPCA's building code waiver, New York could not use sections of its building code to incentivize the manufacture and use of appliances that exceeded DOE's minimum standards. Such an incentive would relate to energy conservation standards for covered appliances—regardless of whether New York left available alternate forms for compliance. *See* 42 U.S.C. § 6297(c).[7]

In addition to the real example above, which concerns an "energy efficiency" regulation, a hypothetical example demonstrates how the same logic

---

[7] Another example appears in Section C403.5 of New Yor's Energy Conservation Construction Code. That section requires the installation of an economizer (a mechanical system that brings cool outdoor air into a building) to reduce the energy usage of air conditioning equipment. However, if a building's air conditioning equipment exceeds the DOE minimum rating by 20%, the economizer requirement is waived. The result is that Section C403.5 provides another incentive for the manufacture and use of air conditioning equipment that is more efficient than DOE's requirements by eliminating the need for builders to purchase and install economizer systems. Such an incentive would ordinarily be preempted by EPCA's preemption provision. But the building code as a whole provides sufficient alternative pathways for compliance to qualify for EPCA's building code exception—saving the incentive provided by Section C403.5.

applies to an "energy use" regulation. Unlike air conditioners, which are generally used only when the outside temperature is within a certain range, refrigerators run constantly throughout the year. EPCA therefore establishes an "energy use" standard for refrigerators expressed in "kilowatt hours per year," as opposed to the "energy efficiency" standard applicable to air conditioning equipment. *See id*. § 6295 (refrigerator standards establishing "maximum energy use allowed in kilowatt hours per year").

New York's Energy Conservation Construction Code could hypothetically provide a set of options for compliance that include as alternate pathways (1) achieving a high level of thermal insulation, (2) enhanced lighting controls, or (3) using refrigerators that consume 10% fewer kilowatt hours per year of energy than the federal standard. Such a code provision incentivizing refrigerator manufacturers to meet a more rigorous "energy use" standard than DOE requires would undoubtedly concern "energy use," and would fall within the scope of EPCA's preemption clause, Section 6297(c). But the inclusion of such a regulation within a broader building code that offers alternate paths for compliance could be saved from preemption by EPCA's building code exception, Section 6297(f)(3).

In contrast to these examples, the building code amendments at issue in this case have nothing to do with "energy use" or "energy efficiency" as EPCA defines those terms. They do not concern the amount of kilowatt hours of energy an

30

appliance is designed to consume per year, nor the amount of useful output per unit of energy any appliance is designed to produce. They do not incentivize or require the use of any appliance that exceeds federal energy conservation standards. The law at issue here bears no relationship at all to energy conservation standards. Instead, the regulation concerns certain fuel sources and the emissions they produce, prohibiting them for reasons unrelated to whether they conserve energy.

### C. EPCA's Waiver Provision Confirms That Congress Preempted Only Regulations That Concern Excessive or Inefficient Energy and Water Use.

Appellants are correct that "Section 6297(d)'s waiver provision sheds light on the breadth of Congress's preemptive intent," App. Br. 47, but that fact does not help their argument. Instead, Appellants' sweeping theory of EPCA's preemption clause creates a disconnect between the scope of EPCA's waiver and preemption provisions that cannot be reconciled with the careful statutory scheme that Congress crafted.

If Appellants were correct, then Congress made the inexplicable choice to preempt all laws that restrict appliances to protect health and safety—but authorized DOE to *waive* preemption only as to those laws targeting "energy or water interests." 42 U.S.C. § 6297(d)(1)(B). Appellants assert that EPCA preempts all state and local laws that prohibit appliances for any reason. But Congress authorized DOE to waive EPCA preemption only if it finds that a regulation is

31

"needed to meet unusual and compelling State or local energy or water interests," such as when the "energy or water savings resulting" from an otherwise preempted law outweigh its overall costs. *Id*. § 6297(d)(1)(B), (C). That means that once DOE sets an energy conservation standard, it irreversibly precludes state and local governments from addressing through regulation any of the dangers that appliances may pose.

The better interpretation is that Congress intended EPCA's preemption clause, waiver authority, and DOE's own powers under the statute to work as a symmetrical, coherent whole. EPCA charges DOE with setting national standards for energy and water conservation. The preemption clause bars state and local authorities from enacting regulations that relate to energy and water conservation standards, because such regulations could compete with DOE's national standards. But Congress recognized that sometimes state and local energy and water interests are so unique that a tailored local standard is called for rather than the federal standard. Congress therefore authorized DOE to waive the national standards if it finds that a local conservation standard is justified in addressing unusual local energy and water conservation needs. Congress thus tailored the waiver standard to match precisely the category of regulations that are preempted under a straightforward reading of EPCA's preemption clause: conservation standards that target "energy or water savings." *Id*. § 6297(d)(1)(C)(ii). Regulations aimed at

health and safety interests (such as fire safety or the avoidance of pollution), by contrast, do not fit the prescribed waiver standard—just as they do not fit within EPCA's preemptive clause or DOE's regulatory powers under EPCA.

It is highly implausible that Congress intended EPCA to preempt both state energy conservation standards as well as health and safety laws but only authorized DOE to regulate and waive preemption of energy conservation standards. Such an interpretation would be neither "a symmetrical and coherent regulatory scheme" nor would it fit "all parts into an harmonious whole." *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (citations omitted). The waiver provision therefore usefully illustrates that Appellants' sweeping theory of EPCA preemption clashes with the limited scope of regulation that Congress viewed as subject to preemption and potentially eligible for a waiver. *See N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 646 (1995) (courts look to statute's "objectives" as a "guide to the scope of the state law that Congress understood would survive"); *Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 347 (D. Vt. 2007) (observing that "EPCA expresses no environmental objective or purpose").

33

### D.     The Word "Concerning" Does not Transform Congress's Definition of "Energy Use."

Having dismissed the phrases "energy use" and "point of use" as "a distraction," App. Br. 24, Appellants next suggest that "concerning" is the "most important term" in the preemption clause, App. Br. 28. They raise two arguments about the meaning of the word, but neither helps their case. Appellants' first point is unremarkable and unhelpful: Appellants argue at length—and no one disputes—that "concerning" means that both laws that *directly* set "energy use" standards as well as laws that *indirectly* incentivize or require energy conservation are within the scope of the preemptive clause. App. Br. 30–32. Appellants' second point is nonsensical: they seem to argue that the word "concerning" effectively transforms the words that follow, rendering irrelevant Congress's careful definition of "energy use" so that even laws that do not relate to product design standards are preempted. App. Br. 32–33.

Appellants argue strenuously that Congress's use of "concerning" means that laws that only indirectly concern EPCA's preempted subject matter are swept within the clause's scope. App. Br. 31. But this point is undisputed. Everyone agrees that a law that only indirectly established appliance energy use standards, such as a law setting out a "maximum building-wide energy consumption limit," could still be a law "concerning" appliance "energy use" because if it indirectly

34

regulates the energy efficiency of the appliances that might be installed. JA-193. Similarly, a law that provided incentives for the installation and use of appliances based on whether they use less energy than DOE requires could "concern" appliance energy conservation standards even if it did not prohibit the use of other appliances. This premise is neither contested nor helpful to Appellants' case.

The problem for Appellants is that New York's law neither directly *nor indirectly* concerns "energy use" as Congress defined that term in EPCA. Contrary to Appellants' claims, the meaning of "energy use" is not a "distraction"—it is the crux of this case. And, as explained above, New York's law has no relationship to "energy use" as Congress defined that term: the law is indifferent to whether an appliance is designed to use small or large amounts of energy. The law does not regulate or touch on whether appliances use large or small amounts of kilowatt hours per year. Instead, New York's law regulates something unrelated: the environmental impact of particular fuel sources.

Appellants' remaining premise—that "concerning" somehow transforms the scope of the preemption clause—is equally unavailing. Appellants imagine that the word "concerning" converts any prohibition on using gas appliances into a regulation of those appliances' "energy use (or energy efficiency)." App. Br. 32. In their view, any law that prevents an appliance from operating is "inextricably intertwined with—covered appliances' energy use." App. Br. 33.

35

But this argument is just a repackaging of Appellants' failed definition of "energy use" as relating to the actual energy consumed by a given appliance when operated by a particular consumer. And because Appellants' definition of "energy use" is wrong, they cannot turn to the word "concerning" to somehow change the meaning of the term. *See Cal. Rest. Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting) ("'[C]oncerning' cannot transform the meaning of 'energy use.'"). "As even Plaintiffs acknowledge, Congress' use of the word 'concerning' does not create a limitless preemption; the regulation at issue must still relate to or be about or regarding the 'energy use' of a covered product for preemption to apply." JA-192. EPCA defines "energy use" as a standardized measure of an appliance's consumption of energy during a use period, which New York's law does not concern or relate to. Instead, New York prohibits certain appliances based on emissions characteristics unrelated to how much energy they are designed to use. The law therefore does not concern "energy use" as defined in EPCA.

Appellants also cite this Court's decision in *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 157–58 (2d Cir. 2010) but fail to describe or engage with its holding. Yet that decision squarely illustrates the difference between laws that effectively concern energy conservation standards—and are therefore subject to EPCA preemption—and laws like New York's code amendments, which do not directly or indirectly relate to energy conservation. In

36

*Metro Taxicab Board*, the Court addressed a similar preemption provision in EPCA, which "preempts state laws that are 'related to fuel economy standards.'" *Id.* (quoting 49 U.S.C. § 32919(a)). The Court analyzed a New York City law that incentivized hybrid taxis, concluding that the law was effectively a fuel economy standard even though it did not explicitly mention fuel economy. In that case, "'hybrid' [wa]s simply a proxy for 'greater fuel efficiency,'" so a rule that incentivized cars on the basis of hybrid status did "nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* at 157–58.

There is no similar equivalency between the emissions addressed by New York's code amendments and the energy efficiency of any EPCA-covered appliance. "Indeed, some gas appliances are more efficient than electric appliances, so the ordinance may have the indirect effect of *increasing* energy consumption in new buildings in some circumstances." *Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting) (citing 10 C.F.R. § 430.32(e)(1)(ii) (setting a more stringent standard for gas furnaces than for electric furnaces)). And while the incentive provided by the New York City law "solely on the basis of whether or not a vehicle has a hybrid engine has no relation to an end other than an improvement in fuel economy," the ends served by New York's code amendments are wholly distinct from energy efficiency. *Metro. Taxicab Bd. of Trade*, 615 F.3d at 157. New York's code amendments produce no inherent improvement in energy efficiency of

37

the state's appliances nor improve the state's energy conservation. Instead, the law serves different ends: mitigating the climate crisis that threatens New York's future.

### E. Prohibitions on Appliance Operation are not "Maximum Energy Use" Standards.

Appellants make the strange claim that even if "energy use" refers to a static value set at the time of appliance manufacture, New York's law "sets that static value to zero." App. Br. 24. In their view, if New York restricts an appliance from operating for any reason, it must be understood to be "setting its maximum energy use to zero." App. Br. 1. Following this logic, once an appliance is subject to a federal energy efficiency standard, no state or local authority can ever restrict its use in any location, because a regulation requiring an appliance to be turned off "set[s] its maximum energy use to zero." App. Br. 1.

As an initial matter, this argument makes little sense: because "energy use" is a static design characteristic, New York's law cannot alter it. As EPCA uses the terms, a furnace that is turned on in a building has the same "energy use" as an unused furnace sitting in a box in warehouse. An appliance that cannot lawfully operate in certain new buildings in New York does not have a different "energy use" value based on whether or not it can be installed; its "energy use" is set before it is ever introduced into commerce. The "maximum energy use standard" theory thus fails for the same reason as Appellants' other arguments that turn on

38

misreading "energy use" to refer to a shifting measure of an appliance's actual use in the hands of a consumer.

And because Appellants mistake every appliance prohibition for a zero "maximum energy use" standard, their reading would insulate EPCA-covered appliances from virtually all zoning, fire safety, and air pollution legislation. This sweeping rule creates bizarre and dangerous results. According to Appellants' theory, once DOE has prescribed an energy efficiency standard for a product, state and local authorities lose all power to prohibit the use of that product on any other ground. And because DOE has no ability to create substitute health and safety protections, the result of Appellants' theory is to create a regulatory vacuum: Once an appliance is subject to a federal energy conservation standard, it is simultaneously insulated from every other form of regulation.

Such a law would make very little sense. EPCA would displace all state law from wholly unrelated domains, even though the "[f]ederal law does not speak to these issues." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 265 (2013). And while Appellants perceive every form of appliance prohibition as setting a "maximum energy use standard" of "zero," they provide no reason to believe that Congress shares this unorthodox view. There is no indication that Congress considered appliance prohibitions to be "maximum energy use standards," much

39

less that it intended EPCA preemption to extend to arenas far removed from energy (and water) conservation.

For example, New York has for decades judged that portable kerosene burners are too dangerous to allow for their use in dense, multi-family residential buildings throughout the state. Section 239-e of the state's Real Property Law prohibits the use of any portable kerosene heater in a multiple dwelling (defined in Section 239-a(2) to mean dwellings occupied as the residence of three or more independent families and including dwelling portions of hospitals, nursing homes, and other institutions). Such heaters are so "highly flammable" that "fire officials confiscate[] them whenever they [a]re spotted in homes or apartments." Robert D. McFadden, *Fire Kills 4 and Burns 2 in a Home in Brooklyn*, N.Y. Times (Dec. 28, 1990), https://www.nytimes.com/1990/12/28/nyregion/fire-kills-4-and-burns-2-in-a-home-in-brooklyn.html (quoting N.Y.C. Fire Department spokesman).

But according to Appellants' theory, by banning kerosene space heaters in all multifamily buildings, New York has actually issued a standard setting those heaters' "maximum energy use to zero." App. Br. 1. Congress indisputably included kerosene space heaters as covered products under EPCA, and DOE has already considered whether to issue an energy conservation standard for this appliance, pausing only because insufficient energy savings were currently available. *See* Energy Conservation Program: Energy Conservation Standards for

40

Direct Heating Equipment, 86 Fed. Reg. 66403, 66404 (Nov. 23, 2021).

Appellants' position is that Congress *required* that all fire safety laws prohibiting appliances immediately give way if DOE ever decides to issue an energy standard. Their rule is unequivocal in this important respect: once DOE sets an energy conservation standard for a covered product, any law that "categorically prohibit[s] covered gas appliances from using any energy" is preempted. App. Br. 55. By Appellants' rule, the moment DOE finds that there are energy savings to be had by regulating kerosene space heaters, New York's crucial fire-safety regulation—and countless others—are wiped off the books. That is, to put it mildly, not a result that one would impute to a rational Congress. Nor does it make any sense that Congress would require such radical results in such an oblique fashion, addressing itself to "energy conservation standards" yet choosing to preempt all local appliance regulation.

And setting aside space heaters, Appellants' theory poses immediate problems for the laws prohibiting the use of appliances subject to the energy conservation standards DOE has already set. These include over 70 categories of devices ranging from furnaces to fans, industrial boilers to residential freezers— and even television sets. Under Appellants' theory, those standards already exempt covered appliances from large swaths of state and local regulatory authority. According to Appellants' rule, noise ordinances cannot restrict the use

41

of loud industrial fans; zoning laws and building codes cannot prohibit the use of industrial furnaces in residential neighborhoods and towns; and cities must not restrict the use of walk-in freezers in private residences—because doing so sets the maximum quantity of energy they may consume at zero.

Appellants try to avoid these problems by proposing that the scope of ECPA preemption may be indeterminate. They suggest that a "regulation prohibiting the use of an appliance in certain unsuitable spaces" might be lawful under certain undescribed circumstances, even though in Appellants' view such a regulation would still "prohibit [the] covered gas appliances from using any energy." App. Br. 54–55. How are courts to make sense of Appellants' theory? Is it permissible for a bedroom community to ban industrial furnaces from every single-family home? What if that renders an appliance "categorically prohibit[ed]," App. Br. 55, in the entire town? Can fire safety regulations bar a dangerous appliance throughout a city or state? Only in certain buildings and rooms? Appellants do not say.

Rather than adhering to Congress's text and a stable definition of "concerning . . . energy use," Appellants urge the Court to create a system of unclear preemption, where states and cities can only guess at the scope of EPCA's coverage. Though its contours are extremely vague, there is little question that Appellants' rule would arbitrarily sweep in many prohibitions on using

42

inappropriate or unsafe appliances. And because EPCA does not authorize DOE to grant waivers on health and safety grounds, no actor at any level of government would have authority to reinstate or create adequate substitutes for the countless health, welfare, and zoning laws that EPCA would displace. The Court should reject Appellants' theory. *See In re Nine W. LBO Sec. Litig.*, 87 F.4th 130, 145 (2d Cir. 2023) ("Courts should interpret statutes to avoid absurd results.").

### F.     Appellants Misunderstand Congress's 1987 EPCA Amendments.

Appellants maintain that Congress's 1987 amendments sought to greatly expand the scope of EPCA preemption, reaching beyond energy conservation standards to any regulation that affects whether an appliance operates for any reason. App. Br. 37–38. At bottom their argument is that when Congress substituted the phrase "'regulation[s] concerning'" covered appliances' "'energy use'" for "energy conservation standard or other requirement," it radically expanded EPCA preemption far beyond the statute's focus on energy conservation. App. Br. 37. Appellants maintain that this is another route to their preferred outcome: even if the Ninth Circuit was wrong about the meaning of "energy use" and "point of use," the result can still be a sweeping preemptive clause that reaches laws that have nothing to do with energy conservation. App. Br. 36 (asserting that

43

whatever "point of use" actually means, EPCA preemption must extend far beyond "energy conservation standards").

Unfortunately for Appellants' argument, nothing about Congress's 1987 amendment supports the view that Congress intended to expand preemption beyond energy conservation standards. First, the text that Congress chose to use in the 1987 amendment is "energy use," and Congress has assigned that term a consistent meaning dating back to the 1975 version of EPCA. As described above, Congress defined the term in such a way as to exclude laws concerning an appliance's actual energy consumption in the hands of an end user. *See* Section I, *supra.* If, as Appellants assert, Congress actually intended to expand EPCA preemption to all laws prohibiting appliances from operating for any reason, and thereby prohibiting them from consuming energy in the hands of an end user, Congress would not have used the term "energy use," which is not susceptible to such a broad preemptive scope.

Second, the fact that Congress omitted the outdated phrase "energy efficiency standard" from the 1987 preemption clause did not indicate an expansion of EPCA's preemption clause beyond "energy conservation standards." While earlier versions of the statute and preemption clause used the phrase "energy efficiency standard," Congress later distinguished between "energy efficiency"

44

standards and "energy use" standards.[8] Congress generally replaced "energy efficiency standard" with the broader concept of "energy conservation standard" throughout the statute, and it used this exact phrase in the title of the preemption clause. *See* Pub. L. No. 100-12, § 2, 101 Stat. at 103 (defining "energy conservation standard" to include "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a covered product"). The text of the preemption clause simply echoes the definition of "energy conservation standard" by listing its constituent parts.

Nor, finally, is the legislative history of the amendment any help to Appellants: Congress intended to "continue[] the basic concept of preempting State energy efficiency standards" when it amended EPCA in 1987. H.R. Rep. No. 100-11, at 24; *see also* 133 Cong. Rec. 3070 (1987) (statement of Sen. Johnston) (sponsor's description of NAECA as having "two basic principles": "to establish efficiency standards" and "to preempt State *efficiency standards*") (emphasis added). Surely if Congress in fact intended to radically alter the scope of state law preempted by EPCA, it would have indicated the expansion somewhere. But there is no trace of such an expansion in the text of the 1987 amendments, the legislative

---

[8] As described above, the standards refer to products that used too much energy in absolute terms (an "energy use" standard), or that produced too little useful output in relation to the energy they consumed (an "energy efficiency" standard). *See* Section I, *supra*.

45

history, or the decades of stable interpretation preceding the Ninth Circuit panel's erroneous ruling in *California Restaurant Association.*

Appellants nonetheless maintain that Congress intended a tortured syllogism that apparently occurred to no one for decades—that any regulation that prohibits the operation of a covered appliance "concern[s]" a "quantity" of energy used because it sets a "maximum energy use" standard of "zero." App. Br. 1. It is far more plausible that if Congress indeed intended such a far-reaching result, it would have just said what Appellants insist it meant: when DOE establishes an energy conservation standard, it preempts every state regulation restricting that appliance's operation. But Congress did not do so. It explained that EPCA preempts only state regulations that concern "energy use," defined as the quantity of energy an appliance is designed to consume.

### G.    Appellants' Policy Concerns Should Be Addressed to Congress.

Appellants assert that Congress enacted EPCA as a "sweeping national energy policy," that effectively guarantees the availability of appliances using a range of fuel sources throughout the country. App. Br. 49. In their view, Congress wanted to guarantee that "consumers nationwide would have access to the same types of products," effectively mandating that every state and city must make available in every building all forms of energy. App. Br. 50. In reality, Congress's

46

aims in EPCA were far more targeted. As described above, Congress wanted to ensure that manufacturers complying with DOE's energy conservation standards were not also required to meet efficiency targets that varied from state to state. But there is no indication in EPCA's text, structure, history, or logic that Congress intended to create a nationwide consumer use guarantee. Appellants maintain that Congress wanted to prevent local laws making "certain appliances unavailable for consumers in some areas but not others." App. Br. 51. But state and local bans on kerosene heaters create precisely this outcome, and there is no indication that Congress included kerosene space heaters within EPCA with the intention of guaranteeing that appliance's nationwide availability.

If Congress in fact wanted to guarantee the availability of every appliance in every building and community across the country, it would be bizarre to do so by obliquely addressing energy conservation standards. Instead, Congress could enact a law like the one introduced in the 118th Congress as H.R. 6089 in 2023. That law, the "Energy Choice Act," aimed to prohibit any "state or local government" from restricting consumers' access to "an energy service based on the type or source of energy to be delivered to an end-user of such energy service." H.R. 6089, 118th Cong. (2023). While that law failed to advance, the present Congress is considering H.R. 3699, a slightly modified version of the same law. Or Congress could enact something like an "Appliance Choice Act," guaranteeing that any

47

listed appliance be made available in every home, regardless of local health, fire safety or environmental considerations.

But Congress has not enacted such a law. If Appellants believe that cities and states should be deprived of local control over emissions and fuel sources, or if they believe that a nationwide appliance use guarantee is sound policy, then they should address themselves to Congress. But Appellants cannot short-circuit the political process by claiming that Congress has already enacted such a radical diminishment of traditional police powers. Neither EPCA nor any other federal law preempts New York's law.

## CONCLUSION

For the reasons above, the district court's decision should be affirmed.

Dated: December 3, 2025     Respectfully submitted,

           */s/ Dror Ladin*

           Dror Ladin
           Meagan Burton
           Earthjustice
           48 Wall Street, 15th Floor
           New York, NY 10005
           (917) 410-8701
           dladin@earthjustice.org
           mburton@earthjustice.org

           *Attorneys for Intervenors-Defendants-Appellees New York Geothermal Organization and PUSH Buffalo*

48

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software it contains 10,899 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

Dated: December 3, 2025

/s/ Dror Ladin
Dror Ladin

49