# No. 25-2041

## United States Court of Appeals
## for the Second Circuit

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., DBA MASTER PLUMBERS COUNCIL OF THE CITY OF NEW YORK; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; AND TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants*,

v.

WALTER T. MOSLEY, IN HIS OFFICIAL CAPACITY AS NEW YORK SECRETARY OF STATE AND MEMBER OF THE STATE FIRE PREVENTION AND BUILDING CODE COUNCIL,

*Defendant-Appellee*,

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, PUSH BUFFALO,

*Intervenors-Defendants-Appellees*.

On Appeal from the U.S. District Court, Northern District of New York
No. 1:23-cv-01267, Hon. Glenn T. Suddaby

**BRIEF OF THE GUARINI CENTER ON ENVIRONMENTAL, ENERGY AND LAND USE LAW AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLEE AND INTERVENORS-DEFENDANTS-APPELLEES AND FOR AFFIRMANCE**

Nathaniel R. Mattison
GUARINI CENTER ON ENVIRONMENTAL, ENERGY AND LAND USE LAW
N.Y.U. SCHOOL OF LAW
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6146
nathaniel.mattison@law.nyu.edu

*Counsel for* Amicus Curiae

December 10, 2025

NEW YORK DEPARTMENT OF STATE; NEW YORK STATE FIRE PREVENTION AND BUILDING CODE COUNCIL; AND JAMES CABLE, RUTHANNE VISNAUSKAS, ROBERTA REARDON, ERIC ADAMS, MICHAEL SPANO, JOSEPH M. DESTEFANO, CLAUDIA BRAYMER, JOSEPH TOOMEY, SHAWN HAMLIN, TIMOTHY DERUYSCHER, ROBERT HUGHES, WILLIAM W. TUYN, PATRICK DOLAN, AND DOMINIC MARINELLI, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE STATE FIRE PREVENTION AND BUILDING CODE COUNCIL,

*Defendants.*

## DISCLOSURE STATEMENT

The Guarini Center on Environmental, Energy and Land Use Law ("Guarini Center") is a nonpartisan, not-for-profit think tank at New York University School of Law. No publicly held entity owns an interest of more than ten percent in the Guarini Center. The Guarini Center does not have any members who have issued shares or debt securities to the public.

December 10, 2025

Respectfully submitted,

/s/ *Nathaniel R. Mattison*

Nathaniel R. Mattison
GUARINI CENTER ON ENVIRONMENTAL, ENERGY AND LAND USE LAW
NEW YORK UNIVERSITY SCHOOL OF LAW
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6146
nathaniel.mattison@law.nyu.edu

*Counsel for* Amicus Curiae *Guarini Center on Environmental, Energy and Land Use Law*

i

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ........................................................................i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF IDENTIFICATION AND INTEREST ......................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................3

ARGUMENT ........................................................................................5

I.     EPCA Preempts Only State And Local Laws Interfering With Manufacturers' Statutory Design, Production, And Marketing Obligations....................................................................................5

     A.  EPCA Grants Manufacturers Limited Rights Related To Their Statutory Duties—But Does Not Guarantee Their Exemption From State or Local Laws Unrelated To Those Duties ........................5

     B.  The District Court's Opinion Is Consistent With Congress's Scheme Of Manufacturer Rights And Duties Under EPCA, While Plaintiffs-Appellants' Arguments Are Not ..............................14

II.    Analogous Preemption Decisions Under The National Manufactured Housing Construction And Safety Standards Act Support A Narrow View Of EPCA Preemption........................................................21

CONCLUSION....................................................................................27

CERTIFICATES

# TABLE OF AUTHORITIES

## Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005)………………………………10, 11, 12, 14

*Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144 (9th Cir. 2012)………………………………......11, 12, 13, 14, 19

*California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024)…………………………………………………………….2, 13, 14

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004)……………………………………………………………….21

*Georgia Manufactured Housing Ass'n, Inc. v. Spalding Cnty.*, 148 F.3d 1304 (11th Cir. 1998)………………………………………………………25

*Lauderbaugh v. Hopewell Twp.*, 319 F.3d 568 (3d Cir. 2003)……………………26

*Murphy v. NCAA*, 584 U.S. 453 (2018)………………………………………...10

*Schanzenbach v. Town of Opal*, 706 F.3d 1269 (10th Cir. 2013)……………...25, 26

*Scurlock v. City of Lynn Haven*, 858 F.2d 1521 (11th Cir. 1988)………………24, 25

*Texas Manufactured Housing Ass'n, Inc. v. City of Nederland*, 101 F.3d 1095 (5th Cir. 1996)………………………………………………………25

## Statutes

42 U.S.C. § 5401(b)………………………………………………………….22

42 U.S.C. § 5402(6)…………………………………………………………22

42 U.S.C. § 5403(a)…………………………………………………………23

42U.S.C. § 5403(d)…………………………………………………………..24

42 U.S.C. § 5403(g)…………………………………………………………23

42 U.S.C. § 6201…………………………………………………………….16

42 U.S.C. §§ 6291–6297……………………………………………………...6

42 U.S.C. § 6291(2)…………………………………………………………...5

42 U.S.C. § 6291(6)…………………………………………………………...6

**Statutes (Cont.)**

42 U.S.C. § 6293……………………………………………………………..6, 8, 9

42 U.S.C. § 6293(c)……………………………………………………………...7

42 U.S.C. § 6294……………………………………………………………...8

42 U.S.C. § 6294(c)……………………………………………………………...7

42 U.S.C. § 6295………………………………………………………….6, 8, 16

42 U.S.C. § 6295(c)……………………………………………………………11

42 U.S.C. § 6295(m)……………………………………………………………...7

42 U.S.C. § 6295(o)…………………………………………………………..8, 9

42 U.S.C. § 6296……………………………………………………………...9

42 U.S.C. § 6296(a)……………………………………………………………...7

42 U.S.C. § 6296(b)……………………………………………………………...6

42 U.S.C. § 6296(d)……………………………………………………………...6

42 U.S.C. § 6297(a)………………………………………………………….8, 9, 12

42 U.S.C. § 6297(a)(2) (1982)……………………………………………………24

42 U.S.C. § 6297(b)……………………………………………………………...8

42 U.S.C. § 6297(c)…………………………………………………………..*passim*

42 U.S.C. § 6297(d)……………………………………………………………10

42 U.S.C. § 6297(f)…………………………………………………………..*passim*

42 U.S.C. § 6302………………………………………………………….6, 9

42 U.S.C. § 6302(a)……………………………………………………………...6

42 U.S.C. §§ 6311–17……………………………………………………………6

American Homeownership and Economic Opportunity Act of 2000, Pub. L. No.
106–569, § 604(2), 114 Stat. 2944 (2000)…………………………………..26

National Manufactured Housing Construction and Safety Standards Act, §§ 5401 *et
seq.* ……………………………………………………………...22

National Mobile Home Construction and Safety Standards Act of 1974, Pub. L.
No. 93-383, tit. VI, 88 Stat. 700 (1974)……………………………………22

**Statutes (Cont.)**

N.Y. Energy Law § 11-104(6)–(8)……………………………………………………..3

N.Y. Exec. Law § 378(19)…………………………………………………………….3

**Legislative History**

H.R. Rep. No. 100-11 (1987)………………………………………………..*passim*

S. Rep. No. 100-6 (1987)…………………………………………………….*passim*

**Regulations**

Energy Conservation Program: Energy Conservation Standards for Consumer Furnaces, 88 Fed. Reg. 87,502 (Dec. 18, 2023)……………………………8, 18

**Other Authorities**

Brief of the Guarini Center on Environmental, Energy and Land Use Law at New York University School of Law as *Amicus Curiae* in Support of Defendant-Appellee's Petition For Rehearing En Banc, *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) (No. 21-16278), ECF. No. 110…………………..3

Brief of the Guarini Center on Environmental, Energy and Land Use Law at New York University School of Law as *Amicus Curiae* in Support of Defendant-Appellee and for Affirmance, *Ass'n of Contracting Plumbers v. City of New York*, No. 25-977 (2d Cir. Nov. 6, 2025), ECF. No. 50………………………….3

Katrina M. Wyman & Danielle Spiegel-Feld, *The Urban Environmental Renaissance*, 108 Cal. L. Rev. 305 (2020)………………………………………..2

Nathaniel R. Mattison, *Beyond Gas Bans: Alternative Pathways to Reduce Building Emissions in Light of State Preemption Laws*, Guarini Center Policy Paper (2022), https://guarinicenter.org/document/beyond-gas-bans/...................2

## STATEMENT OF IDENTIFICATION AND INTEREST

*Amicus curiae* Guarini Center on Environmental, Energy and Land Use Law at New York University School of Law ("Guarini Center") respectfully submits this brief in support of Defendant-Appellee Walter T. Mosley, in his official capacity as New York Secretary of State and Member of the State Fire Prevention and Building Code Council, and Intervenors-Defendants-Appellees New York Geothermal Energy Organization and PUSH Buffalo, and for affirmance of the District Court's decision in this action.[1] All parties have consented to the Guarini Center's filing of this brief.

Through research, writing, and education, the Guarini Center endeavors to advance state and local government efforts to develop and implement innovative energy and environmental policies for a sustainable and equitable economy. The Guarini Center's work has focused, *inter alia*, on policies for decarbonizing buildings, including studying whether New York City should adopt a carbon trading program for buildings pursuant to Local Law 97 of 2019, its landmark climate law capping emissions from existing buildings.

---

[1] This brief does not purport to represent the views, if any, of New York University or New York University School of Law. Furthermore, per Fed. R. App. P. 29(a)(4)(E), no party's counsel authored this brief either in whole or in part, and no person contributed money intended to fund this brief's preparation or submission.

1

The Guarini Center is interested in ensuring that the Court properly defines the scope of preemption under 42 U.S.C. § 6297(c),[2] since the Energy Policy and Conservation Act ("EPCA") plays an important role in shaping states' and localities' initiatives to reduce buildings' energy-related impacts. The Guarini Center's scholars have analyzed EPCA's text and related case law as part of research supporting states' and local governments' authority to advance their residents' environmental interests. *See* Katrina M. Wyman & Danielle Spiegel-Feld, *The Urban Environmental Renaissance*, 108 Cal. L. Rev. 305 (2020); Nathaniel R. Mattison, *Beyond Gas Bans: Alternative Pathways to Reduce Building Emissions in Light of State Preemption Laws*, Guarini Center Policy Paper (2022), https://guarinicenter.org/document/beyond-gas-bans/. In addition, the Guarini Center previously participated as *amicus curiae* in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), which concerned claims that Berkeley, California's ordinance restricting the installation of fuel gas piping in newly constructed buildings was preempted by EPCA, and has filed a brief as *amicus curiae* in *Association of Contracting Plumbers v. City of New York*, No. 25-977, which will be heard in tandem with this action. *See* Brief of the Guarini Center on Environmental, Energy and Land Use Law at New York University

---

[2] Unless otherwise indicated, all further statutory references in this brief are to Title 42, United States Code, and to the current edition of the same.

School of Law as *Amicus Curiae* in Support of Defendant-Appellee's Petition For Rehearing En Banc, *Cal. Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094 (9th Cir. 2024) (No. 21-16278), ECF. No. 110; Brief of the Guarini Center on Environmental, Energy and Land Use Law at New York University School of Law as *Amicus Curiae* in Support of Defendant-Appellee and for Affirmance, *Ass'n of Contracting Plumbers v. City of New York*, No. 25-977 (2d Cir. Nov. 6, 2025), ECF. No. 50. Based on its academic research and prior briefing as *amicus curiae*, the Guarini Center has concluded that Congress intended section 6297(c) to affect only a limited set of sub-national policies, and that New York's law requiring all-electric construction in most new buildings (the "Electrification Act," codified in relevant part at N.Y. Energy Law § 11-104(6)–(8) and N.Y. Exec. Law § 378(19)) is not among them.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

Plaintiffs-Appellants argue that, notwithstanding the specific language used by Congress in EPCA and the precedents that bind this Court, New York's Electrification Act is a preempted "[s]tate regulation concerning … energy use." As amply documented by Defendant-Appellee and Intervenors-Defendants-Appellees, the District Court properly rejected Plaintiffs-Appellants' position. *See generally* Def.-Appellee's Br. 26–65; Intervenors-Defs.-Appellees' Br. 17–48. Simply put, EPCA's text, structure, and history all demonstrate that Plaintiffs-Appellants'

3

reading of the statute is unfounded, and that the Electrification Act—as a regulation of new buildings' on-site *emissions*—does not "concern[] … energy use," § 6297(c), thus placing it outside EPCA's zone of preemption.

The Guarini Center writes separately to explain several additional reasons why this Court should reject Plaintiffs-Appellants' arguments and affirm the decision of the District Court.

*First*, the text and structure of EPCA show that it creates only certain limited rights for manufacturers. These rights are focused on ensuring that manufacturers are not subject to multiple, energy efficiency-focused regulations that affect either the design of EPCA-covered products or how manufacturers disclose products' energy impacts to consumers. Manufacturers' rights under EPCA do not include any right to expect the ongoing or universal availability of fossil fuels, nor an unlimited guarantee that EPCA-covered, fossil fuel-consuming appliances may be installed everywhere and forever. EPCA thus does not limit states' and local governments' authority to enforce restrictions on covered product purchasers that affect where fossil fuel-consuming covered products may be installed for reasons unrelated to those products' efficiency—such as in furtherance of pollution abatement goals (like those underpinning the Electrification Act).

*Second*, the Court should consider case law under the National Manufactured Housing Construction and Safety Standards Act, §§ 5401 *et seq.* ("NMHCSSA"), as

4

a model for how to interpret the scope of EPCA preemption and states' and local governments' retained policymaking authority. NMHCSSA, like EPCA, contains an express preemption provision that grants manufactured home producers a limited right to make their products according to one set of federally-determined production standards. Courts have found, however, that this right does not preclude state and local governments from limiting whether or where manufactured homes may be installed for reasons unrelated to those homes' construction and safety qualities. This analogous case law further supports the conclusion that the Electrification Act is not preempted.

Accordingly, the Court should deny Plaintiffs-Appellants' appeal in this case as a matter of law and affirm the decision of the District Court.

## ARGUMENT

I. **EPCA Preempts Only State And Local Laws Interfering With Manufacturers' Statutory Design, Production, And Marketing Obligations**

    A. **EPCA Grants Manufacturers Limited Rights Related To Their Statutory Duties—But Does Not Guarantee Their Exemption From State or Local Laws Unrelated To Those Duties**

EPCA is intended to reduce the society-wide energy burdens caused by "covered products,"[3] and thus focuses both on how those products are designed to

---

[3] "Covered products" are "consumer products of a type" subject to EPCA regulation. § 6291(2).

transform energy into useful outputs and on how purchasers are informed about products' energy impacts. *See generally* §§ 6291–6297, 6302.[4] As amended, EPCA imposes an extensive set of duties on the Department of Energy ("DOE") in order to ensure that covered products achieve minimum energy performance levels—which the statute terms "energy conservation standards"[5]—and that DOE increases these minimums through time (as appropriate). *See generally* §§ 6293, 6295.

EPCA's regulatory scheme also imposes a number of duties on manufacturers, both to ensure that they design covered products to meet applicable energy conservation standards and that they clearly inform consumers about the energy effects of consumers' covered product purchases. Under EPCA, manufacturers generally are permitted to distribute only covered products that are at least as efficient as DOE-set energy conservation standards. § 6302(a)(5). Manufacturers also are required to supply relevant data to DOE that assists with energy conservation standards' development and enforcement. §§ 6296(b), (d). With respect to product

---

[4] EPCA's provisions regulating commercial and industrial equipment largely track those pertaining to consumer products. *See generally* §§ 6311–17. Therefore, consistent with the approach of the District Court and the parties in this case, the remainder of this brief will refer only to EPCA's provisions regulating covered consumer products.

[5] An "energy conservation standard" usually is "a *performance standard* which prescribes a *minimum level of energy efficiency* or a *maximum quantity of energy use* … determined in accordance with test procedures prescribed under section 6293" of the act. § 6291(6)(A) (emphasis added). For certain consumer products, DOE instead may prescribe a design standard instead of a performance standard. § 6291(6)(B).

marketing, EPCA requires manufacturers to label products with disclosures concerning covered products' estimated annual operating costs, and it provides that these disclosures must be based on DOE's covered product testing results. §§ 6294(c)(1), 6296(a). In addition, EPCA forbids manufacturers from making written representations or statements in broadcast advertising "with respect to the energy use or efficiency … of a covered product … or the cost of energy consumed by such product, unless such product has been tested in accordance with [the applicable] test procedure and such representation fairly discloses the results of such testing." § 6293(c)(1).

When imposing the foregoing duties on manufacturers, Congress recognized the need to simplify manufacturers' energy efficiency-related compliance obligations in certain respects. Thus, for example, EPCA provides that "[a] manufacturer shall not be required to apply new standards to a product with respect to which other new standards have been required during the prior 6-year period." § 6295(m)(4)(B). This grants manufacturers some relief from the need to increase the energy performance of their products over relatively short time intervals, thereby avoiding some—but not all—of the challenges that might be associated with updates to energy conservation standards.[6] Congress similarly provided *targeted*

---

[6] Among other things, manufacturers are *not* entitled to a modification of DOE's timeline for setting new standards where components of a product themselves are

7

accommodations for manufacturers against some of the potential downstream effects of DOE's energy conservation standards setting process. In particular, DOE "may not prescribe an amended … standard" when interested parties clearly establish "that the standard is likely to result in the unavailability … in any covered product type … of performance characteristics … that are *substantially* the same as those generally available … at the time of" DOE's rulemaking. § 6295(o)(4) (emphasis added).

Alongside the foregoing duties and rights with respect to DOE, Congress included several preemption clauses pertaining to state and local government regulations that might interfere with manufacturers' obligations under EPCA. *See generally* § 6297; *see also* S. Rep. No. 100-6, at 2, 4, 9 (1987), H.R. Rep. No. 100-11, at 23–24 (1987). These provisions closely track the structure of DOE's and manufacturers' duties. *Compare* § 6297(a) *with* §§ 6293–6294; *and compare* §§ 6297(b)–(c) *with* § 6295. Overall, the preemption provisions ensure a high degree of national conformity to EPCA's requirements for covered products' design and marketing.

---

covered products at different points in their regulatory cycle. Energy Conservation Program: Energy Conservation Standards for Consumer Furnaces, 88 Fed. Reg. 87,502, 87,516–17 (Dec. 18, 2023) (stating that "[t]he 6-year period applies to covered products individually, and ECPA does not provide exceptions to the review requirements when related products or components have overlapping review timeframes").

However, EPCA's preemption provisions do not convey any promise that manufacturers will be exempt from *all* state and local laws that might affect their products, including laws affecting where or when their products may be installed for reasons other than increasing covered products' efficiency. *See* S. Rep. No. 100-6, at 4, 9–11; H.R. Rep. No. 100-11 at 23–24, 37–40. No clause of section 6297 shields manufacturers, for instance, from the traditional police powers of state and local governments to address the health, environmental, and safety concerns that may be associated with covered products' use, including health, environmental, and safety issues a state's or city's residents face due to the localized burning of fossil fuels in buildings. *See generally* §§ 6297(a)–(f). EPCA's substantive provisions dictating manufacturers' obligations regarding covered products' design and marketing similarly are silent as to *other* kinds of legal obligations that manufacturers might face, such as duties to prevent or abate water pollution or air pollution that might arise from covered products' production and distribution, or from covered products' use by end-users. *See generally* §§ 6293–6296, 6302.[7]

---

[7] For instance, the provision concerning DOE's inability to set energy conservation standards that are "likely to result in the unavailability … of performance characteristics …," § 6295(o)(4), reflects only that manufacturers are protected from having performance characteristics and features of their products become "unavailable" due to the *energy efficiency* regulations that DOE sets (upon a proper evidentiary showing of "substantial" effects from those regulations). This provision, being tied specifically to appliance energy efficiency regulations, has nothing to say about the effects that *other* types of regulations that pertain to other subject matter—

9

Viewed in their full context, it is apparent that EPCA's preemption provisions provide *targeted* protections for certain manufacturer interests that correspond to manufacturers' federal duties: namely, those with respect to the levels of energy performance to which covered products are designed, and with respect to how energy efficiency information is disclosed to consumers. Put simply, for each federal duty, manufacturers have a "right" not to be subject to a sub-national duty that affects the efficiency levels to which products are designed, or that affects what manufacturers must disclose to end-users about products' efficiency. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500–03 (9th Cir. 2005); *cf. Murphy v. NCAA*, 584 U.S. 453, 477–79 (2018) (Alito, J.) (discussing federal preemption cases, and stating that "if we look beyond the phrasing employed in the Airline Deregulation Act's preemption provision, [for example,] it is clear that this provision operates just like any other

---

such as local air quality or climate change—may have on what products, or product features, may be available. Those non-efficiency regulations neither are matters within DOE's ability to review, nor are they potentially of concern to DOE under EPCA's statutory scheme. DOE's inability to waive state and local appliance efficiency regulations "likely to result in the unavailability in the State of any covered product type … of performance characteristics …," § 6297(d)(4), simply mirrors the foregoing, limited restriction on DOE's authority as to its own efficiency standards setting, as is evident from the provisions' parallel textual formulations, the statute's structure, and the relevant legislative history. *See* H.R. Rep. No. 100-11, at 25 ("This final criterion is identical to the criterion for the establishment of a Federal standard set forth in new [§ 6295(o)(4)] … except that the examination under [§ 6297(d)(4)] is limited to the effect in the State rather than on a national basis.").

10

federal law with preemptive effect. It confers on private entities … a federal right to engage in *certain* conduct subject only to *certain* (federal) constraints" (emphasis added)).

Thus, for example, a state or local government plainly cannot set efficiency standards that apply to room air conditioners and require manufacturers of those devices to achieve higher energy efficiency ratios than applicable federal standards. *See* §§ 6295(c), 6297(c). As a logical corollary to these rights, EPCA also limits states' and local governments' ability to require purchasers to choose only product units that are more efficient than federal standards, or to install only such more efficient units in new construction. *See* §§ 6297(c)(1), (3); *see also Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1151–52 (9th Cir. 2012). These purchaser protections logically relate to manufacturers' "right" (absent an exception) not to be compelled by a state or local government to distribute only versions of their products that are designed to be more efficient than is required by the energy conservation standards set under section 6295.

As prior appellate case law makes clear, however, section 6297 does *not* preempt regulations that do *not* implicate manufacturers' specific EPCA rights and obligations—thus establishing a clear boundary between regulations that are preempted and those that are not. For example, in *Air Conditioning & Refrigeration Institute v. Energy Resources Conservation & Development Commission*, the Ninth

11

Circuit held that section 6297(a) did not preempt California from, *inter alia*, requiring that manufacturers label their products with their names and products' model numbers and dates of manufacture. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500–02. The Ninth Circuit reasoned that California's regulations did not address product label disclosures of "any measure of energy consumption," which are the actual subject of manufacturers' duties under section 6294. *Id.* at 501–02. The Ninth Circuit further concluded that Congress's use of the phrase "with respect to" in section 6297(a) did not cause California's requirements to be preempted: looking to case law interpreting the phrase "relates to," the court found that the "relation between placing a manufacturer's name, the model name, and the date of manufacture on an appliance and measures of energy consumption, as defined in EPCA, is indirect, remote, and tenuous," and therefore not preempted. *Id.* at 502.

*Building Industry Association of Washington*, noted above, also reflects these principles. The Washington State building energy code at issue in that case was acknowledged by all to be a regulation "concern[ing] the energy efficiency or energy use of EPCA covered products" because "[s]everal options under [the Washington code] call for higher efficiency covered products." *Bldg. Indus. Ass'n of Washington*, 683 F.3d at 1150. Using the specific rubric Congress has prescribed for analyzing building codes for new construction, however, the Ninth Circuit explained that the code still was not preempted because homebuilders (as the purchasers of covered

12

products) had other options within its framework that did not depend on using higher efficiency covered products. Specifically, the code's "allowing less expensive, more efficient options [as a method of compliance] does not *require* builders to use more efficient products within the meaning of" EPCA. *Id.* at 1151 (emphasis added). There thus was no invasion of homebuilders' interest under EPCA (as holders of rights that are corollaries to manufacturers' rights) of being able to purchase and install equipment not exceeding federal efficiency requirements.

*California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024) is the only appellate opinion that does not adhere to the foregoing understanding of EPCA's preemptive scope. There are, however, serious reasons to doubt the soundness of the panel's holding in that case. First, as detailed in the dissent from the circuit's denial of rehearing en banc, the panel assigned "key terms … colloquial meanings instead of the technical meanings required by established canons of statutory interpretation," *id.* at 1120 (Friedland, J., dissenting from denial of rehearing en banc), thus evidently altering the meaning of a "narrow preemption provision," *id.* at 1126 (Friedland, J.). In addition, the panel appears to have assumed, without a clear evidentiary foundation, that Berkeley's ordinance restricting gas piping was a "building code," but then did not apply the specific test provided by Congress for determining whether a building code is preempted by EPCA. *See id.* at 1098, 1101–04. Finally, the panel departed from the Ninth Circuit's

13

own precedents examining EPCA preemption—which support a view of manufacturer rights and the statute's preemptive effect that are tailored to Congress's clear policy purposes—without any substantial explanation or justification for the divergence. *Compare generally id.* at 1100–07, *with Air Conditioning & Refrigeration Inst.*, 410 F.3d at 497–505, *and with Bldg. Indus. Ass'n of Washington*, 683 F.3d at 1145–49, 1151–53. Given these apparent errors, the Ninth Circuit panel's reasoning and holding in *California Restaurant Association* should not be credited by this Court.

**B. The District Court's Opinion Is Consistent With Congress's Scheme Of Manufacturer Rights And Duties Under EPCA, While Plaintiffs-Appellants' Arguments Are Not**

As discussed in detail above, EPCA's preemption provisions provide *targeted* protection for a discrete set of manufacturer interests with respect to covered products. The decision of the District Court in this matter is consistent with the structure of rights and duties under EPCA that is apparent on the face of the statutory text. As the District Court explained, the term "energy use" has a distinct, specialized meaning within EPCA's scheme, and the word "concerning" does not broaden that statutory meaning; rather, the statutory definition of "energy use" anchors subsequent provisions of EPCA and cabins the possible scope of the term "concerning" to the limited set of energy efficiency-related issues Congress was attempting to address through the statute. J.A. 189–90, 191–92. The District Court

14

also pointed out, specifically, the narrow scope of covered product manufacturers' and purchasers' rights to the preservation of product "availability" in the context of state preemption waiver applications, explaining that "[b]ecause the statutes here do not concern the energy use of covered products, they are outside the scope of the EPCA's preemption, and therefore the EPCA has nothing to say about what they can regulate, even if those regulations happen to impact the availability to New York consumers of certain covered products." J.A. 193–94. Accordingly, the District Court necessarily—and properly—found that Plaintiffs-Appellants' preemption claim failed, and that New York should not be enjoined from implementing the Electrification Act.

Plaintiffs-Appellants' arguments before this Court, by contrast, seem to rely on an unfounded expansion of section 6297(c) to protect a manufacturer interest in the ready availability of particular fuel sources (and thus a corollary interest, on the part of covered product purchasers, in particular fuels' availability). *See* Pls.-Appellants' Br. 55.[8] Yet EPCA contains no evidence of a manufacturer or purchaser

---

[8] Plaintiffs-Appellants vaguely state that they "brought this suit to vindicate the federal right created by Congress's choice.," Pls.-Appellants' Br. 2, without explicitly stating what that right is. Based on their statement that the Electrification Act's "'practical effect' is to categorically prohibit covered gas appliances from using any energy," *id.* at 55, it appears to be a purchaser right to access and utilize fossil fuels (which would be the logical corollary for a manufacturer right to have fossil fuels available for use).

interest in fossil fuels' ubiquitous or permanent availability, nor a manufacturer or purchaser expectation that the local availability and useability of covered products never will be altered by state or local regulations unrelated to products' particular levels of energy performance. And the various pieces of textual, structural, and historical evidence that Plaintiffs-Appellants claim support their view, *see* Pls.-Appellants' Br. 34–56, do no such thing. *See also* Def.-Appellee's Br. 26–65; Intervenor-Defs.-Appellee's Br. 17–20, 25–38, 43–46.

To begin with, Congress's declared purposes for EPCA do not support a manufacturer or purchaser interest in fossil fuels' continued availability for use by covered products. Instead, Congress's statement of purpose generally favors reduced energy consumption. *See generally* § 6201. Moreover, section 6295 (the most pertinent substantive provision for defining manufacturer rights in this case) does not imply a manufacturer interest in fossil fuels' further availability, regardless of other circumstances. Section 6295 simply sets initial energy conservation standards for a range of covered products and provides a process for those standards' upward amendment. *See generally* § 6295. Like other EPCA provisions, section 6295—in conjunction with section 6297(c)—only assures manufacturers that their appliances need only be designed to achieve DOE's energy conservation standards; it provides no guarantee, though, that those appliances must or will be used in any particular

16

place, or that their "availability" will not change for reasons unrelated to their energy efficiency.

Plaintiffs-Appellants aver that "EPCA is a sweeping national energy policy," Pls.-Appellants' Br. 49, and that Congress "did not want a 'patchwork' of regulations under which appliances would be legal in some places but not others," *id.* at 51. Yet the legislative history on which they rely to make this claim demonstrates that Congress's only references to a "patchwork" in connection with EPCA-covered appliances were to the "patchwork" of *state appliance energy efficiency standards* that had emerged in the wake of DOE's failure (under the 1978 version of EPCA) to set nationally applicable standards for covered products and its related policy of waiving preemption of states' appliance energy efficiency standards. S. Rep. No. 100-6, at 4, 12; H.R. Rep. No. 100-11, at 24, 31. This is a significantly narrower field of inter-state differences than variations among state energy policies, writ large.

At the time that Congress enacted the current version of section 6297(c), Congress made no statements that it intended its textual revisions to prevent any changes in different fuels' availability among states and localities, much less within such jurisdictions. *See generally* S. Rep. No. 100-6; H.R. Rep. No. 100-11. Instead, the 1987 House and Senate reports indicate only a desire to resolve the differences among states' appliance energy efficiency standards. *See generally id.* Congress's

17

statements regarding small natural gas-fired furnaces, S. Rep. 100-6 at 5–6, 8–9, H.R. Rep. No. 100-11 at 35, are not contrary evidence of a broader policy preference for locking in the relative market positions of fossil fuel- and electricity-powered appliances, despite what Plaintiffs-Appellants appear to imply. *See* Pls.-Appellants' Br. 50. In reality, Congress's statements about small natural gas furnaces relate only to one factor that was used in the initial rulemaking for a single appliance type's energy conservation standard—and that factor has since ceased to apply in subsequent rulemakings. *See* Energy Conservation Program: Energy Conservation Standards for Consumer Furnaces, 88 Fed. Reg. 87,502, 87,590–92 (Dec. 18, 2023) (reviewing statutory language and related legislative history of § 6295(f)(1)(B) (the initial small gas furnace rule) in response to comments on rulemaking for certain other gas furnaces). Indeed, the legislative history reflects that the analysis Congress required DOE to undertake concerning potential switching between small natural gas furnaces and electric resistance heating was not a generalizable policy against regulatory choices that might drive heating electrification: Congress was not concerned about potential switching between natural gas furnaces and heat pumps, a different electric heating technology. *See* H.R. Rep. No. 100-11, at 35; *see also* 88 Fed. Reg. 87,502, at 87,591.

Moreover, and again contrary to Plaintiffs-Appellants' assertions, the section 6297(f)(3) test for excepting certain "building codes for new construction" from

18

preemption does not somehow "doom[] the district court's reading," Pls.-Appellants' Br. 42. Rather, to the extent that the section 6297(f)(3) test illuminates anything about the scope of EPCA preemption and its application to the case at hand, it is to demonstrate that the amendments to the New York State building and energy codes required by the Electrification Act are outside the realm of potentially preemptible regulations. *See also* Def.-Appellee's Br. 52–54, Intervenor-Defs.-Appellee's Br. 25–31.

The various parts of the section 6297(f)(3) test focus specifically on the proper measurement and crediting of energy efficiency at both the building and the appliance level. They are meant to ensure that neither code provisions directly pertaining to covered products, nor code provisions pertaining (for example) to building shell characteristics, effectively act as requirements for those covered products to be designed to attain levels of efficiency higher than applicable federal standards in order to be installed. *See* §§ 6297(f)(3)(A)–(G). If there *is* such an effective requirement, then manufacturers' and purchasers' narrow EPCA interests actually are invaded by a building code for new construction, thus warranting preemption. *Cf. Bldg. Indus. Ass'n of Washington*, 683 F.3d at 1151–55. But in the case at hand, none of the building and energy code amendments required by the Electrification Act could factor into the section 6297(f)(3) analysis. The Electrification Act's requirements do not, *inter alia*, prevent a builder from being

19

able "to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective," § 6297(f)(3)(A), or "require that [a] covered product have an energy efficiency exceeding the applicable energy conservation standard," § 6297(f)(3)(B), or affect whether "baseline building designs are based on the efficiency level for [a] covered product which meets but does not exceed" its applicable energy conservation standard, § 6297(f)(3)(D). Taken together, section 6297(f)(3)'s repeated use of the phrase "energy efficiency" underscores the discrete, appliance efficiency-related set of concerns that the test—and EPCA as a whole—was meant to address.[9] The Electrification Act's required code amendments, by contrast, affect something entirely different: namely, new building's emissions arising from the on-site burning of fossil fuels, a matter which—as both Defendant-Appellee and Intervenors-

---

[9] The nature of the building code test is further reflected in and explained by EPCA's legislative history. Both the House and Senate committee reports concerning the 1987 EPCA amendments attest to the fact that building energy codes were one of the ways states actually set appliance-specific energy efficiency standards in the era when DOE's "no standards" efficiency standards prevailed, especially for space and water heating equipment and space cooling equipment. S. Rep. No. 100-6, at 10; H.R. Rep. No. 100-11, at 25–26, 27. The committee reports also show that Congress specifically intended the (B) prong of the section 6297(f)(3) building code test to confirm that states could continue their existing practice of setting appliance efficiency standards via building code provisions, while clarifying that those standards (to the extent that they were mandatory) could not be higher than applicable federal ones. S. Rep. No. 100-6, at 10–11; H.R. Rep. No. 100-11, at 25–26, 39.

Defendants-Appellees point out—has no consistent relationship with covered products' efficiencies. *See* Def.-Appellee's Br. 58–59, Intervenor-Defs.-Appellee's Br. 21–22, 37–38. Thus, the section 6297(f)(3) test underlines the inapplicability of section 6297(c) to the Electrification Act. If the specific test Congress has provided for evaluating building codes for new construction is entirely indifferent to the building and energy code amendments required by the Electrification Act, those amendments then plainly fall outside the scope of Congress's regulatory concerns in EPCA.

In short, EPCA's text, structure, and history do not suggest that the statute offers any protection to covered product manufacturers from state or local regulations that are not premised upon and intended to affect the energy performance levels to which covered products are designed, even if those non-efficiency regulations may alter the local markets for covered products. If manufacturers do not have such protection, neither do Plaintiffs-Appellants.

## II. Analogous Preemption Decisions Under The National Manufactured Housing Construction And Safety Standards Act Support A Narrow View Of EPCA Preemption

Plaintiffs-Appellants insist that precedents interpreting express preemption provisions in other statutory schemes support their arguments about the possible scope of the term "concerning." Pls.-Appellants' Br. 30–33. But the few precedents they cite are not on point. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,

21

541 U.S. 246 (2004), for example, involved the overlap of federal emissions standards for new motor vehicles with a California air district's requirements on vehicle fleets that were explicitly tied to new fleet vehicles' emissions.

For more apt analogies to the circumstances of this case, the Court should consider case law interpreting the scope of preemption under the National Manufactured Housing Construction and Safety Standards Act, §§ 5401 *et seq.* ("NMHCSSA"), a statutory scheme that similarly creates uniform standards for a certain class of fungible consumer products. Congress passed NMHCSSA in 1974, *see* National Mobile Home Construction and Safety Standards Act of 1974, Pub. L. No. 93-383, tit. VI, 88 Stat. 700 (1974), and has amended the law several times in the intervening years. Congress's stated purposes for the act include "protect[ing] the quality, durability, safety, and affordability of manufactured homes," "facilitate[ing] the availability of affordable manufactured homes and … increase[ing] homeownership for all Americans," and "ensur[ing] uniform and effective enforcement of Federal construction and safety standards for manufactured homes." §§ 5401(b)(1), (2), (7).[10] To that end, Congress has directed the Department of Housing and Urban Development to develop uniform national standards

---

[10] A "manufactured home" is "a structure, transportable in one or more sections, … which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities …." § 5402(6).

(including "energy conservation standards") for manufactured home construction through a consensus committee process that includes both manufactured home producers and representatives of consumer interests. §§ 5403(a), (g). The construction standards are supposed to "meet high standards of protection consistent with the purposes of" NMHCSSA. § 5403(a)(1)(A)(ii).

Furthermore, the statute since its inception has included an express preemption provision addressed at certain local and state regulations pertaining to manufactured homes. The language of this provision bears a strong resemblance the language Congress has employed in EPCA. *See* § 6297(c). As amended, the paragraph provides that:

> Whenever a Federal manufactured home construction and safety standard established under this chapter is in effect, no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, *with respect to* any manufactured home covered, any standard *regarding* the construction or safety applicable to the same aspect of performance of such manufactured home which is not identical to the Federal manufactured home construction and safety standard. *Federal preemption under this subsection shall be broadly and liberally construed . . . .*

§ 5403(d) (emphasis added).[11] Like EPCA's preemption provision as to covered product manufacturers, NMHCSSA thus essentially grants manufactured home producers a right not to be subject to competing sub-national standards affecting how manufactured homes are designed and produced. Also like EPCA, courts have found that the scope of preemption reaches construction and safety standards that operate through restrictions on manufactured home purchasers. For example, a locality cannot compel residents to install only manufactured homes exceeding federal standards. *See Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1524–25 (11th Cir. 1988) (holding NMHCSSA preempted zoning ordinance requiring mobile homes to meet construction standards different from federal ones to be installed, since

---

[11] The relevant preemption provision of EPCA, now codified at section 6297(c), used the phrase "with respect to" prior to 1987. § 6297(a)(2) (1982) ("This part supersedes any State regulation insofar as such State regulation may now or hereafter provide for any energy efficiency standard or other requirement *with respect to* energy efficiency or energy use of a covered product …." (emphasis added)). Both the Senate and House reports concerning the 1987 EPCA amendments state that the general meaning of the pre-1987 statutory language was intended to be carried forward, although Congress was changing the precise wording. S. Rep. No. 100-6, at 9 ("New section 327(c) states that on the effective date for each Federal energy conservation standard, that standard preempts State regulation, as provided under current law."); H.R. Rep. No. 100-11, at 23–24 ("In overall form, the section follows substantially the preemption requirements in current EPCA. … It also continues the basic concept of preempting State energy efficiency standards and allowing waivers of preemption under certain circumstances."); *id.* at 37 ("New Section 327(c) states that on the effective date for each Federal energy conservation standard, that standard supersedes any State regulation, as provided under current EPCA.").

24

ordinance effectively conditioned mobile homes' location on compliance with local standards).

NMHCSSA's preemptive reach, however, is not unlimited, just as EPCA's is not. Even if a city may not use its zoning authority to set different standards for manufactured homes' construction, the same city *may* use zoning to limit manufactured homes to particular lots, or may refuse to permit manufactured homes at all, without being preempted. *See id.* at 1525 ("Undoubtedly [the city] could limit Zone R-AA to conventionally-built residences and exclude mobile homes."); *accord. Texas Manufactured Housing Ass'n, Inc. v. City of Nederland*, 101 F.3d 1095, 1100 (5th Cir. 1996). NMHCSSA's preemption rule furthermore allows sub-national laws limiting manufactured home installation based on units' age, *Schanzenbach v. Town of Opal*, 706 F.3d 1269, 1272–76 (10th Cir. 2013) (upholding ordinance forbidding installation of homes manufactured more than 10 years before permit application), and units' roof pitch, *Georgia Manufactured Housing Ass'n, Inc. v. Spalding Cnty.*, 148 F.3d 1304, 1308–11 (11th Cir. 1998) (upholding ordinance requiring 4:12 roof pitch for manufactured homes to be installed), since such ordinances do not compel manufacturers to depart from federal safety standards. In short, where no federal "right" under NMHCSSA is implicated, a state or locality can exercise its traditional police powers in ways that limit purchasers'

25

access to or use of manufactured homes, such as by directing purchaser choices *among* NMHCSSA-compliant homes, or by forbidding them outright.[12]

EPCA's text, structure, and history all demonstrate that this Court should come to a similar conclusion in this matter as courts have done in cases under NMHCSSA. The Electrification Act's regulation of new buildings' ability to generate on-site fossil fuel emissions does not "concern[] … energy use," just as aesthetically-driven roof pitch restrictions in a local zoning ordinance are not standards "with respect to" the safety qualities of manufactured home construction. At bottom, section 6297(c) does not forbid a state or local government like New York State from cabining its residents' choices among EPCA-compliant covered products (as the Electrification Act effectively does) so long as the law enacting that restriction does not require the installation of only covered products that exceed

---

[12] Congress added the "liberal construction" language of section 5403(d) by statutory amendment in 2000. *See* American Homeownership and Economic Opportunity Act of 2000, Pub. L. No. 106–569, § 604(2), 114 Stat. 2944 (2000). However, appellate courts in cases decided after this amendment appear to have viewed cases decided prior to it as continuing to be apt precedent in understanding the boundary between federal authority and local or state authority with respect to manufactured housing. *See Schanzenbach*, 706 F.3d at 1274–76; *see also Lauderbaugh v. Hopewell Twp.*, 319 F.3d 568, 575–78 (3d Cir. 2003) (treating *Sculock*, *Georgia Manufactured Housing Ass'n*, and *Texas Manufactured Housing Ass'n* as relevant case law in formulating standard for district court to apply on remand, in case concerning local zoning ordinance where it was unclear if the ordinance's effective restriction on the installation of some types of manufactured housing was for aesthetic reasons or was premised on housing safety standards).

26

federally-set minimum energy performance standards (which the Electrification Act assuredly does not).

## CONCLUSION

The text, structure, and history of EPCA—as well as relevant precedents—demonstrate that section 6297(c) only applies to a narrow set of state and local regulations. This preempted set of regulations does not encompass the Electrification Act, which simply limits where and when fossil fuel-consuming appliances may be installed. EPCA does not grant covered product manufacturers or purchasers any protections from this exercise of New York State's police power. Congress crafted section 6297(c) to address a specific set of potentially overlapping, energy efficiency-focused regulations of EPCA-covered appliances, and confined its preemptive intent to those circumstances only.

Therefore, for the reasons explained in this brief, as well as those advanced by Defendant-Appellee and Intervenors-Defendants-Appellees, the Court should deny Plaintiffs-Appellants' appeal as a matter of law and affirm the decision of the District Court.

27

December 10, 2025                    Respectfully submitted,

/s/ *Nathaniel R. Mattison*
Nathaniel R. Mattison
GUARINI CENTER ON ENVIRONMENTAL, ENERGY
AND LAND USE LAW
NEW YORK UNIVERSITY SCHOOL OF LAW
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6146
nathaniel.mattison@law.nyu.edu

*Counsel for* Amicus Curiae *Guarini Center on
Environmental, Energy and Land Use Law*

28

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Second Circuit Rules 29.1(c) and 32.1(a)(4) because this brief contains 6408 words, excluding the portions of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief furthermore complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in Microsoft Word using Times New Roman, a proportionally spaced typeface, in 14-point font.

December 10, 2025                    Respectfully submitted,

/s/ *Nathaniel R. Mattison*
Nathaniel R. Mattison
GUARINI CENTER ON ENVIRONMENTAL, ENERGY
AND LAND USE LAW
NEW YORK UNIVERSITY SCHOOL OF LAW
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6146
nathaniel.mattison@law.nyu.edu

*Counsel for* Amicus Curiae *Guarini Center on Environmental, Energy and Land Use Law*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of December, 2025, a true and correct copy of the foregoing Brief of the Guarini Center on Environmental, Energy and Land Use Law at New York University School of Law as *Amicus Curiae* in Support of Defendant-Appellee Walter T. Mosley, in his official capacity as N.Y. Secretary of State and Member of the State Fire Prevention and Building Code Council, and Intervenors-Defendants-Appellees New York Geothermal Energy Organization and PUSH Buffalo was filed with the Clerk of the United States Court of Appeals for the Second Circuit via the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

December 10, 2025

Respectfully submitted,

/s/ *Nathaniel R. Mattison*

Nathaniel R. Mattison
GUARINI CENTER ON ENVIRONMENTAL, ENERGY AND LAND USE LAW
NEW YORK UNIVERSITY SCHOOL OF LAW
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 998-6146
nathaniel.mattison@law.nyu.edu

*Counsel for* Amicus Curiae *Guarini Center on Environmental, Energy and Land Use Law*