# 25-2041

## United States Court of Appeals
### *for the*
## Second Circuit

MULHERN GAS CO., INC.; NEW YORK STATE BUILDERS ASSOCIATION; NATIONAL ASSOCIATION OF HOME BUILDERS; NEW YORK PROPANE GAS ASSOCIATION; NATIONAL PROPANE GAS ASSOCIATION; NORTHEAST HEARTH, PATIO AND BARBECUE ASSOCIATION; PLUMBING CONTRACTORS ASSOCIATION OF LONG ISLAND; LICENSED PLUMBING ASSOCIATION OF NEW YORK CITY, INC., dba Master Plumbers Council of the City of New York; HOLMES MECH. LLC; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 1049; PLUMBERS LOCAL UNION NO. 200; INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL UNION 97; and TRANSPORT WORKERS UNION LOCAL 101, AFL-CIO,

*Plaintiffs-Appellants,*

– v. –

WALTER T. MOSLEY, in his official capacity as New York Secretary of State and member of the State Fire Prevention and Building Code Council,

*Defendant-Appellee,*

NEW YORK GEOTHERMAL ENERGY ORGANIZATION, PUSH BUFFALO,

*Intervenor-Defendants-Appellees,*

On Appeal from the United States District Court for the Northern District of New York, No. 1:23-CV-01267 (Hon. Glenn T. Suddaby, District Judge)

## REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

BRIAN C. BARAN
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

SARAH JORGENSEN
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree Street,
  Suite 2300
Atlanta, Georgia 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Attorneys for Plaintiffs-Appellants*

 COUNSEL PRESS    (800) 4-APPEAL • (388402)

NEW YORK DEPARTMENT OF STATE; NEW YORK STATE FIRE PREVENTION AND BUILDING CODE COUNCIL; and JAMES CABLE, RUTHANNE VISNAUSKAS, ROBERTA REARDON, ERIC ADAMS, MICHAEL SPANO, JOSEPH M. DESTEFANO, CLAUDIA BRAYMER, JOSEPH TOOMEY, SHAWN HAMLIN, TIMOTHY DERUYSCHER, ROBERT HUGHES, WILLIAM W. TUYN, PATRICK DOLAN, and DOMINIC MARINELLI, in their official capacities as members of the State Fire Prevention and Building Code Council,

*Defendants.*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 2

   I.  EPCA Preempts New York's Gas Ban. ................................................ 2

     A. Whether under EPCA's plain text or Defendants' rewrite, the ban is preempted because it effectively caps covered appliances' energy use at zero. ................................................................. 2

       1. Regulating in a purportedly "different domain" cannot escape the well-established meaning of "concerning." ............. 3

       2. EPCA's text and amendment history preclude rewriting §6297(c) to preempt "energy conservation standards or their equivalents." ....................................................... 11

       3. Nothing turns on Defendants' and the district court's definition of "energy use." ....................................................... 18

       4. Circuit precedent prevents resurrecting the presumption against preemption....................................................... 21

     B. EPCA's structure, purpose, and history confirm that New York's gas ban is preempted. ....................................................... 23

       1. Defendants cannot account for the building code exception...23

       2. Defendants cannot explain away Congress's effort to preserve consumer choice and avoid a burdensome patchwork of standards. ....................................................... 27

       3. Recognizing that New York's ban is preempted would not create an unconstrained right to use appliances.................... 29

  II. The Secretary's Fallback Argument Misapplies the Standard for Facial Challenges. ....................................................... 32

CONCLUSION ................................................................................. 35

CERTIFICATE OF COMPLIANCE ....................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health,*
  685 F.3d 174 (2d Cir. 2012) ................................................................ 5

*Air Evac EMS, Inc. v. Cheatham,*
  910 F.3d 751 (4th Cir. 2018) ............................................................. 22

*Am. Trucking Ass'ns v. City of Los Angeles,*
  569 U.S. 641 (2013) ....................................................................... 5, 28

*Arizona v. United States,*
  567 U.S. 387 (2012) ........................................................................... 29

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra,*
  870 F.3d 1140 (9th Cir. 2017) ............................................................. 8

*Ass'n of Contracting Plumbers of N.Y. v. City of New York,*
  2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) .................................. 10, 12

*Building Industry Ass'n of Washington v.*
  *Washington State Building Code Council,*
  683 F.3d 1144 (9th Cir. 2012) ...................................................... 24-25

*Buono v. Tyco Fire Prods., LP,*
  78 F.4th 490 (2d Cir. 2023) .................................................. 10, 22, 23

*Cal. Rest. Ass'n v. City of Berkeley,*
  89 F.4th 1094 (9th Cir. 2024) .................................................. *passim*

*California v. ARC Am. Corp.,*
  490 U.S. 93 (1989) ............................................................................. 29

*Carson v. Monsanto Co.,*
  72 F.4th 1261 (11th Cir. 2023) .......................................................... 22

*Cavel Int'l, Inc. v. Madigan,*
  500 F.3d 551 (7th Cir. 2007) .............................................................. 7

ii

*Citizens United v. FEC,*
558 U.S. 310 (2010) ...................................................................... 34

*Council for Responsible Nutrition v. James,*
159 F.4th 155 (2d Cir. 2025) ...................................................... 22

*Coventry Health Care of Mo., Inc. v., Nevils,*
581 U.S. 87 (2017) .......................................................................... 9

*DCC Propane, LLC v. KMT Enters.,*
147 F.4th 171 (2d Cir. 2025) ................................................. 22-23

*Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan,*
938 F.3d 246 (5th Cir. 2019) ...................................................... 22

*EagleMed LLC v. Cox,*
868 F.3d 893 (10th Cir. 2017) .................................................... 22

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,*
476 F.3d 326 (5th Cir. 2007) ........................................................ 7

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.,*
541 U.S. 246 (2004) ................................................................ 3, 29

*Gobeille v. Liberty Mut. Ins. Co.,*
577 U.S. 312 (2016) ....................................................................... 7

*Holder v. Martinez Gutierrez,*
566 U.S. 583 (2012) ..................................................................... 16

*John Doe No. 1 v. Reed,*
561 U.S. 186 (2010) ................................................................ 32-33

*Lamar, Archer & Cofrin, LLP v. Appling,*
584 U.S. 709 (2018) ................................................................. 9-11

*Medicaid & Medicare Advantage Prods. Ass'n of P.R. v.
Emanuelli Hernández,*
58 F.4th 5 (1st Cir. 2023) .......................................................... 22

*Monsalvo Velázquez v. Bondi,*
145 S. Ct. 1232 (2025) ........................................................... 15-16

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ...................................................................9-10, 31

*Nat'l Ass'n for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025) ............................................................ 34

*Nat'l Meat Ass'n v. Harris*,
565 U.S. 452 (2012) .......................................................................... 8

*National Shooting Sports Foundation, Inc. v. James*,
144 F.4th 98 (2d Cir. 2025) ..........................................................33-34

*New York v. Nat'l Highway Traffic Safety Admin.*,
974 F.3d 87 (2d Cir. 2020) ............................................................... 16

*Pharm. Care Mgmt. Ass'n v. Wehbi*,
18 F.4th 956 (8th Cir. 2021) ............................................................ 22

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
579 U.S. 115 (2016) .......................................................................... 22

*Pulsifer v. United States*,
144 S. Ct. 718 (2024) ........................................................................ 27

*Rowe v. N.H. Motor Transp. Ass'n*,
552 U.S. 364 (2008) ...........................................................6-7, 18, 28, 30

*Shuker v. Smith & Nephew, PLC*,
885 F.3d 760 (3d Cir. 2018) ............................................................. 22

*Tanasi v. New All. Bank*,
786 F.3d 195 (2d Cir. 2010) ............................................................. 23

*United States v. Miller*,
145 S. Ct. 839 (2025) ........................................................................ 11

*United States v. Salerno*,
481 U.S. 739 (1987) .......................................................................... 34

*United States v. Sup. Ct. of N.M.*,
839 F.3d 888 (10th Cir. 2016) .......................................................32-33

*Va. Uranium, Inc. v. Warren*,
139 S. Ct. 1894 (2019) ...................................................................... 8

iv

*Van Buren v. United States,*
141 S. Ct. 1648 (2021) ........................................................... 14

*Wash. State Grange v. Wash. State Republican Party,*
552 U.S. 442 (2008) ............................................................... 32

*Wos v. E.M.A. ex rel. Johnson,*
568 U.S. 627 (2013) ............................................................. 6, 18

*Ye v. GlobalTranz Enters.,*
74 F.4th 453 (7th Cir. 2023) ................................................... 22

**Statutes**

21 U.S.C. §678 ............................................................................ 7

Energy Policy and Conservation Act,
42 U.S.C. §§6201-6422 .................................................... *passim*

§6291(1)-(2) .......................................................................... 34

§6291(4) ......................................................................... 12, 19

§6291(6) ......................................................................... 2, 4, 12

§6292(a) ............................................................................... 34

§6292(a)(1) ........................................................................... 31

§6292(b) ............................................................................... 34

§6293(b)(3) ........................................................................... 20

§6294(a)(2)(I) ....................................................................... 20

§6294(a)(3) ........................................................................... 20

§6295.................................................................................... 11

§6295(o)(2)(A) ...................................................................... 14

§6295(o)(2)(B) ...................................................................... 15

§6295(o)(3) ........................................................................... 15

§6295(o)(4) .................................................................................... 28

§6295(p) ........................................................................................ 15

§6295(q)(1)(A) ............................................................................... 17

§6297(a)(2) (1982) ........................................................................ 14

§6297(c) .................................................................................. *passim*

§6297(c)(4)-(5) ............................................................................... 13

§6297(c)-(f) ..................................................................................... 6

§6297(d) ........................................................................................ 27

§6297(d)(4) .................................................................................... 28

§6297(f)(3) .............................................................. 17, 21, 23-24, 26-27

§6297(g) .................................................................................... 20-21

§6311(1)-(2) ................................................................................... 34

§6312(b) ........................................................................................ 34

Energy Policy and Conservation Act,
  Pub. L. No. 94-163, §327(a)(2), 89 Stat. 871, 926-27 (1975) .............. 12

N.Y. Energy §11-104(6)-(8) ............................................................... 2

N.Y. Exec. §378(19) ......................................................................... 2

## Regulations

2020 Energy Conservation Construction Code of New York State
  §C406.2 ....................................................................................... 26

## Ordinances

N.Y.C. Admin. Code §27-2034 ........................................................... 31

N.Y.C. Admin. Code §27-2035 ........................................................... 31

vi

**Other Authorities**

Brief for Plaintiffs-Appellants, *Ass'n of Contracting Plumbers of N.Y. v. City of New York*, No. 25-977 (2d Cir.), Dkt.23.1 ................... 10

Brief for the United States as Amicus Curiae Supporting Appellants, *Ass'n of Contracting Plumbers of N.Y. v. City of New York*, No. 25-977 (2d Cir.), Dkt.26.1 ........................................... 16

Energy Audits,
42 Fed. Reg. 20,012, 20,013 (Apr. 15, 1977) (proposed rule) ............. 20

Energy Audits,
42 Fed. Reg. 33,158, 33,159 (June 29, 1977) ..................................... 20

Energy Conservation Program for Consumer Products,
47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982) (proposed rule) ............... 16

Energy Conservation Program for Consumer Products,
47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982) ..................................... 16

*Relate*, Black's Law Dictionary (5th ed. 1979) ......................................... 9

## INTRODUCTION

There is no dispute that at the very least, EPCA preempts state energy conservation standards, whether in form or function, and whether direct or indirect. That means New York cannot expressly set covered gas appliances' maximum energy use—not at zero, and not at any other number. The only remaining question is whether EPCA allows New York to get to the same result by banning gas appliances outright or banning the piping necessary to use them. It does not. Both approaches function as energy conservation standards by capping gas appliances' energy use at zero. So even on the narrowest proposed reading of EPCA, New York's gas ban is preempted.

Defendants' core contention to the contrary is that bans like New York's are just different—"entirely," "fundamentally" different—from what EPCA preempts. So long as New York avoids mentioning the banned appliances' "energy performance," and so long as its stated objective involves the kind of energy those appliances use, not how much, Defendants contend it has steered clear of preemption. But case after case holds that maneuvers like those cannot avoid preemption provisions like EPCA's. The preemption analysis looks past artful framing to a law's practical effect. What matters is what the law does. And what New York's law does is prohibit covered gas appliances from having greater-than-zero energy use.

1

The Ninth Circuit correctly applied these principles to EPCA's plain text to hold that EPCA preempts laws like New York's. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). This Court should do the same and therefore reverse.

## ARGUMENT

## I. EPCA Preempts New York's Gas Ban.

### A. Whether under EPCA's plain text or Defendants' rewrite, the ban is preempted because it effectively caps covered appliances' energy use at zero.

EPCA preempts "regulation[s] concerning" covered products' "energy use." 42 U.S.C. §6297(c).[1] New York's gas ban is such a regulation. The ban undisputedly prohibits both "appliances that use fossil fuel for combustion" and the "infrastructure, such as piping," needed to fuel them in most new buildings. Secretary.Br.11-12; N.Y. Energy §11-104(6)-(8); N.Y. Exec. §378(19). By prohibiting the installation of gas appliances and infrastructure, the ban effectively regulates the quantity of energy they can use. And that is what New York cannot do.

Said differently, New York could not have banned covered gas appliances by expressly "prescrib[ing] … a maximum quantity of energy use" of zero; that would be an "energy conservation standard," §6291(6), which all agree are preempted. Banning the appliances or their piping outright gets to the same preempted result just as effectively. Even on

---

[1] Further statutory references are to 42 U.S.C. unless otherwise noted.

New York's too-narrow reading of §6297(c), its ban, "whether in form or function," effectively imposes standards "that limit the quantity of energy [covered] appliances are designed to consume." Secretary.Br.1-2. New York's limit for gas appliances' energy use is zero.

The Secretary attempts to escape this straightforward application of EPCA's plain text by insisting that this case is about how "energy use" is defined and measured. Not so. The question here is not how to calculate energy use, but rather whether a regulation categorically precluding appliances from using any energy at all is a regulation concerning their energy use. The Secretary's answer boils down to the notion that its regulation is just "different." That cannot be squared with the well-established meaning of "concerning" and would impermissibly "engraft" a purpose-based "limiting component" onto the preemption provision Congress wrote. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004); *Cal. Rest.*, 89 F.4th at 1106-07 (collecting cases).

### 1. Regulating in a purportedly "different domain" cannot escape the well-established meaning of "concerning."

Defendants cannot account for the statutory term "concerning" or the wealth of preemption precedent that comes with it. To be clear, nobody is suggesting that "concerning" somehow "transform[s] the meaning of the term 'energy use.'" *Contra* Secretary.Br.55; Intervenors.Br.34. Rather, "concerning" identifies the relationship to the preempted subject matter,

3

including "energy use," that triggers preemption. Like "related to," "concerning" signals broad but not unlimited preemption. Opening.Br.28-29. Congress's choice of that term refutes the core of Defendants' argument: that by regulating in "an entirely different domain"—by which the Secretary means writing in terms of "fuel type" rather than "quantity"—or on different "grounds," New York has left §6297(c)'s preempted territory behind. Secretary.Br.1-2, 54, 62-63.

a. Start on common ground: New York cannot set energy conservation standards; it cannot "prescribe[] a minimum level of energy efficiency or a maximum quantity of energy use … for a covered product," §6291(6). *See* JA-189-92; Secretary.Br.31-33; Intervenors.Br.19-21. And Congress extended preemption "beyond state regulations that directly set competing performance standards" to at least reach those that do so indirectly. Secretary.Br.40; Intervenors.Br.34-35; *see also* Secretary.Br.1-2 ("in form or function"), Secretary.Br.58-59 ("by proxy"; "backdoor"; "practically the same effect" (attribution omitted)). So even on the Secretary's view of the preempted subject matter as limited to "the quantity of energy [covered] appliances are designed to consume," Secretary.Br.1, "concerning" signals that indirectly regulating that designed-for quantity is just as preempted as doing so directly.

Had New York expressly set an energy conservation standard for a covered gas appliance by prescribing a maximum energy use—whether just below the federal standard, at 0.0001 Btu per year, or at zero—it is

4

undisputed that its law would be preempted. Had New York, expressly prohibited the installation of any covered gas appliance whose labeled energy use exceeds zero, it is undisputed that its law would be preempted. It follows that achieving the same result by striking the reference to labeled energy use (as the gas appliance ban does) or by prohibiting the piping necessary to use the appliances (as the gas infrastructure ban does) is likewise preempted.

The Secretary resists that conclusion, contending that the ban "fundamentally differs" because it is facially directed at "the *type* of energy" an appliance uses, not the number on its energy use label. Secretary.Br.62-63; *accord* Intervenors.Br.21-22. By regulating in this "entirely different domain," the Secretary contends, New York avoided preemption even of indirect regulations. Secretary.Br.54.

Controlling precedent says quite the opposite. States cannot circumvent preemption just "by shifting their regulatory focus" from one angle to another. *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013). As both this Court and the Supreme Court have repeatedly explained, what matters is the law's "practical effect." *See 23-34 94th St. Grocery Corp. v. N.Y.C. Bd. of Health*, 685 F.3d 174, 183 (2d Cir. 2012) (rejecting the argument that a city law did not "explicitly" regulate preempted activity because the argument "ignore[d] the [law's] practical effect"); *see also, e.g., Am. Trucking*, 569 U.S. at 652 (cannot "select[] an indirect but wholly effective means" of achieving a prohibited

5

result); *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008) (cannot "produce[] the very effect that the federal law sought to avoid"). "Pre-emption is not a matter of semantics," and so it cannot be evaded "by resorting to creative statutory interpretation or description at odds with the [challenged] statute's intended operation and effect." *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013). Rather, "a proper analysis requires consideration of what the state law in fact does." *Id.* at 637.

Nor does New York's stated objective "to reduce greenhouse gas emissions and improve indoor air quality" protect its ban from preemption, Secretary.Br.1. "Despite the importance of [those] objective[s]," EPCA does not "create[] an exception on that basis." *Rowe*, 552 U.S. at 374. "To the contrary, it explicitly lists a set of exceptions … , but the list says nothing about" emissions or air quality. *Id.*; *see* §6297(c)-(f). So the Secretary's "focus [on] the *reason why* [New York] has" banned gas appliances cannot avoid preemption. *Rowe*, 552 U.S. at 373.

In short, because New York's ban functionally prohibits using covered gas appliances whose labeled energy use exceeds zero, the ban is preempted no matter which domain it is framed in.

**b.** The Secretary's attempt to apply the "connection with or reference to" test underscores why the ban flunks it. *Contra* Secretary.Br.57-63. Tellingly, the Secretary ignores both the closest case, *Rowe*, and one of the test's core considerations: "the nature of the effect of the state law"

6

on the preempted subject matter, *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 320 (2016) (attribution omitted); *see* Opening.Br.30-33. Perhaps that is because Defendants cannot explain how New York's ban has anything other than a "significant impact" on covered gas appliances' energy use, even as designed, let alone why it would not "produce[] the very effect that the federal law sought to avoid." *Rowe*, 552 U.S. at 371-72 (cleaned up). The Secretary insists that the ban would not "interfere with" uniformity, Secretary.Br.58, as if making gas appliances legal in some jurisdictions but not others is somehow more uniform than making gas appliances that meet federal standards legal in some jurisdictions but not others. There is no meaningful difference.

The Secretary's cases do not support his position. The Secretary looks to out-of-circuit cases interpreting a federal statute preempting state requirements "with respect to premises, facilities and operations of any establishment at which [meat] inspection is provided" or "[m]arking, labeling, packaging, or ingredient requirements" for such establishments' products. 21 U.S.C. §678; *see* Secretary.Br.60-61. Two circuits held that the preemption provision is "concerned with the methods, standards of quality, and packaging that slaughterhouses use," not "what meats may be available for slaughter and human consumption." *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007); *accord Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 553-54 (7th Cir. 2007). It does not follow that there is a categorical rule against

7

preemption provisions capturing "upstream or downstream" regulations concerning the preempted subject matter. *Contra* Secretary.Br.60-61. If the Secretary's horsemeat cases are a match for anything here, it is the gas distribution decisions about which EPCA has "nothing to say." *See Cal. Rest.*, 89 F.4th at 1003; *id.* at 1119 (Baker, J., concurring). And if there's a meat analogy for New York's gas ban, it is instead California's preempted ban on the sale of meat from non-ambulatory pigs, which improperly "function[ed] as a command to slaughterhouses to structure their operations" the way state law required. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).[2] A plurality opinion about implied preemption is no more help. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901-02 (2019) (plurality opinion) (federal statute conferred "extensive and sometimes exclusive [federal] authority to regulate nearly every aspect of the nuclear fuel life cycle *except* mining"); *id.* at 1914-15 & n.4 (Ginsburg, J., concurring in the judgment) (distinguishing *National Meat* on the ground that federal law "left" uranium mining "to state regulation").

---

[2] The Secretary also invokes a Ninth Circuit case about foie gras. Secretary.Br.61 (citing *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1149-51 (9th Cir. 2017)). That case simply recognized that the regulation at issue was more like the not-preempted horsemeat bans than the preempted regulation in *National Meat. See Canards*, 870 F.3d at 1149-51. That is entirely consistent with the Ninth Circuit's later holding that EPCA preempts gas bans like New York's. *Cal. Rest.*, 89 F.4th at 1098.

**c.** Finally, despite arguing below that "'concerning' is the equivalent of 'related to,'" D.Ct.Dkt.48 at 22, the Secretary now flips his position to say it instead "most naturally means 'about,'" making the "related to" cases irrelevant, Secretary.Br.56. The Secretary had it right the first time.

The Supreme Court has made its view clear: "'Concerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018) (cleaned up); *accord Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (recognizing in a preemption case that the "ordinary meaning" of "relating to" is "to stand in some relation; *to have bearing or concern*; to pertain; refer; to bring into association with or connection with" (emphasis added) (quoting *Relate*, Black's Law Dictionary (5th ed. 1979))). That understanding comes from both a long line of preemption cases and a stack of dictionary definitions. *Lamar*, 584 U.S. at 717-18 (citing *Coventry Health Care of Mo., Inc. v., Nevils*, 581 U.S. 87, 95-96 (2017); and *Morales*, 504 U.S. at 378-90). Rejecting the argument that "respecting" and "concerning" "denote a more limited scope than 'related to,'" the *Lamar* Court saw no "clear distinction," explaining instead that the terms' "overlapping and circular" dictionary definitions formed an "interconnected web." *Id.* at 716-18. There is no reason to treat express preemption provisions any differently; they are interpreted just like any other statutory provision. *Infra* pp.21-23.

9

With no answer to *Lamar* or *Morales*, the Secretary opts to say nothing about them. Secretary.Br.56-57. He instead accuses Plaintiffs of "fail[ing] to cite a single" preemption case that "held the term 'concerning'" has "the same preemptive scope as the term 'relating to.'" Secretary.Br.56. To the contrary, Plaintiffs cited a case that relies on *Lamar* and *Morales* to hold just that for the very provision at issue: *California Restaurant Ass'n. See* Opening.Br.29 (citing *Cal. Rest.*, 89 F.4th at 1103). And not just the panel; every judge who weighed in agreed. *Cal. Rest.*, 89 F.4th at 1125 (Friedland, J., dissenting from the denial of rehearing en banc) ("The Supreme Court has said that 'concerning' means the same thing as 'relating to' … ."). It is the Secretary who has no case reading "concerning" his way. The best he musters is this Court's use of the word "concerns" when applying a provision that says "about." *See Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 497-98 (2d Cir. 2023); Secretary.Br.56. All that does is reinforce *Lamar*'s point about the words' overlapping definitions.[3]

---

[3] The *Contracting Plumbers* district court suggested, but declined to hold, that "concerning" is narrower than "relating to." *Ass'n of Contracting Plumbers of N.Y. v. City of New York*, 2025 WL 843619, at *15-16 (S.D.N.Y. Mar. 18, 2025). Its reasoning bears no resemblance to the Secretary's; rather than "about," the court focused on the purportedly narrower meaning of "with respect to." *See id.* Its suggestion is incorrect for the reasons the plaintiffs in that case explained. Brief for Plaintiffs-Appellants at 52-57, *Ass'n of Contracting Plumbers of N.Y. v. City of New York*, No. 25-977 (2d Cir.), Dkt.23.1; *see also id.* at 23 & n.10 (collecting dictionary definitions).

The amici States dismiss *Lamar*'s discussion as "isolated remarks" and "context-specific dict[a]" later contradicted by *United States v. Miller*, 145 S. Ct. 839 (2025). *See* DC.Br.16-18. In reality, the relevant part of *Lamar* was resolving the question presented. *See* 584 U.S. at 712, 716-20. And *Miller*'s point is simply that "with respect to," in a "very different statutory context[]," complete with a presumption against sovereign-immunity waivers, did not turn a sovereign-immunity waiver into a source of substantive liabilities. *See* 145 S. Ct. at 852.

Regardless, New York's gas ban is "about" energy use for all the same reasons it "concern[s]" it.

### 2. EPCA's text and amendment history preclude rewriting §6297(c) to preempt "energy conservation standards or their equivalents."

Defendants' inability to account for "concerning" even on their narrow reading should put an end to this case. But make no mistake: The view that §6297(c) reaches only energy conservation standards or their equivalents rewrites the statute and undoes Congress's amendments. Opening.Br.19-20, 34-38.

**a.** Section 6297(c) does not say what the Secretary wants it to say. Here it is again:

> [E]ffective on the effective date of an **energy conservation standard** established in or prescribed under [§6295] for any covered product, **no State regulation concerning the energy efficiency, energy use**, or water use **of such covered product** shall be effective with respect to such product … .

11

§6297(c) (emphasis added). Congress did not say "no State regulation that acts as an energy conservation standard," *see Contracting Plumbers*, 2025 WL 843619, at *6; JA-191-92 (adopting this and similar views). It did not say "no State regulation that imposes competing performance-based requirements," *see* Secretary.Br.1. It did not say "no State regulation that relates to energy conservation standards," *see* Intervenors.Br.1. And it did not use the phrases "as designed," "designed to consume," or "inherent in the product's design," *e.g.*, Secretary.Br.1-2, 23, 59. If any of that was what Congress meant, it could have said so. And having said so in 1975—when it preempted only "energy efficiency standard[s]" and "similar requirement[s]"—it certainly knew how to. Energy Policy and Conservation Act, Pub. L. No. 94-163, §327(a)(2), 89 Stat. 871, 926-27 (1975); Opening.Br.34-38.

What Congress did say refutes Defendants' reading. Congress provided different definitions for "energy conservation standard" and "energy use." §6291(4), (6). So those terms are not "interchangeable." *Cal. Rest.*, 89 F.4th at 1105; Opening.Br.35. And Congress distinguished between them in §6297(c). It used "energy conservation standard" as the trigger for preemption and then—in the same sentence—used "regulation concerning energy efficiency, energy use, or water use" to describe what is preempted. §6297(c). Congress perhaps signaled that "energy conservation standards" were a central concern by naming them in the title. But by choosing different language for the operative text, Congress

12

confirmed that energy conservation standards were not its sole concern—and not its preferred definition of the preempted subject matter. *Contra* Secretary.Br.31-32. Rebranding this problem as "textual symmetry," Secretary.Br.33, does not make it go away.

The Secretary suggests that Congress had specific laws setting performance standards in mind when it carved out three states' preexisting "regulation[s] concerning the water use" of certain faucets. Secretary.Br.35 (quoting §6297(c)(4)-(5)). From that, the Secretary concludes that five years earlier, the Congress that enacted §6297(c) meant to cover only "state laws that impose performance-based requirements." *Id.* The Secretary's conclusion does not follow. All the faucet carveouts suggest is that Congress understood its language to reach performance standards, not that it meant to reach no further.

**b.** Defendants' inability to explain away §6297(c)'s amendment history confirms the point. Recall that Congress excised the term "energy efficiency standard" from the earlier preemption provision and—instead of swapping in its successor, "energy conservation standard"—expanded the provision's scope to "regulation[s] concerning … energy use." Opening.Br.36-38. Defendants contend that this rewrite accomplished nothing of substance. Secretary.Br.36-42; Intervenors.Br.43-46. Nothing they say overcomes the presumption that "[w]hen Congress amends legislation, … it intends the change to have real and substantial effect."

13

*Van Buren v. United States*, 141 S. Ct. 1648, 1660-61 (2021) (attribution omitted).

Intervenors suggest that all Congress meant to do was "echo[] the definition of 'energy conservation standard' by listing its constituent parts." Intervenors.Br.44-45. But why would Congress have made a list if all it meant to say was "energy conservation standards"? Intervenors.Br.1. Intervenors have no answer.

Perhaps, the Secretary suggests, Congress was trying to avoid preempting design requirements that "are neutral as to energy performance." Secretary.Br.39-41. There is no evidence that was the objective, but even so, there was no need to rewrite the preemption provision to accomplish it. Had Congress simply swapped in "energy conservation standard" for "energy efficiency standard," it would have preempted "any energy [conservation] standard or other requirement *with respect to energy efficiency or energy use* of a covered product." §6297(a)(2) (1982) (emphasis added). That language would not have reached design requirements that do not concern energy use or efficiency. Even if the "with respect to" clause modifies only "other requirement," it confirms that energy conservation standards, including those styled as design requirements, are requirements concerning energy use or efficiency to begin with. That aligns with EPCA's handling of federal design requirements; the standard-setting process ensures that they concern energy use or efficiency. *See* §6295(o)(2)(A) (requiring federal

14

standards to "be designed to achieve the maximum improvement in energy efficiency … which the Secretary determines is technologically feasible and economically justified"); *see also* §6295(o)(2)(B), (o)(3), (p).

Nor is there any evidence that Congress shared the Secretary's view. Despite relying on the legislative history to say the 1987 amendments changed nothing, the Secretary fails to identify anything supporting his explanation for the rewrite. *See* Secretary.Br.37-41. He offers no evidence that Congress even identified the risk he says it was trying to mitigate, much less rewrote the scope of preemption for that reason alone.

The Secretary falls back to the position that Congress meant to adopt a "longstanding administrative construction" limiting preemption to energy conservation standards. Secretary.Br.43. But that theory requires Congress to have used the administratively construed term. In *Monsalvo Velázquez v. Bondi*, 145 S. Ct. 1232 (2025), the Court adopted a "longstanding administrative construction" of "days" as having its specialized legal-deadline meaning (rolling to the next business day) rather than its ordinary calendar-day meaning, *id.* at 1241-43. That construction came from a regulation that had controlled for decades before Congress used the term in the statute at issue. *Id.* at 1242-43. Here, by contrast, Congress replaced the phrase the Department had purportedly construed with a new one. "That alteration dooms [the Secretary's] position, because the doctrine of congressional ratification

15

applies only when Congress reenacts a statute without relevant change." *Holder v. Martinez Gutierrez*, 566 U.S. 583, 593 (2012).

Besides, there was no construction to adopt or ratify. One paragraph in a proposed rule's preamble, 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982), and a final rule's preamble expressly declining "to specify or define" the scope of preemption, 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982), do not add up to a settled interpretation. *See, e.g.*, *Monsalvo Velázquez*, 145 S. Ct. at 1242-43 (longstanding regulation with the force of law); *New York v. Nat'l Highway Traffic Safety Admin.*, 974 F.3d 87, 98 (2d Cir. 2020) (phrase had a "settled legal meaning" where the agency implemented its view in a final rule for decades). In fact, the Department's pre-1987 interpretation supports Plaintiffs. Opening.Br.38 n.7; Brief for the United States as Amicus Curiae Supporting Appellants at 26-27, *Contracting Plumbers*, No. 25-977 (2d Cir.), Dkt.26.1.

**c.** The statutory structure provides further support. If "energy efficiency, energy use, or water use" were just another way to say "energy conservation standard" such that preemption ended at the factory door, Secretary.Br.31-36; JA-189-92, the building code exception, waiver provision, and Congress's choice of "concerning" in §6297(c) would "make little sense." *See Cal. Rest.*, 89 F.4th at 1101-04; Opening.Br.42-48. Instead, the statute's repeated indications that Congress cared about covered products' entire lifecycle show that EPCA's preemptive scope extends to regulations concerning appliances' energy use in the real

16

world—not just those that function as energy conservation standards before a product is marketed. *See* Opening.Br.39-41; *infra* pp.23-29.

All in all, Congress easily could have, but did not, use "energy conservation standard" to define the preempted subject matter. Instead, Congress broadly preempted "any State regulation concerning … energy use." Courts must "presume that Congress means what it says" and cannot "simply reconfigure the statute to fit [New York's] needs." *Cal. Rest.*, 89 F.4th at 1105.

**d.** Anyhow, New York's ban would be preempted even under the Secretary's narrow view. As discussed, the statute effectively imposes an energy conservation standard: the maximum energy use for all types of covered gas appliances is zero. *Supra* pp.2-5. That is a "limit [on] the quantity of energy those appliances [may be] designed to consume," Secretary.Br.1. That the limit applies only to gas appliances does not make it any less a standard. §6295(q)(1)(A) (requiring separate standards for appliances using "different kind[s] of energy"). Neither does applying it only to new buildings—if that made it not a standard, §6297(f)(3)'s exception for certain regulations governing only new construction would be pointless.

New York's ban also burdens the design and manufacturing decisions that the Secretary admits Congress wanted to protect. *See* Opening.Br.48-49; Secretary.Br.50-51. To continue competing in the New York market for new construction, gas appliance manufacturers must

17

redesign their products to use electricity. And manufacturers already offering both gas and electric appliances must account for the ban when making supply and distribution decisions. Bans like New York's "can require a product redesign, or the development of multiple product lines, which in turn could impose downstream burdens, including on national marketing or distribution plans," Secretary.Br.51.

At bottom, the Secretary's position would "produce the very effect that the federal law sought to avoid," *Rowe*, 552 U.S. at 371-72 (cleaned up). He admits that Congress updated the preemption provision "to counteract the patchwork of state efficiency standards." Secretary.Br.36-37. Allowing New York's ban would enable just such a patchwork. The Secretary's insistence otherwise ignores both the law's admitted purpose and "what the state law in fact does." *Wos*, 568 U.S. at 637.

### 3. Nothing turns on Defendants' and the district court's definition of "energy use."

Defendants try to make this case turn on EPCA's definition of "energy use." Secretary.Br.27-31; Intervenors.Br.13-25. Again and again, Defendants return to "energy use," chalking up any difficulties with their position to using the wrong definition. *See, e.g.*, Secretary.Br.55 (asserting without explanation that "plaintiffs' reliance on the term 'concerning' … requires adopting plaintiffs' own view of the term 'energy use'"). But the debate over the definition (and especially what it means by "point of use") is irrelevant because New York's ban is preempted even

on its own reading. Its statute effectively imposes an energy conservation standard that "limit[s]" to zero the lab-tested, labeled, and fixed "quantity of energy" gas appliances may be "designed to consume," Secretary.Br.1-2. *See supra* pp.2-5; Opening.Br.48-49.

**a.** To be clear, there is good reason to doubt that when Congress wrote the "energy use" definition in 1975, "point of use" had a "well-established technical meaning" such that it does nothing more than reiterate that "energy use" includes only energy "directly consumed by the appliance." *Contra Cal. Rest.*, 89 F.4th at 1123 (Friedland, J., dissenting from the denial of rehearing en banc). Delete "point of use," and the definition says the same thing: Measure "the quantity of energy directly consumed by a consumer product." §6291(4).

As to the purportedly well-established meaning of "point of use," the Secretary's earliest source is from 1998, decades after Congress used the term. Secretary.Br.45-48. Judge Friedland likewise cited nothing predating EPCA, *see* 89 F.4th at 1123-24 & nn.10-15, and the handful of "examples" from the '70s are no help. A California agency's report that does not use the term "point of use" sheds no light on its meaning. *Contra id.* at 1123. And the two mentions from a rulemaking involving a different EPCA provision, *see id.* at 1123-24, use the term colloquially. Although "point of use" appears in passages distinguishing source from site energy, it does so by referring to the place where something happens,

19

not through some special meaning.[4] Moreover, if "point of use" had a technical meaning in this context, especially one critical to interpreting the statute, one would have expected the Department of Energy to have told the Ninth Circuit about it in either of the government's briefs. It did not, and neither did anybody else—until a group of states changed their mind when advocating for rehearing. *See* Opening.Br.41-42.

Understanding "point of use" to mean the place where an appliance is used is consistent with EPCA's testing and labeling provisions. *Contra* Secretary.Br.28-31; *Cal. Rest.*, 89 F.4th at 1122 (Friedland, J., dissenting from the denial of rehearing en banc). Appliances are tested at their point of use in a laboratory using methods designed to reflect real-world conditions, §6293(b)(3), and the result goes on the label, §6294(a)(2)(I), (a)(3). That the actual energy use might vary in the real world does not require changing the label. §6297(g).

Contrary to the Secretary's suggestion, *see* Secretary.Br.30-31, §6297(g)'s no-warranty provision does not suggest that "energy use" can only ever be a fixed value. Rather, it says that the "energy use" on a label will not necessarily be the "energy use" experienced "under conditions of

---

[4] *See* 42 Fed. Reg. 20,012, 20,013 (Apr. 15, 1977) (proposed rule) (contrasting "trac[ing]" "energy conservation impacts" "back to the original fuel source" with evaluating impacts at "the point of use on site"); 42 Fed. Reg. 33,158, 33,159 (June 29, 1977) ("point of electric power generation" versus "point of use").

actual use." §6297(g). If "energy use" did nothing more than describe a number on a label, there would be no need for such a disclaimer.

**b.** The Secretary tries to spin "point of use" as the "focus[]" of and essential premise for the Ninth Circuit's decision. Secretary.Br.44-45. It was not. The Ninth Circuit's recognition that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations" turned also on §6297(f)(3)'s building code exception, which was "[o]f critical importance" to understanding §6297(c)'s scope. *See Cal. Rest.*, 89 F.4th at 1101-02. The waiver provision and "concerning" also supported the point. *Id.* at 1103-04. And the Ninth Circuit said nothing about "point of use" when explaining why the text forecloses the view that §6297(c) preempts only energy conservation standards. *Id.* at 1105. The opinion would hold together just as well with "point of use" removed.

Giving "point of use" (and, in turn, "energy use") the technical meaning the Secretary prefers does not change the reality that text, structure, history, and purpose all show that Congress's concern was not confined to the factory floor; it sought to improve appliances' energy use and efficiency in the real world while protecting consumer choice.

### 4. Circuit precedent prevents resurrecting the presumption against preemption.

As Supreme Court precedent requires, this Court has held that "[w]hen a federal law contains an express-preemption clause," courts "do

not invoke any presumption against preemption." *DCC Propane, LLC v. KMT Enters.*, 147 F.4th 171, 174 (2d Cir. 2025) (attribution omitted); *accord Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *Buono*, 78 F.4th at 495.[5]

The Secretary nonetheless suggests that a presumption still exists for "ambiguous" express preemption provisions, while expressly declining to rely on any such presumption. Secretary.Br.25 n.8. That is incorrect. *Franklin* means what it says: There is no presumption against preemption when construing an express preemption clause. Rather, courts must follow the statutory text, which "necessarily contains the best evidence of Congress' preemptive intent." *Franklin*, 579 U.S. at 125.

To be sure, a panel of this Court recently suggested in a footnote that the presumption still justifies "resol[ving] [an] ambiguity against preemption." *Council for Responsible Nutrition v. James*, 159 F.4th 155, 171 n.8 (2d Cir. 2025) (relying on a pre-*Franklin* decision). But this Court had already twice applied *Franklin* to hold that "[w]hen a federal law

---

[5] Every circuit to have considered the issue agrees, except one. *See Medicaid & Medicare Advantage Prods. Ass'n of P.R. v. Emanuelli Hernández*, 58 F.4th 5, 11-12 & n.5 (1st Cir. 2023); *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019); *Ye v. GlobalTranz Enters.*, 74 F.4th 453, 465 (7th Cir. 2023); *Pharm. Care Mgmt. Ass'n v. Wehbi*, 18 F.4th 956, 967 (8th Cir. 2021); *Cal. Rest.*, 89 F.4th at 1101 (9th Cir.); *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017); *Carson v. Monsanto Co.*, 72 F.4th 1261, 1267 (11th Cir. 2023); *cf. Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018). *But see Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018) (confining *Franklin* to bankruptcy cases).

22

contains an express-preemption clause," no presumption applies. *DCC Propane*, 147 F.4th at 174 (attribution omitted); *Buono*, 78 F.4th at 495 (same); *see also DCC Propane*, 147 F.4th at 181 (determining "the best interpretation of the statutory text" and "reject[ing] the premise that policy considerations can trump" it (cleaned up)). A later panel cannot overrule those decisions, and so "the rule announced by the first panel" controls. *Tanasi v. New All. Bank*, 786 F.3d 195, 200 n.6 (2d Cir. 2010).

### B. EPCA's structure, purpose, and history confirm that New York's gas ban is preempted.

#### 1. Defendants cannot account for the building code exception.

Defendants try and fail to explain what work §6297(f)(3)'s building code exception does under their interpretation of §6297(c). Secretary.Br.52-54; Intervenor.Br.25-31. The Secretary admits that the exception confirms that "EPCA preempts '*indirect regulation* concerning the energy use of the covered products that could be used' in a building." Secretary.Br.53 (quoting JA-193). But the Secretary's insistence that New York's ban is not such a regulation leaves him without any coherent account of what regulations would be preempted but for the exception. *See* Opening.Br.42-46.

As the Secretary admits, §6297(f)(3) "allows states to adopt codes that set energy consumption or conservation objectives for buildings" that incentivize (without requiring) appliances exceeding federal standards. Secretary.Br.52. And as the Secretary also recognizes, Congress's

23

decision to include the exception indicates that it understood that those regulations would otherwise be preempted. Secretary.Br.52-53. These two concessions, taken together, contradict the Secretary's claim that preemption is limited to product-specific design or manufacturing standards that operate on the factory floor. Instead, Congress was concerned about regulations that affect appliances installed in actual buildings. *See Cal. Rest.*, 89 F.4th at 1101. Had Congress meant to limit §6297(c)'s preemptive scope as the Secretary contends, the exception would make no sense.

Plaintiffs previously pointed out that no gas-ban proponent has been able to show that any regulation would both (i) be preempted by §6297(c) under Defendants' interpretation and (ii) qualify for the exception. Opening.Br.45-46. The district court's attempt did not work. Opening.Br.43-45. Defendants offer nothing better. Secretary.Br.52-54; Intervenor.Br.25-31.

**a.** The Secretary's sole example is the building code from *Building Industry Ass'n of Washington v. Washington State Building Code Council*, 683 F.3d 1144 (9th Cir. 2012), which required "a 15% reduction in new buildings' energy consumption," *id.* at 1149. Secretary.Br.53. It was undisputed there that the code would have been preempted but for §6297(f)(3), and the Ninth Circuit held that it satisfied the exception's requirements. *Bldg. Indus.*, 683 F.3d at 1145-49.

24

Plaintiffs agree that the Washington provision was preempted. Where the Secretary's answer falls apart, however, is in attempting to explain why §6297(c) reaches Washington's building code but not New York's gas ban. The Secretary suggests that Washington's code was a regulation concerning covered products' energy use or efficiency under §6297(c) because it "incorporated performance-based criteria" such that "an appliance's energy performance was relevant." Secretary.Br.53-54. In other words, like the district court, the Secretary suggests that a building code would need to "explicitly" incorporate an energy use requirement to trigger preemption, JA-193; on that view, New York's law is not preempted because, instead of invoking the forbidden words, it regulates "an entirely different domain—namely, fuel type." Secretary.Br.54.

But that view cannot be reconciled with the Secretary's narrow interpretation of §6297(c) as "displac[ing] only those laws that regulate … the quantity of energy a product is *designed* to consume," Secretary.Br.31 (emphasis added). Washington's building code merely incentivized one covered appliance over another, without requiring any product to be redesigned with a different "fixed value" for energy use, Secretary.Br.28-29; JA-192; *see Bldg. Indus.*, 683 F.3d at 1152-53. It did not "impose competing performance-based obligations" applicable to manufacturers "*before* a product enters the market." Secretary.Br.28-29, 35-36. And it left manufacturers subject to "one uniform performance standard"; appliances meeting without exceeding federal standards could

25

still be designed, manufactured, sold, and installed, but were just disincentivized. Secretary.Br.35-36. In short, under the Secretary's reading of §6297(c), Washington's building code would not have been preempted in the first place, leaving §6297(f)(3) with nothing to do.

Recognizing the problem, Intervenors declare that New York's ban, unlike Washington's building code, "do[es] not incentivize or require the use of any appliance that exceeds federal energy conservation standards." Intervenor.Br.31. But Intervenors cannot draw any principled line; if merely making covered products less economically attractive triggers preemption, then so would an outright ban.

**b.** Intervenors run into the same problems. They point to New York Energy Conservation Construction Code §C406.2, which—when builders select it as an option—"requires … the building's heating and air conditioning appliances to exceed" federal efficiency standards "by 10%." Intervenors.Br.26-29 (emphasis omitted); *accord* Intervernors.Br.29-30 (hypothetical doing the same for "energy use").

But section C406.2 does not actually require manufacturers (or builders) to do anything. Rather, when read in context, it offers one of many options toward complying with a broader building code. Intervenors.Br.26. Nothing in the code requires following this particular path or choosing a particular appliance. At most, it incentivizes choosing higher-efficiency appliances while leaving manufacturers free to produce and consumers free to install products meeting the federal standard. No

need for any "product redesign" or "the development of multiple product lines," Secretary.Br.51. Accordingly, this provision is not preempted under Defendants' reading.[6]

**c.** The inability to explain what §6297(f)(3) does under a reading of §6297(c) that allows New York's ban is dispositive. That neither the district court nor Defendants can give §6297(f)(3) any work to do creates the "kind of superfluity" that, "in and of itself, refutes [their] reading[s]." *See Pulsifer v. United States*, 144 S. Ct. 718, 731-32 (2024).

### 2. Defendants cannot explain away Congress's effort to preserve consumer choice and avoid a burdensome patchwork of standards.

In the waiver provision and beyond, Congress signaled that its energy objectives should not come at the expense of consumer choice or leave manufacturers to navigate a patchwork of standards. Opening.Br.47-48, 51-52. Neither Defendants' response to the waiver provision nor their account of the legislative history suggests otherwise.

**a.** The Secretary concedes that §6297(d)'s waiver provision reflects that Congress wanted to prevent federal, state, and local governments alike from setting standards that are "so stringent that they could result in a product's unavailability" and to avoid "competing state performance standards" that "can require a product redesign, or the development of

---

[6] Moreover, Intervenors merely assert but do not establish that New York's building code meets the criteria for the exception. Intervenors.Br.28.

multiple product lines." Secretary.Br.51. The Secretary insists, however, that New York's ban is not such a law, declaring that it is "unrelated to" products' "energy performance." Secretary.Br.51.

That misses the point. That the Department can neither set standards nor grant waivers that would make appliance performance characteristics unavailable, §§6295(o)(4), 6297(d)(4), confirms that Congress cared about consumers' ability to continue buying and using the kinds of appliances already available. That New York "selected an indirect but wholly effective means" of making gas appliances unavailable is no excuse. *Am. Trucking*, 569 U.S. at 652. Its ban has just as "significant [an] impact" on Congress's "pre-emption-related objectives" as an energy conservation standard would. *Rowe*, 552 U.S. at 371 (cleaned up).

The Secretary is right to acknowledge that "[b]y imposing the same restriction on both [the Department's] standard-setting authority and its waiver authority, Congress made clear" that it did not want the Department to make types of appliances unavailable any more than it wanted state and local governments to do so. Secretary.Br.51. But it does not follow that the scope of preemption matches the Department's regulatory authority. Congress allowed the Department to issue "energy conservation standards," but it defined the preempted subject matter more broadly. *Supra* pp.11-17. The building code exception confirms the point; everyone agrees building codes are within the preempted scope,

28

but the Department cannot promulgate them. Nothing limits Congress to preempting only what it chooses to do at the federal level; it is free to limit the powers of both the states and federal agencies. *See California v. ARC Am. Corp.*, 490 U.S. 93, 100 (1989) ("Congress has the authority, in exercising its Article I powers, to pre-empt state law."); *Arizona v. United States*, 567 U.S. 387, 399 (2012) (same).

**b.** The Secretary turns to EPCA's legislative history to bolster his claim that Congress meant to confine preemption to energy conservation standards. Secretary.Br.36-43. Legislative history cannot override the text, and in any event, the Secretary's account fails to fully capture Congress's intent.

The Secretary simply ignores the unhelpful parts of the legislative history. He neglects Congress's preference for diverse energy sources and neutral energy consumption objectives. Opening.Br.49. And he skips past Congress's careful attention to consumer choice. Opening.Br.47, 49-51. The reality is that allowing bans like New York's "would undo Congress's carefully calibrated regulatory scheme." *See Engine Mfrs.*, 541 U.S. at 253-55.

### 3. Recognizing that New York's ban is preempted would not create an unconstrained right to use appliances.

**a.** For all Defendants' insistence otherwise, nothing about recognizing that New York's ban is preempted depends on an unlimited "federal right to use covered products." *Contra, e.g.*, Secretary.Br.26, 34,

36, 43, 49, 65; Intervenors.Br.41-42. That is a strawman. Nobody is arguing that no regulation can ever limit any individual's use of any covered product under any circumstance. And recognizing that EPCA takes a real-world approach—not one confined to the factory floor—does not compel that conclusion. New York's law is preempted because banning "products that operate on [fossil fuels] 'concerns' the energy use of those products," *Cal. Rest.*, 89 F.4th at 1103, not because it happens to affect the circumstances under which an individual may use a covered product.

Likewise, Plaintiffs have never claimed that Congress's desire to prevent a patchwork requires invalidating all regulations with any effect on appliance energy use, however slight or tangential. But neither was Congress's patchwork concern limited to conflicting standards. Congress prohibited a patchwork of regulations concerning appliances' energy use, §6297(c). Regulations that incidentally impact energy use, like time-and-place restrictions, might contribute at the margin to differing local requirements for appliances. *See* Secretary.Br.63-64. But that is no reason to ignore the "significant impact" to Congress's objectives that banning gas appliances in most new buildings causes. *See Rowe*, 552 U.S. at 375 (emphasis omitted).

That some line drawing is inevitable is a feature of Congress's use of the word "concerning," not a bug in Plaintiffs' and the Ninth Circuit's

reading. *See Morales*, 504 U.S. at 390. No one EPCA case will answer every possible preemption question any more than one ERISA case could.

**b.** Dispensing with the strawman also dispenses with the purportedly absurd results, *see* Secretary.Br.63-64; Intervenors.Br.39-42. Defendants' parades of horribles mistakenly assume that Plaintiffs' view would create an unfettered right to use covered appliances. Without that assumption, their concerns are exaggerated.

The Secretary's parade is illustrative. Most regulations the Secretary identifies do not ban the affected appliances. Restrictions on how and where certain gas-fired appliances can be installed do not have any apparent relationship to their energy use. *See* N.Y.C. Admin. Code §27-2034 (*e.g.*, prohibiting gas water heaters in bedrooms). Gas-fired refrigerators do not appear to be covered products, *see* §6292(a)(1) (identifying only electric refrigerators), and regardless, if New York City's design requirements affect energy use, N.Y.C. Admin. Code §27-2035, that effect is likely incidental.

That leaves the two bans, neither of which is in danger. Section 6297(c) preemption kicks in only when a federal standard does. Secretary.Br.67. The Secretary does not identify any federal standards for "oil-fired cooking appliances." Secretary.Br.63. And as Intervenors admit, there is no federal standard for indoor kerosene heaters either. Intervenors.Br.41. Perhaps after nearly four decades, the federal government will suddenly decide to impose standards on these products.

31

And perhaps New York will be unable to distinguish these measures from its ban. But that remote prospect does not show that the sky will fall.

## II. The Secretary's Fallback Argument Misapplies the Standard for Facial Challenges.

In an effort to avoid a merits ruling, the Secretary contends that even if the gas ban is preempted as to EPCA-covered appliances, it is nevertheless shielded from a facial challenge because it reaches some appliances that are not covered by EPCA, such as decorative gas fireplaces. Secretary.Br.66-68. That misapplies the legal standard and goes at most to the proper remedy, not the merits.

To be sure, a facial challenge generally requires showing that the challenged law is "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). But that standard is tethered to the "plaintiffs' claim and the relief that would follow." *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). "The label is not what matters"; where, as here, the claim and accompanying relief "reach beyond the particular circumstances of the[] plaintiffs," facial standards apply—but only "to the extent of that reach." *Id.*; *accord United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 914 (10th Cir. 2016) ("[F]acial standards are applied … to the universe of applications contemplated by plaintiffs' claim, not to all conceivable applications contemplated by the challenged provision.").

The scope of EPCA's preemption provision confirms the point. Congress preempted state regulations only to the extent they operate on covered appliances. §6297(c) ("no State regulation concerning" energy use "of such covered product *shall be effective with respect to such product*" (emphasis added)). It was well within Congress's power to choose a scalpel over a meat-ax. But by the Secretary's logic, a state could easily flout EPCA by simply packaging a regulation of a single non-covered appliance with an otherwise preempted regulation of covered appliances. That result is contrary to Supreme Court precedent. *See Reed*, 561 U.S. at 194.

Here, "the universe of applications contemplated by [P]laintiffs' claim" is the gas ban's application to covered products under EPCA, *Sup. Ct. of N.M.*, 839 F.3d at 914. Plaintiffs sought relief from enforcement of the State's ban on "fuel gas appliances that are subject to regulation under" EPCA. JA-24 ¶1; *see* JA-47-48 ¶91 (seeking declaratory relief as to the ban's effect on covered appliances); D.Ct.Dkt.54 at 19 (same). It is therefore irrelevant to Plaintiffs' claim that the ban is not preempted as to its effect on non-covered products—a point no one disputes. *See Sup. Ct. of N.M.*, 839 F.3d at 915.

The case the Secretary relies on is in accord with these principles. Because the plaintiffs in *National Shooting Sports Foundation, Inc. v. James*, 144 F.4th 98 (2d Cir. 2025), claimed that a statutory provision was "entirely unconstitutional" and "unenforceable in all its

applications," they had to show that it could not be "constitutionally applied against anyone in any situation," *id.* at 106-08. *See also United States v. Salerno*, 481 U.S. 739, 745 (1987) (fact that a law "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid").

What's more, the Secretary ignores the statute's prohibition on gas infrastructure, which has no possible constitutional application. The inevitable result of a wholesale ban on gas systems is to prevent covered gas appliances from using any energy, which means there is no way for the infrastructure ban to avoid EPCA's preemption provision. By contrast, the ban on gas appliances is preempted only as to covered products, which, as a practical matter, includes most gas appliances. *See, e.g.*, §§6291(1)-(2), 6292(a), 6311(1)-(2), 6312(b) (listing covered products); §§6292(b), 6312(b) (authorizing rulemaking to cover additional products).

Any concern over the breadth of Plaintiffs' claim is properly addressed by cabining the remedy to covered products, not by, as the Secretary suggests, dismissing the claim. *See Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (an objection to the scope of a facial challenge "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint"); *Nat'l Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 229 & n.16 (2d Cir. 2025) (denying a facial challenge "to the entirety" of the law but considering whether the law was invalid as to certain applications); *Cal. Rest.*, 89 F.4th at 1099, 1104 (concluding, on a facial

challenge, "that EPCA preempts Berkeley's building code's effect against covered products" but not "on non-covered products"). The Secretary ignores this critical point. Even were Plaintiffs' complaint too broadly stated, that would at most be a reason to make Plaintiffs amend their complaint to clarify its scope. But that would be a pointless exercise in formalism that would change nothing about the dispute in this case: Plaintiffs say New York's ban on EPCA-covered products and gas infrastructure is preempted, whereas the Secretary says it is not. There is no obstacle to resolving that dispute on the merits.

## CONCLUSION

This Court should reverse.

Respectfully submitted,

/s/ Sarah O. Jorgensen

Brian C. Baran
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310
bbaran@reichmanjorgensen.com

Sarah O. Jorgensen
REICHMAN JORGENSEN
  LEHMAN & FELDBERG LLP
1201 West Peachtree Street,
  Suite 2300
Atlanta, GA 30309
(650) 623-1401
sjorgensen@reichmanjorgensen.com

*Counsel for Plaintiffs-Appellants*

December 18, 2025

35

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set in this Court's December 15, 2025 order granting leave to file an oversized reply brief of not more than 8,000 words (Dkt.59.1) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 7,960 words.

Dated: December 18, 2025

/s/ Sarah O. Jorgensen
Sarah O. Jorgensen

36